STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON P.A.
Darrell W. Payne, *pro hac vice*
Fla. Bar No. 773300
dpayne@stearnsweaver.com
Veronica L. de Zayas, *pro hac vice*
Florida Bar No. 91284
vdezayas@stearnsweaver.com
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-2650

IRELL & MANELLA LLP
Bruce A. Wessel, SBN 116734
bwessel@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:  (310) 277-1010
Facsimile:   (310) 203-7199

Attorneys for Defendant
Econocaribe Consolidators, Inc.

FERNALD LAW GROUP APC
Brandon C. Fernald (Bar No. 222429)
Adam P. Zaffos (Bar No. 217669)
Sasha N. Brower (Bar No. 221198)
15910 Ventura Blvd., Suite 1702
Encino, California 91436
Telephone:     (323) 410-0320
Facsimile:     (323) 410-0330
brandon.fernald@fernaldlawgroup.com
adam@fernaldlawgroup.com
sasha@fernaldlawgroup.com

Attorneys for Defendant and
Counterclaimant
Groupage Services of New England,
LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANGUARD LOGISTICS SERVICES (USA), INC., formerly known as NACA LOGISTICS (USA), INC.,<br><br>Plaintiff,<br><br>vs.<br><br>GROUPAGE SERVICES OF NEW ENGLAND, LLC; ECONOCARIBE CONSOLIDATORS, INC., d/b/a ECU WORLDWIDE & ECU WORLDWIDE (USA); and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:18-cv-00517-DSF<br><br>DEFENDANTS GROUPAGE SERVICES OF NEW ENGLAND AND ECONOCARIBE CONSOLIDATORS, INC.'S JOINT SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br>Date:  January 10, 2022<br>Time:  1:30 p.m.<br>Judge:  Hon. Dale S. Fischer<br>Ctrm:  7D |

Pursuant to Central District of California Local Rule 56-1 and the Court's Standing Order and Order Regarding Motions for Summary Judgment, Defendants Groupage Services of New England, LLC ("NEG") and Econocaribe Consolidator's, Inc. ("ECU") hereby submit their Joint Statement of Uncontroverted Facts and Conclusions of Law in support of their Motions for Summary Judgment against Plaintiff Vanguard Logistics Services (USA), Inc. ("Vanguard").[1]

## SEPARATE STATEMENT OF UNCONTROVERTED FACTS

| No. | Uncontroverted Fact: | Supporting Evidence |
|---|---|---|
| **Wessel Declaration** | | |
| **1.** | "Vanguard began talking to Boston Freight Terminals ('BFT') about its CFS warehousing rates in the summer of 2017." | • Wessel Decl. Ex. 1 (Vanguard Resp. to NEG RFA No. 18) |
| **2.** | "Vanguard informed NEG on November 27, 2017 that it intended to change its Boston import CFS facility from NEG to BFT before the end of the year." | • Wessel Decl. Ex. 1 (Vanguard Resp. to NEG RFA No. 15) |

[1] In support of their Joint Separate Statement of Uncontroverted Facts and Conclusions of Law, NEG and ECU provide the following support: the Declaration of Bruce A. Wessel ("Wessel Decl.") and exhibits thereto; the Declaration of John D. Abisch ("Abisch Decl.") and exhibits thereto; and the Declaration of Joseph Meunier ("Meunier Decl.") and exhibits thereto.

| No. | Uncontroverted Fact: | Supporting Evidence |
|---|---|---|
| **3.** | "On or about December 11, 2017, Vanguard sent a notice to its customers that effective December 18, 2017, Vanguard would change its CFS to BFT." | • Wessel Decl. Ex. 1 (Vanguard Resp. to NEG RFA No. 19)<br><br>• Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 46)<br><br>• Meunier Decl. ¶ 10<br><br>• Meunier Decl. Ex. C |
| **4.** | "Vanguard terminated NEG's access to Vanguard's VPN server on December 21, 2017." | • Wessel Decl. Ex. 1 (Vanguard Resp. to NEG RFA No. 13) |
| **5.** | "Vanguard cut off NEG's access to Vanguard's systems December 21, 2017." | • Wessel Decl. Ex. 1 (Vanguard Resp. to NEG RFA No. 30)<br><br>• Meunier Decl. ¶ 14 |
| **6.** | "On December 21, 2017, Vanguard cut off NEG's access to Vanguard's computer systems." | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 48)<br><br>• Meunier Decl. ¶ 14 |
| **7.** | "On December 21, 2017, Vanguard disabled NEG's access to Vanguard's network." | • Wessel Decl. Ex. 2 (Vanguard Resp to ECU RFA No. 49)<br><br>• Meunier Decl. ¶ 14 |
| **8.** | "On December 21, 2017, Vanguard cut off NEG's access to emails directed to NEG through any Vanguard email address." | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 52) |

11030823

| No. | Uncontroverted Fact: | Supporting Evidence |
|---|---|---|
| **9.** | "Beginning on or after December 21, 2017, Vanguard never asked NEG to continue doing business with Vanguard." | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 39) |
| **10.** | "Beginning on or after December 21, 2017, Vanguard never asked NEG to rescind any notice of termination of the Agreement." | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 41) |
| **11.** | "Vanguard did not send Terry Groff's December 21, 2017 letter addressed to Michael J. Fencer to ECU." | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 42) |
| **12.** | "Vanguard never sent a notice to its customers after December 21, 2017 advising them that it was continuing its business relationship with NEG." | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 47) |
| **13.** | "During December 2017, Vanguard sent a third-party vendor to remove any Vanguard owned IT equipment at NEG's premises." | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 55) |
| **14.** | "Vanguard continued to have business with companies located in the New England region after December 21, 2017." | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 57) |
| **15.** | "Vanguard never sent any letter or communication to ECU, before January 29, 2018, taking the position that NEG had not properly terminated the Agreement." | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 43) |

11030823

DEFENDANTS' JOINT SEPARATE STATEMENT

| No. | Uncontroverted Fact: | Supporting Evidence |
|-----|----------------------|---------------------|
| **16.** | "Vanguard admits that since CFS warehousing was not governed by the Agency Agreement, nothing in the Agency Agreement prohibited NEG from providing CFS warehousing services for cargo in New England to ECU." | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 38) |
| **17.** | "NEG and ECU would have been able to legally discuss the possibility of doing business together while the Agency Agreement was still in effect if NEG and ECU had done so in a manner consistent with NEG's duties under the Agency Agreement and applicable law." | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 45) |
| **18.** | Vanguard's customers could choose to move their business from Vanguard to NEG. | • Wessel Decl. Ex. 2 (Vanguard Resp. to ECU RFA No. 60) |
| **19.** | "Vanguard's customers had the right to choose to move their business from Vanguard to ECU." | • Wessel Decl. Ex. 2 (Vanguard Response to ECU RFA No. 61) |
| **20.** | Vanguard's claims against NEG and ECU are not based on any alleged breach of Section 2.02(a) of the Agency Agreement for conduct that occurred after the term of the Agency Agreement. | • Wessel Decl. Ex. 3 (Vanguard Resps. to ECU RFA Nos. 3, 4) |

| No. | Uncontroverted Fact: | Supporting Evidence |
|-----|----------------------|---------------------|
| 21. | Vanguard cannot identify the names of any customers that switched to ECU as a result of NEG's improper acts or contract breaches.<br><br>Vanguard's alleged damages are based on the loss of business in the region covered by the Agency Agreement with NEG, rather than the loss of specific individual customers. | • Wessel Decl. Ex. 4 (Vanguard Resp. to NEG Interrog. No. 11)<br><br>• Wessel Decl. Ex. 5 (Vanguard Resp. to NEG Interrog. No. 12) |
| 22. | On December 21, 2017, the CEO of Vanguard Charles Brennan hired Joe Pimentel to be Vanguard's representative in Boston. Pimentel remember the date because that is the day that NEG and Vanguard split up. | • Wessel Decl. Ex. 6 (Dep. of Joe Pimentel at 26:1–14; 28:19–29:2) |
| 23. | The customers identified in the reports Vanguard initially claimed as trade secrets were known, readily ascertainable through public sources, or otherwise generally available to Vanguard's competitors in the shipping industry. | • Wessel Decl. Ex. 3 (Vanguard Resp. to ECU RFA No. 11) |

11030823

DEFENDANTS' JOINT SEPARATE STATEMENT

| No. | Uncontroverted Fact: | Supporting Evidence |
| --- | --- | --- |
| **24.** | On December 21, 2017 David Sanchoyerto sent an internal email at Vanguard under the subject line "Boston Restructure Checklist." In that email he wrote: "Hello team, I started a checklist this morning to capture items that need to be actioned due to the change in our Boston CFS and the end of our relationship with NEG." The list included "Notice of Termination to NEG" and removing NEG's access to Vanguard networks and databases. | • Wessel Decl. Ex. 7 |
| **25.** | After December 2017, Vanguard continued to be an active participant in the market and did substantial business in the New England region. Vanguard's service in the Northeast saw "improvements on [their] services to Boston" after terminating the contract with NEG. | • Wessel Decl. Ex. 8 |
| | **Abisch Declaration** | |
| **26.** | At all times ECU intended have business discussions with NEG in a legally appropriate and proper manner and in a professional manner. | • Abisch Decl. ¶¶ 5, 13<br>• Abisch Decl. Ex. D. |

11030823

| No. | Uncontroverted Fact: | Supporting Evidence |
|---|---|---|
| **27.** | ECU always believed that whether or not to terminate the NEG/Vanguard agreement was NEG's decision to make by itself. | • Abisch Decl. ¶¶ 7, 20 |
| **28.** | ECU and NEG both had lawyers conclude that the post-termination non-compete provisions in the NEG/Vanguard agreement were not valid and not enforceable and Vanguard does not base its claims on any conduct occurring post-termination. | • Abisch Decl. ¶¶ 6, 8–10<br>• Abisch Decl. Exs. A, B<br>• Wessel Decl. Ex. 3 (Vanguard Resps. to ECU RFA Nos. 3, 4 |
| **29.** | NEG made the decision with its counsel about how to terminate the NEG/Vanguard agreement and the form of the notice. ECU was not involved. | • Abisch Decl. ¶¶ 11, 14 |
| **30.** | NEG was concerned that Vanguard would cut off access to Vanguard's network when the termination notice was sent and ECU knew of that concern and helped NEG prepare. ECU did not and would not provide any access to ECU's computer systems, or allow NEG to take any customer orders or represent ECU, until after the Vanguard relationship was terminated. | • Abisch Decl. ¶¶ 16–18, 22<br>• Abisch Decl. Ex. E |

11030823

| No. | Uncontroverted Fact: | Supporting Evidence |
|---|---|---|
| **31.** | ECU wanted NEG to wait for Vanguard to react to the termination notice before contacting customers. | • Abisch Decl. ¶ 19<br>• Abisch Decl. Ex. F |
| **32.** | In December 2017, Vanguard did not contact ECU to tell ECU not to do business with NEG. | • Abisch Decl. ¶ 23 |
| **33.** | ECU did not do anything to intentionally cause NEG to violate any obligations to Vanguard. | • Abisch Decl. ¶ 24 |
| **Meunier Declaration** | | |
| **34.** | NEG served as an exclusive New England agent for Vanguard, and as Vanguard's licensed and bonded Container Freight Station ("CFS" or "warehouse"), for many years. | • Meunier Decl. ¶ 2 |
| **35.** | Other than a few shipments, Vanguard always used NEG as its only Boston warehouse. | • Meunier Decl. ¶ 3 |
| **36.** | As agent for Vanguard, NEG recruited customers, booked and coordinated shipments and documentation, and addressed customer service issues.  NEG handled cargo arriving at its warehouse for consolidation and export or delivery of imported goods to the final destination. | • Meunier Decl. ¶ 4 |

| No. | Uncontroverted Fact: | Supporting Evidence |
|---|---|---|
| **37.** | The financial arrangements between Vanguard and NEG were structured in a way that a significant portion of NEG's income came from its CFS services. | • Meunier Decl. ¶ 4 |
| **38.** | The Agreement was "at-will" and both NEG and Vanguard had the right to terminate. | • Meunier Decl. ¶ 5 |
| **39.** | Section 2.02 of the Agreement contains non-compete provisions restricting NEG's business activities for a period of one year after the termination of the agreement. NEG obtained a legal opinion on the enforceability of Section 2.02 (the non-compete clause) in the event the Agreement was terminated. | • Meunier Decl. ¶¶ 6–7<br>• Meunier Decl. Ex. A |
| **40.** | NEG shared the legal memo with Mr. Abisch of ECU. | • Meunier Decl. ¶ 7<br>• Meunier Decl. Ex. A |
| **41.** | On November 27, 2017, Mr. Sanchoyerto of Vanguard told Mr. Meunier that Vanguard was terminating the CFS arrangement with NEG effective January 1, 2018. | • Meunier Decl. ¶ 8 |

11030823

| No. | Uncontroverted Fact: | Supporting Evidence |
|---|---|---|
| **42.** | Between December 1, and 6, 2017, NEG sent emails questioning the logistics of Vanguard's CFS change to BFT and advising of NEG's position that the change violated the Agreement. | • Meunier Decl. ¶ 9<br>• Meunier Decl. Ex. B |
| **43.** | On December 11, 2017, Vanguard sent a notice to customers telling them that Vanguard was going to use Boston Freight Terminals (BFT) as its CFS for both Import and Export cargo. | • Meunier Decl. ¶ 10<br>• Meunier Decl. Ex. C |
| **44.** | The December 11, 2017 notice did not mention NEG. | • Meunier Decl. ¶ 10<br>• Meunier Decl. Ex. C |
| **45.** | By announcing BFT as Vanguard's new CFS in the December 11, 2017 notice, that meant that NEG was being replaced by BFT. | • Meunier Decl. ¶ 10<br>• Meunier Decl. Ex. C |
| **46.** | NEG made the final decision to terminate the Agreement after the December 11, 2017 notice. | • Meunier Decl. ¶ 11 |
| **47.** | It did not make economic or logistic sense for NEG to continue working with Vanguard if Vanguard was using BFT for CFS services. | • Meunier Decl. ¶ 12 |
| **48.** | NEG was unsatisfied with its relationship with Vanguard. | • Meunier Decl. ¶¶ 11–12 |

11030823

| No. | Uncontroverted Fact: | Supporting Evidence |
|-----|---------------------|---------------------|
| **49.** | NEG was reliant on Vanguard for access to the shipment/cargo management software. | • Meunier Decl. ¶ 13 |
| **50.** | Between December 11, 2017 and December 21, 2017, NEG had to prepare for the possibility that Vanguard would cutoff computer access when NEG's notice of termination went out. | • Meunier Decl. ¶ 13 |
| **51.** | Joe Meunier worried that Vanguard would terminate the agreement and worried what effect that termination would have on NEG's business, including the agreement's post-termination non-compete provision. | • Meunier Decl. ¶¶ 6, 8–9, 13 |
| **52.** | ECU put backup systems in place so that NEG could continue operations, including shipments in progress, in the event Vanguard cutoff computer access. | • Meunier Decl. ¶ 13 |
| **53.** | NEG was provided ECU email addresses but no one from NEG was provided any access to ECU's computer systems or software. | • Meunier Decl. ¶ 13 |
| **54.** | NEG sent notice of termination on December 21, 2017. | • Meunier Decl. ¶ 14<br>• Meunier Decl. Ex. D |
| **55.** | Vanguard cut off NEG's access to Vanguard's computer network that same day. | • Meunier Decl. ¶ 14 |

11030823

| No. | Uncontroverted Fact: | Supporting Evidence |
|---|---|---|
| **56.** | Vanguard sent a letter to NEG on December 21, 2017 stating "NEG is to discontinue printing or issuing any Vanguard brand bills of lading." | • Meunier Decl. ¶ 14 <br> • Meunier Decl. Ex. E |
| **57.** | Vanguard's letter also stated that "by rejecting Vanguard shipments and by "terminating" the Agreement without providing ninety days' notice, NEG has materially breached the Agreement . . . ." | • Meunier Decl. ¶ 14 <br> • Meunier Decl. Ex. E |
| **58.** | Prior to the termination on December 21, 2017, NEG acted as Vanguard's exclusive agent and did not perform any agent services for ECU. | • Meunier Decl. ¶ 15 |
| **59.** | NEG did not take any bookings, arrange for any shipments, accept any cargo or take any actions to actually manage shipments for ECU or its customers prior to termination. | • Meunier Decl. ¶ 15 |
| **60.** | NEG provided agency services only to Vanguard during the entire term of the Agreement. | • Meunier Decl. ¶ 15 |
| **61.** | NEG did not provide any agency services to ECU before December 21, 2017. | • Meunier Decl. ¶ 15 |
| **62.** | Only after December 21, 2017, did NEG became ECU's agent. | • Meunier Decl. ¶ 15 |

| No. | Uncontroverted Fact: | Supporting Evidence |
|-----|----------------------|---------------------|
| **63.** | On December 22, 2017, NEG's counsel wrote Vanguard's counsel: "NEG informs us, despite its good faith offer to process Vanguard's goods in transit, that Vanguard abruptly terminated NEG access to logistics programs needed to accomplish that end . . . ." | • Meunier Decl. ¶ 16<br>• Meunier Decl. Ex. F |
| **64.** | Vanguard's counsel responded, asking NEG to return Vanguard's phone and to make arrangements to have a vendor remove Vanguard's Cisco router from NEG's premises.  These were returned as requested by Vanguard. | • Meunier Decl. ¶ 16<br>• Meunier Decl. Ex. G |

11030823

## NEG'S SEPARATE STATEMENT OF CONCLUSIONS OF LAW

1.     Vanguard's conspiracy claim against NEG fails because NEG cannot conspire to breach a contract to which it is a party. "Because a party to a contract owes no tort duty to refrain from interference with its performance, he or she cannot be bootstrapped into tort liability by the pejorative plea of conspiracy." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd*., 7 Cal. 4th 503, 514 (1994); *JRS Prods., Inc. v. Matsushita Elec. Corp. of Am*., 115 Cal. App. 4th 168, 181 (2004) (explaining that the California Supreme Court essentially "rejected the notion that a party to a contract could tortiously conspire with another to breach the contract." (citing *Applied Equipment Corp*, 7 Cal. 4th at 514)).

2.     Because the Agreement between NEG and Vanguard was at-will, NEG had the right to terminate. NEG's actions were consistent with NEG's duties under the at-will Agreement and applicable law. *See, e.g.*, *Ixchel Pharma, LLC v. Biogen, Inc*., 9 Cal. 5th 1130, 1145 (2020) ("As for the future hopes he has no legal right but only an expectancy; and when the contract is terminated by the choice of [a contracting party] there is no breach of it.").

3.     On December 21, 2017, Vanguard accepted NEG's termination on December 21, 2017, when it prevented NEG from providing further agent services. Vanguard thus consented to immediate termination, waived its rights to 90 days' notice, and cannot take advantage of its own wrong. *Mad River Lumber Sales, Inc. v. Willburn*, 205 Cal. App. 2d 321, 324-25 (1962) (the plaintiff prevented Mad River from correcting its deficiencies when she blocked access to the road, and as such she was precluded from seeking a judicial determination that the contract had been terminated by any breach of Mad River).

4.     Vanguard cannot demonstrate that NEG engaged in any conduct that could constitute a breach prior to the December 21, 2017 termination of the Agreement. Prior to December 21, 2017, ECU and NEG only sought to determine whether the non-compete in the Agreement was void under *Ixchel*—it was.

11030823                    DEFENDANTS' JOINT SEPARATE STATEMENT

5. Since NEG's termination of the at-will contract cannot constitute a breach of contract, Vanguard's second and third causes of action for breach of fiduciary duty and duty of loyalty must also fail because the underlying acts for each of the claims is that there was a purported breach of contract. *Nygard, Inc. v. Uusi– Kerttula*, 159 Cal. App. 4th 1027, 1046 (Cal. Ct. App. 2008) (because defendant did not breach his employment contract, the court "necessarily conclude[d]" that he did not breach the duty of loyalty). Once the Agreement terminated on December 21, 2017, NEG was not contractually bound to obtain written consent from Vanguard and was free to act as the agent of another. Vanguard does not seek to enforce the non-compete provisions of Section 2.02(a) of the Agreement.

6. Vanguard's claims against both NEG and ECU for purported interference with its prospective economic relationships with its customers must fail because it cannot "identify specific third parties with whom it had an economic relationship." *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1090 (C.D. Cal. 2017) (intentional interference claim dismissed where plaintiff did not specifically identify customers or economic relationships with which defendant was alleged to have interfered). Vanguard does not allege and has never identified a single customer that it claims to have lost because of misconduct by NEG or ECU.

7. Vanguard's claim for interference with prospective economic relationship also fails because it did not allege conduct that could establish the "independently wrongful conduct" element. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158-59 (2003) ("The tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial objectives, unless their interference amounts to independently actionable conduct.").

8. Vanguard's tort claim for economic interference must also fail because NEG is a party to the contract, and "[i]f the defendant is a party to the contract, the plaintiff is relegated to a cause of action for breach of that contract." *Woods v. Fox*

*Broad. Sub., Inc*., 129 Cal. App. 4th 344, 350 (Cal. Ct. App. 2005) (citing *Applied Equipment,* 7 Cal. 4th at 513, 517-518).

9.      Vanguard's statutory unfair competition claim fails because, like the claims above, Vanguard failed to establish that NEG engaged in unfair, unlawful, or fraudulent acts as defined under California law. Bus. & Prof. Code § 17200, *et seq; Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1135 (9th Cir. 2014) ("Section 17200 'borrows violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under Bus. & Prof. Code § 17200 et seq. and subject to the distinct remedies provided thereunder.'" (internal citations omitted)).

10.      Vanguard must prove, with certainty, "both the existence of damages and the causal connection between the wrong and the injury." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 532 n.26 (1983). Vanguard cannot demonstrate that NEG proximately caused the damage that Vanguard sustained. *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909 (Cal. Ct. App. 2005) (causation in contract claims); *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (Cal. Ct. App. 2010) (causation in breaches of fiduciary and loyalty duties) *Korea Supply Co.*, 29 Cal. 4th at 1165 (causation in intentional interference).

11.      Damages must not be "speculative, imaginary, continent or merely possible." *Navellier v. Sletten*, 262 F.3d 923, 939 (9th Cir. 2001). The measure of damages on the intentional interference claim is "an amount that will reasonably compensate plaintiff for all loss or harm, providing that you find it was [or will be] suffered by plaintiff and caused by the defendant's conduct." *Sole Energy Co. v. Petrominerals Corp*., 128 Cal. App. 4th 212, 232-33 (Cal. Ct. App. 2005) (internal citations omitted). Because the Agreement between the parties was at-will, future profits would be speculative beyond the 90-day notice period. Damages would be further limited by Vanguard's acceptance of NEG's termination, and that they cannot demonstrate that they lost any customer.

12.    Non-restitutionary disgorgement, the remedy that transfers to the plaintiff that which the defendant unfairly lost, cannot be recovered in an individual action under §17200. *Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1007 (Cal. Ct. App. 2005). Because Vanguard seeks restitution that originates from a contingency expectancy of payment, rather than a quantifiable sum, this remedy is not available.

13.    Punitive damages are not available to Vanguard because there are no actual damages and because it has failed to identify any alleged conduct that qualifies as oppressive, malicious, or fraudulent. *Sole Energy Co.*, 128 Cal. App. 4th at 238 (Cal. Ct. App. 2005) ("An award of actual damages, even if nominal, is required to recover punitive damages."); *see also* Civ. § 3294(a); *Basich v. Allstate Ins. Co.*, 87 Cal. App. 4th 1112, 1121 (Cal. Ct. App. 2001) ("If the plaintiff is going to prevail on a punitive damages claim, he or she can only do so by establishing malice, oppression or fraud by clear and convincing evidence. Thus, any evidence submitted in response to a motion for summary adjudication must necessarily meet that standard.").

14.    Vanguard's sixth cause of action for declaratory relief against NEG fails because the claims rely on the same allegations as for breach of contract. To the extent that Vanguard seeks declaratory relief on the non-compete clause, it is unenforceable under California law. *Ixchel Pharma, LLC v. Biogen, Inc*., 9 Cal. 5th 1130, 1145–50 (2020).

## **ECU'S SEPARATE STATEMENT OF CONCLUSIONS OF LAW**

1.     Vanguard filed a motion to amend and file a Second Amended Complaint ("SAC") "in order to dismiss its second and third causes of action for misappropriation of trade secrets (the Claims). Dkt. 96 at 1. This Court "grant[ed] the motion on the condition that the [misappropriation of trade secret] Claims are dismissed with prejudice. *Id.* at 2. Vanguard thereafter filed the SAC without its misappropriation of trade secret claims, thereby accepting the Court's condition. SAC (Dkt. 97).

2.     In VLS's SAC, VLS alleges no independently wrongful conduct. *See generally* SAC.

3.     "[T]o state a claim for interference with an at-will contract by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148 (2020). Since Vanguard fails to allege and cannot prove independently wrongful conduct, its eighth and ninth causes of action for interference with contractual relations and interference with prospective economic advantage fail as a matter of law. *Id.*

4.     Vanguard's seventh cause of action for inducing breach of contract fails to state a triable issue of fact because ECU committed no intentional acts to disrupt the at-will contract. *Oakley, Inc. v. Nike, Inc.*, 988 F. Supp. 2d 1130, 1135 (C.D. Cal. 2013) ("[E]ven when believing all of [plaintiff's] evidence, and drawing all justifiable inferences in [plaintiff's] favor, it is clear that [defendant] is entitled to judgment as a matter of law [as to the element of intentional acts], and failure of proof on an essential element renders all other facts immaterial.").

5.     Vanguard's seventh, eighth, and ninth causes of action for inducing breach of contract, interference with contractual relations, and interference with prospective economic advantage fail because ECU was not a substantial cause to any harm alleged by Vanguard. "A cause of action for interference with contractual relations and a cause of action for interference with prospective economic relations

- 18 -

1  both require the plaintiff to prove causation." *Franklin v. Dynamic Details, Inc.*, 116

2  Cal. App. 4th 375, 391 (2004) ("A cause of injury, damage, loss or harm is something

3  that is a substantial factor in bringing about an injury, damage, loss or harm.").

4  Because Vanguard terminated the agreement with NEG (and ECU did not cause NEG

5  to terminate the Vanguard agreement), ECU's actions were not a cause or substantial

6  factor to any of the harm Vanguard alleges. *Id.* at 394 (granting motion for summary

7  judgment as plaintiffs "failed to meet their burden of producing evidence showing the

8  existence of a triable issue of fact as to causation of damages").

9       6.     Vanguard's ninth cause of action for interference with prospective

10  economic advantage fails for additional reasons because it admits that its customers

11  were free to leave Vanguard, it has failed to identify any such customers, and it has

12  admitted that it does not know who these customers were. *Packaging Sys., Inc. v.*

13  *PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1090 (C.D. Cal. 2017) (intentional

14  interference claim dismissed where plaintiff did not specifically identify customers or

15  economic relationships with which defendant was alleged to have interfered); *see*

16  *also Damabeh v. 7–Eleven, Inc.*, No. 5:12-CV-1739-LHK, 2013 WL 1915867, at *10

17  (N.D. Cal. May 8, 2013); *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal.

18  App. 4th 507, 527 (1996).

19       7.     Vanguard's tenth cause of action for unfair competition under California

20  Business & Professions Code § 17200 fails because Vanguard cannot show that

21  ECU's conduct unfair, damages are not available for violations of § 17200, and

22  Vanguard does not seek injunctive relief. *Bank of the West v. Superior Court*, 2 Cal.

23  4th 1254, 1272, 1258 (1992) ("[T]he Unfair Business Practices Act [Cal. Bus. & Prof.

24  Code § 17200 et seq.] does not authorize an award of damages[.]"); *compare McGill*

25  *v. Citibank*, 2 Cal. 5th 945, 954 (2017) ("T]he primary form of relief available under

26  the UCL to protect consumers from unfair business practices is an injunction."), *with*

27  SAC at 29–30 (Prayer for Judgment failing to include injunctive relief).

28

11030823

DEFENDANTS' JOINT SEPARATE STATEMENT

8.      Vanguard's claim for damages as to all causes of action against ECU fail because they are speculative. *See Assoc. Gen'l. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*, 456 U.S. 519, 532, 103 S.Ct. 897, 905 n.26 (1983). Vanguard cannot present any evidence of specific valid contracts or existing relationships that have been disrupted. *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc*., 2008 WL 11334030, at *20 (C.D. Cal. Mar. 17, 2008) (granting summary judgment). *See, e.g*., *Bio-Medical Research Ltd. v. Thane Int'l, Inc.*, 249 F. App'x 539, 542 (9th Cir. Sept. 27, 2007) (Unpub. Disp.) (dismissing claim for interference with prospective economic advantage where plaintiffs did not identify any particular relationship that had been disrupted). Vanguard failed to identify any existing customer it lost due to any particular alleged wrongful conduct by ECU should compel this Court to enter summary judgment. *See Urica, Inc. v. Pharmaplast SAE*, 2013 WL 12123230, at *12-13 (C.D. Cal. May 6, 2013) (granting summary judgment on interference claims where plaintiff failed to identify any existing customer it lost due to alleged interference, and to adduce any evidence demonstrating harm as a result of such interference).

9.      Vanguard's claim for punitive damages as to all causes of action against ECU fail because Vanguard cannot prove "by clear and convincing evidence that the [ECU] has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294; *Kappe v. AXA Equitable Life Ins. Co.*, 2010 WL 11597481, at *7 (C.D. Cal. Nov. 9, 2010) (granting motion for summary judgment to dismiss claim for punitive damages). Moreover, Punitive damages are not available under § 17200 of the California Business and Professions Code, Vanguard's tenth claim. *Czechowski v. Tandy Corp.*, 731 F.Supp. 406, 410 (N.D. Cal. 1990) ("section 17200 of the Business and Professions Code will not support an award of punitive damages").

1 | Dated:         November 17, 2021          IRELL & MANELLA LLP
2 |                                            Bruce A. Wessel

3 |                                            By: /s/ Bruce A. Wessel
4 |                                                Bruce A. Wessel

5 |                                            Attorneys for Defendant
6 |                                            EconoCaribe Consolidators, Inc.

7 |

8 |                                            STEARNS WEAVER MILLER
  |                                            WEISSLER ALHADEFF &
9 |                                            SITTERSON, P.A.

10 |                                           By: /s/ Darrell Payne
11 |                                               Darrell Payne

12 |                                           By: /s/ Veronica L. de Zayas

13 |
  |                                               *Pro Hac Vice* Counsel for
14 |                                               Defendant EconoCaribe
15 |                                               Consolidators, Inc.

16 |

17 |                                           FERNALD LAW GROUP APC
  |                                           ADAM P. ZAFFOS
18 |

19 |                                           By: /s/ Adam P. Zaffos
20 |                                               Adam P. Zaffos
  |                                               Attorneys for Defendant and
21 |                                               Counterclaimant Groupage Services of
22 |                                               New England, LLC

23 |

24 |

25 |

26 |

27 |

28 |

11030823                    DEFENDANTS' JOINT SEPARATE STATEMENT

## **Attestation of Concurrence in Filing**

In accordance with Local Rule 5-4.3.4(a)(2)(i), I attest that concurrence in the content and filing of this stipulation has been obtained from each of the other signatories who are listed on the signature page.

Dated:  November 17, 2021                    Irell & Manella LLP


By:_____/s/ Bruce A. Wessel_____
           Bruce A. Wessel
           Attorneys for Defendant
           Econocaribe Consolidators, Inc.

11030823