1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

STEARNS WEAVER MILLER
WEISLLER ALHADEFF & SITTERSON P.A.
Darrell W. Payne, *pro hac vice*
Fla. Bar No. 773300
dpayne@stearnsweaver.com
Veronica L. de Zayas, *pro hac vice*
Florida Bar No. 91284
vdezayas@stearnsweaver.com
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-2650

IRELL & MANELLA LLP
Bruce A. Wessel, SBN 116734
bwessel@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:   (310) 277-1010
Facsimile:    (310) 203-7199

Attorneys for Defendant
Econocaribe Consolidators, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANGUARD LOGISTICS SERVICES (USA), INC., formerly known as NACA LOGISTICS (USA), INC., <br><br> Plaintiff, <br><br> vs. <br><br> GROUPAGE SERVICES OF NEW ENGLAND, LLC; ECONOCARIBE CONSOLIDATORS, INC., d/b/a ECU WORLDWIDE & ECU WORLDWIDE (USA); and DOES 1-10, inclusive, <br><br> Defendants. | Case No. 2:18-cv-00517-DSF <br><br> ECONOCARIBE CONSOLIDATORS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT <br><br> Date:   Monday, January 10, 2022 <br> Time:  1:30 p.m. <br> Judge:  Hon. Dale S. Fischer <br> Ctrm:  7D <br><br> *[Filed concurrently with the Notice of Motion and Motion; Joint Separate Statement of Uncontroverted Facts and Conclusions of Law and accompanying declarations and exhibits; and [Proposed] Judgment]* |

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ..................................................................................1

II.  PROCEDURAL HISTORY ...................................................................3

III. SUMMARY OF UNDISPUTED FACTS ...............................................3

IV.  ARGUMENT ........................................................................................5

    A.   Vanguard Has Not Alleged and Cannot Prove Independently Wrongful Conduct by ECU ...........................................6

    B.   ECU Had No Intent to Disrupt the Contract or Induce a Breach and No Reason to Believe That Would Occur .......................9

    C.   ECU Was Not a Substantial Cause of Any Harm to Vanguard ............................................................................13

    D.   Vanguard Has Not Identified Any Customers Interfered With, and Admits Its Customers Were Free to Leave Vanguard ............................................................................16

    E.   Vanguard's Statutory Unfair Competition Claim Fails Because There Was No Unfair Conduct and No Relief Available .............................................................................18

    F.   Vanguard's Damages Claims Are Speculative ...................................18

    G.   Vanguard's Claim for Punitive Damages Fails to State a Triable Issue of Fact ...............................................................20

V.   CONCLUSION ....................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Assoc. Gen'l. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*,
  459 U.S. 519 (1983) ........................................................................ 19

*Baez v. Pension Consulting All., Inc.*,
  Case No. 2:17-cv-01938-RGK-AGR, 2018 WL 1942389 (C.D. Cal.
  Mar. 16, 2018) ................................................................................ 15

*Bank of the West v. Superior Court*,
  2 Cal. 4th 1254 (1992) .................................................................... 18

*Breitman v. Stettner*,
  Case No. CV122034PSGPJWX, 2013 WL 12121538 (C.D. Cal.
  May 14, 2013), *aff'd*, 606 F. App'x 367 (9th Cir. 2015) ..................... 13

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...................................................................... 5, 6

*Czechowski v. Tandy Corp.*,
  731 F.Supp. 406 (N.D. Cal. 1990) .................................................... 20

*Damabeh v. 7–Eleven, Inc.*,
  Case No. 5:12-CV-1739-LHK, 2013 WL 1915867 (N.D. Cal. May 8,
  2013) ............................................................................................. 17

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
  11 Cal. 4th 376 (1995) .................................................................. 6, 16

*Dooley v. Crab Boat Owners Ass'n.*,
  Case No. C 02–0676 MHP, 2004 WL 902361 (N.D. Cal. April 26, 2004) ......... 19

*Dryden v. Tri-Valley Growers*,
  65 Cal. App. 3d 990 (1977) .............................................................. 13

*Enigma Software Grp. USA LLC v. Malwarebytes Inc.*,
  Case No. 5:17-cv-02915-EJD, 2021 WL 3493764 (N.D. Cal.
  Aug. 9, 2021) ................................................................................... 9

*Franklin v. Dynamic Details*,
   116 Cal. App. 4th 375 (2004) ............................................................ 2, 13, 14, 15

*Giannetta v. Marmel*,
   Case No. 5:20-cv-01410-RGK-KK, 2021 WL 2954083 (C.D. Cal.
   Mar. 19, 2021) ........................................................................................ 9

*Hilderman v. Enea TekSci, Inc.*,
   Case No. 05CV1049 BTM(AJB), 2009 WL 10672188 (S.D. Cal.
   July 29, 2009) ........................................................................................ 18

*Ixchel Pharma, LLC v. Biogen, Inc.*,
   9 Cal. 5th 1130 (2020) ...................................................................... *passim*

*JDIS Grp., LLC v. 626 Holdings, LLC*,
   Case No. SA CV 20-994-DMG, 2021 WL 4813757 (C.D. Cal. June
   7, 2021) .................................................................................................. 9

*Kappe v. AXA Equitable Life Ins. Co.*,
   Case No. CV 09-03459 ODW (AGR), 2010 WL 11597481 (C.D.
   Cal. Nov. 9, 2010) ................................................................................ 20

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ..................................................................... 8, 18

*McGill v. Citibank*,
   2 Cal. 5th 945, 954 (2017) .................................................................. 18

*Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*,
   Case No. CV 05-2200 MMM, 2008 WL 11334030 (C.D. Cal. Mar.
   17, 2008) ................................................................................................ 19

*Nelson v. Tucker Ellis, LLP*,
   48 Cal. App. 5th 827 (2020) ............................................................... 7

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
   210 F.3d 1099 (9th Cir. 2000) ............................................................ 6

*Oakley, Inc. v. Nike, Inc.*,
   988 F.Supp.2d 1130 (C.D. Cal. 2013) .......................................... 1, 10, 13

*Oumere LLC v. Zarpas*,
   Case No. 8:21-cv-00224-DOC(JDEx), 2021 WL 2894643 (C.D.
   Cal. June 29, 2021) ............................................................................... 9

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*,
   268 F. Supp. 3d 1071 (C.D. Cal. 2017)................................................17

*PMC, Inc. v. Saban Entm't, Inc.*,
   45 Cal. App. 4th 579 (1996)..............................................................8, 16

*Reeves v. Hanlon*,
   33 Cal. 4th 1140 (2004)..........................................................................6

*Sebastian Int'l, Inc. v. Russolillo*,
   Case No. CV 00-3476 SVW....................................................................15

*SIC Metals, Inc. v. Hyundai Steel Co.*,
   Case No. SACV1800912CJCPLAX, 2018 WL 6842958 (C.D. Cal.
   Nov. 14, 2018)......................................................................................16

*Stereoscope, LLC v. U.S. Bank Nat'l Assoc.*,
   675 F. App'x 725 (9th Cir. 2017)..........................................................14

*Stevenson Real Est. Servs., Inc. v. CB Richard Ellis Real Est. Servs., Inc.*,
   138 Cal. App. 4th 1215 (2006)............................................................18

*Trendmood, Inc. v. Rabinowitz*,
   Case No. Case No. 2:20-cv-10877-MCS-RAO, 2021 WL 5277441
   (C.D. Cal. Aug. 31, 2021) ......................................................................9

*Urica, Inc. v. Pharmaplast SAE*,
   Case No. CV 11-02476 MMM, 2013 WL 12123230 (C.D. Cal.
   May 6, 2013)........................................................................................19

*Wang Lab. v. Mitsubishi Elecs. Am.*,
   860 F. Supp. 1448 (C.D. Cal. 1993)........................................................6

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
   42 Cal. App. 4th 507 (1996)................................................................17

*Wyatt Tech. Corp. v. Malvern Instruments Inc.*,
   Case No. CV 07-08298 DDP, 2009 WL 2365647 (C.D. Cal. July 29,
   2009), *aff'd*, 526 F. App'x 761 (9th Cir. 2013)....................................17

**Statutes**

Cal. Bus. & Prof. Code § 17200 et seq.............................................18, 20

Cal. Civ. Code § 3294...........................................................................20

**Rules**

Fed. R. Civ. P. 56(a) ................................................................. 5, 6

**Other Authorities**

Second Restatement of Torts. Section 768(1)(b) ........................................ 7

ECU'S MEMORANDUM ISO ITS MOTION FOR SUMMARY JUDGMENT

I.      **INTRODUCTION**

Plaintiff Vanguard Logistics Services (USA), Inc. ("Vanguard" or "VLS") pursues four claims against defendant Econocaribe Consolidators, Inc. ("ECU") in the Second Amended Complaint (Dkt. 97, "SAC"): the seventh claim for inducing breach of contract, the eighth claim for interference with contractual relations, the ninth claim for interference with prospective economic advantage, and the tenth claim for statutory unfair competition. By this motion, ECU seeks judgment in its favor on all four claims.

The contract that Vanguard alleges ECU interfered with is an at-will Agency Agreement (attached as Exhibit 2 to the SAC, Dkt. 97-2) between Vanguard and Defendant Groupage Services of New England, LLC ("NEG").

Vanguard's claims against ECU fail for multiple reasons.

First, the California Supreme Court held in *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130 (2020) that when the contract allegedly interfered with is at-will, the plaintiff must allege and prove independently wrongful conduct. Vanguard has not done this.

Second, there is no evidence that ECU intended to cause any improper interference or disruption or knew that disruption was certain, and there is uncontroverted evidence that ECU did not. There is no genuine issue of material fact that ECU was interested in doing business with NEG only if it was legally permissible to do so. Counsel for NEG and ECU both analyzed the post-termination non-compete in the agreement and concluded that it was not valid (and Vanguard wisely does not allege breach of that provision). Beyond that, ECU relied on NEG and its counsel as to how the agreement would be terminated. ECU played no role in the decision of how to give that notice. *See Oakley, Inc. v. Nike, Inc.*, 988 F.Supp.2d 1130 (C.D. Cal. 2013) (granting summary judgment for defendant on interference

with contract claim, where there was no evidence of intentional acts to interfere with performance of the contract).

Third, there is no genuine issue of material fact that ECU was not a substantial factor in causing any harm to Vanguard. NEG's decision to terminate the agreement was NEG's decision alone. NEG ultimately decided to terminate only after Vanguard terminated its warehouse relationship with NEG on December 11, 2017. ECU did not cause any harm to Vanguard's business relationships. *See Franklin v. Dynamic Details*, 116 Cal. App. 4th 375 (2004) (plaintiff failed to show triable issue regarding causation).

Fourth, as NEG details in its own motion for summary judgment, there was no breach of the agreement by NEG. The series of events that took place on December 21, 2017, as a matter of law, constituted a formal termination of the agreement by both parties. ECU was then free to use NEG as its agent. Events before December 21, 2017 were legally proper discussions, negotiations, and preparations. They were fair business behavior, not tortious conduct. Events following the termination were entirely proper as well.

Fifth, the claim based on interference with customers also fails because of the absence of evidence that ECU interfered with any customers. Vanguard has not identified a single customer that it contends it lost because of misconduct by ECU (or NEG).

Sixth, the statutory unfair competition claim fails for the same reasons the other claims fail and because there is no relief available.

Finally, Vanguard's damages claims are speculative and there is no evidence to support a punitive damages claim here.

Based on the undisputed facts, and the applicable law, ECU's discussions and plans about possibly doing business in the future with NEG are not tortious, and thus ECU is entitled to summary judgment as a matter of law.

## II.    PROCEDURAL HISTORY

When Vanguard filed this case in January 2018, the complaint included misappropriation of trade secrets claims under both federal and California law. Vanguard dismissed those claims with prejudice when it filed the SAC on January 14, 2021. The dismissal followed a January 4, 2021 Order (Dkt. 96) where this Court conditionally granted Vanguard's motion for leave to file the SAC "on the condition that the Claims are dismissed with prejudice." Dkt. 96 at 6. The Court left it to Vanguard to decide whether to "accept those conditions." Vanguard then did so when it thereafter filed the SAC without the trade secrets claims. *Id.* at 7.

## III.    SUMMARY OF UNDISPUTED FACTS

Vanguard and ECU are competitors. SAC ¶ 4. They are both licensed non-vessel operating common carriers ("NVOs" or "NVOCCs"). *Id.* ¶ 9. NEG used to provide agent and warehouse service to Vanguard and now provides these two services to ECU. *Id.* ¶ 14. This case concerns the December 21, 2021 termination of the Vanguard/NEG Agency Agreement (the "Agreement"). SAC, Ex. 2 (Dkt. 97-2). The Agreement provided that either NEG or Vanguard could terminate "at any time upon ninety (90) days prior notice." Agreement §§ 3.03(b) and (c). In addition, the Agreement gave Vanguard immediate termination rights if "NEG shall breach, default, or fail to observe or violate any term, covenant or agreement contained in this Agreement." *Id.* § 3.03(b)(A).

Vanguard contends that the Agreement only covered agency services and that the non-exclusive arrangement for warehouse services could be terminated by either party without advance notice. Vanguard admits that NEG was always free to provide warehouse services to anyone, including ECU. UF 16.[1] These services—called Container Freight Station services or CFS—concern the warehouse where

---

[1] UF ("Uncontroverted Fact") refers to citations from the concurrently filed Joint Separate Statement of Uncontroverted Facts and Conclusions of Law (Dkt. 129).

freight is consolidated into a container for ocean shipping export or deconsolidated from a container after importation. SAC ¶ 12.

In the summer of 2017, Vanguard began talking to Boston Freight Terminals ("BFT") about providing CFS warehouse services to Vanguard to replace NEG. UF 1. On November 27, 2017, Vanguard told NEG it would be terminating NEG for import CFS warehouse services and would use BFT instead. UF 2. On December 11, 2017, Vanguard made a public announcement to all its customers that BFT would be its new CFS warehouse for **both** imports and exports. UF 3 (citing Meunier Decl. Ex. C ("To ensure our customers have the best network of CFS stations to deliver their **export cargo** to, and pickup their **import cargo** from . . . ." (emphasis added))).

Many things happened on December 21, 2017, which was ten days after Vanguard's CFS termination notice. David Sanchoyerto of Vanguard sent an internal email under the subject line "Boston Restructure Checklist." UF 24. In that email he wrote: "Hello team, I started a checklist this morning to capture items that need to be actioned due to the change in our Boston CFS and the end of our relationship with NEG." *Id.* The list included "Notice of Termination to NEG" and removing NEG's access to Vanguard networks and databases. *Id.*

That same day, NEG's counsel sent a letter to Vanguard terminating the Agreement. UF 54. Vanguard's counsel responded telling NEG to "discontinue" doing work for Vanguard. UF 56.

Also that same day, Vanguard shut off NEG's access to Vanguard's networks and systems. UF 4–8. In addition, Vanguard hired Joe Pimentel to be Vanguard's new representative in Boston. UF 22. Taken together, all of the events of December 21, 2017—the letters and the Vanguard's cutting off NEG's access to Vanguard's computers and databases—constituted a termination of the Agreement, with the explicit and implicit agreement of both NEG and Vanguard.

1   Vanguard clearly wanted the contract to end. Vanguard did not ask NEG to
2   continue doing business with Vanguard. UF 9. Vanguard did not tell its customers
3   that it was continuing business with NEG. UF 12. Vanguard removed its equipment
4   from NEG. UF 13. And during this December 2017 timeframe, Vanguard did not
5   send any cease-and-desist letter or contact ECU at all. UF 10, 11, 32. Of course,
6   Vanguard moved all of NEG's warehouse business to BFT. UF 2–3, 43, 45.

7   ECU did not and would not provide any access to ECU's computer systems,
8   or allow NEG to take any customer orders or represent ECU, until after the
9   Vanguard relationship was terminated.  UF 30, 53.  NEG did not take any bookings,
10  arrange for any shipments, accept any cargo or take any actions to actually manage
11  shipments for ECU or its customers prior to termination.  UF 59; *see* UF 58, 60–62.

12  Vanguard's claims are mainly based on the discussions between NEG and
13  ECU prior to December 21, 2017. Vanguard admits "NEG and ECU would have
14  been able to legally discuss the possibility of doing business together while the
15  Agency Agreement was still in effect if NEG and ECU had done so in a manner
16  consistent with NEG's duties under the Agency Agreement and applicable law."
17  UF 17. Vanguard also admits "nothing in the Agency Agreement prohibited NEG
18  from providing CFS warehousing services . . . to ECU." UF 16. Finally, Vanguard
19  admits that Vanguard's customers could choose to move their business from
20  Vanguard to NEG and to ECU. UF 18–19. Thus, Vanguard's claims hinge on the
21  theory that the back-and-forth between ECU and NEG about forming a business
22  relationship was somehow tortious. It was not.

23  **IV.   <u>ARGUMENT</u>**

24  A party seeking summary judgment bears the initial burden of establishing
25  there is no genuine issue as to any material fact and that the moving party is entitled
26  to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v.*
27  *Catrett,* 477 U.S. 317, 322–23 (1986). "A summary judgment motion may, and

28

should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex Corp.,* 477 U.S. at 323. "The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial." *Wang Lab. v. Mitsubishi Elecs. Am.*, 860 F. Supp. 1448, 1451 (C.D. Cal. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). The moving party can meet this burden by one of two methods: "The moving party may produce evidence negating an essential element of the nonmoving Party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1106 (9th Cir. 2000).

## A.   <u>Vanguard Has Not Alleged and Cannot Prove Independently Wrongful Conduct by ECU</u>

In August of 2020, the California Supreme Court held "that to state a claim for interference with an at-will contract by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148 (2020). In January of 2021, Vanguard dismissed its trade secret claims against ECU with prejudice. These two events effectively marked an end to Vanguard's interference case against ECU. Vanguard has not alleged and cannot prove any "independently wrongful" conduct by ECU.

Before *Ixchel*, California required proof of independently wrongful conduct for interference with prospective economic advantage (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376 (1995)) and for termination of at-will employment contracts (*Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004)). In *Ixchel*, the Supreme Court extended the independently wrongful requirement to all at-will contracts. *Ixchel*, 9 Cal. 5th at 1162 ("We hold that tortious interference with at-will contracts requires independent wrongfulness.").

The holding in *Ixchel* follows the reasoning of the Second Restatement of Torts. Section 768(1)(b) provides: "One who intentionally causes a third person . . . not to continue an existing contract terminable at-will does not interfere improperly with the other's relation if . . . the actor does not employ wrongful means[.]" Restatement (Second) of Torts § 768(1)(b). Comment i explains that when a party terminates an at-will contract, there is no breach; the "competitor is therefore free, for [its] own competitive advantage, to obtain the future benefits for [itself] by causing the termination. Thus [the competitor] may offer better contract terms . . . and [the competitor] may make use of persuasion or other suitable means, all without liability." *Id.* cmt. i.

*Ixchel* explains: "parties to at-will contracts have no legal assurance of future economic relations . . . . An at-will contract may be terminated, by its terms, at the prerogative of a single party, whether it is because that party found a better offer from a competitor, because the party decided not to continue doing business, or for some other reason. And the other party has no legal claim to the continuation of the relationship. The contracting parties bargained for these terms, aware of the risk that the relationship may be terminated at any time." *Id.* at 1147.

The Court explained why the independently wrongful requirement is important: "allowing interference with at-will contract claims without requiring independent wrongfulness risks chilling legitimate business competition. . . . Allowing disappointed competitors to state claims for interference with at-will contracts without alleging independently wrongful conduct may expose routine and legitimate business competition to litigation." *Id.* at 1148.

An act is independently wrongful only "if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1142 (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003)); *see also Nelson v. Tucker Ellis, LLP*,

48 Cal. App. 5th 827 (2020) (no independently wrongful conduct). The conduct complained of by Vanguard falls well short of satisfying this demanding standard.

Vanguard has not pled a claim for independently wrongful conduct against ECU, having dropped the trade secret claims. Vanguard's only claims are three interference torts and statutory unfair competition. Vanguard has not alleged any independently wrongful conduct by ECU in the SAC. All that Vanguard has done in discovery is list a chronology of events in 2016 and 2017 that it contends constitute interference. But that list does not show any wrongful conduct by ECU at all, and certainly does not identify any *independently* wrongful conduct, under the requirements set forth in *Ixchel* and *Korea Supply*. The uncontroverted facts demonstrate that ECU's dealings with NEG while the contract was in effect were proper competitive business behavior. Beyond that, Vanguard does not allege and cannot show any independently wrongful conduct.

The court in *PMC, Inc. v. Saban Entm't, Inc.*, 45 Cal. App. 4th 579, 603 (1996), explained that competitive business behavior is permissible and that

> in the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability. Such acts merely maximize competition in a competitive marketplace.

*Id.* at 603–04 (citations omitted) (disapproved of on other grounds by *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 n.11 (2003)). *PMC* specifically rejects Vanguard's main argument that "secret negotiations" are wrongful. Put differently, NEG and ECU could have private business discussions without telling Vanguard and that does not create grounds for an interference lawsuit.

Because of the California Supreme Court's ruling in *Ixchel*, ECU's motion for summary judgment on the seventh, eighth, and ninth claims must be granted because of the absence of any evidence of independently wrongful conduct. *See, e.g.*, *JDIS Grp., LLC v. 626 Holdings, LLC*, Case No. SA CV 20-994-DMG (DFMx), 2021 WL 4813757, at \*5–6 (C.D. Cal. June 7, 2021) (granting motion to dismiss for failure to allege independently wrongful acts in claim based on an at-will contract); *Oumere LLC v. Zarpas*, Case No. 8:21-cv-00224-DOC(JDEx), 2021 WL 2894643, at \*4–5 (C.D. Cal. June 29, 2021) (granting motion to strike intentional interference with contractual relations claim where plaintiff did not allege an independently wrongful act); *Enigma Software Grp. USA LLC v. Malwarebytes Inc.*, Case No. 5:17-cv-02915-EJD, 2021 WL 3493764, at \*10 (N.D. Cal. Aug. 9, 2021) (granting motion to dismiss because the complaint "fails to adequately plead that [the defendant] engaged in any independently wrongful act which interfered with a specific contractual obligation under its at-will agreements with users."); *Trendmood, Inc. v. Rabinowitz*, Case No. Case No. 2:20-cv-10877-MCS-RAO, 2021 WL 5277441, at \*5–6 (C.D. Cal. Aug. 31, 2021) (granting motion to dismiss claims for interference with prospective economic advantage; plaintiff did not plead facts demonstrating independently wrongful conduct); *Giannetta v. Marmel*, Case No. 5:20-cv-01410-RGK-KK, 2021 WL 2954083, at \*3 (C.D. Cal. Mar. 19, 2021) (granting motion to dismiss tortious interference claim because they did not plead an independently wrongful act.). As set forth above, Vanguard has not alleged independently wrongful acts that meet the standard required under *Ixchel*, nor come forward with evidence of any such acts.

## B. <u>ECU Had No Intent to Disrupt the Contract or Induce a Breach and No Reason to Believe That Would Occur</u>

ECU knew of the agreement between Vanguard and NEG, but there is no genuine issue of fact that ECU did not intend to induce the breach of, or disrupt, that agreement and had no reason to believe a breach, or disruption, was certain to occur.

1    To the contrary, ECU wanted NEG to comply with the agreement and ECU relied

2    on, and actively encouraged, NEG to do just that.

3    In *Oakley, Inc. v. Nike, Inc.*, 988 F. Supp. 2d 1130 (C.D. Cal. 2013), Oakley

4    alleged that Nike interfered with Oakley's endorsement contract with professional

5    golfer Rory McIlroy, and the court granted summary judgment in Nike's favor

6    because there was no triable issue of fact that Nike did not engage in intentional acts

7    designed to induce a breach of contract or a disruption of the contractual

8    relationship. *Id.* at 1135–36, 1138. Nike knew of the endorsement contract between

9    Oakley and McIlroy, and Nike told McIlroy's agent (the "Agent") that Nike did not

10   want to sign an endorsement deal with McIlroy until he was free to do so. Nike also

11   knew that Oakley had a contractual right of first refusal. The Agent told Nike that

12   Oakley would not match and that McIlroy could enter into the deal with Nike. In

13   holding there was no interference by Nike, the court said that whether the Agent's

14   statement was accurate did not affect the outcome of the motion because Nike had

15   the right to rely on the Agent's statement. Thus "no reasonable fact finder could

16   conclude the Nike 'form[ed] an intent to harm' the Oakley-McIlroy agreement[.]'"

17   *Id.* at 1138.

18   Here, the facts are even stronger for ECU than they were for Nike because

19   ECU analyzed the post-termination non-compete to make sure that NEG was

20   permitted to do business with ECU, UF 28, 38–40, and ECU did not begin a

21   business relationship with NEG until after the contract was terminated when

22   Vanguard cut off NEG's access to the Vanguard network. UF 26, 31, 33, 58–62.

23   And ECU did not sign an agreement with NEG until long after the termination. Dkt.

24   129-11 (Abisch Decl. ¶ 21). Further, as NEG argues in its motion, there was no

25   breach of the agreement at all. UF 20.

26   There is no dispute that ECU wanted to know whether the post-termination

27   non-compete was valid and enforceable, and both NEG's and ECU's counsel

28   concluded that it was not. UF 28. Vanguard will argue that this legal research shows

1  improper conduct, but that gets it backwards. Vanguard's threat to enforce the

2  unenforceable post-termination non-compete is the improper conduct here.

3       Emails from Mr. Abisch on December 15, 2017 and December 20, 2017 also

4  demonstrate that ECU did not intend to interfere with the agreement. UF 30; *see*

5  *also* UF 26, 33. On December 15, 2017, Mr. Abisch reported on the timeline to his

6  superior. He relied on NEG and its counsel to manage the termination process,

7  having received a draft of a termination letter that NEG planned to send. UF 30

8  (citing December 15, 2017 email, Ex. E to the Declaration of John D. Abisch).

9       In a December 15, 2017 email, Mr. Abisch explained to his superior that NEG

10 was concerned that Vanguard would immediately terminate when NEG sent the

11 termination notice. UF 30 (citing December 15, 2017 email, Ex. E to the Declaration

12 of John D. Abisch). Thus, NEG wanted to have backup systems in place from ECU.

13 UF 49, 51–52. ECU did not and would not allow NEG to have access to any ECU

14 networks or booking systems until the Vanguard relationship was over. UF 30. Here

15 is what Mr. Abisch wrote his superior on December 15:

16         The attorney for NEG has prepared a letter [that NEG] is
           waiting to send until his team is fully prepared to be cutoff
17         from the Vanguard system. The thinking is in the event
           that Vanguard receives this letter and terminates
18         immediately and cuts them off from their software they
           want to be immediately prepared to handle bookings from
19         their clients. We are sending some staff to NEG next week
           to get them set up on our system and be prepared to handle
20         the business.

21

22 UF 30 (quoting December 15, 2017 email, Ex. E to the Declaration of John D.

23 Abisch). Thus, there was an understanding that Vanguard might choose to

24 immediately terminate NEG and cut off its access to networks and databases when

25 Vanguard received NEG's notice, preventing NEG from communicating with

26 clients; so, NEG took pre-termination efforts to prepare in the event it occurred

27 (which it did). UF 30, 50. It is also clear from the December 15th email that the

28 thinking was that NEG would only need access to ECU's system in the event that

1   Vanguard chose to terminate immediately, and there was no intention for the parties
2   to begin doing business together unless and until Vanguard immediately terminated.
3   UF 30, 31, 50, 52–53.

4          There is also additional uncontroverted evidence of ECU's intent not to harm
5   Vanguard. Late in the day on December 20, 2020, Mr. Meunier and Mr. Abisch
6   emailed about the timing of notice to customers of NEG's planned switch from
7   Vanguard to ECU. UF 31. Mr. Meunier sought Mr. Abisch's opinion because some
8   of Mr. Meunier's team members wanted to send out a simultaneous notice to
9   customers with the notice of termination, but Mr. Meunier was uncertain about
10  doing this. UF 31. Mr. Abisch was cautious and responded to Mr. Meunier: "My
11  suggestion is to NOT proactively put something out prior to learning more how
12  V[anguard] reacts to the letter you sent." UF 31 (quoting the December 20, 2017
13  email, Ex. F to the Declaration of John D. Abisch). Indeed, Mr. Abisch believed
14  both in terms of helping in the event of litigation and communicating with
15  customers, that it made sense to react to Vanguard "as opposed to intiat[ing] the
16  'divorce'" when it came to customer communications. UF 31 (quoting the
17  December 20, 2017 email, Ex. F to the Declaration of John D. Abisch). How did
18  Vanguard react? It sent its own termination notice and immediately disabled NEG's
19  access to Vanguard's network and databases. UF 4–8, 56. Vanguard could have
20  contacted NEG and ECU to discuss an orderly transition, but it did not.

21         When NEG sent the termination letter on December 21, 2017, Vanguard's
22  reaction was swift. UF 54–57, 4–8, 12, 24. Vanguard responded to the termination
23  notice with its own letter that same day, asserting that Vanguard had immediate
24  termination rights and explicitly directing NEG to "discontinue printing or issuing
25  Vanguard brand bills of lading." UF 56. Vanguard shut off NEG's access to
26  Vanguard networks and databases. UF 55, 4–8. Thus, Vanguard terminated the
27  agreement and foreclosed any ability of NEG to continue working during a wind-
28  down period.

1    This chronology demonstrates that ECU recommended to NEG that Vanguard

2    have the opportunity to determine how its separation from NEG would proceed,

3    recognizing that Vanguard would have the option of terminating immediately or

4    working out a transition period. UF 31. Vanguard chose immediate termination. UF

5    54–57, 4–8, 12, 24. There is no genuine issue of material fact that ECU did not

6    intend to harm Vanguard or expect that such harm was likely to occur. Therefore,

7    summary judgment in ECU's favor is warranted. *See Oakley, Inc.*, 988 F. Supp. 2d

8    at 1138; *see also Breitman v. Stettner*, Case No. CV122034PSGPJWX, 2013 WL

9    12121538, at \*7 (C.D. Cal. May 14, 2013) (granting summary judgment as to claims

10   for intentional interference with contractual relations and interference with

11   prospective business advantage, where there was no evidence to support that

12   defendant intentionally acted to disrupt the contractual relationship), *aff'd*, 606 F.

13   App'x 367 (9th Cir. 2015).

14   **C.    <u>ECU Was Not a Substantial Cause of Any Harm to Vanguard</u>**

15   It is uncontroverted that NEG made the decision on its own to prepare for the

16   end of its relationship with Vanguard because of dissatisfaction with the business

17   relationship, including the termination of the warehouse arrangement that Vanguard

18   publicly announced on December 11, 2017. UF 3, 27, 46–48.

19   The interference torts "require the plaintiff to prove causation." *Franklin v.*

20   *Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 391 (2004). Causation "is something

21   that is a substantial factor in bringing about injury, damage, loss or harm." *Id.*

22   (prevailing on summary judgment because the plaintiff "failed to show a triable

23   issue regarding causation"). "It has been repeatedly held that a plaintiff, seeking to

24   hold one liable for unjustifiably inducing another to breach a contract, must allege

25   that the contract would otherwise have been performed, and that it was breached and

26   abandoned by reason of the defendant's wrongful act and that such act was the

27   moving cause thereof." *Dryden v. Tri-Valley Growers*, 65 Cal. App. 3d 990, 997

28

1  (1977) (affirming dismissal of claims for interference with contractual relations,

2  where "proximate causation, a vital element of the cause of action, was lacking as a

3  matter of law" (citations omitted)); *Stereoscope, LLC v. U.S. Bank Nat'l Assoc.*, 675

4  F. App'x 725, 726 (9th Cir. 2017) (citing *Dryden* and affirming dismissal of claims

5  for intentional interference with contractual relations and intentional interference

6  with prospective economic advantage).

7        There is no causal nexus between ECU and NEG's pre-termination

8  communications and Vanguard's loss of any business. That ECU and NEG

9  discussed the possibility of doing business in the future and planned for that

10  possibility did not cause any customer to leave Vanguard. Vanguard's theory of

11  liability attempts to establish causation through a temporal sequence, just as the

12  plaintiff attempted to do in *Franklin*. Vanguard implicitly argues that because the

13  parties' communications preceded the termination of the agency agreement, it was

14  the communications and planning for future business together that "caused the

15  loss." *See Franklin*, 116 Cal. App. 4th at 393. As the *Franklin* court recognized,

16  "[a] cause and effect relationship based upon such a temporal sequence is a classic

17  example of the logical fallacy of post hoc, ergo propter hoc (literally, 'after this,

18  therefore because of this')." *Id.* at 393–94.

19        The parties' communications did precede the termination, but the law permits

20  that. ECU did not cause the termination. That decision was always NEG's to make,

21  and NEG decided to terminate only after, and because of, Vanguard's conduct. UF

22  46–48, 50.

23        Likewise, ECU did not cause the termination to occur without providing 90-

24  days' notice, *see* Agreement §§ 3.03(b) and (c); rather, Vanguard chose to terminate

25  immediately. NEG determined the form of notice to Vanguard and its counsel and

26  the reaction to the notice was up to Vanguard. UF 29. Vanguard decided to

27  terminate immediately. UF 54–57, 4–8, 12, 24. A notice of termination by Vanguard

28  to NEG was certainly part of Vanguard's plan: Mr. Sanchoyerto's December 21,

2017 checklist included an item—"Notice of Termination to NEG." UF 24. This is consistent with the letter Vanguard sent to NEG ordering it to cease work for Vanguard and the termination of NEG's access to Vanguard's network and databases. UF 55–56. Vanguard hired a replacement for NEG on December 21, 2017. UF 22. These facts show that Vanguard was prepared and ready to move on.

Most importantly, there is no evidence, whatsoever, that any customer decided to move its business because of anything that ECU said or did. Customers made independent decisions to select which companies they would do business with. Some chose to continue the relationships they already had with NEG. No trier of fact could draw a reasonable inference that ECU's conduct was a substantial factor in causing a loss to Vanguard. *See Franklin*, 116 Cal. App. 4th at 443; *see also Baez v. Pension Consulting All., Inc.*, Case No. 2:17-cv-01938-RGK-AGR, 2018 WL 1942389, at *4 (C.D. Cal. Mar. 16, 2018) (granting summary judgment on the issue of causation where there was no evidence that the defendant's conduct was a substantial factor in bringing about the harm).

Vanguard will argue that the two years of discussions between ECU and Vanguard illustrates some kind of improper conspiracy, but it indicates the opposite: NEG was reluctant to terminate, and ECU engaged in lawful and proper business conduct. NEG had to make the decision about whether to terminate the Vanguard agreement, and that ultimately depended on how Vanguard was treating NEG. As is evident, Vanguard decided to abuse NEG (in a business sense), including terminating the warehouse arrangement, and that ultimately pushed NEG to terminate. UF 43–47. Vanguard caused the termination. No action by ECU caused any harm to Vanguard. *See Sebastian Int'l, Inc. v. Russolillo*, Case No. CV 00-3476 SVW JWJX, 2005 WL 1323127, at *6 (C.D. Cal. Feb. 22, 2005) (granting summary judgment where there was an absence of any evidence that would allow a jury to determine that Plaintiff's loss was caused by defendant's actions and not another cause such as counterfeiting, plaintiff's management turnover, or general market

conditions); *SIC Metals, Inc. v. Hyundai Steel Co.*, Case No. SACV1800912CJCPLAX, 2018 WL 6842958, at *6 (C.D. Cal. Nov. 14, 2018) ("Plaintiffs have simply offered no facts to suggest that the [contract] 'would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act.'").

### D.   <u>Vanguard Has Not Identified Any Customers Interfered With, and Admits Its Customers Were Free to Leave Vanguard</u>

Vanguard's claims for interference with prospective economic advantage—the fourth claim against NEG and the ninth claim against ECU—are nearly identical. Vanguard alleges that it has "established economic relationships with its customers." SAC ¶¶ 47, 78. Vanguard also alleges that it is "informed and believes . . . that [defendants'] wrongful acts have actually disrupted the relationships between plaintiff and its customers." SAC ¶¶ 50, 81.

Vanguard's prospective economic advantage claim against ECU fails for three independent reasons.

First, as a legal matter, this tort requires proof of independently wrongful conduct. *See Della Penna*, 11 Cal. 4th at 393; *see also PMC, Inc.*, 45 Cal. App. 4th at 603 (conduct must fall outside the privilege of fair competition). Vanguard does not even allege this element in its complaint and has no evidence to prove it.

Second, Vanguard admits that its customers were free to leave Vanguard. Specifically, "Vanguard admits that its customers could choose to use Vanguard's or others' services . . ." UF 18–19 (citing Vanguard's admissions in ECU's RFA Nos. 60, 61).

Third, Vanguard did not and cannot identify any customer relationships that were interfered with (perhaps because it feared that those customers would refute the contention).[2] Defendants' interrogatories asked Vanguard to identify such

---

[2] There is ample evidence that Vanguard continued to have substantial business in New England after the termination. Vanguard's new warehouse BFT was so busy

customers, and Vanguard claimed it did not know who the customers were. UF 21 (Vanguard cannot identify the names of any customers that switched to ECU as a result of NEG's improper acts or contract breaches). In similar situations courts have dismissed interference claims involving customers. *See Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1090 (C.D. Cal. 2017) (intentional interference claim dismissed where plaintiff did not specifically identify customers or economic relationships with which defendant was alleged to have interfered); *Wyatt Tech. Corp. v. Malvern Instruments Inc.*, Case No. CV 07-08298 DDP (MANx), 2009 WL 2365647, at *24 (C.D. Cal. July 29, 2009) (granting summary judgment as to claim for intentional interference with economic advantage, where there was no evidence of any specific relationship with any specific customer, as the plaintiff did not have a "reasonably probable future economic benefit from any [general customers], as opposed to simply competing for business"), *aff'd*, 526 F. App'x 761 (9th Cir. 2013); *see also Damabeh v. 7–Eleven, Inc.*, Case No. 5:12-CV-1739-LHK, 2013 WL 1915867, at *10 (N.D. Cal. May 8, 2013); *Westside Ctr. Assocs. v. Safeway Stores 23, Inc*., 42 Cal. App. 4th 507, 527 (1996).

---

that there were so many records that a response to NEG's subpoena was burdensome. Dkt. 129-10 (Wessel Decl. Ex. 9) (declaration of BFT); *see also* Dkt. 129-11 (Abisch Decl. ¶ 26) (Vanguard's continued business in New England); UF 14 ("Vanguard continued to have business with companies located in the New England region after December 21, 2017"); UF 25 ("After December 2017, Vanguard continued to be an active participant in the market and did substantial business in the New England region"). Whether customers used Vanguard or ECU or someone else had to do with service, price, and schedules, as evidenced by documents recently produced from the records of Joe Pimentel (the person Vanguard hired December 21, 2017 to handle the New England market). Dkt. 129-9 (Wessel, Decl. Ex. 8); *see also* Dkt. 129-11 (Abisch Decl. ¶ 25) (no Vanguard business lost because of wrongful conduct, but was instead due to customer decisions based on relationships, service, competitive pricing, etc.).

### E.   Vanguard's Statutory Unfair Competition Claim Fails Because There Was No Unfair Conduct and No Relief Available

Vanguard's tenth claim for unfair competition under California Business & Professions Code Section 17200 simply lists the same allegations as supporting the other three claims against ECU. *See Hilderman v. Enea TekSci, Inc.*, Case No. 05CV1049 BTM(AJB), 2009 WL 10672188, at *4 (S.D. Cal. July 29, 2009) (defendant entitled to summary judgment on unfair competition claim that was premised on intentional interference claim on which defendant was entitled to summary judgment where there was no evidence of damages or that defendant interfered); *Stevenson Real Est. Servs., Inc. v. CB Richard Ellis Real Est. Servs., Inc.*, 138 Cal. App. 4th 1215, 1224–25 (2006) (defendant entitled to motion for judgment on pleadings on unfair competition claim where there was no independent wrongful conduct). For the reasons set forth above, ECU's conduct was fair competition. In addition, Vanguard cannot seek damages from ECU under Section 17200. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1272, 1258 (1992) ("[T]he Unfair Business Practices Act [Cal. Bus. & Prof. Code § 17200 et seq.] does not authorize an award of damages[.]"); see also *Korea Supply Co.*, 29 Cal. 4th at 1152 ("We hold that nonrestitutionary disgorgement of profits is not an available remedy in an individual action under the UCL."). Injunctive relief is the primary form of relief under Section 17200, and that relief is not sought by Vanguard here. *Compare McGill v. Citibank*, 2 Cal. 5th 945, 954 (2017) ("T]he primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction."), *with* SAC at 29–30 (Prayer for Judgment failing to include injunctive relief). As a matter of law, ECU is entitled to summary judgment on the unfair competition claim.

### F.   Vanguard's Damages Claims Are Speculative

Vanguard seeks as damages ten years of lost profits. Dkt. 117 at 6. It is uncontroverted that Vanguard cannot show that it lost any particular customer or

any particular business from any customer. UF 21. Rather, it seeks damages solely for the termination of the at-will Vanguard – NEG Agency Agreement claiming in a "but for world" the agreement would have continued for a decade. The claims are hopelessly speculative, largely because there can be no reasonable expectation of future lost profits for an at-will agency agreement. Therefore, summary judgment is appropriate for this reason as well.

It is black letter law that a plaintiff must prove, with certainty, both the existence of damages and the causal connection between the wrong and the injury. No damages can be recovered for uncertain, conjectural, or speculative losses. *See Assoc. Gen'l. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 532 n.26 (1983). Thus, summary judgment is proper if there is no evidence to show how any wrongful conduct by ECU actually caused the loss of a customer or particular business from a customer. *See* UF 21, 25; Dkt. 129-10 (Wessel Decl. Ex. 9) (declaration of BFT); *see generally* Dkt. 129-9 (Wessel, Decl. Ex. 8); Dkt. 129-11 (Abisch Decl. ¶¶ 25, 26).

Because it is undisputed that Vanguard presented no evidence of specific valid contracts or existing relationships that have been disrupted, Vanguard's claims must be dismissed on summary judgment. *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc*., Case No. CV 05-2200 MMM (MCx), 2008 WL 11334030, at *20 (C.D. Cal. Mar. 17, 2008) (granting summary judgment).

Vanguard's admitted failure to identify any existing customer it lost due to any particular alleged wrongful conduct by ECU should compel this Court to enter summary judgment. *See Urica, Inc. v. Pharmaplast SAE*, Case No. CV 11-02476 MMM (RZx), 2013 WL 12123230, at *12–13 (C.D. Cal. May 6, 2013) (granting summary judgment on interference claims where plaintiff failed to identify any existing customer it lost due to alleged interference, and to adduce any evidence demonstrating harm as a result of such interference); *see also Dooley v. Crab Boat Owners Ass'n.,* Case No. C 02–0676 MHP, 2004 WL 902361, at *14 (N.D. Cal.

April 26, 2004) (granting summary judgment on interference claims because there was no evidence of damages flowing from loss of contract, and no evidence of damage to prospective economic relationships).

### G. <u>Vanguard's Claim for Punitive Damages Fails to State a Triable Issue of Fact</u>

In order to obtain punitive damages, Vanguard must have evidence to prove "by clear and convincing evidence that [ECU] has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294; *Kappe v. AXA Equitable Life Ins. Co.*, Case No. CV 09-03459 ODW (AGR), 2010 WL 11597481, at *7 (C.D. Cal. Nov. 9, 2010) (granting motion for summary judgment to dismiss claim for punitive damages). As a matter of law, Vanguard cannot meet this standard for the reasons stated above. There is no evidence of any wrongdoing by ECU and thus no "clear and convincing" evidence. Moreover, punitive damages are not available under Section 17200 of the California Business and Professions Code, Vanguard's tenth claim. *Czechowski v. Tandy Corp.*, 731 F.Supp. 406, 410 (N.D. Cal. 1990) ("section 17200 of the Business and Professions Code will not support an award of punitive damages").

## V. <u>CONCLUSION</u>

For the foregoing reasons, ECU respectfully requests that the Court grant this Motion for Summary Judgment as to Vanguard's seventh, eighth, ninth, and tenth claims against ECU in the Second Amended Complaint, grant this Motion for Summary Judgment as to Vanguard's claims for damages and punitive damages against ECU as to all claims, and dismiss the action against ECU in its entirety.

Dated: November 17, 2021

IRELL & MANELLA LLP
Bruce A. Wessel

By: /s/ Bruce A. Wessel
    Bruce A. Wessel

    Attorney for Defendant
    EconoCaribe Consolidators, Inc.

STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.

By: /s/ Darrell Payne
    Darrell Payne

By: /s/ Veronica L. de Zayas

    *Pro Hac Vice* Counsel for
    Defendant EconoCaribe Consolidators,
    Inc.