STEARNS WEAVER MILLER
WEISLLER ALHADEFF & SITTERSON P.A.
Darrell W. Payne, *pro hac vice*
Fla. Bar No. 773300
dpayne@stearnsweaver.com
Veronica L. de Zayas, *pro hac vice*
Florida Bar No. 91284
vdezayas@stearnsweaver.com
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-2650

IRELL & MANELLA LLP
Bruce A. Wessel, SBN 116734
bwessel@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:   (310) 277-1010
Facsimile:   (310) 203-7199

Attorneys for Defendant
Econocaribe Consolidators, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANGUARD LOGISTICS SERVICES (USA), INC., formerly known as NACA LOGISTICS (USA), INC., <br><br> Plaintiff, <br><br> vs. <br><br> GROUPAGE SERVICES OF NEW ENGLAND, LLC; ECONOCARIBE CONSOLIDATORS, INC., d/b/a ECU WORLDWIDE & ECU WORLDWIDE (USA); and DOES 1-10, inclusive, <br><br> Defendants. | Case No. 2:18-cv-00517-DSF <br><br> ECONOCARIBE CONSOLIDATORS, INC.'S OPPOSITION TO VANGUARD LOGISTICS SERVICES (USA), INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT <br><br> Date:   Monday, January 10, 2022 <br> Time:   1:30 p.m. <br> Judge:   Hon. Dale S. Fischer <br> Ctrm:   7D <br><br> *[Filed concurrently with Defendants' Joint Statement of Genuine Disputes, Accompanying Declarations, and Defendants' Evidentiary Objections]* |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   Introduction ....................................................................................1

II.  Background......................................................................................3

III. The Standards for Ruling on Cross-Motions for Summary
     Judgment........................................................................................4

IV.  Argument ........................................................................................5

     A.   ECU Did Not Intend to Induce Breach or to Disrupt .........................6

          1.   Analysis of the Non-Compete Does Not Show that
               ECU Intended to Induce Breach or Disrupt ..............................6

          2.   Exchange of the Memorandum of Understanding
               Does Not Show that ECU Intended to Induce
               Breach or Disrupt.......................................................................9

          3.   The Offer of a $50,000 Advance Does Not Show
               that ECU Intended to Induce Breach or Disrupt ....................10

     B.   ECU Did Not Cause a Breach or Disruption ......................................11

     C.   Vanguard Has Not Demonstrated Independently Wrongful
          Conduct .............................................................................................15

     D.   Vanguard Cannot Use Its Abandoned Trade Secret Claims
          to Support Its Interference and Other Claims ....................................17

V.   Conclusion....................................................................................18

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*1-800 Contacts, Inc. v. Steinberg*,
  107 Cal. App. 4th 568 (2003) ............................................................................ 6, 7

*A-Mark Coin Co. v. General Mills, Inc.*,
  148 Cal. App. 3d 312 (1983) .................................................................................. 7

*Barnes v. District of Columbia*,
  42 F. Supp. 3d 111 (D.D.C. 2014) ....................................................................... 18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................ 5

*Coast Hematology-Oncology Assocs. Med, Grp. v. Long Beach Mem.
  Med. Ctr.*,
  58 Cal. App. 5th 748 (2020) ................................................................................. 16

*Franklin v. Dynamic Details, Inc.*,
  116 Cal. App. 4th 375 (2004) ............................................................................... 11

*Ixchel Pharma, LLC v. Biogen, Inc.*,
  9 Cal. 5th 1130, 1148 (2020) ......................................................................*passim*

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) .......................................................................................... 2

*LucasArt Entm't Co. v Humongous Entm't Co.*,
  870 F. Supp. 285 (C.D. Cal. 1993) ........................................................................ 9

*Lucky Kim Int'l, Inc. v. I & J Ltd.*,
  Case No. 2:09-cv-07542-JHN-FFMx, 2011 WL 13213892 (C.D.
  Cal. Feb. 2, 2011) ................................................................................................... 5

*Mingus Constructors, Inc. v. United States*,
  812 F.2d 1387 (Fed. Cir. 1987) .............................................................................. 5

*Oakley, Inc. v. Nike, Inc.*,
  988 F. Supp. 2d 1130 (C.D. Cal. 2013) ................................................................. 5

28

**Page(s)**

*Pacific Gas & Electric Co. v. Bear Stearns & Co.,*
   50 Cal. 3d 1118 (1990) .................................................................................. 8, 9

*PMC, Inc. v. Saban Entm't, Inc.,*
   45 Cal. App. 4th 579 (1996) ......................................................................... *passim*

*Reeves v Hanlon,*
   33 Cal. 4th 1140 (2004) .................................................................................. 15

# I.   **INTRODUCTION**

ECU opposes Vanguard's motion for partial summary judgment against ECU, a motion that seeks a ruling that ECU is liable on Vanguard's seventh claim for inducing breach of contract and eighth claim for intentional interference with contract. ECU, in its own motion for summary judgment, seeks judgment against Vanguard on the same two claims, as well as Vanguard's other two related claims against ECU (Vanguard's ninth and tenth claims). The Court should deny Vanguard's motion and grant ECU's.

In its notice of motion, Vanguard seeks a ruling on four elements of its interference claims. The first two elements are undisputed: There was a contract between Vanguard, and NEG and ECU knew about it. The third and fourth elements are disputed: ECU's intent and causation. Vanguard contends the evidence proves that "ECU intentionally engaged in conduct designed to induce a breach or disruption of the contractual relationship" (Vanguard Notice of Motion at 3), but this very evidence proves the opposite. ECU's conduct was non-actionable, permissible business behavior. ECU did not intend to improperly interfere with the NEG/Vanguard business relationship, and ECU acted cautiously to understand and follow the applicable law. And while Vanguard contends that "ECU played a substantial role in disrupting the contractual relationship" (*id.*), that is not true, as nothing ECU did caused any legal breach or disruption (assuming there was a breach or disruption). The deteriorating business relationship between NEG and Vanguard in 2017 was not caused by ECU. Indeed, the main culprit of that deterioration was Vanguard itself.

Vanguard's memorandum addresses the evidence of ECU's intent only on page 21, and it lists only three groups of evidence that Vanguard believes prove ECU's intent. *First*, ECU and NEG shared their counsels' legal conclusions that the post-termination non-compete clause of the Agency Agreement was unenforceable. That sharing of legal conclusions was permissible, not tortious. *Second*, between December

13 and 15, 2017, ECU and NEG exchanged a Memorandum of Understanding ("MOU"). Again, sharing information about a non-binding MOU, or any potential terms or negotiations over a future contract, was permissible business conduct as a matter of law. *Third*, NEG and ECU discussed that if NEG did become ECU's agent, ECU would pay NEG a $50,000 advance. Again, discussion of the proposed business arrangement, including the financial terms of a possible deal, was legally permissible. As a matter of law, none of this evidence proves interference. Not surprisingly, Vanguard cites no legal support for the proposition that obtaining legal advice, or negotiating future business terms, constitutes illegal or inappropriate conduct. To the contrary, all of the evidence reflects entirely permissible and non-actionable business behavior supporting a ruling for ECU and against Vanguard. *See* Section IV.A.

While Vanguard's notice of motion seeks a ruling that ECU was a substantial cause of the alleged breach or disruption, Vanguard's memorandum does not discuss this element. Rather, Vanguard argues there was a breach and a disruption (Vanguard Mem. at 21–22, 23–24), not that ECU was the cause. Vanguard has not presented evidence or argument to meet this element and ECU has demonstrated in its motion that this element cannot be met as a matter of law. *See* Section IV.B.

Further, an additional reason to deny Vanguard's motion (and grant ECU's) is that, because Vanguard's claims are based solely on an at-will contract and other prospective customer dealings, Vanguard blithely ignores its obligation to come forward with evidence of any independently wrongful act by ECU, as required under *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148 (2020) and *PMC, Inc. v. Saban Entm't, Inc.*, 45 Cal. App. 4th 579, 603 (1996) (disapproved of on other grounds by *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 n.11 (2003)). *See* Section IV.C. To summarize ECU's separate motion for summary judgment, ECU seeks a ruling that ECU did not intend to induce a breach of contract or disrupt the contractual relationship and that ECU did not cause any such breach or

ECU'S OPPOSITION TO VLS'S MOTION FOR PARTIAL SUMMARY JUDGMENT

disruption or any harm to Vanguard. *See generally* Dkt. 131, 131-1 (ECU's Motion for Summary Judgment). Further, ECU emphasizes that there is an additional element to Vanguard's claims that Vanguard's motion ignores—the requirement that Vanguard also prove an independently wrongful act by ECU because the contract was at-will. *Ixchel Pharma, LLC*, 9 Cal. 5th at 1148. Vanguard ignores these cases and ignores its requirement to show independently wrongful conduct. Because independently wrongful conduct is an affirmative element of Vanguard's seventh and eighth claims, Vanguard's partial motion for summary judgment should be denied.

## II.    BACKGROUND

The material facts are set forth in ECU's Summary of Undisputed Facts in its Memorandum in Support of its Motion for Summary Judgment. Dkt. 131-1 at 3–5. However, Vanguard's recitation of the facts is incomplete and incorrect, in some respects, as set forth in the disputed items in Defendants' Joint Statement of Genuine Disputed Facts, filed concurrently herewith. A summary of some of the more critical additional facts follows.

The Vanguard/NEG Agency Agreement was an at-will contract. DUF 38.[1] NEG's CFS business, and particularly the CFS income, were an integral part of financial feasibility of the agreement, with NEG's CFS fees specifically referenced in the agreement and such fees controlled in part by Vanguard. DGDF 12-14[2]; DUF 47. When NEG was unwilling to modify the terms of the agreement for Vanguard's benefit, Vanguard decided to take away NEG's primary income to force NEG to renegotiate more favorable terms, and Vanguard ultimate decided to move the CFS business to BFT. DGDF 41–42.

---

[1] "DUF" refers to those items in Defendants' Joint Separate Statement of Uncontroverted Facts (Dkt. 129), filed with Defendants' Motions for Summary Judgment.

[2] "DGDF" refers to the paragraph numbers in Defendants' Joint Statement of Genuine Disputed Facts (Dkt. 134), filed concurrently herewith.

NEG was reliant on Vanguard for access to the shipment/cargo management software. DUF 49. ECU coordinated on training and preparing for a transition to possible future business with NEG, as a backup plan—like a backup generator when the power goes out—only in the event that Vanguard cut off NEG from its customers and computer systems, after termination. DUF 30, 49–53, 4–8, 55; DGDF 52, 53.

The redlined, draft MOU was not finalized into an agreement, and no cash advance was ever provided to NEG, until after December 21, 2017, after termination of the Vanguard agreement. DUF 62; DGDF 47–50.

ECU did not cause NEG to send its termination letter; it was always only NEG's role to determine whether to terminate, and ECU played no role whatsoever in the content of that notice. DUF 27, 28, 29, 46; DGDF 52. ECU always intended that its business discussions with NEG would be legally appropriate and conducted in a professional manner: ECU wanted NEG to "professionally terminate." DUF 26. ECU did not do anything to intentionally cause NEG to violate any obligations to Vanguard. DUF 33.

Vanguard continued to have substantial business in the New England region after the termination, and saw improvements on its services, after terminating the NEG contract, with nearly all Boston-area customers continuing to do business or willing to do business with Vanguard. DUF 14, 25; DGDF 60, 92. Vanguard has not identified any customers that it has lost because of any wrongful conduct by ECU, and it is not making a claim for lost customers. DUF 21.

## III.  THE STANDARDS FOR RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a

- 4 -

1   genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24
2   (1986).

3       On cross motions for summary judgment, "the court must evaluate each party's
4   motion on its own merits, taking care in each instance to draw all reasonable
5   inferences against the party whose motion is under consideration." *Mingus*
6   *Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). It is
7   permissible for a party to concede an issue arguendo for that party's summary
8   judgment motion and dispute the issue in opposition to a cross motion. *Id.*

9   **IV.   ARGUMENT**

10      There are sufficient uncontroverted facts to grant ECU's motion for summary
11  judgment. Assuming arguendo that ECU's motion is denied, there are genuine
12  disputes precluding granting Vanguard's motion, most especially on the issues of
13  intent and causation. ECU disputes Vanguard's contention that ECU intended to
14  disrupt. ECU disputes that it caused any disruption. There is no authority cited that
15  supports granting a motion for summary judgment in Vanguard's favor, and there is
16  substantial authority supporting the grant of ECU's motion. *See, e.g.*, *Oakley, Inc. v.*
17  *Nike, Inc.*, 988 F. Supp. 2d 1130, 1135, 1138 (C.D. Cal. 2013) (denying plaintiff's
18  motion for summary judgment, and granting defendant's motion for summary
19  judgment, on plaintiff's intentional interference claim because "no reasonable fact
20  finder could conclude that [the defendant] formed an intent to harm"); *Lucky Kim*
21  *Int'l, Inc. v. I & J Ltd.*, Case No. 2:09-cv-07542-JHN-FFMx, 2011 WL 13213892, at
22  *4 (C.D. Cal. Feb. 2, 2011) (granting defendant summary judgment on interference
23  claim, where there was no evidence of intent to induce disruption where no awareness
24  of contract, performance, or exclusivity provisions that would prohibit acceptance of
25  orders). Moreover, Vanguard is also not entitled to summary judgment because it has
26  failed to address ECU's affirmative defenses, much less establish that it is entitled to
27  judgment as a matter of law, as to each defense.

28

11045333

For these and the following reasons, Vanguard's motion for partial summary judgment should be denied.

## A.    ECU Did Not Intend to Induce Breach or to Disrupt

Vanguard fails to show that ECU had an intent to induce breach or disrupt the contract. In listing the elements of a claim for inducing breach of contract, Vanguard cites *1-800 Contacts, Inc. v. Steinberg*, 107 Cal. App. 4th 568 (2003). Vanguard Mem. at 19. There, the court affirmed the dismissal of an inducing breach of contract claim against defendant, explaining: "Whether or not a breach of the agreement occurred, the evidence did not show or substantiate that [defendant] . . . acted with knowledge that any such breach would thereby be caused." *1-800 Contacts, Inc.*, 107 Cal. App. 4th at 586. Similarly, the undisputed facts here show that ECU did not act with knowledge that any breach or disruption would occur.

All the evidence on which Vanguard relies to show intent by ECU is identified on page 21 of Vanguard's Memorandum. These alleged facts do not prove an intent to induce breach or disrupt. As in *1-800 Contacts*, the back and forth between two parties was not tortious, but rather a permissible business dialogue. *See id.* at 586, 594 (affirming dismissal of complaint).

### 1.    Analysis of the Non-Compete Does Not Show that ECU Intended to Induce Breach or Disrupt

NEG and ECU both analyzed the validity of the Agency Agreement's post-termination non-compete clause, and they each concluded that it was illegal under California law and not enforceable. DGDF 28, 33; DUF 28, 39. Vanguard argues that this proves interference with contract, but it offers no explanation whatsoever why it was improper for two companies to analyze whether public policy makes a contract provision void. Specifically, Vanguard contends that ECU's receipt of an NEG legal memo concluding that the provision was unenforceable under California law, and ECU's response that its counsel agreed with the conclusion of NEG's counsel, is

- 6 -

1   enough to constitute legal disruption of a contractual relationship. Vanguard Mem. at

2   20–21. Vanguard's conclusory argument is not supported by any legal authority.

3       To the contrary, *PMC* makes clear that a competitor can "cut rates or prices,

4   allow discounts or rebates, enter into secret negotiations behind the plaintiff's

5   back . . . all without incurring liability." *PMC, Inc.*, 45 Cal. App. 4th at 603–04; *A-*

6   *Mark Coin Co. v. General Mills, Inc.*, 148 Cal. App. 3d 312, 324 (1983) (same).

7   Because a business can attempt to undercut a competitor, and can secretly negotiate

8   with a possible business partner, that business must be permitted to fully analyze all

9   applicable legal considerations, like ECU here.

10       *1-800 Contacts* is instructive because that case also involved the sharing of

11   information about legal obligations and contracts, including details about a non-

12   compete. *1-800 Contacts, Inc.*, 107 Cal. App. 4th at 586. The defendant there,

13   Steinberg, was repeatedly assured by his potential future business partner, Conder,

14   that Conder would "not disclose any confidential information of plaintiff's, in part

15   because he had signed a confidentiality agreement. with plaintiff." *Id.* Conder

16   revealed his contractual non-compete obligation, and obtained assurances that

17   Steinberg was not within the class of prohibited competitors. *Id.* The court found that

18   this evidence and other conduct, including working with Conder, "did not show or

19   substantiate that Steinberg . . . acted with knowledge that any such breach would

20   thereby be caused." *Id.* Not surprisingly, there was no suggestion that Conder's

21   sharing of information about his legal obligations was somehow wrongful or illegal.

22   The dismissal of the complaint—including claims for inducing breach of contract and

23   inducing breach of fiduciary duties—was affirmed. *Id.* at 594.

24       If ECU and NEG can share and negotiate price terms, discounts, and future

25   contract terms—and *1-800 Contacts* and *PMC* confirm that they can—there cannot

26   be any legal prohibition on sharing legal insights and analyses. *Id.* at 586; *PMC, Inc.*,

27   45 Cal. App. 4th at 603–04. Future contract terms would necessarily take into

28

11045333   ECU'S OPPOSITION TO VLS'S MOTION FOR PARTIAL SUMMARY JUDGMENT

consideration current contract terms and obligations. ECU is aware of no law or statute—and Vanguard has identified none—that prohibits NEG and ECU from analyzing the legality of Vanguard's non-compete language, and there is nothing unlawful or illegitimate about the sharing of such information or using it to be certain to proceed legally and appropriately. ECU intended to have business discussions with NEG in a legally appropriate, proper, and professional manner. DUF 26. Vanguard's argument, in essence, would require that NEG and ECU remain uninformed and ignorant of the illegality of Vanguard's own restrictive non-compete provisions, when considering whether and how NEG would end its at-will agreement with Vanguard. Neither law nor common sense supports this contention. As a matter of law, the communications between NEG and ECU about the unenforceability of the non-compete were permissible and protected activity. They do not support Vanguard's interference claim.

Vanguard relies on *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990) (hereinafter, "*PG&E*") to argue that even if ECU correctly believed the non-compete was unenforceable, there was nevertheless intentional interference. Vanguard Mem. at 24. *PG&E* is relevant, but it supports ECU. In *PG&E*, the defendant accused of interference won, with the California Supreme Court ordering the interference case dismissed. *PG&E*, 50 Cal. 3d at 1138. Addressing "whether a cause of action in tort may be stated for intentional interference with contractual relations . . . when it is alleged [the] defendant induced a party to a contract to seek a judicial determination whether it may terminate the contract according to its terms," the court rejected the claim in that case because "it would be an unwarranted expansion of the scope of [the tort] and a pernicious barrier to free access to the courts." *Id.* at 1123. The Court explained: "Our legal system is based on the idea that it is better for citizens to resolve their differences in court[.]" *Id.* at 1137. To allow the interference claim to go forward "would threaten free access to the courts[.]" *Id.*

- 8 -

Similarly, researching a legal question as to the enforceability of a restraint of trade is permissible behavior, whether the purpose is to decide what steps must be taken to compete legally and appropriately, or whether to prepare for possible (unwarranted) litigation. Restricting the ability to evaluate legal rights and obligations "would threaten free access to the courts" by imposing "pernicious barriers" on the right to obtain legal advice. Of course, if a contract provision is unenforceable as a matter of public policy, the law should encourage research and analysis to advance that public policy. *See also LucasArt Entm't Co. v Humongous Entm't Co.*, 870 F. Supp. 285 (C.D. Cal. 1993) (granting "motion for summary judgment on the interference claims on the ground that [the counterclaimant] has failed to show any evidence of actual disruption" and "the issuance of the press release in no way evidences an intent to disrupt").

Vanguard may be focused on one sentence in *PG&E*: "we conclude that it may be actionable to induce a party to a contract to terminate a contract according to its terms." *PG&E*, at 1127. But the California Supreme Court made clear in *Ixchel* that more is required for an interference claim involving an at-will contract: Independently wrongful conduct is now an essential element of any such claim. *Ixchel Pharma, LLC*, 9 Cal. 5th at 1148.

## 2. Exchange of the Memorandum of Understanding Does Not Show that ECU Intended to Induce Breach or Disrupt

Vanguard argues that a redlined draft of a memorandum of understanding ("MOU") constitutes legal disruption. Vanguard Mem. at 21. This also has no merit. Again, the *PMC* court specifically rejected this untenable view, and clearly established that these negotiations and similar conduct are permissible:

> [A] defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability.

Such acts merely maximize competition in a competitive marketplace.

*Id.* at 603–04 (citations omitted).

The MOU, and the various redlines and drafts, reflected some of the basic terms under which the parties expected to do business in the future, but the MOU was not a final agreement to actually conduct business. DUF 62; DGDF 47. This exchange of price and contract terms is by definition just the sort of negotiations specifically blessed in *PMC*. Because a competitor can offer to cut rates, it can propose such terms—whether in an MOU, an outline, or through a verbal exchange. Because a business can offer price terms, it can also offer other details of a proposed contract. Because prospective business partners can negotiate secretly, they can exchange all the prospective contract terms as part of those negotiations. "Such acts merely maximize competition in a competitive marketplace." *PMC, Inc.*, 45 Cal. App. 4th at 603–04; *see also Ixchel Pharma, LLC*, 9 Cal. 5th at 1148. As such, an MOU or any exchange of potential contract terms, cannot be a basis for a finding of legal disruption to an at-will contract.

*PMC* specifically rejects Vanguard's main argument that "secret negotiations" are wrongful. *Id.* Whether the negotiations are secret, or conducted sporadically and over an extended period of time, does not convert appropriate discussions about possible future business into unlawful conduct. Put differently, NEG and ECU could have private business discussions without telling Vanguard, and that does not create grounds for an interference lawsuit. Moreover, Vanguard itself was having private business discussions with BFT at the very same time." DGDF 90.

### 3. The Offer of a $50,000 Advance Does Not Show that ECU Intended to Induce Breach or Disrupt

Finally, Vanguard complains about an agreement to provide a $50,000 advance, in the future, if the parties ultimately conducted business, and only after the Vanguard agreement was terminated. Vanguard Mem. at 21; DGDF 50. An advance

to help with expected cash flow issues is in effect a discount, and such "discounts" are specifically one of the items identified as authorized in *PMC*. Any additional benefit that reduces the cost of money for the borrowing party is effectively a discount or a benefit. This is the essence of competition: a party considering better or different prices or terms from another potential business partner. It is undisputed that no advance was provided or accepted until after the Vanguard at-will agreement was terminated. DGDF 47–50. There is no suggestion nor evidence that funds were actually paid or transferred before termination. DGDF 48–50. As with any other offered contract term, there is nothing illegal or improper about an advance to be provided once the parties began doing business, and this issue cannot salvage Vanguard's interference claims.

### B.  ECU Did Not Cause a Breach or Disruption

The interference torts "require the plaintiff to prove causation." *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 391 (2004). Vanguard's disruption argument is based on four pieces of evidence: the misleading argument that the contract might be confidential; the MOU that Vanguard didn't know about; the termination (and purported lack of notice); and alleged 100% loss of business. Vanguard Mem. at 23–24. Vanguard's breach argument is premised on lack of a 90-day notice and permissible communications between ECU and Vanguard. *Id.* at 21. None of this evidence demonstrates causation. That is: none of this conduct can be shown to have caused a breach or disruption of the Vanguard/NEG contract. *See Franklin*, 116 Cal. App. 4th at 393–94 (plaintiff failed to show triable issue regarding causation).

First, Vanguard implicitly suggests there is some confidentiality obligation that prohibits disclosure of the Vanguard agreement. Vanguard Mem. at 23. Nowhere does Vanguard claim that the Agency Agreement was confidential; instead Vanguard relies on ECU's emails that show concern about confidentiality. A review of the Vanguard

Agency Agreement reveals that it does not contain any confidentiality designation, nor does it contain any prohibition on NEG sharing that document with anyone. Dkt. 97-2 (Second Amended Complaint, Ex. 2). Vanguard publicly filed the Agency Agreement. *Id.* An ECU employee's description of that document as confidential, does not make it so. *See* DGDF 33. This is particularly true where Vanguard never asserted that the agreement was confidential as a trade secret or propriety information as part of its flawed (and abandoned) trade secret claims. *See* Dkt. 49 (Vanguard's First Am. Compl.), ¶¶ 92, 100, 107, 113. ECU was only interested in evaluating the appropriate legal impact of Vanguard's post-termination non-compete. DGDF 30. ECU only saw an unsigned version of that agreement and never knew whether it was an actual, final agreement. DGDF 30. There is certainly no evidence or claim that confidential information was somehow used to obtain customers or disrupt any agreement, and any such claims that confidential information was used improperly were dismissed with prejudice. Dkt. 96 at 6 (granting Vanguard's motion for leave to file a second amended complaint and remove its trade secret claim "on the condition that the Claims are dismissed with prejudice"). ECU's email demonstrating concern about confidentiality is not evidence that ECU caused legal interference.

Second, Vanguard cites the MOU exchanged after Vanguard terminated the warehouse arrangement and before NEG sent the termination letter. As explained above, *see* Section IV.A.2, the MOU amounts to nothing more than a permissible, good faith offer or exchange of terms. *See Ixchel Pharma, LLC*, 9 Cal. 5th at 1148 (explaining why "a competitor's good faith offer that causes a business to withdraw from an at-will contract" does not trigger liability). It is undisputed that the various drafts and redlines of the MOUs between NEG and ECU reflected some of the basic terms under which the parties were willing to do business in the future, but they were not a final agreement to actually conduct business. DUF 62; DGDF 47. It was a non-binding document to align key terms, but there would be no ECU agreement until

ECU'S OPPOSITION TO VLS'S MOTION FOR PARTIAL SUMMARY JUDGMENT

after the NEG-Vanguard agreement was over. DUF 62; DGDF 47. Such offers and negotiations, even if secret, are permissible competitive conduct, not legal interference or disruption. *See PMC, Inc.*, 45 Cal. App. 4th at 603. As such, permissible negotiations cannot "cause" improper interference or disruption.

Third, Vanguard cites the efforts to coordinate a possible future transition (through training at NEG's offices or providing access to computers). This falls in this same category of offers or terms for future business, and are thus permissible competitive conduct, and cannot have caused a breach. This is particularly true where the resources were provided only as a "backup" so that NEG would have access to its customers and be able to continue its business, if Vanguard decided to cut off all NEG access to computers, and customer/shipment booking and tracking systems, DUF 30, 49–53—which it did. DUF 4–8, 55. It is undisputed that the "backup generator" switch was never turned on, and NEG never had access to ECU's computer or booking systems, and never provided ECU agent services or took any ECU customer orders or represented ECU, until after Vanguard cut off NEG's computer and customer access, and after the Vanguard relationship was terminated, which was after December 21, 2017. DUF 30, 53; DGDF 53.

Fourth, Vanguard's statement that "almost 100% of the business" was converted by ECU and NEG is simply not true, not supported by the document cited, and certainly not sufficient evidence to constitute disruption. It would also be non-actionable as Vanguard agrees that customers had the right to make their own decision. DUF 18, 19. There is overwhelming evidence that Vanguard continued to have substantial business in the New England region after the termination, and saw improvements on their services, after terminating the NEG contract. DUF 14, 25; DGDF 92. Nearly all Boston-area customers or potential customers contacted by Vanguard's sales representative in early 2018 were either doing business with Vanguard or were willing to do business with Vanguard, and none reported any

11045333

wrongful conduct by ECU or NEG as a reason for not doing business with Vanguard. DGDF 60. Major customers like Bollore, BOC International, and Fedex either continued to book or said they would support Vanguard. DGDF 60. An optimistic letter sent to a banker less than a week after the NEG termination does not establish the loss of 100% of Vanguard's business, and certainly does not contradict these facts, much less any evidence of disruption actually caused by wrongful conduct. *See* DGDF 60.

Finally, the undisputed evidence is clear that it was not ECU that caused NEG to finally send its termination letter (whether or not 90-days' notice was required or Vanguard effected an immediate termination). DUF 27, 28, 29. It was always NEG's decision to make, and always NEG's role to determine, whether to terminate the at-will contract or ultimately whether to do business with ECU. DUF 27, 28, 29. NEG only made the decision that NEG needed to terminate after Vanguard's December 11, 2017 notice (advising all customers that Vanguard's Boston CFS would change) went out. DUF 46. It was NEG only that decided to send the December 21, 2017 termination letter to Vanguard. DUF 29, 46. ECU did not advise nor request as to which day NEG sent its notice, and ECU played no role whatsoever in the content of that notice, including whether NEG determined that it could proceed without providing 90-days' notice because of Vanguard's termination of NEG's CFS business. DUF 29, 46.

After NEG's notice, Vanguard decided to terminate immediately. DUF 54–57, 4–8, 12, 24. A notice of termination by Vanguard to NEG was certainly part of Vanguard's plan: Mr. Sanchoyerto's December 21, 2017 checklist included an item—"Notice of Termination to NEG." DUF 24. This is consistent with the letter Vanguard sent to NEG ordering it to cease work for Vanguard and the termination of NEG's access to Vanguard's network and databases. DUF 55–56. Vanguard hired a replacement for NEG on December 21, 2017. DUF 22. These facts show that

Vanguard was prepared and ready to move on, and that ECU did not cause the termination without 90-days' notice.

Even if a 90-day notice period was contemplated or required, it was not ECU that caused any lack of notice or the lack of any transition period that amounted to breach or disruption. The undisputed facts show that there was effectively a mutual agreement between NEG and Vanguard to terminate the agreement, effective December 21, 2017. *See, supra.* The undisputed facts demonstrate that NEG did not take any bookings, arrange for any shipments, accept any cargo or take any actions to actually manage shipments for ECU or its customers, prior to termination. DUF 59. NEG was not provided access to the ECU computer network or booking system, and never provided any agent services to ECU, until after December 21, 2017. DUF 59, 61–62. Therefore, the lack of 90-day notice is not the legal cause of any interference or disruption.

### C.     <u>Vanguard Has Not Demonstrated Independently Wrongful Conduct</u>

No analysis of the interference torts and at-will contracts is complete without a discussion of the California Supreme Court's 2020 *Ixchel* decision. Vanguard ignores *Ixchel* and thus does not identify independently wrongful conduct as a necessary element of its claims. For that reason alone, Vanguard's motion should be denied.

Where an at-will contract is involved, disruption means more than merely encouraging the termination of the at-will contract. Because an at-will contract (like a mere prospective economic relationship) involves no legal rights "but only an expectancy," there is no breach "when the contract is terminated by the choice of [a contracting party.]" *Reeves v Hanlon*, 33 Cal. 4th 1140, 1151–52 (2004) (*quoting* Restatement (Second) of Torts, § 768, cmt. *i* (Am. Law Inst. 1975)). The competitor can cause the termination, without any liability. *Id.* at 1152. Termination does not equate to legal disruption.

The California Supreme Court, in *Ixchel*, provided an example of the sort of competitive conduct that would be discouraged, if a disappointed competitor like Vanguard, did not have to present proof of wrongful conduct. "Without an independent wrongfulness requirement, a competitor's good faith offer that causes a business to withdraw from an at-will contract could trigger liability or at least subject the competitor to costly litigation." *Ixchel Pharma, LLC*, 9 Cal. 5th at 1148. Nearly all of the acts that Vanguard cites to amount to nothing more than good faith offers, or negotiations, of contract terms and consideration for possible future business. *See* Vanguard Mem. at 23 (legal opinions confirming propriety of transaction (DGDF 30, 40); negotiations (DGDF 33); outlines/exchanges of possible terms and issues (DGDF 34–37, 47, 51); and requests/offers for resources to assist with transition (DGDF 38, 46, 48–50, 52–53)). Such offers, even if they were part of NEG's decision to terminate, are not legal interference. *See Ixchel Pharma, LLC*, 9 Cal. 5th at 1148; *see also PMC, Inc.*, 45 Cal. App. 4th at 604 (competitor cannot incur liability for "secret negotiations behind plaintiff's back").

In *Coast Hematology-Oncology Associates Medical Group v. Long Beach Memorial Medical Center*, 58 Cal. App. 5th 748 (2020), the court affirmed the dismissal of claims for tortious interference with contract and prospective economic advantage, explaining: "The common law has shaped both torts with an eye to preserving valid competition in the marketplace." *Id.* at 766. "Courts thus have been wary of lawsuits brought by a rival that has lost business or employees and suing based on conduct regarded by the commercial world as both commonplace and appropriate. . . . The law thus has been careful to draw liability lines to maximize areas of competition unburdened by legal penalties." *Id.* at 767. On the specifics of the case, the court said the defendant did not use wrongful conduct in hiring employees away from plaintiff and had a right to offer more pay or better terms. *Id.*

at 768. The bottom line there (and here) is that there was "robust competition . . . not underhanded skullduggery." *Id.* at 769.

The conduct relied upon by Vanguard is robust, commonplace, and appropriate business competition between rivals. NEG was ultimately attracted to ECU precisely because, first, Vanguard made the existing agreement financially unfeasible, and, second, ECU offered better terms than those that Vanguard imposed upon its long-time partner. The law has shaped all of Vanguard's tort claims to preserve valid competition in the marketplace, and thus Vanguard's claims cannot stand.

### D.  Vanguard Cannot Use Its Abandoned Trade Secret Claims to Support Its Interference and Other Claims

In Vanguard's argument that NEG breached fiduciary and loyalty duties, Vanguard insinuates that sharing financial information related to the Agency Agreement was improper, including information in an August 7, 2017 fax ("the Aug. 7 fax"). Vanguard Mem. at 17. In Vanguard's arguments against ECU, Vanguard makes no mention or reference to the Aug. 7 fax. *Id.* at 19–24. Thus, Vanguard cannot rely on the Aug. 7 fax to support its interference and inducing breach of contract claims.

Moreover, like with Vanguard's insinuation that the Agency Agreement was confidential, *see* Section IV.B, Vanguard cannot resuscitate its trade secret claim after it was dismissed with prejudice. Dkt. 96 at 6 (granting Vanguard's motion for leave to file a second amended complaint and remove its trade secret claim "on the condition that the Claims are dismissed with prejudice"). This is the precise sort of gamesmanship and sharp practice that ECU was concerned about when it sought clarity in requiring Vanguard's dismissal to be with prejudice. Dkt. 92 at 4, 11. The Aug. 7 fax was specifically identified as an area of concern. *Id.* at 8, 11. ECU warned about the "risk and uncertainty associated with possible future related claims from Vanguard, whether in this case or some other." *Id.* at 15. Only a dismissal with prejudice would "confirm that these confidentiality issues are fully and finally

removed from this litigation," so that the litigation can focus only on the actual issues and facts that remain relevant. *Id.* at 16; *see Barnes v. District of Columbia*, 42 F. Supp. 3d 111, 120 (D.D.C. 2014) (dismissing with prejudice so that the defendant was not left to "the plaintiff's caprice"). The Court properly required the claims to be dismissed with prejudice, in part to preserve ECU's right to recover its attorneys' fees from Vanguard. Dkt. 96 at 4–7 ("The Court therefore grants Vanguard's Motion on the condition that the Claims are dismissed with prejudice and that the Court will determine whether and in what amount to award Defendants' fees and costs relating to the Claims at a later date to be set by the Court . . . .").

Further, when ECU attempted to obtain discovery from Vanguard about the basis for its trade secret claims, and specifically identified the Aug. 7 fax, Vanguard refused to allow its witness to answer any questions, and refused to allow ECU to investigate and contest the validity of the unsupported confidentiality claims. DGDF 93. Vanguard's counsel promised, "the trade secret stuff is completely off the table" and "the purpose [of amendment] was to eliminate discovery on trade secrets." DGDF 94. In response to a question specifically asking about the Aug. 7 fax information, Vanguard's counsel again confirmed, "They are abandoned." DGDF 95. In addition to being completely impermissible, Vanguard's duplicitous strategy directly prejudiced ECU by preventing discovery that would have proved ECU's contention that the information was simply not confidential, and could never be the basis for any wrongful conduct that would support any interference claims.

Vanguard cannot disregard this Court's order providing for dismissal with prejudice. Dkt. 96. Any claims relating to the Aug. 7 fax should be stricken and disregarded, and cannot be the basis for salvaging the flawed interference claims.

## V.   **CONCLUSION**

For the foregoing reasons, VLS's motion for partial summary judgment should be denied.

Dated: December 10, 2021

IRELL & MANELLA LLP
Bruce A. Wessel

By: /s/ Bruce A. Wessel
    Bruce A. Wessel

Attorney for Defendant
Econocaribe Consolidators, Inc.

STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.

By: /s/ Darrell Payne
    Darrell Payne

By: /s/ Veronica L. de Zayas

*Pro Hac Vice* Counsel for
Defendant Econocaribe Consolidators,
Inc.

- 19 -

11045333

1

**<u>Attestation of Concurrence in Filing</u>**

2       In accordance with Local Rule 5-4.3.4(a)(2)(i), I attest that concurrence in the

3   content and filing of this stipulation has been obtained from each of the other

4   signatories who are listed on the signature page.

5

6   Dated: December 10, 2021                    Irell & Manella LLP

7

8                                               By:_____/s/ Bruce A. Wessel_____

9                                                  Bruce A. Wessel
                                                   Attorneys for Defendant
10                                                 Econocaribe Consolidators, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11045333