STEARNS WEAVER MILLER
WEISLLER ALHADEFF & SITTERSON P.A.
Darrell W. Payne, *pro hac vice*
Fla. Bar No. 773300
dpayne@stearnsweaver.com
Veronica L. de Zayas, *pro hac vice*
Florida Bar No. 91284
vdezayas@stearnsweaver.com
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-2650

IRELL & MANELLA LLP
Bruce A. Wessel, SBN 116734
bwessel@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:   (310) 277-1010
Facsimile:   (310) 203-7199

Attorneys for Defendant
Econocaribe Consolidators, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANGUARD LOGISTICS SERVICES (USA), INC., formerly known as NACA LOGISTICS (USA), INC., <br><br> Plaintiff, <br><br> vs. <br><br> GROUPAGE SERVICES OF NEW ENGLAND, LLC; ECONOCARIBE CONSOLIDATORS, INC., d/b/a ECU WORLDWIDE & ECU WORLDWIDE (USA); and DOES 1-10, inclusive, <br><br> Defendants. | Case No. 2:18-cv-00517-DSF <br><br> ECONOCARIBE CONSOLIDATORS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT <br><br> Date:  Monday, January 10, 2022 <br> Time:  1:30 p.m. <br> Judge:  Hon. Dale S. Fischer <br> Ctrm:  7D |

# **TABLE OF CONTENTS**

**Page**

I.     Introduction ...............................................................................................1

II.    Undisputed Facts ......................................................................................2

       A.     All ECU Conduct Was Permissible Business Behavior ......................2

       B.     Vanguard Did Not Ask ECU to Cease Working With NEG ...............4

III.   Argument ..................................................................................................4

       A.     Vanguard Has No Admissible Evidence of Independently
              Wrongful Conduct by ECU ...........................................................4

              1.     Independently Wrongful Conduct Is Required for a
                     Claim for Inducing Breach of Contract .....................................4

              2.     Labeling the Alleged Interference a "Conspiracy"
                     Does Not Make it "Independently Wrongful"...........................6

       B.     Vanguard Has No Admissible Evidence That ECU
              Intended to Cause Disruption or Breach of the Agreement..................7

       C.     Vanguard Has No Evidence That ECU Caused Harm to
              Vanguard .....................................................................................8

       D.     There Is No Interference With Any Specific Customers;
              Hassapis's List of 1301 Customers Does Not Save the
              Interference Claims .......................................................................9

       E.     Vanguard's Unfair Competition Claim Fails on the Merits
              and Because No Relief Is Available ....................................................11

       F.     Vanguard Fails to Provide Even a Scintilla of Evidence
              Showing a Casual Connection Between the Lack of 90-
              Day Notice and the Loss of Customers or Any Other Non-
              Speculative Damages Theory ...........................................................11

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
   7 Cal. 4th 503 (1994)...........................................................................7

6

7

*ATM Express, Inc. v. ATM Express, Inc.*,
   No. 07cv1293-L(RBB), 2009 WL 2973034 (S.D. Cal. Sept. 11,
   2009) .........................................................................................................8

8

9

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture
   Partners*,
   52 Cal. App. 4th 867 (1997) ...................................................................6

10

11

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
   11 Cal. 4th 376 (1995) ............................................................................6

12

13

*Dryden v. Tri-Valley Growers*,
   65 Cal. App. 3d 990 (1977) .....................................................................4

14

15

*In re Fosamax Prods. Liability Litig.*,
   707 F.3d 189 (2d Cir. 2013) ..................................................................12

16

17

*Franklin v. Dynamic Details, Inc.*,
   116 Cal. App. 4th 375 (2004)...............................................................11

18

19

*Ixchel Pharma, LLC v. Biogen, Inc.*,
   9 Cal. 5th 1130 (2020).........................................................................5, 6

20

21

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ..........................................................................6

22

23

*Milton H. Green Archives Inc. v. CMG Worldwide, Inc.*,
   No. CV 05-2200 MMM, 2008 WL 11334030 (C.D. Cal. Mar. 17,
   2008) .........................................................................................................9

24

25

*PMC, Inc. v. Saban Entm't, Inc.*,
   45 Cal. App. 4th 579 (1996) ...................................................................6

26

27

*Pollara v. Radiant Logistics Inc*,
   No. CV 12-0344 GAF, 2013 WL 12113385 (C.D. Cal. May 30,
   2013) .........................................................................................................5

28

**Page(s)**

*Reeves v. Hanlon*,
   33 Cal. 4th 1140 (2004)...........................................................................5

*T.L. Martin v. U-Haul Co. of Fresno*,
   204 Cal. App. 3d 396 (1988) ...............................................................12

*Triton Energy Corp. v. Square D Co.*,
   68 F.3d 1216 (9th Cir. 1995) ...........................................................4, 11

*Wyatt Tech. Corp. v. Malvern Instruments, Inc.*,
   No. CV 07-08298 DDP, 2009 WL 2365647 (C.D. Cal. July 29,
   2009) ......................................................................................................9

**Other Authorities**

Judicial Council of California Civil Jury Instructions (2020) ....................................5

# I. **INTRODUCTION**

Attempting to create factual disputes to avoid summary judgment, Vanguard inundates the court with irrelevant evidence and unfocused argument. In the end, the undisputed facts show that ECU is entitled to judgment in its favor as a matter of law.

In its opposition, Vanguard now admits that despite four years of litigation: (1) it has no evidence that NEG performed any agency or other services for ECU before December 21, 2017; and (2) it has no evidence that ECU's computer systems were operational at NEG before December 21, 2017. Dkt. 133-28 ("Hassapis Opp. Decl.") ¶¶ 5–7. Thus, the record shows that NEG did not provide any services to ECU and that NEG did not have access to the ECU computer network, until after Vanguard terminated NEG's computer access, after December 21. *See* Section II.A.

ECU at all times had permissible business discussions with NEG, and ECU had little or no involvement in the decisions that both NEG and Vanguard made in December 2021 to end their relationship. ECU did not engage in independently wrongful conduct, had no intent to interfere with the NEG/Vanguard contract, and did not cause any harm to Vanguard. In addition, as explained in NEG's motion, there was also no breach of contract by NEG. When NEG sent a termination notice on December 21, Vanguard itself made the notice effective that day by shutting off NEG's access to the Vanguard computer network and directing NEG to "discontinue" providing services. Vanguard had the options of asserting that the NEG notice was only effective in 90 days and sending a cease and desist letter to ECU. It did neither.

While most of VLS's tactics to avoid summary judgment are familiar,[1] one stands out—the sudden claimed ability of VLS to identify the names of 1301 "lost" customers. For nearly four years, VLS steadfastly refused to identify lost customers.

---

[1] The Court's Order re Motions for Summary Judgment requires the opposing party to "briefly state why it disputes the moving party's asserted fact, cite to the relevant . . . evidence, and describe what in that . . . evidence refutes the asserted fact." MSJ Order at 3. Plaintiff's lengthy argument and six pages of citations to evidence, used repeatedly, do not comply with the order, and do not create any triable issues of fact.

VLS's assertion that it "recently has been able to identify 1301" lost customers is too little, too late. It is too little because VLS provides no evidence as to why these are its "lost customers" and, if they were lost, why the loss was due to something other than the competitive nature of the marketplace. It is too late because VLS does not explain how it miraculously just learned the names and could not provide them earlier.[2]

## II.    UNDISPUTED FACTS

### A.    All ECU Conduct Was Permissible Business Behavior

The back-and-forth between NEG and ECU was permissible business behavior, and NEG cannot change that by labeling these lawful discussions a "conspiracy."

Vanguard argues that "ECU was very concerned about the 90-day notice provision and was looking for an excuse not to comply." Dkt. 133 ("VLS Opp.") at 4. But the alleged supporting evidence for this assertion is an August 11, 2017 email which states only that "there is an agency agreement in place between [NEG and VLS], and we are told it is completely one sided in favor of VLS. If [NEG] were to give notice VLS would make it very difficult for [NEG], and also for us, if we were to sign him up." *See* Dkt. 133-23. No reasonable trier of fact could read these two sentences as Vanguard does. Ultimately, this email simply demonstrates a justified concern that if NEG terminated the agreement, Vanguard would make things difficult.

VLS's December 11 notice to customers that BFT was VLS's new CFS warehouse triggered the end of NEG's relationship with VLS. Dkt. 129-18 ("Meunier Decl.") ¶¶ 10–11; PSGI[3] 43–48. Between December 11 and 21, NEG and ECU made plans so that if VLS cut off NEG, NEG would be ready to start up with ECU. VLS

---

[2] That ECU is identified as one of Vanguard's 1301 allegedly lost customers is bizarre, and suggests that there was, at best, a lack of good faith in submitting this list in opposition to defendants' motions. Hassapis Opp. Decl. Ex. 4 (No. 248 is Econocaribe Consolidators, Inc.; others include Vanguard affiliates (Nos. 480, 710–713)).

[3] "PSGI" refers to Plaintiffs' Statement of Genuine Issues, Dkt. 133-2.

1   admits there is no evidence that ECU provided services, or that NEG was operational

2   on ECU's network, before December 21. Hassapis Opp. Decl. ¶¶ 5–7.

3       The undisputed chronology of events on December 21 is that NEG delivered

4   notice, then Vanguard cut off NEG from its network and told NEG to "discontinue"

5   providing services to Vanguard. PSGI 4–8, 54–57; *see also* PSGI 74, 65–69.

6       Vanguard submits three declarations with identical conclusory language

7   arguing that "VLS had no choice except to cut off NEG's access to its computers since

8   by that date NEG was already up and running on ECU's network." Dkt. 133-41

9   ("Sanchoyerto Decl.") ¶ 10 ("felt" he had no choice); Dkt. 133-3 ("Brennan Decl.")

10  ¶ 10 (same); Dkt. 133-4 ("Donahue Decl.") ¶ 6.[4] But there is no admissible evidence

11  that NEG was "up and running on ECU's network" when Vanguard cut off NEG's

12  access to Vanguard's computers mid-day on December 21 after receiving NEG's

13  notice, and it is not true. None of Vanguard's witnesses claim to have personal

14  knowledge of the status of ECU's computer network on December 21. Vanguard does

15  not submit any admissible evidence from a forensic expert, a customer, nor from any

16  other witness showing that NEG was booking customers for ECU before December

17  22. *See* Dkt. 145 ("Defendants' Evidentiary Objections") at 5–6. The only admissible

18  evidence is that NEG was ***not*** "up and running" on ECU's computer network until

19  after December 21. The Abisch Declaration confirms:

20      ECU did not and would not provide any access to ECU's computer systems,
        or allow NEG to take any customer orders or represent ECU, until after the
21      Vanguard relationship was terminated. This happened when Vanguard cut off
        NEG's computer and customer access. . . . NEG was not provided access to
22      the ECU computer or booking system, and never provided access to the ECU
        computer network or booking system, and never provided any agent services
23      to ECU, until after December 21, 2017, likely on December 22, 2017 or
        December 23, 2017.
24

25  Abisch Decl. ¶ 17; Dkt. 134-15 (Abisch Dep.) at 214:1–13, 217:1–7; 272:6–16 (no

26  access until after Vanguard terminated/cut off NEG access); PSGI 30, 53, 58–62.

27  _____

28  [4] They could have demanded cooperation during a transition, which they did not do.

**B.    Vanguard Did Not Ask ECU to Cease Working With NEG**

Vanguard chose to make the termination notice effective on December 21 and that is what ended the Vanguard/NEG contract. It is undisputed that no one at Vanguard contacted ECU on December 21 to assert any continuing contract rights, or to contact ECU at any time during December to tell ECU to cease working with NEG. *See* PSGI 32, 15, 11. Because Vanguard did not contact ECU—there was no "cease and desist" letter, for example—Vanguard effectively confirmed that ECU could work with NEG going forward. Vanguard cannot claim now that ECU interfered with the NEG/Vanguard relationship because it was Vanguard that chose not to put ECU on notice that there were issues and unilaterally decided to cut off NEG's ability to continue to service customers using Vanguard's systems. ECU cannot be held responsible for Vanguard's own strategic decisions or its unsubstantiated "feelings" about the nature of the NEG/ECU business relationship on December 21.

## III.    ARGUMENT

VLS's opposition fails to create a disputed issue of fact for trial because it does not rely on direct evidence for the truly material facts, but on inferences, and the necessary "quantum or quality" of evidence is lacking. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The inquiry on summary judgment is "whether the nonmoving party has come forward with sufficiently 'specific' facts from which to draw reasonable inferences about other material facts that are necessary elements of the nonmoving party's claim." *Id.* VLS has not met its burden to show independently wrongful conduct, intent, causation, and damages. *See Dryden v. Tri-Valley Growers*, 65 Cal. App. 3d 990, 997 (1977) ("repeatedly held that . . . unjustifiably inducing another to breach" requires breach "by reason of the defendant's wrongful act").

**A.    Vanguard Has No Admissible Evidence of Independently Wrongful Conduct by ECU**

**1.    Independently Wrongful Conduct Is Required for a Claim for Inducing Breach of Contract**

- 4 -

Inducing or encouraging the termination of an at-will contract—alone, without a separate wrongful act—is not actionable in California after *Ixchel Pharma, LLC v. Biogen, Inc*., 9 Cal. 5th 1130 (2020). VLS's argument that *Ixchel* does not apply to an inducement claim is wrong as a matter of law. Describing the elements of an interference claim, the court in *Ixchel* specifically included inducement to breach as a subset of an interference claim. *Id.* at 1141 (defendant's "intentional acts designed ***to induce a breach*** or disruption of the contractual relationship" (emphasis added)). Where an at-will contract is involved, *Ixchel* controls and applies to both interference and inducement claims. *Ixchel* explains the history of interference torts in California noting that, in *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1145 (2004), it previously held "that a plaintiff must plead independent wrongfulness to state a claim for interference with a specific category of at-will contracts: employment contracts." *Ixchel Pharma, LLC,* 9 Cal. 5th at 1145. *Ixchel* expanded *Reeves* to all at-will contracts. *Id.* at 1148. *Reeves*, like *Ixchel*, also mentioned inducement in holding "that inducing the termination of an at-will employment relationship [is only] actionable under the standard applicable to claims for intentional interference with prospective economic advantage. . . . A plaintiff must plead and prove that the defendant engaged in an independently wrongful act[.]" *Reeves*, 33 Cal. 4th at 1144–45. At-will contracts involve no legal assurance of future business, and only a mere expectancy, so competition is fostered when competitors offer more money and make "use of persuasion and other suitable means" as part of normal business conduct. *Id.* at 1151–52.

VLS's reading of *Ixchel* is unreasonable and ignores California's interest in robust marketplace competition. *See Ixchel*, 9 Cal. 5th at 1148 ("requiring independent wrongfulness" is necessary to avoid "chilling legitimate business competition").[5] No court has read *Ixchel* to create the massive loophole that VLS's

---

[5] An "interference claim 'is slightly broader [than an inducement claim] in that it protects against intentional acts not necessarily resulting in a breach.'" *Pollara v. Radiant Logistics Inc*, No. CV 12-0344 GAF (SPx), 2013 WL 12113385, at *12 (C.D. Cal. May 30, 2013) (citation omitted); *compare* Judicial Council of California Civil

inducement claim requires. That lack of notice was not an issue in *Ixchel* is immaterial; *Ixchel* establishes that any suit challenging termination of at-will contracts, whether for interference or inducement to breach, must show independent wrongful conduct.

Vanguard now appears to have finally conceded that NEG had the absolute right to terminate the at-will contract, and therefore Vanguard now only asserts a legal objection to the termination without 90 days' notice. As explained below, ECU did not cause NEG to give the notice that it gave and Vanguard is estopped from objecting to the lack of notice because it cannot argue that it did not consent to the termination. Indeed, Vanguard admits that it was the one that chose to terminate on December 21, supposedly in order to "mitigate its damages." VLS Opp. at 8–9.

### 2. Labeling the Alleged Interference a "Conspiracy" Does Not Make it "Independently Wrongful"

VLS spends pages of its brief discussing its contention that ECU and NEG conspired to breach the contract. VLS Opp. at 10–16. But that is just putting a different label on the same facts that are purportedly the inference. To be independently wrongful, the conduct must be wrongful by some legal measure other than the fact of the interference itself. *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392–93 (1995); *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture Partners*, 52 Cal. App. 4th 867, 881 (1997) (granting summary judgment because competition privilege permitted defendant to offer more lucrative lease terms). The conduct must be unlawful; it must be proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard. *Ixchel Pharma, LLC*, 9 Cal. 5th at 1142. The conduct must fall outside the privilege of fair competition. *PMC, Inc. v. Saban Entm't, Inc.*, 45 Cal. App. 4th 579, 595, 603 (1996), disapproved on other grounds in *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 n.11 (2003).

---

Jury Instructions (2020) CACI No. 2200 (inducing breach of contract), *with* CACI No. 2201 (interference with contract). The former requires breach; the latter does not.

1   ECU's conduct consisted of legitimate offers, negotiations, exchanges of price

2   and deal terms, and preparations for future potential business. *See* Dkt. 131-1 (ECU

3   Motion) at 7–9; Dkt. 136 (ECU Opp. to VLS Motion) at 6–17. This conduct qualifies

4   as fair competition, and not independently wrongful conduct, as a matter of law. *See*

5   ECU's 5th, 11th, 12th, and 13th Affirmative Defenses. Dkt. 99 at 13–14.

6   Vanguard claims that a "civil conspiracy" is an independently wrongful act.

7   That is not correct. "Conspiracy is not a cause of action, but a legal doctrine that

8   imposes liability on persons who, although not actually committing a tort themselves,

9   share with the immediate tortfeasors a common plan or design in its perpetration . . .

10  a coconspirator incurs tort liability co-equal with the immediate tortfeasors." *Applied*

11  *Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–11 (1994). Breach of

12  contract is not a tort and, in any event, Vanguard has not pled nor asserted a conspiracy

13  count because there has never been evidence to plead such a claim. Vanguard's bald

14  argument that ECU and NEG "conspired" to breach the agreement is just describing

15  the conduct complained of. It is not independently wrongful.

16  **B.   Vanguard Has No Admissible Evidence That ECU Intended to**
17  **Cause Disruption or Breach of the Agreement**

18  Responding to the fact that ECU did not intend to disrupt the NEG/Vanguard

19  contractual relationship (PSGI 33), Vanguard argues that getting an opinion about the

20  enforceability of the post-termination non-compete "proves that ECU and NEG were

21  strategizing how to breach the Agency Agreement." Opp. at 16. No reasonable trier

22  of fact could accept that argument. Analyzing a contract so as to respect terms if

23  enforceable shows respect for the contract and the law, not an intent to breach.[6] That

24  NEG and ECU were prepared for Vanguard to cut NEG off shows an intent to be

---

[6] Vanguard admits that its "claims are not based on NEG breaching the post-termination non-compete." VLS Opp. at 16. But Vanguard threatened to enforce the unenforceable non-compete in its December 21 letter, which "remind[s] NEG of its [post-termination] non-compete obligations[.]" Meunier Decl. Ex. E at 2.

prepared, not an intent to interfere. NEG had to be prepared because it was concerned that Vanguard would assert a right of immediate termination, which it did.

Likewise, it was always NEG's decision whether or not to terminate, and it was NEG's final decision, after consulting with its counsel, about how to terminate and the form of notice. ECU was not involved. PSGI 27, 29.[7] Vanguard argues this court can put aside this evidence and "infer" an intent by ECU to compel NEG to not provide 90-days' notice. VLS Opp. at 13, 15. But Vanguard fails to point to any evidence that this inference is *justifiable*. *See, e.g.*, *ATM Express, Inc. v. ATM Express, Inc.*, No. 07cv1293-L(RBB), 2009 WL 2973034, at *8–9 (S.D. Cal. Sept. 11, 2009) (granting summary adjudication because defendant's knowledge of plaintiff's use of tradename did not demonstrate justifiable inference of bad intent).

Vanguard relies on the August 11, 2017 email (VLS Opp. at 15) but that email confirms there was no discussion of any 90-day notice period or suggestion that NEG not comply with any notice provisions. *See* Section II, above. The other facts cited by Vanguard only focus ECU's plans for the post-termination transition, which include no mention of not complying with any notice period.

## C. Vanguard Has No Evidence That ECU Caused Harm to Vanguard

In late November and early December 2017, Vanguard and NEG engaged in a spirited debate about the interrelationship between the agency and warehouse arrangements, and Vanguard twice notified customers that BFT would be its new CFS. VLS Opp. at 4–5. NEG's attorney drafted the notice of termination sent to Vanguard on December 21. ECU was uninvolved in the parties' debate and in drafting

---

[7] Vanguard objects to the undisputed fact that NEG's lawyer was involved and claims this is an "advice of counsel" defense. It is not. It is evidence that ECU knew that NEG and its counsel were dealing with Vanguard and handling the termination logistics themselves without ECU's involvement. Vanguard makes conclusory arguments, with unfocused citations, but offers no direct evidence controverting the fact that ECU was not involved. PSGI 27, 29. Rather, the only evidence is that ECU wanted NEG to "professionally terminate." Abisch Decl. Ex. D.

the notice letter. During this critical timeframe, there is no evidence that NEG and ECU ever discussed whether the notice would be effective immediately or in 90 days, because such discussions did not happen. ECU was not involved in that aspect of the notice. PSGI 27, 29. The evidence does show that NEG and ECU were concerned that Vanguard would terminate immediately, and cut off NEG's customer access, when it received the notice. However, Vanguard was the cause of NEG deciding to send the notice, and Vanguard was the cause of the termination becoming effective on December 21. ECU was not the cause of any of this and as a matter of law cannot be held liable. Even if discussion of non-competes or deal terms, or offers to provide working capital, were wrongful, nothing ECU did was the cause of harm to Vanguard.

### D.    There Is No Interference With Any Specific Customers; Hassapis's List of 1301 Customers Does Not Save the Interference Claims

Vanguard does not identify any wrongful acts by ECU that interfered with customer relationships and does not identify any customers interfered with. As a matter of law, a plaintiff cannot assert a claim for interference with customer relations without identifying the customers and the wrongful act that the defendant engaged in. *See Milton H. Green Archives Inc. v. CMG Worldwide, Inc.*, No. CV 05-2200 MMM (MCx), 2008 WL 11334030, at *20 (C.D. Cal. Mar. 17, 2008) (granting summary judgment where the plaintiffs did not identify a specific buyer or an existing economic relationship); *Wyatt Tech. Corp. v. Malvern Instruments, Inc.*, No. CV 07-08298 DDP (MANx), 2009 WL 2365647, at *24 (C.D. Cal. July 29, 2009) (granting summary judgment; "simply competing for business" is not actionable).

VLS now relies upon a new list—apparently created out of whole cloth—of 1301 "lost" customers. Hassapis Decl. Ex. 4. The "1301 list" was never before identified in any pleading or any discovery. *See, e.g.*, PSGI 21. In March 2019, VLS swore it did not know the names of lost customers, and in May 2021, VLS's in-house counsel George Hassapis again refused to name lost customers, swearing that "Vanguard's damages are based on the loss of business . . . rather than the loss of

specific individual customers." Dkt. 129-5 (Interrog. No. 11 Resp.); Dkt. 129-6 (Interrog. No. 12 Resp.). VLS's failure to identify lost customers was hotly contested, and the Court ultimately granted ECU's motion to compel. *See, e.g.*, Dkt. 112 (ECU's motion to compel) at 6, 7, 9; Dkt. 117 at 10 (VLS claims it could not identify documents showing losses re any particular customer); Dkt. 121 (ECU's motion to compel reply) at 5; Dkt. 124 (granting motion to compel). VLS also again represented that "VLS is not claiming any losses of any particular customers[.]" Dkt. 117 at 10.

The new "1301 list" is entirely without foundation or explanation. *See* Defendants' Evidentiary Objections. There is no showing the declarant had any personal knowledge or involvement in identifying the supposedly lost customers, particularly because the declarant only claims to be familiar with VLS's employment records. Hassapis Opp. Decl. ¶ 2. There is no explanation as to why this information has been withheld (or could not have been discerned by Vanguard) over the course of more than three years of discovery. The list appears to be a cobbled-together afterthought, at best, or perhaps a fraud, at worst. Would Vanguard be entitled to any lost profits because it somehow claims it "lost" the business of its own affiliates or subsidiaries? Of course not. But, as noted above, the list reveals that Vanguard asks this Court to rely on evidence that Vanguard's own affiliates are "lost customers." *See* Hassapis Opp. Decl. Ex. 4 at Nos. 480, 710–713. Vanguard also has the unmitigated gall to claim that Defendants (ECU and NEG) are also "lost customers." *Id.* at Nos. 248, 1021. The list has no evidentiary value because it also includes competitors like Shipco and Carotrans, and many, many customers that were booking or requesting quotes with Vanguard, as of April 2018. *Compare* Dkt. 143, *with* Hassapis Opp. Decl. Ex. 4 (Nos. 139–142, 600, 516–518, 695, 259–260, 97, 94–95, 559, 1259, 738–739, 417, 114–116, 120–127, 153–155, 500, 1025, 1028, 1243, 900, 83–86, 273, 748, 184–188, 955–956, 1221, 1222). This Court should not countenance such a contrived attempt to use improper and unsubstantiated "evidence" to evade dismissal on

summary judgment. *Triton Energy Corp.*, 68 F.3d at 1222 (granting summary judgment where experts in product defect case failed to examine the product).

### E. Vanguard's Unfair Competition Claim Fails on the Merits and Because No Relief Is Available

None of ECU's conduct constitutes unfair competition. Moreover, Vanguard has not identified any relief available under California's statutory unfair competition law, which does not permit damages.

### F. Vanguard Fails to Provide Even a Scintilla of Evidence Showing a Casual Connection Between the Lack of 90-Day Notice and the Loss of Customers or Any Other Non-Speculative Damages Theory

Vanguard's only damages theory is for ten years of lost profits, for an at-will contract. Dkt. 117 at 2 (extrapolating claimed net profit over 10 years). But loss of ten years of profits was not proximately caused by lack 90 days' notice. To have damages for lack of notice, Vanguard would have to identify specific customers it lost that it contends that it would have kept, but for the lack of notice. Vanguard's implicit assertion that a "loss of net profits" theory absolves it from proving causation (VLS Opp. at 22-23) is wrong. There must be evidence showing how the wrongful conduct caused some loss. *See Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 391 (2004) (plaintiff must prove causation). Even if ECU were involved with NEG's alleged failure to give notice (it wasn't), Vanguard identifies no evidence—e.g., customer emails, sworn testimony, financial documents, shipping records, etc.—that demonstrates any causal connection between any lack of 90-day notice and any particular decision by even one customer to stop doing business with Vanguard or reduce its Vanguard shipments. Moreover, there is no evidence of how the supposed loss of opportunity resulted in reduced sales or profits.

The fact that there is no causation evidence as to any specific customer is consistent with the undisputed fact that Vanguard continues to have business in New England. PSGI 25. Why would a customer decide to reduce, but not eliminate, its

- 11 -

business with Vanguard because of some alleged wrongful act, like a lack of notice? How could a lack of notice have caused less sales with a particular customer, like Fedex or Bollore, in contrast to a complete loss of the "opportunity" to have sales? Vanguard presented no evidence explaining how a lack of notice caused any particular customer loss.[8] There is nothing unique about the transportation market that would cause a loss of only part of a customer's business. There is no evidence of any lost opportunity or sales, with any one customer, because of anything that ECU did. The only competent evidence shows a robust market, with ECU and Vanguard (along with Carotrans, Shipco, etc.) competing—on price and service—for customers who regularly share their business with many NVOs. Abisch Decl. ¶¶ 24–26 (active competition in market; no wrongful conduct like bribes, coercion or fraud).

Moreover, Vanguard's argument that it cut off NEG from its network on December 21 to mitigate damages demonstrates that Vanguard had the ability to mitigate damages by talking to customers directly, rather than leaving NEG as its agent for 90 days. Vanguard's only damages theory (seeking damages for a 10 year period after termination of an at-will contract) does not fit with the claims Vanguard is pursuing (alleged breach of lack of 90-day notice). Under the at-will contract, a 10-year damage period is speculative. The only damages theory Vanguard could pursue has been waived because Vanguard presented no evidence of specific, recoverable damages based on what actually happened during the 90 day period. *See T.L. Martin v. U-Haul Co. of Fresno*, 204 Cal. App. 3d 396, 409–11 (1988) (limiting recoverable damages to notice period).[9]

---

[8] Vanguard's conclusory expert reports do not help Vanguard avoid summary judgment. *See* Defendants' Evidentiary Objections; *In re Fosamax Prods. Liability Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) ("Although we have typically applied the sham issue of fact doctrine where a party submits an affidavit that contradicts the party's own prior statements, it may also apply when a party attempts to use evidence from an expert witness to defeat summary judgment."). In fact, neither the Luna nor Howard report connects any customer's lost business to any lack of notice or bad act.

[9] Vanguard's evidence does not support liability, damages, or punitive damages.

1

2     Dated: December 21, 2021                    IRELL & MANELLA LLP
                                                  Bruce A. Wessel
3

4                                                 By: /s/ Bruce A. Wessel
5                                                     Bruce A. Wessel

6                                                     Attorney for Defendant
                                                      EconoCaribe Consolidators, Inc.
7

8
                                                  STEARNS WEAVER MILLER
9                                                 WEISSLER ALHADEFF &
                                                  SITTERSON, P.A.
10
                                                  By: /s/ Darrell Payne
11                                                    Darrell Payne
12

13
                                                  By: /s/ Veronica L. de Zayas
14

15                                                    *Pro Hac Vice* Counsel for
                                                      Defendant EconoCaribe Consolidators,
16                                                    Inc.

17

18

19

20

21

22

23

24

25

26

27

28

## **Attestation of Concurrence in Filing**

In accordance with Local Rule 5-4.3.4(a)(2)(i), I attest that concurrence in the content and filing of this stipulation has been obtained from each of the other signatories who are listed on the signature page.


Dated:  December 21, 2021                   Irell & Manella LLP



                                            By:_____/s/ Bruce A. Wessel_____
                                                Bruce A. Wessel
                                                Attorneys for Defendant
                                                Econocaribe Consolidators, Inc.