STEARNS WEAVER MILLER
WEISLLER ALHADEFF & SITTERSON P.A.
Darrell W. Payne, *pro hac vice*
Fla. Bar No. 773300
dpayne@stearnsweaver.com
Veronica L. de Zayas, *pro hac vice*
Florida Bar No. 91284
vdezayas@stearnsweaver.com
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-2650

IRELL & MANELLA LLP
Bruce A. Wessel, SBN 116734
bwessel@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:   (310) 277-1010
Facsimile:   (310) 203-7199

Attorneys for Defendant
Econocaribe Consolidators. Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANGUARD LOGISTICS SERVICES (USA), INC., formerly known as NACA LOGISTICS (USA), INC.,<br><br>Plaintiff,<br><br>vs.<br><br>GROUPAGE SERVICES OF NEW ENGLAND, LLC; ECONOCARIBE CONSOLIDATORS, INC., d/b/a ECU WORLDWIDE & ECU WORLDWIDE (USA); and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:18-cv-00517-DSF-GJS<br><br>**DEFENDANT ECU'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW PURSUANT TO LOCAL RULE 16-4**<br><br>Pretrial Date: October 3, 2022<br>Time: 3 P.M.<br>Trial Date: October 18, 2022<br>Judge: Hon. Dale S. Fischer<br>Courtroom: 7D |

Defendant Econocaribe Consolidators, Inc. ("ECU") respectfully submits this Memorandum of Contentions of Fact and Law pursuant to L.R. 16-4. Plaintiff Vanguard Logistics Services (USA), Inc. ("VLS") has two claims seeking damages against ECU. Claim 7 is for inducing breach of the contract between VLS and defendant Groupage Services of New England, LLC ("NEG") and Claim 8 for interference with the same contract.

## I.   DEFENDANT'S CLAIMS AND DEFENSES (L.R. 16-4.1)

### A. Summary Of Plaintiff's Claims (L.R. 16-4-1(a))

The operative complaint is VLS's Second Amended Complaint ("SAC").  As a result of the Court's summary judgment order dated February 8, 2022 (Dkt. 153), VLS has three remaining claims against ECU: (1) inducing NEG to breach its at-will contract with VLS (Claim 7); (2) interference with VLS's at-will contractual relations with NEG (Claim 8); and (3) violation of California's Unfair Competition Law ("UCL"), Calif. Bus. & Prof. Code Sec. 17200 et seq. (Claim 10), arising from the same conduct alleged for Claims 7 and 8.  The Court entered summary judgment in ECU's favor on VLS's claim for interference with prospective economic advantage (Claim 9), and dismissed VLS's UCL claim (Claim 10) to the extent it was based on Claim 9.  The Court ruled that VLS cannot seek a monetary award for equitable relief under the UCL claim (Claim 10).

NEG made the decision to terminate its agreement with VLS on its own and made the decision on when and how to terminate the agreement on its own. ECU did not intend to cause or cause a breach of the agreement. ECU also did not interfere with that agreement.

### B. Elements Required To Establish Plaintiff's Claims (L.R. 16-4.1(b)) and Defendant's Brief Description of Key Evidence in Opposition (L.R. 16-4.1(c))

This Memo seeks to avoid repetition as the evidence related to the remaining three claims is essentially the same. VLS's UCL claim (Claim 10) is derivative of its other claims, and the elements of a claim for interference with contractual relations (Claim 8) are the similar those for inducing breach of contract (Claim 7).

1) Claim 7 against ECU: Inducing Breach of Contract:

As to claim 7, for inducing breach of contract, the elements are: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach of the contract; (4) actual breach of the contract; and (5) resulting damage. *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998), *as modified* (Sept. 23, 1998); *Pac. Gas & Elec. Co. v Bear Stearns & co.*, 50 Cal. 3d 1118, 1129 (1990). *See also Dryden v. Tri-Valley Growers*, 65 Cal. App. 3d 990, 997 (1977) (inducement claim requires proof that contract breached by reason of defendant's wrongful act and that such act was the moving cause thereof).

The inducement element requires plaintiff to show that the defendant actively and affirmatively induced a breach. *Imperial Ice v. Rossier*, 18 Cal.2d 33, 37 (1941). "One does not induce another to commit a breach of contract with a third person ... when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person.... For instance, B is under contract to sell certain goods to C. He offers to sell them to A, who knows of the contract. A accepts the offer and receives the goods. A has not induced the breach and is not subject to liability." *ACO Pacific v. ACO*, 70 F.3d 1277 (9th Cir. 1995) (applying California law). NEG made all the decisions about its contractual relationship with VLS on its own. ECU did not induce NEG to breach the agreement (if there is a finding of breach, which should not occur.)

Finally, the fifth element (causation) requires that a plaintiff prove causation by showing that the conduct of a defendant is a substantial cause of the alleged

damage. *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 391 (2004). ECU did not cause NEG to terminate the agreement and did not direct or cause the form of notice that NEG gave.

Because VLS proffered no evidence that the lack of 90 days' notice was a substantial cause of any reduced sales, VLS fails to satisfy the standard for recovery of damages. Proof of damages cannot be speculative. *Assoc. Gen'l Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 532 n.26 (1983). Lost profits damages must be proven to be certain as to their occurrence and their extent. *Lewis George Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 3 Cal. 4th 960, 975 (2004). No damages can be recovered for breach of contract that are not clearly ascertainable in both their nature and origin. Cal. Civil Code section 3301. Moreover, damages resulting from any breach of contract that is terminable upon the giving of notice is limited to the period of the notice. *Martin v. U-Haul Co. of Fresno*, 204 Cal. App. 3d 396, 407 (1988).

2) <u>Brief Description of Evidence in Opposition to Claim 7</u>

VLS cannot satisfy the third element of Claim 7 because there is no evidence that ECU engaged in any intentional acts designed to induce a breach of the VLS-NEG Agreement.  In particular, the only evidence before the Court is that ECU did not request, encourage nor induce NEG to breach any provision of the agreement, including the 90-day notice provision in the Agreement.  VLS's breach of contract claim is not based upon and does not allege a breach of Section 2.02(a) (the non-compete) of the Agency Agreement for conduct that occurred after the term of the Agreement.  In addition, VLS cannot satisfy the fifth element of Claim 7 because there is no evidence that VLS lost any business or customers as a result of the alleged breach of the 90-day notice provision.  As for the claims against ECU, the Court must separately evaluate the elements of these claims, independently of

whether there was any breach of the VLS-NEG agreement. Of course, if NEG did not breach the agreement there can be no claim against ECU for inducing breach.

*Key Evidence*

1.      Plaintiff Vanguard Logistics Services (USA), Inc. ("VLS") and Defendant Groupage Services of New England, LLC ("NEG') entered into the agency agreement on April 17, 2008 and entered into the operative agreement in this case on December 12, 2013 ("Agreement").

2.      Pursuant to the terms of the Agreement, either party could terminate the agreement on 90 days' notice, and VLS could terminate immediately if there was a breach of the agreement by NEG. The Agreement was, therefore, an at-will agreement.

3.      John Abisch was an executive at Defendant Econocaribe Consolidators, Inc. ("ECU") from 2013 to 2019, serving as Regional Chief Executive Office for North America and the Caribbean.

4.      Joe Meunier is the owner and CEO of NEG. Mr. Abisch has known Mr. Meunier for more than 15 years. They have worked together as members of the industry association known as the National Customs Brokerage and Freight Forwarders Association of America.

5.      Mr. Meunier and Mr. Abisch talked many times over the years about working together. In late 2016, Mr. Meunier told Mr. Abisch that NEG had a right to terminate its at-will agreement with VLS and that NEG's counsel had concluded that the non-compete in the VLS agreement was not enforceable post-termination.

6.      In early December 2016, Mr. Abisch told Mr. Meunier that ECU's counsel agreed the non-compete was not enforceable post-termination.

7.      On December 6, 2016, Mr. Abisch told Mr. Meunier in writing that ECU did not want to receive any confidential information from NEG.

8.      Separately, VLS and NEG were having disputes regarding their business. In June 2017, because VLS was dissatisfied with its profits relating to the Agreement,

- 4 -

VLS asked NEG to accept reduced income under the Agreement by increasing a refund NEG was obligated to pay VLS for certain services relating to NEG's warehouse or Container Freight Station ("CFS") business.

9.    NEG did not agree to the changes, and in August 2017, VLS began discussions with Boston Freight Terminals ("BFT") about terminating its CFS/warehouse arrangement with NEG and replacing NEG with BFT.    VLS's strategy was to "pull some business" from NEG in order to "push [Mr. Meunier] to renegotiate" and to "force [NEG] to rethink [its] position."

10.    VLS knew that NEG might end its relationship with VLS, and it might lose the NEG routings and other business, if it terminated NEG's warehouse business. VLS negotiated a deal with BFT that "doubles our CFS refund," resulting in additional profits estimated to be $212,000 per year.

11.    In August of 2017, around the same time that VLS started talking with BFT, Mr. Meunier of NEG told Mr. Abisch of ECU that NEG was potentially interested in doing business with ECU.

12.    The two discussions – one initiated by VLS and the other initiated by NEG – were confidential. NEG did not know about the VLS conversation. VLS did not know about the NEG conversation. Both NEG and VLS understood that their agreement was terminable at will and logically understood that other might consider termination at some point.  ECU also understood that the NEG/VLS relationship was an at-will.

13.    During October 2017, NEG and ECU discussed what the terms of a potential agreement would look like, if NEG decided to terminate its at-will agreement with VLS. This was not a binding agreement but the outlines of what a future agreement might look like. Mr. Abisch was interested in proceeding with the opportunity, but only if NEG want to terminate its relationship with VLS and do so professionally and properly.

14.    On November 27, 2017, after VLS became confident it would retain a significant customer even if NEG decided to terminate, David Sanchoyerto of VLS told Mr. Meunier that VLS was terminating its CFS/warehouse relationship with NEG for imports, which was the more profitable part of the CFS business. Mr. Meunier told Mr. Sanchoyerto that VLS's termination violated the agreement. Mr. Sanchoyerto disagreed. Email communications on this issue followed.

15.    On December 11, 2017, VLS sent notice to customers that BFT was its new warehouse, displacing NEG. The notice did not mention NEG, and was unclear as to whether it applied to both imports and exports.  VLS never coordinated with NEG on the warehouse transition to BFT.

16.    Because a substantial amount of NEG's revenue came from the warehouse business, Mr. Meunier decided that NEG/VLS relationship was no longer economically viable and that he had to terminate NEG's relationship with VLS, as was his right under the agreement. Further, Mr. Meunier did not believe it made sense to split warehouse and agency services as VLS had decided to do.

17.    Mr. Meunier explained to Mr. Abisch that he was concerned that VLS would not cooperate in a reasonable transition or wind-down period and that VLS might immediately cut off NEG from all computer systems, booking and tracking software, and NEG's customers.  NEG was completely reliant on VLS for this infrastructure.  ECU provided computer training and some laptops, to be used only as a backup plan if VLS immediately cut off computer access and decided not to cooperate during the transition period. On December 20, 2017, Mr. Abisch recommended that NEG wait until it learned how VLS reacted, before NEG put out any information to customers proactively.

18.    NEG delivered a notice of termination to VLS on December 21, 2017 and VLS responded by cutting off NEG's access to VLS computers and computer systems as NEG had feared.  NEG made its own decisions, as guided by its own counsel, on how to terminate with VLS. ECU did not provide any feedback, legally

or otherwise, about the language in the termination notice. ECU relied on NEG and its counsel as to how NEG would provide any notice. ECU did not do anything intentionally to cause NEG to breach the agreement, as it related to notice or any other contract obligation. Mr. Abisch always let Mr. Meunier know that ECU wanted NEG to comply with its contractual obligations to VLS.

19.     VLS stipulated that it is not seeking damages for any lost business occurring before December 21, 2017. VLS admitted that its breach of contract claim is not based upon and does not allege a breach of Section 2.02(a) (the non-compete) of the Agency Agreement for conduct that occurred after the term of the agreement. Also, VLS dismissed its trade secrets and confidentiality claims. The only remaining basis for its breach of contract claim is that NEG did not provide 90 days' notice of termination.

20.     Prior to December 21, 2017, NEG did not provide any services to ECU and did not act as ECU's agent. None of the communications between ECU and NEG prior to December 21, 2017 were improper or a violation of any duty by NEG. At all times, ECU respected the agreement between VLS and NEG. Moreover, VLS concedes that it was proper for NEG and ECU to discuss warehouse services at any time and it would have been proper for NEG to provide warehouse services to ECU at any time.

21.     The VLS/NEG agreement ended on December 21, 2017 based on VLS's conduct. VLS did not ask that the contract remain in effect for an additional 90 days. VLS did not tell ECU that the contract had not been terminated properly by ECU. VLS did not tell ECU that the 90-day notice provision had been violated. In fact, VLS did not contact ECU to tell ECU to ask ECU to stop doing business with NEG. To the contrary, by its silence, VLS consented to the NEG/ECU arrangement. ECU did not start doing business with NEG until after December 21, 2017. ECU did not take any customer orders from NEG, it did not arrange for any shipments, it did not rely on NEG to act as its agent, until after December 21, 2017. ECU did not allow NEG to

book shipments using ECU's laptops or customer booking software until after
December 21, 2017.

22.    Prior to December 21, 2017, ECU exchanged draft MOUs with NEG,
but none of the MOUs were final contracts.  The MOU did not bind the parties nor
result in NEG being employed by ECU or involving itself as ECU's agent.  No final
agreement was entered into or signed until May 2018, and that agreement had
additional, different terms than some of the basic terms listed in the MOU.

23.    In the days after December 21, 2017, VLS had the opportunity to meet
with customers and did so. VLS hired Joseph Pimentel to seek business for VLS from
customers handled by NEG and customers who were not handled by NEG. VLS
maintained many customers.

24.    Customers always had the right to decide which company to use whether
it was ECU, VLS, or one of their competitors such as Carotrans and Shipco. Likewise,
as an independent agent and CFS warehouse, NEG had the right to consider switching
its agency relationship from VLS to ECU, or to other competitors, like Carotrans or
Shipco. There was no prohibition that prevented NEG from pursuing or considering
competitive offers for its services, and from negotiating the potential terms of future
agreements with other competitors. ECU also had the right to compete for customers
and local agents, by making competitive offers and proposals, and by evaluating and
preparing for potential future business.

25.    ECU at all times engaged in fair competition in the marketplace. There
is no evidence that ECU did anything improper in dealing with NEG, customers or
otherwise.  ECU competed as companies do on price, service, routes, and other
factors.

*Evidence Regarding Causation and Damages*

26.    There is no evidence that the lack of 90-day notice caused VLS to lose
any customers.  VLS relies only upon its experts to try to demonstrate that reduced
customer sales due to a supposed lack of opportunity were caused by a lack of 90

days' notice, but its experienced-based expert has no opinion about whether VLS lost business or customers due to any lack of 90 days' termination notice from NEG. The same expert, Greg Howard, concluded that "there is no way" to separate out alleged wrongful conduct from other permissible ways that could have caused the alleged loss of business.

26.    Thus, there is no evidence accounting for permissible, competitive reasons for any reduction in VLS business or profits, including those relating to independent customer choices such as scope of coverage, service, price, transit times, location, etc. No customers testified that they moved business from VLS because of any lack of 90 days' notice. There is extensive evidence that customers moved their business solely for permissible competitive reasons. There is substantial evidence that VLS did not lose any customer opportunities, and had numerous meetings and opportunities to quote rates and compete for business, and did retain substantial business from even customers that kept some of their business with NEG or shifted some to ECU.

27.    Similarly, VLS's damages expert, Barbara Luna, did not analyze nor account for any other causes that explained reductions in VLS's sales or income, after termination. She assumed, relying solely on Mr. Howard to provide some conclusion as to causation, that all reductions in sales were only due to the alleged lack of 90-days' notice. Ms. Luna's damages opinion did not rely upon losses relating to other income or business or fees or additional costs, and relied solely on a comparison by customer code for a subset of the business and income covered by the Agreement, before and after termination.

28.    VLS did not analyze or account for permissible reasons that customers chose to move business from one competitor to another. VLS did not present evidence that customers refused to meet with VLS or consider competitive bids, and thus that VLS had "lost opportunities" with customers. Other than a customer-code analysis with no connection to the alleged lack of 90-days' notice, VLS did not

present evidence of any other categories of damages.  Thus, VLS failed to prove any non-speculative damages.

29.    VLS presents no damages evidence separate and apart from the issues regarding the 90-day notice.  Its experts analyzed only the impact of the lack of 90-days' notice and did not analyze any damages purportedly flowing from any other alleged contract breach.  Critically, VLS does not claim any damages for any acts occurring prior to the December 21, 2017 termination of the agreement.  Therefore, the expert opinions do not satisfy the causation or damages element of VLS's claim, for any other conduct.

3) <u>Claim 8 against ECU: Interference with Contractual Relations:</u>

The elements for tortious interference with contractual relations are: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Ixchel Pharma, LLC v. Biogen, Inc*., 9 Cal. 5th 1130, 1141 (2020) (citation omitted) ("*Ixchel*"). "The economic relationship between parties to contracts that are terminable at will is distinguishable from the relationship between parties to other legally binding contracts." *Ixchel*, 9 Cal. 5th at 1144-45 (citing *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1151 (2004)).

For a claim for interference with an at-will contract, the plaintiff must prove the additional element of independently wrongful conduct. *Ixchel*, 470 P. 3d at 1148. An act is independently wrongful only if it is proscribed by some determinable legal standard. *Id.* at 1142. As with Claim 7, the interference torts require that a plaintiff prove causation by showing that the conduct of a defendant is a substantial cause of

the alleged damage. *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 391 (2004).

4) <u>Brief Description of Evidence in Opposition to Claim 8</u>

Because the elements for this claim are nearly the same as the elements for Claim 7, ECU refers the Court to key evidence described in Section I.B(2), above.

The Agency Agreement between NEG and VLS was terminable at will, and ECU is a competitor of VLS. VLS cannot prove independently wrongful conduct by ECU. There is no fraud, no misrepresentations, and no illegal or illicit conduct such as bribes or other crimes.

ECU and NEG exchanged proposals, considered doing business in the future, and negotiated for future business prospects. None of this conduct is legally wrongful conduct. There is no legal prohibition on preparing to do business in the future or exchanging the terms of future dealings in a draft MOU or agreeing to provide future loans if the relationship went forward. None of the actions that VLS describes is proscribed by some determinable legal standard, and thus none of acts qualify as independently wrongful. Similarly, even though the evidence demonstrates that ECU did not induce NEG to breach the Agency Agreement, an inducement to breach cannot also be a basis establishing independently wrongful conduct. Otherwise, the *Ixchel* requirement of independently wrongful conduct would have no meaning.

Whether or not NEG breached the agreement by any failure to give 90 days' notice, ECU's conduct in dealing with NEG and customers in the New England market was lawful competition and not independently wrongful conduct, and thus VLS cannot prevail on its claim for interference with VLS's contractual relations with NEG.

5) <u>Claim 10: Unfair Competition (against ECU):</u>

Because this claim is derivative of VLS's Claims 7 and 8, above, ECU refers the Court to the sections above.  VLS cannot prevail on this claim either nor is there any viable remedy. *See Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 558 (9th Cir. 2010). An additional element is that proof of a UCL claim requires proof of unlawful, unfair, fraudulent acts. Cal. Bus. & Prof. Code § 17200; *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151-52 (9th Cir. 2008).

Competitive business behavior is not unlawful. *PMC, Inc. v. Saban Entm't*, 45 Cal. App. 4th 579, 603 (1996), disapproved in part on other grounds by *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003).  Competitive business behavior is permissible. "In the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability. Such acts merely maximize competition in a competitive marketplace." 45 Cal. App. 4th at 603 (citation omitted).

To obtain punitive damages VLS was required to show by clear and convincing evidence that ECU has been guilty of oppression, fraud, or malice. Cal. Civil Code section 3294. VLS cannot show such conduct by ECU.

6) <u>Brief Description of Key Evidence in Opposition to Claim 10</u>

Because the elements for this claim derivative of Claims 7 and 8, ECU refers the Court to key evidence described in Sections I.B(2) and (4), above.  ECU engaged is permissible and appropriate competition and did not engage in any unfair, unlawful, or fraudulent business activity.

Because ECU's conduct was proper competitive behavior and not independently wrongful, it also does not satisfy the standard for punitive damages.

Further, the only evidence is that ECU never intended to purposefully induce any breach or disrupt the VLS Agreement; ECU's intention was to always comply with any contractual and legal requirements and for NEG to do the same, and to only proceed with future business with NEG if NEG were able to professionally terminate in a legal and appropriate manner.

### C. Summary Of Defendant ECU's Affirmative Defenses, Elements Required, Brief Description of Key Evidence (L.R. 16-4.1(d), (e), and (f))

ECU's affirmative defenses and factual support are set forth below and grouped together where the evidentiary support is the similar. ECU incorporates NEG's affirmative defenses, and NEG's arguments and evidence.

**ECU's Second, Third, and Fourth Affirmative Defenses** -- Estoppel, Waiver, and Laches. VLS waived any and all arguments that 90 days' notice was required for NEG to terminate by not asking NEG to make the date of termination 90 days after the notice, by not telling ECU that VLS did not consider the notice effective for 90 days, and by taking affirmative steps to terminate the agreement immediately, including by cutting off NEG's computer access. VLS is estopped from arguing that it was entitled to 90 days' notice based on its conduct when it received NEG's notice on December 21, 2017. VLS unreasonably delayed notifying ECU of VLS's position on termination and thus its claims are barred by laches. NEG itself has similar defenses to the claim that NEG breached the agreement and ECU incorporates NEG's arguments.

**ECU's Fifth, Sixth, Tenth, Eleventh, Twelfth, and Thirteenth Affirmative Defenses** – Lawful Good Faith Actions, Authorized by Law, Litigation Privilege, Competition Privilege, Justification, Competition. ECU's acts are not actionable because they are lawful and proper without an intent to interfere, authorized by law,

privileged (under the litigation privilege, the competition privilege, and justification) and to hold otherwise would be a restraint of trade. VLS admits that NEG and ECU had the right to discuss a business relationship at all times. Thus VLS concedes at least some if not all of the communication between NEG and ECU was proper. VLS admits that it did not suffer any damages before December 21, 2017, the date of termination yet it still contends that there must have been some wrongful conduct prior to that date. NEG has listed the chronology of events prior to December 21, 2017 but examined individually ECU's conduct was entirely proper. ECU had a right to meet with NEG and to offer NEG more favorable terms than VLS. It had a right to plan with NEG for an orderly transition given VLS's decision to terminate the NEG warehouse/CFS relationship on December 11, 2017 and VLS's ability and threat to terminate the agreement immediately. At bottom, ECU's business activity was privileged as fair competition and VLS's effort to punish that behavior would act as a restraint of trade. Every party to an at-will agreement should understand that the other party can termination and can, before such termination, consider alternatives.

**ECU's Seventh Affirmative Defense -- <u>Unclean Hands</u>.** VLS knew about the discussions between ECU and NEG prior to December 21, 2017 and knew that VLS considered the activity to be a material breach of the agreement (even though that belief was wrong) but failed to notify NEG and ECU. VLS's conduct is inconsistent with trying to enforce its interpretation of the agreement and consistent with a plan to sue NEG and VLS. VLS is guilty of unclean hands, including representing that it "had no choice" but to terminate the agreement on December 21, 2017 when, in fact, it had other choices that it intentionally abandoned. VLS knew from the summer of 2017 that is wanted to alter its business relationship with NEG and proceeded to carefully implement that plan.  VLS took away NEG's warehouse/CFS business, knowing that it was a substantial part of NEG's income, as a part of an intentional

tactic to force NEG to re-negotiate the Agency Agreement and provide more income to VLS.  VLS's conduct was a breach of the Agency Agreement and a breach of its duty of good faith and fair dealing.

**ECU's Eighth Affirmative Defense** -- <u>Superseding Acts, Actions of Others</u>. VLS triggered the termination of the agreement when it terminate at least a part of the warehouse/CFS agreement. Further, independent decision of customers to leave VLS may have diminished VLS's business but such independent acts are not the responsibility or fault of NEG and ECU. Further evidence is presented in connection with the Ninth Affirmative Defense.

**ECU's Ninth Affirmative Defense** -- <u>Failure to Mitigate Damages</u>. VLS could have but did not work with NEG to have a transition. Instead, VLS disconnected VLS computers. VLS could have but did not competently handle its decision to change warehouses in December 2017. VLS sent out multiple notice of the change of warehouses and failed to mention NEG at all. This confused customers and disrupted the market. Further, VLS failed to take steps to maintain a presence in the New England market, and intentionally did not open a Boston office, even though it knew a local presences was important. VLS knew, as early as September 2017, that there was a risk that its decision to take away NEG's CFS/warehouse business could cause VLS to lose business and NEG routings if the Agency Agreement were terminated, and VLS did not adequately make efforts to mitigate any damages.

**ECU's Fourteenth Affirmative Defense** -- <u>No Fraudulent or Misleading Statement</u>. VLS has no evidence of fraudulent or misleading statements to the market, or to anyone, to support an unfair competition claim.

**ECU's Fifteenth, Seventeenth, Eighteenth, and Nineteenth Affirmative Defenses** – <u>Breach of Covenant of Good Faith and Fair Dealing, Prior Breach,</u>

<u>Prevention, Acquiescence.</u>  NEG's defenses to a breach of contract claim allege that VLS itself breach their agreement and the allegations and evidence presented by NEG are incorporated here. VLS's own breaches and actions prevented NEG from performing and ECU cannot be held responsible for VLS's actions.  VLS intentionally terminated NEG's CFS business for an improper purpose to try to force NEG to make concessions and pay more to VLS under the Agreement, while knowing that the termination would cause severe economic consequences for NEG, and likely force NEG to terminate its agency relationship with VLS.  VLS consented in the termination by its conduct on December 21, 2017.

**ECU's Sixteenth Affirmative Defense** -- *Ixchel*. The California Supreme Court *Ixchel* decision addresses the right of a party to terminate an at-will agreement and the role of third parties.  Because the VLS Agreement is at-will, ECU and NEG are permitted to solicit and exchange offers and proposals and NEG is permitted to withdraw from any existing contract.  To the extent that *Ixchel* adds or strengthens any defenses of ECU as the law develops post-*Ixchel*, those arguments are incorporated here.

VLS's own acts caused the harm of which it complains thus superseding any alleged harm caused by alleged improper acts of ECU. VLS's acts include terminating NEG's warehouse business and failing to take steps to delay the termination of the agreement by demanding 90 days' notice for NEG and by preventing NEG from performing. The elements of this defense require showing that VLS's conduct and acts occurred after ECU's and were a superseding cause. *Self v. General Motors,* 8 Cal. 4th 548 (1994).

The elements for the affirmative defense of privilege to protect one's own interests and justification as a defense to interference are that ECU acted only to protect its own legitimate interests, acted reasonably and in good faith, and used

appropriate means. CACI 2210. *Richardson v. La Rancherita*, 98 Cal. App. 3d 73, 81 (1979).

## II.   IDENTIFICATION OF EVIDENTIARY ISSUES (L.R. 16-4.1(h)).

The evidentiary issues have been detailed in the Daubert motions (Dkt. 157 (motion to exclude Howard); Dkt. 158 (motion to exclude Luna)), and motions in limine filed (or sought to be filed) by ECU (and NEG) (Dkt. 166 (motion to exclude evidence/argument re: post-termination non-compete violation); Dkt. 167 (motion to exclude evidence re: undisclosed "lost" customer list); and Dkt. 168 (ex parte application re: motion to exclude evidence re: dismissed claims).  Additionally, ECU lists the evidentiary issues below:

- VLS's expert opinions are flawed and speculative.
- VLS should be bound by its admission that there is no breach of contract claim relating to the non-compete, for conduct occurring after termination.
- No evidence or argument regarding the application of the non-compete, after termination, should be considered.
- Any evidence or testimony relying on information relating to damages supposedly relating to any of the 1301 supposedly "lost customers", only disclosed months after discovery, is not admissible and cannot be a basis for damages.
- VLS cannot proffer any evidence or argument suggesting that the use of confidential or trade secret information is a wrongful act or can be considered as part of VLS's remaining claims.
- VLS cannot present evidence or argument regarding the other dismissed claims, including interference with prospective economic advantage regarding customers, and equitable remedies such as unjust enrichment under the UCL.

## III.   IDENTIFICATION OF ISSUES OF LAW (L.R. 16-4.1(i))

Defendant ECU respectfully submits that at least the following legal issues remain to be decided by the Court:

A wrongful act is required for the interference claims and the inducement or any conspiracy cannot be the prerequisite wrongful act, as a matter of law. ECU's conduct in pursuing the possibility of doing business with NEG in the future (including making offers, considering the financial terms of future dealings, drafting MOUs, preparing for future business, obtaining legal advice regarding the possible transaction, making a future loan, and preparing to do business by providing training and laptops) was all permissible competitive conduct. ECU did not ask or induce NEG to give less than 90 days' notice of termination; rather, ECU communicated that NEG should follow its contractual obligations. NEG made any decisions about whether it was entitled to immediately terminate (because of VLS's prior termination of the CFS business, breach of the VLS Agreement, and/or breach of its duty of good faith and fair dealing), without relying upon or being improperly induced by ECU. ECU's conduct simply does not constitute a tort under California law.

## IV.    **BIFURCATION OF ISSUES (L.R. 16-4.3)**

ECU does not request bifurcation of any issues.

## V.    **JURY TRIAL (L.R. 16-4.4)**

The parties have stipulated to a trial of all the issues by the Court and waived a jury trial. Dkt. 156.

## VI.    **ATTORNEYS' FEES (L.R. 16-4.5)**

ECU is entitled to recover its attorneys' fees incurred in connection with VLS's dismissal of its trade secret claims (Claims 2 and 3, under the First Amended Complaint), with prejudice (*see* Dkt. 96 and Dkt. 97), pursuant to under 18 U.S.C. § 1836 (3)(D) and Cal. Civ. Code § 3426.4, because VLS's trade secret claims were in

bad faith.  Under the DTSA, the bad faith may be established by circumstantial evidence.  VLS also failed to comply with Cal. Civ. Proc. Code § 2019.210, which requires that trade secrets be identified with "reasonable particularity." *See, Loop AI Labs v. Gatti*, 2015 WL 9269758, at *3 (N.D. Cal. Dec. 21, 2015).  "Bad faith" as used in section 3426.4 consists of both "objective speciousness of the plaintiff's claim ... and [ ] subjective bad faith in bringing or maintaining the claim." *SASCO v. Rosendin Elec., Inc*., 207 Cal. App. 4th 837, 845, 143 Cal. Rptr. 3d 828, 834 (2012), as modified on denial of reh'g (Aug. 7, 2012) (awarding fees because a complete lack of evidence); *see Cypress Semiconductor Corp. v. Maxim Integrated Prod., Inc*., 236 Cal. App. 4th 243, 247, 186 Cal. Rptr. 3d 486, 490 (2015) (awarding fees where evidence showed only effort to recruit competitor's employees; plaintiff dismissed suit to avoid trial on merits); *Source Prod. & Equip. Co. v. Schehr*, No. CV 16-17528, 2020 WL 4785048, at *4 (E.D. La. Aug. 18, 2020) (award of partial fees; plaintiffs had ever-evolving conceptualization of claims and articulation of trade secrets); *Progressive Sols., Inc. v. Stanle*y, No. 16-CV-04805-SK, 2018 WL 6267837, at *4 (N.D. Cal. July 13, 2018) (absence of any evidence that plaintiff ever had potentially viable DTSA claim against defendant).

The trade secret claims, and VLS's continued pursuant of those claims over the course of 2 ½ years of litigation, were objectively specious.  VLS amended its interrogatories to attempt to identify supposedly confidential information, but never identified any trade secrets with reasonable particularity.  No documents identified as purported confidential information were ever marked as confidential.  The Agency Agreement did not identify the reports or the information in an August 7, 2017 fax as confidential. Customers, routes, shipping costs and quotes are all widely-known and shared by customers and often available on public databases. "Remembered information as to specific needs and business habits of particular customers is not confidential." *Catalogue Serv. of Westchester, Inc. v. Henry*, 484 N.Y.S. 2d 615, 616 (1985) (reversing injunction). ECU never took nor ever used any

trade secrets from Vanguard; nor did Vanguard have any such secrets. And, VLS was not diligent in abandoning its trade secret claims because ECU served a discovery response on August 28, 2018, confirming it had none of the reports at-issue, and produced documents over in 2018 and 2019, demonstrating no access to any confidential documents.

## VII.    **ABANDONMENT OF ISSUES (L.R.16-4.6)**

The following claims, counterclaims, and affirmative defenses have been dismissed:

- The Court dismissed claim 9, intentional interference with economic advantage, at summary judgment. Dkt. 153 at 14-15

- At summary judgement, the Court also found that VLS could not recover damages on claim 10. Dkt. 153 at 20-21.

- ECU dismissed its First Affirmative Defense – failure to state a claim – by this filing.

- VLS abandoned its trade secrets and confidentiality claims. *See* Dkt. 96, and Dkt. 97.

Dated: September 12, 2022

Bruce A. Wessel


By:/s/ Bruce A. Wessel
Bruce A. Wessel


STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON,
P.A.

By:/s/ Darrell Payne
Darrell Payne

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorneys for Defendant
EconoCaribe Consolidators, Inc.

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 1800 Avenue of the Stars, Suite 900, Los Angeles, California 90067-4276.

On September 12, 2022, I served the foregoing ECU Memorandum of Contentions of Fact and Law Pursuant to Local Rule 16-4 on each interested party, by email, as follows:

| | | |
|---|---|---|
| David S Porter, Esq.<br>Law Offices of David S. Porter<br>17011 Beach Blvd.,<br>Suite 900,<br>Huntington Beach, CA 92647 | Telephone: (714) 444-5992 Fax: (714) 960-9229<br>Email: dporter@dporterlaw.com | Attorneys for Plaintiff, Vanguard Logistics Services (USA), Inc. |
| Merak Eskigian<br>Mark Goshgarian<br>Goshgarian and Associates PLC<br>23901 Calabasas Road, Suite 2073<br>Calabasas, CA 91302-1542 | Telephone: (818) 519-9000<br>Fax:  (818) 591-0810<br>Email: meskigian@gmlawplc.net<br>Email: mgoshgarian@gmlawplc.net | Attorneys for Plaintiff, Vanguard Logistics Services (USA), Inc. |
| Adam P. Zaffos, Esq.<br>Fernald Law Group APC<br>510 West 6th Street, Suite 700<br>Los Angeles, CA 90014 | Telephone: (323) 410-0327<br>Facsimile: (323) 410-0330<br>Email: adam@fernaldlawgroup.com | Attorneys for Groupage Services of New England, LLC a Massachusetts limited liability company |
| Darrell Payne, Esq.<br>Veronica de Zayas, Esq.<br>Stearns Weaver Miller Weissler Alhadeff &<br>Sitterson, P.A.<br>150 W. Flagler Street<br>Suite 2200<br>Miami, FL 33130 | Telephone: (305) 789-3200<br>Fax: 305-789-2650<br>Email: dpayne@stearnsweaver.com<br>vdezayas@stearnsweaver.com | Attorneys for Econocaribe Consolidators, Inc. |
| Bruce Wessel, Esq.<br>Irell & Manella LLP<br>1800 Avenue of the Stars<br>Suite 900<br>Los Angeles, CA 90067 | Telephone: (310) 203-7045<br>Email: BWessel@irell.com | Attorneys for Econocaribe Consolidators, Inc. |

☐     (BY MAIL) I placed a true copy of the foregoing document in a sealed envelope addressed to each interested party, as stated on the attached service list. I placed each such envelope, with postage thereon fully prepaid, for collection and mailing at Irell & Manella LLP, Los Angeles, California. I am readily familiar with Irell & Manella

LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service. Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

[X]    (BY ELECTRONIC MAIL) I caused the foregoing document to be served electronically by electronically mailing a true and correct copy through Irell & Manella LLP's electronic mail system to the e-mail address(es), as stated on the attached service list, and the transmission was reported as complete and no error was reported.

Executed on September 12, 2022, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| Bruce A. Wessel | /s/ Bruce A. Wessel |
|---|---|
| (Type or print name) | (Signature) |

## MAILING LIST

| David S Porter, Esq. Law Offices of David S. Porter 17011 Beach Blvd., Suite 900, Huntington Beach, CA 92647 (by e-mail only) | Telephone: (714) 444-5992 Fax: (714) 960-9229 Email: dporter@dporterlaw.com | Attorneys for Plaintiff, Vanguard Logistics Services (USA), Inc. |
|---|---|---|
| Adam P. Zaffos, Esq. Fernald Law Group APC 510 West 6th Street, Suite 700 Los Angeles, CA 90014 | Telephone: (323) 410-0327 Facsimile: (323) 410-0330 Email: adam@fernaldlawgroup.com | Attorneys for Groupage Services of New England, LLC a Massachusetts limited liability company |
| Darrell Payne, Esq. Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. 150 W. Flagler Street Suite 2200 Miami, FL 33130 | Telephone: (305) 789-3200 Fax: 305-789-2650 Email: dpayne@stearnsweaver.com | Attorneys for Econocaribe Consolidators, Inc. |

| Bruce Wessel, Esq.<br>Irell & Manella LLP<br>1800 Avenue of the Stars<br>Suite 900<br>Los Angeles, CA 90067 | Telephone: (310) 203-7045<br>Email: BWessel@irell.com | Attorneys for<br>Econocaribe<br>Consolidators, Inc. |
| --- | --- | --- |