STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON P.A.
Darrell W. Payne, *pro hac vice*
Fla. Bar No. 773300
dpayne@stearnsweaver.com
Veronica L. de Zayas, *pro hac vice*
Florida Bar No. 91284
vdezayas@stearnsweaver.com
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-2650

IRELL & MANELLA LLP
Bruce A. Wessel, SBN 116734
bwessel@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:   (310) 277-1010
Facsimile:   (310) 203-7199

Attorneys for Defendant
Econocaribe Consolidators, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANGUARD LOGISTICS SERVICES (USA), INC., formerly known as NACA LOGISTICS (USA), INC., <br><br>          Plaintiff, <br><br>     vs. <br><br> GROUPAGE SERVICES OF NEW ENGLAND, LLC; ECONOCARIBE CONSOLIDATORS, INC., d/b/a ECU WORLDWIDE & ECU WORLDWIDE (USA); and DOES 1-10, inclusive, <br><br>          Defendants. | Case No. 2:18-cv-00517-DSF-GJS <br><br> DEFENDANT ECONOCARIBE CONSOLIDATORS, INC.'S PROPOSED FINDING OF FACT AND CONCLUSIONS OF LAW <br><br> TRIAL DATE: <br> October 18, 2022 <br> Judge: Hon. Dale S. Fischer <br> Ctrm: 7D |

Defendant EconoCaribe Consolidators, Inc. ("ECU") submits its proposed Findings of Fact and Conclusions of Law, reserving the right to supplement, post-trial.

**FINAL JUDGMENT AS TO LIABILITY**

THIS CAUSE came before the Court for a non-jury trial commencing on October 18, 2022.  The Court, having conducted the trial, received evidence, heard the testimony of the parties' lay and expert witnesses, and being otherwise fully advised in these premises, finds in favor of Defendant Econocaribe Consolidators, Inc. ("ECU") on Vanguard Logistics Services (USA), Inc., formerly known as NACA Logistics (USA), Inc.'s ("VLS" or "Vanguard") claims for inducing breach of contract and interference with contractual relations.

**FINDINGS OF FACT**

**The Parties and their Business**

1.      Vanguard is a non-vessel operating common carrier, more commonly referred to as a NVOCC or a NVO, and is licensed with the Federal Maritime Commission ("FMC"). Stip., DE 189 at § 6 ¶ 1.

2.      ECU is also an NVOCC or NVO and is licensed with the FMC. Stip., DE 189 at § 6 ¶ 2.

3.      ECU and Vanguard are major competitors of each other. Stip., DE 189 at § 6 ¶ 3.

4.      NEG is also a licensed NVOCC that has operated in the Boston and New England region for approximately 30 years. Stip., DE 189 at § 6 ¶ 4.

5.      NVOCC's generally arrange for shipments in containers that are used for intermodal transport (i.e., transfer from one mode of transportation to another). Stip., DE 189 at § 6 ¶ 5.

6.      NVOCC's commonly appoint agents throughout different geographical areas to provide sales and marketing services and support, promote their NVOCC's service offerings, serve as the local representation and the face of the NVOCC services and handle the paperwork and transactions for shipments, including preparation of house bills of lading (or "HBLs") to be issued to shippers/customers. Stip., DE 189 at § 6 ¶ 6.

- 1 -

7.    A NVOCC issues paperwork, including the HBL, documenting its obligation to carry goods from origin to destination, using primarily sea transit. Cargo is also carried by rail, air and truck. To accomplish the physical handling and transport of goods, NVOCCs often hire third-party providers such as ocean carriers, rail carriers, air carriers and motor truck carriers. Stip., DE 189 at § 6 ¶ 9.

8.    Some shipments require physical consolidation into the container at origin and deconsolidation of cargo from the containers at destination. These consolidation/deconsolidation services typically are provided by a Container Freight Station ("CFS"). Stip., DE 189 at § 6 ¶ 10.

9.    In various different markets, a NVO may own its own CFS; it may have a representative operate a CFS for the NVO; it may use an independent CFS operator that accepts shipments from a variety of NVOs; it may have some combination of some or all these options for each market. Stip., DE 189 at § 6 ¶ 11.

10.    Boston Freight Terminal ("BFT") operates a CFS warehouse in Boston, and provides CFS services to different NVOCC's. Stip., DE 189 at § 6 ¶ 12.

11.    NEG was a representative agent for VLS, and provided CFS services for VLS, for many years. Stip., DE 189 at § 6 ¶ 13.

12.    The transportation logistics business is extremely competitive.  The major NVO competitors in the industry include ECU, Vanguard, Shipco, and Carotrans, as well as other smaller players.  Abisch Decl.

13.    The customers are almost always non-exclusive.  The transportation industry is heavily regulated by the Federal Maritime Commission, and freight forwarder and other customers are well-known to the NVO competitors.  Abisch Decl.

14.    Freight forwarder customers are sophisticated and knowledgeable about the market and use different NVOs for different shipments, depending on the particular route, cargo, timing, and price.  Major customers include well-known national companies like FedEx, but local or regional freight forwarders are an important part of the business as well. Abisch Decl.

15.    Nearly all customers use multiple NVOs at the same time, and customers aggressively compare and negotiate pricing and service with the NVOs.  Abisch Decl.

**The Agreement**

16.    This litigation arises out an at-will agency agreement between NEG and Vanguard. NEG has been Vanguard's representative for many years.  The most recent agency agreements were entered into on April 17, 2008, and on December 12, 2013 ("Agreement").  The 2013 agreement is the operative agreement for this dispute.  Exs. 27; 75.

17.    The Agreement appointed NEG as Vanguard's representative for ocean exports and imports within New England, pursuant to section 2.01(a).  NEG agreed "to act exclusively as NACA's representative pursuant to section 2.01(a) and agrees not to act as a representative for any other exporter and/or importer of goods or any other NVOCC without NACA's prior written consent." Ex. 75 § 2.01(b).  NEG's responsibilities included the normal services provided by a local independent NVO, such as sales, customer service, issuing transportation documentation, and coordination regarding shipments of cargo.  Ex. 75.

18.    The Agreement also contemplated that NEG would provide similar services relating to export air shipment and NEG would be compensated for that work. Ex. 75 § 6.03.

19.    The Agreement also contained a non-exclusive warehouse services provision, in which NEG agreed to provide Vanguard non-exclusive Container Freight Station ("CFS") services, such as loading and unloading cargo into trucks at NEG's CFS warehouse, where freight is consolidated into a container for ocean shipping export or deconsolidated from a container after importation. Ex. 75 §§ 6; 7.05.  The parties agreed to certain compensation to be paid to NEG for these CFS services.  *Id.*  NEG received additional compensation directly from customers for some CFS charges.  Meunier Decl.  NEG was obligated to pay back a "refund" to Vanguard on some of NEG's CFS services.  Ex. 75 § 6.02.

20.    The Agreement was an at-will agreement, as it provided that either NEG or Vanguard could terminate the agreement "at any time upon ninety (90) days prior notice." Ex. 75 §§ 3.03(b) and (c).

21.    In addition, the Agreement gave Vanguard immediate termination rights if "NEG shall breach, default, or fail to observe or violate any term, covenant or agreement contained in this Agreement." Ex. 75 § 3.03(b)(A).

22.    The Agreement contained a "non-compete," which provides: During the term of this Agreement and thereafter for a period of one (1) year after termination of the Agreement, NEG-shall not, and shall not permit any of its employees . . . to engage, as an agent, officer, director, shareholder, owner, partner, joint venturer, lender or in any capacity, whether as an employee, independent contractor, consultant or advisor, or as a sales representative, of any business selling any products or services in direct or indirect competition with the business of [Vanguard] located or operating within (100) miles of any facility of [Vanguard]."  Ex. 75 § 2.02(a).

**Vanguard Switches the CFS/Warehouse Services from NEG to BFT
and the Relationship between Vanguard and NEG Breaks Down**

23.    There was a history of some disputes and issues between Vanguard and NEG, regarding certain payments, commission fees due to NEG, CFS charges, and other matters.  For example, the parties had an extended meeting on July 21, 2015 to try to address these ongoing issues. See e.g. Ex. 2005.   Many of the issues were not resolved. NEG was dissatisfied with its relationship with VLS. Stip., DE 189 at § 6 ¶ 15; Ex. 3077; Meunier Decl.

**NEG and ECU Discuss NEG Becoming ECU's Agent
and the Enforceability of the Non-Compete**

24.    John Abisch was a long-time executive at Defendant Econocaribe Consolidators, Inc. ("ECU"), most recently serving as Regional Chief Executive Office for North America and the Caribbean, from 2013 to 2019.  Abisch Decl.

- 4 -

25.     Joe Meunier is the owner and CEO of NEG. Mr. Abisch has known Mr. Meunier for more than 15 years. They have worked together as members of the industry association known as the National Customs Brokerage and Freight Forwarders Association of America.  Meunier Decl.; Abisch Decl.

26.     Mr. Meunier and Mr. Abisch talked many times over the years about working together.  Id.

27.     At the end of 2015, Mr. Meunier was in contact with Mr. Abisch and Tim Tudor of ECU. Among the topics discussed was NEG's dissatisfaction with VLS, and the possibility of NEG ending its agreement with VLS and entering into an agreement with ECU. Stip., DE 189 at § 6 ¶ 17.

28.     After a few months, in July of 2016, Mr. Meunier and Mr. Abisch had more communications about NEG becoming ECU's agent in Boston, but Mr. Abisch expressed his concern over the non-compete in the Agreement. Exs. 35; 36; 37.  Mr. Meunier indicated that he thought Vanguard was trying to adjust NEG's deal, particularly as to NEG's warehouse business, and that NEG should have the right to terminate.  Ex. 36.  Mr. Abisch asked Mr. Meunier to get a legal opinion to help ECU's senior officials in India feel confident that there was no legal reason preventing the parties from working together.  Id.

29.     In October of 2016, Mr. Meunier told Mr. Abisch he had a "legal pow pow with a new firm that believes we could be good." Ex. 37.

30.     On October 31, 2016, NEG's then counsel, Casner & Edwards, prepared a research memorandum directed to NEG's principal, Mr. Meunier. Stip., DE 189 at § 6 ¶ 18; Ex. 21.

31.     On November 1, 2016, NEG forwarded the Legal Opinion to ECU. Stip., DE 189 at § 6 ¶ 19.

32.     The legal opinion NEG obtained opined that NEG had a right to terminate its at-will agreement with VLS and that the non-compete in the VLS agreement was not enforceable post-termination, because covenants not to compete

are generally void in California. Ex. 21; 22; 38; 39. The legal opinion concluded that California law was the applicable law for the agreement.  Ex. 22.

33.     ECU undertook to obtain its own legal opinion regarding the enforceability of the non-compete. Exs. 39; 45, 46.

34.     In early December 2016, Mr. Abisch told Mr. Meunier that ECU's legal counsel agreed the non-compete was not enforceable post-termination. Ex. 17B.

35.     Thus, both ECU and NEG lawyers separately concluded that the post-termination non-compete provisions in the NEG/Vanguard agreement were not valid and not enforceable under California law. Stip., DE 189 at § 6 ¶ 21.

36.     In that same communication, Mr. Abisch told Mr. Meunier in writing that ECU did not want to receive any confidential information from NEG. Ex. 46.

37.     There were no substantive communications between the parties for a number of months.

### The Relationship between Vanguard and NEG Breaks Down;

### Vanguard Contacts BFT for a Quote to Replace NEG's CFS Business

38.     Separately, and around the same time as ECU and NEG were negotiating, Vanguard and NEG were having disputes and Vanguard was seeking to move business away from NEG. For example, in June 2017, Vanguard asked NEG to accept reduced income under the Agreement by increasing a refund NEG was obligated to pay Vanguard for certain services relating to NEG's warehouse/CFS business.  Ex. 1003.

39.     NEG did not agree to the changes, Ex. 1003, and, in August 2017, Vanguard began talking to Boston Freight Terminals ("BFT") about providing CFS warehouse services to Vanguard to replace NEG. Exs. 2007; 2008, 2009; see also Stip., DE 189 at § 6 ¶ 22.

### NEG Expresses More Interest in Working With ECU

40.    In August of 2017, NEG reached out to ECU and reinitiated contact on a possible future deal.  For the first time, the parties considered some specific proposals. Ex. 48.

41.    On August 11, 2017, Tim Tudor of ECU wrote to his superior, Shashi Kiran Shetty, about an "opportunity" with NEG to "make a proposal," because the relationship between NEG and VLS "is stressed: 1) The agent feels like they don't get support from VLS and all VLS does is squeeze them over and over for less commissions; and 2) (we suspect) VLS is tired of dealing with them and has been looking for ways to open up their own office and warehouse in Boston, are actively (but not aggressively) looking for a change" Ex. 49. As set forth below, Mr. Tudor was correct that VLS was negotiating its own change of warehouse/CFS services away from NEG.

42.    In August of 2017, NEG and ECU began communicating about a possible new agency agreement and financial terms for NEG to become ECU's representative in Boston. Stip., DE 189 at § 6 ¶ 23.

43.    On October 25, 2017, Mr. Abisch wrote to Tim Tudor and others at ECU that he met with the principals of NEG and that Mr. Abisch had suggestions regarding "how to take the opportunity forward for them to professionally terminate with VLS and become our agent." Ex. 57.

44.    There is no evidence that ECU ever encouraged NEG to terminate the Agreement without giving VLS 90 days' notice.

**Vanguard Switches the CFS/Warehouse Services from NEG to BFT**
**and the Relationship between Vanguard and NEG Breaks Down**

45.    After receiving a quote from BFT to replace NEG's profitable CFS business, VLS implemented a strategy to "pull some business" from NEG in order to "push [Mr. Meunier] to renegotiate" and to "force [NEG] to rethink [its] position." Exs. 182; 2010. VLS planned: "if we can make it work and pull the imports, we won't go back to NEG." Ex. 182.

- 7 -

46.    In reference to the warehouse/CFS switch from NEG to BFT, Hal Donahue of Vanguard wrote to David Sanchoyerto and Karl Laufer, also of Vanguard, that "[t]his is heating up pretty quickly so we will need to be able to make a move." Ex. 2009. Vanguard had been contemplating this switch for at least a year. Ex. 2008.

47.    VLS negotiated a deal with BFT that "doubles our CFS refund," resulting in additional profits estimated to be $212,000 per year. Exs. 1002;1010.

48.    VLS knew that it might lose NEG routings and business from one of its biggest customers if it switched the CFS from NEG to BFT. Ex. 1010.    VLS understood that its action could cause the termination of the Agreement, and have consequences for VLS.

49.    VLS was prepared to fight for customers, such as Kravet, once it terminated the CFS services at NEG. For example, VLS wrote that "Joe's friend is actually a 3rd party on the deal and doesn't actually control the business. We deal with Kravet directly so we're not sure that he could actually pull the business." Ex. 2013.

50.    During the fall of 2017, there were separate communications between ECU and NEG about the possible terms of a future agreement, but NEG did not make any decision to commit to working with ECU.

51.    On November 11, 2017, Mr. Donahue of Vanguard wrote to Jeff Lee of Vanguard:

> I went back and forth with Joe on the imports and refused to budge. We engaged BFT in good faith and I don't think that NEG deserves another chance. We're still getting a bad deal on the exports and pulling the imports may force him to rethink his position.
>
> I believe that we should formally communicate that we are pulling the imports based on his documented unwillingness to negotiate his out of market terms and then make the switch. If we back out of the switch to BFT, we pretty much close that door forever.

Ex. 2010.

- 8 -

52.    On November 22, 2017, Vanguard obtained final internal approval for moving its warehouse import business away from NEG and to BFT, after concluding that it would be more profitable for Vanguard and after failing to convince NEG to renegotiate the existing terms in their Agency Agreement. Ex. 2011. Vanguard recognized that moving the warehouse business from NEG to BFT could cause the end of the NEG relationship, because NEG might "retaliate" by moving the separate Kravet business to a competitor, which could cause a loss of $250,000 to $300,000 per year to Vanguard. Id.

53.    On November 27, 2017, VLS advised NEG orally that it intended to discontinue using NEG's CFS services for import shipments by the end of the year. NEG expressed its objections to VLS that this was a violation of the Agency Agreement. VLS expressed its disagreement and stated that such a move would not affect NEG's appointment to provide Agent Services under the Agency Agreement. Stip., DE 189 at § 6 ¶ 24; Ex. 3015.

54.    Between December 1, and 6, 2017, NEG sent emails contending, among other things, that VLS's intention to change its import CFS to BFT violated the Agency Agreement. Stip., DE 189 at § 6 ¶ 25.

55.    On December 11, 2017, Vanguard made a public announcement to all its customers that BFT would be its new CFS warehouse.  The notice specifically mentioned both delivering "export cargo" and picking up "import cargo" and thus applied to all of NEG's CFS business with VLS.  Ex. 91.  The effective date of the move was in only seven days, on December 18, 2017.  Ex. 91.

56.    On or about December 14, 2017, VLS sent another notice to its customers. Ex. 92.

57.    Neither industry notice even mentioned that NEG was VLS's current CFS warehouse, or indicated what was happening with VLS's relationship with NEG's warehouse pick up and drop off, and consolidation and deconsolidation services.  Id.

58.     VLS never coordinated with NEG on the warehouse transition to BFT. Meunier Decl.

59.     VLS's decision to terminate NEG's CFS warehouse business finally prompted NEG to move forward with a future agreement with ECU.  Meunier Decl.

60.     NEG and ECU exchanged a redlined version of a draft MOU, or Memorandum of Understanding, on December 13, 2017.  Ex. 61.  Both NEG and ECU testified that they understood that this was a non-binding MOU, and that either party could still walk away without a commitment.  Meunier Decl.; Abisch Decl. ECU agreed to provide an advance to NEG, to help with anticipated cash flow issues, but the advance would only be provided after termination of the Vanguard agreement. ECU wanted to be prepared in the event that Vanguard "terminates immediately." Ex. 62.  No loan was provided until after termination and after NEG because ECU's agent and starting booking.  Abisch Decl.; Meunier Decl.

61.     Following Vanguard's public announcement, on December 15, 2017, Mr. Abisch wrote internally at ECU: "I expect we will be able to finalize a deal with New England Groupage (NEG) to become both our agent and our warehouse in Boston next week. In summary, Vanguard has made an announcement that they will change their import cfs in Boston away from NEG to Boston Freight Terminal (BFT). BFT is our current export warehouse and the IPI warehouse for our imports from St George." Ex. 62.

62.     By December 15, 2017, NEG transmitted to ECU a draft of a VLS termination letter. Stip., DE 189 at § 6 ¶ 29.  There was no communication from ECU to NEG providing feedback on the draft letter, or the timing and manner of NEG's termination letter.

63.     On December 20, 2017, Mr. Abisch of ECU recommended that NEG wait until it learned how VLS reacted to the termination letter before NEG put out any information to customers proactively, even though they would "lose out on some bookings by postponing the note," because "this is a marathon as opposed to a sprint."

Ex. 84. Mr. Abisch testified that he wanted to see if Vanguard would cooperate in a transition period before ECU and NEG actually started working together. Abisch Decl.

64.    Mr. Meunier explained to Mr. Abisch that he was concerned that VLS would not cooperate in a reasonable transition or wind-down period and that VLS might immediately cut off NEG from all computer systems, booking and tracking software, and NEG's customers. Abisch Declaration . NEG was completely reliant on VLS for this infrastructure.

65.    ECU, therefore, provided computer training and some laptops, to be used only as a backup plan if VLS immediately cut off computer access and decided not to cooperate during the transition period. Abisch Declaration. ECU had its I.T. Vice President and a representative in charge of Training and Development in NEG's offices beginning between December 19-20, 2017. Stip., DE 189 at § 6 ¶ 32. A few ECU email addresses were set up for some NEG employees, but no one from NEG was provided access to ECU's computer systems or software. Id.

**NEG Terminates the Agreement and Vanguard Accepts the Termination**

66.    On December 21, 2017, NEG's counsel sent a letter to Vanguard terminating the Agreement. Ex. 69. The letter stated:

> NEG hereby gives notice that Vanguard is in material breach of the Agreement based upon, inter alia, Vanguard's abrupt and unilateral relocation of its import Container Freight Station ("CFS") in Boston to Boston Freight Terminals, and its abrupt and unilateral notification to third parties of the same, notably concerning both imports and exports, for which NEG reserves all rights and remedies for any resulting damages to it or its business. As you know, Vanguard's utilization of NEG's facility for both imporls and exports is both an express, and a material term of the Agreement, which term is also evidenced by the parties' longstanding course of performance. Since NEG receives no commission on imports terminating in Boston, but relies on warehouse revenue in lieu of such a commission, the warehousing that Vanguard unilaterally terminated was a material benefit of the NEG bargain under the Agreement.

> Based upon Vanguard's material breach, NEG hereby terminates the Agreement in all respects, and will no longer accept newly ordered Vanguard exports at its facility. However, as an accommodation, and with no legal obligation to do so, and in order to facilitate the orderly wind down of the parties' relationship and currently ordered exports in transit, NEG will cooperate in the disposition of Vanguard exports now on site."

Ex. 69.

67.    On December 21, 2017, Vanguard's counsel immediately responded to NEG's termination letter, telling NEG to "discontinue" doing work for Vanguard. Ex. 1020.

68.    That same day, on December 21, 2017, after VLS received the notice from NEG, VLS terminated NEG's access to VLS's VPN, cut off NEG's access to VLS's computer systems, disabled NEG's access to VLS's network, and cut off NEG's access to emails directed to NEG through any VLS email address. Stip., DE 189 at § 6 ¶ 35.

69.    On December 21, 2017, after VLS received the notice from NEG, David Sanchoyerto sent an internal email at VLS under the subject line "Boston Restructure Checklist." Stip., DE 189 at § 6 ¶ 36. In that email he wrote: "Hello team, I started a checklist this morning to capture items that need to be actioned due to the change in our Boston CFS and the end of our relationship with NEG." Ex. 1023; 2018.

70.    On December 21, 2017, after VLS received the notice from NEG, VLS sent a notice to its customers. Stip., DE 189 at § 6 ¶ 37; Ex. 93.  The notice clearly advised customers that all CFS warehouse business for VLS in Boston would now be handled by BFT. Ex. 93.

71.    The next day, on December 22, 2017, counsel for NEG and counsel for VLS exchanged further letters.  Stip., DE 189 at § 6 ¶ 43; Exs. 1021; 1022.

72.    Vanguard's counsel's letter to NEG demanded that NEG return electronic equipment, such as a phone and a router. Ex. 1022.

73. After December 22, 2017, NEG returned a VLS phone, and cooperated with a VLS vendor to remove VLS's Cisco router from NEG's premises, as requested by VLS. Stip., DE 189 at § 6 ¶ 44.

74. Beginning on or after December 21, 2027, VLS never asked NEG to continue doing business with VLS. Stip., DE 189 at § 6 ¶ 38.

75. Beginning on or after December 21, 2017, VLS never asked NEG to rescind any notice of termination of the Agreement. Stip., DE 189 at § 6 ¶ 39.

76. At no point did Vanguard insist that NEG perform the Agreement, for the 90-day notice period or otherwise. Taken together, all of the events of December 21 and 22, 2017—the letters in addition to Vanguard's cutting off NEG's access to Vanguard's computers and databases—constituted a termination of the Agreement, with the explicit and implicit agreement of both NEG and Vanguard.   Abisch Decl.

77. There is no evidence that, prior to December 22, 2017, NEG provided services to ECU or acted as ECU's agent.

78. NEG and ECU did not enter into a final agreement until May of 2018, and that agreement had additional, different terms than some of the basic terms listed in the memoranda of understanding they exchanged during negotiations. Ex. 72.

79. In the days after December 21, 2017, VLS had the opportunity to meet with its customers and did so. Exs. 2041; 2042, 2043; 2048, 2071; 3012. VLS hired Joseph Pimentel to seek business for VLS from customers handled by NEG and customers who were not handled by NEG. Id.

80. VLS retained business with many of those customers, usually on a non-exclusive basis, as in the past. Exs. 2039; 2057; 2068; 3012; 3013; see also Stip., DE 189 at § 6 ¶ 42.

81. The evidence shows that Vanguard lost business following the switch from NEG to BFT due to normal competitive reasons, such as lack of competitive pricing, inferior servicing and route systems, and inferior customer service. Ex. 2025; 2028; 2044; 2058; 2069.

# CONCLUSIONS OF LAW

1.  Vanguard has two remaining claims against ECU: Claim 7 is for inducing breach of the Agreement between Vanguard and NEG, and Claim 8 is for interference with the same Agreement.

**7th Cause of Action: Inducement to Breach Contract**

2.  The elements required for Vanguard to establish its claim against ECU for inducing breach of contract are:

      i.  That there was a contract between Vanguard and NEG;

      ii.  That ECU knew of the contract;

      iii.  That ECU intended to cause NEG to breach the contract;

      iv.  That ECU's conduct caused NEG to breach the contract;

      v.  That VLS was harmed; and

      vi.  That ECU's conduct was a substantial factor in causing VLS's harm.

See CACI 2200; Quelimane Co. v. Stewart Title Guar. Co., 19 Cal. 4th 26, 55 (1998), as modified (Sept. 23, 1998); Pac. Gas & Elec. Co. v Bear Stearns & co., 50 Cal. 3d 1118, 1129 (1990).

3.  The inducement element requires plaintiff to show that the defendant actively and affirmatively induced a breach. *Imperial Ice v. Rossier*, 18 Cal.2d 33, 37 (1941).

4.  "One does not induce another to commit a breach of contract with a third person ... when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person.... For instance, B is under contract to sell certain goods to C. He offers to sell them to A, who knows of the contract. A accepts the offer and receives the goods. A has not induced the breach and is not subject to liability." *ACO Pacific v. ACO*, 70 F.3d 1277 (9th Cir. 1995) (applying California law).

5.      The causation element requires that a plaintiff prove causation by showing that the conduct of a defendant is a substantial cause of the alleged damage. *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 391 (2004).

6.      Proof of damages cannot be speculative. *Assoc. Gen'l Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 532 n.26 (1983). Lost profits damages must be proven to be certain as to their occurrence and their extent. *Lewis George Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 3 Cal. 4th 960, 975 (2004). No damages can be recovered for breach of contract that are not clearly ascertainable in both their nature and origin. Cal. Civil Code section 3301. Moreover, damages resulting from any breach of contract that is terminable upon the giving of notice is limited to the period of the notice. *Martin v. U-Haul Co. of Fresno*, 204 Cal. App. 3d 396, 407 (1988).

7.      There is no dispute that the first and second elements are satisfied. There was a contract – the Agreement – between Vanguard and NEG, and ECU knew about that Agreement.

8.      Vanguard fails, however, to establish the third and fourth elements: that ECU intended NEG to cause NEG to breach and that ECU's conduct caused a breach.

9.      Vanguard's breach of contract claim against NEG is based solely on the 90-day notice period set forth in Section 3.03(b) of the Agreement. *See, e.g.*, DE 172 at 5. However, in the Pretrial Conference Order, Vanguard appears to seek to hold ECU liable for inducing a breach of other provisions in the contract:

      a. Vanguard claims that ECU "engaged in intentional wrongful acts designed to induce a breach or disruption of the contractual relationship between VLS and NEG, which acts include: (a) conspiring with NEG to misappropriate customers of VLS; (b) conspiring with NEG to breach the AGENCY AGREEMENT during the term of the AGENCY AGREEMENT; (c) inducing NEG to become the representative of ECU without the prior written consent of plaintiff as required by Section

- 15 -

2.01(b) of the AGENCY AGREEMENT; (d) inducing NEG to terminate the AGENCY AGREEMENT without providing ninety (90) days written notice as required by Section 3.03(c) of the AGENCY AGREEMENT; and (e) conspiring with NEG to breach the AGENCY AGREEMENT without required notice. ECU's wrongful conduct caused NEG to breach the AGENCY AGREEMENT." DE 189 at 38.

10.   While these positions are inconsistent, the Court will address all of Vanguard's arguments for the sake of completeness.

11.   The parties stipulated that NEG and ECU would have been able to legally discuss the possibility of doing business together while the Agency Agreement was still in effect if NEG and ECU had done so in a manner consistent with NEG's duties under the Agency Agreement and applicable law. Stip., DE 189 at § 6 ¶ 46. This Court finds that there is no evidence that ECU's discussions with NEG were inconsistent with NEG's duties under the Agency Agreement.

12.   With respect to breach of the 90-day notice period set forth in Section 3.03(b) of the Agreement or any conspiracy to breach the notice period:

    a.   There is no dispute that the Agreement was an at-will Agreement and that NEG had a right to terminate the Agreement.

    b.   There is no evidence that ECU told NEG not to provide proper notice of termination under the Agreement.

    c.   There is no evidence that ECU provided any opinion, advice, or feedback whatsoever about the language in the termination notice or the form of termination.

    d.   To the contrary, the evidence shows that ECU encouraged NEG to terminate the Agreement in a professional manner, which constitutes a tacit encouragement that NEG follow the requirements in the contract relating to termination. For example, on October 25, 2017, Mr. Abisch of ECU wrote to Tim Tudor and others at ECU that he met with the

- 16 -

1    principals of NEG and that Mr. Abisch had suggestions regarding "how
2    to take the opportunity forward for them to *professionally* terminate with
3    VLS and become our agent." Ex. 57 (emphasis added). The evidence
4    shows that Mr. Abisch always let Mr. Meunier know that ECU wanted
5    NEG to comply with its contractual obligations to VLS. Abisch
6    Declaration.

7    e.  Even though Vanguard does not base its claim against ECU on breach of
8        the non-compete in the Agreement, ECU's conduct with respect to the
9        non-compete further evidences that ECU encouraged NEG to govern
10       itself professionally and in accordance with the Agreement. ECU not
11       only required NEG to obtain a legal opinion to ensure the non-compete
12       was unenforceable prior to finalizing any negotiations, but obtained its
13       own legal opinion to ensure that NEG would not violate the non-compete
14       provision by becoming ECU's agent following termination. ECU also
15       told NEG, in writing, that ECU did not want to receive any confidential
16       information from NEG.

17   f.  It is clear – or at least there is no evidence to the contrary – that NEG
18       made the decision as to the form of termination on its own.

19   13.  With respect to breach of, or conspiracy to breach, Section 2.02(b) of the
20   Agreement, which provides that NEG is Vanguard's exclusive agent and may not act
21   as representative for any other NVOCC without Vanguard's prior written consent:

22   a.  NEG unambiguously terminated the Agreement on December 21, 2017,
23       when its legal counsel sent a letter to counsel for Vanguard stating that
24       "NEG hereby terminates the Agreement in all respects[.]" As discussed
25       above, ECU encouraged NEG to terminate in accordance with the
26       provisions of the Agreement and played no role with respect to the form
27       of termination.

28

- 17 -

    b.  Vanguard accepted the termination by telling NEG, on December 21, 2017, to "discontinue" doing work for Vanguard; cutting off NEG from all computer systems, booking and tracking software, and NEG's customers; and demanding that NEG return its electronic hardware. Internally, Vanguard recognized that the relationship was terminated, and acted accordingly.

    c.  Once the Agreement was terminated on December 21, 2017, NEG no longer had an obligation to act as Vanguard's exclusive agent.

    d.  There is no evidence that, prior to December 21, 2017, NEG provided services to ECU or acted as ECU's agent or was engaged by ECU.

    e.  To the contrary, the evidence establishes that, the day before NEG sent the termination letter, on December 20, 2017, Mr. Abisch of ECU recommended that NEG wait until it learned how VLS reacted to the termination letter before NEG put out any information to customers, even though ECU and NEG would "lose out on some bookings by postponing the note," because "this is a marathon as opposed to a sprint."

    f.  ECU did not announce that it was partnering with NEG until January of 2018. Ex. 3019.

    g.  NEG and ECU did not enter into a final agreement until May of 2018, and that agreement had additional, different terms than some of the basic terms listed in the memoranda of understanding they exchanged during negotiations.

    h.  There is no evidence that any customer moved business to ECU prior to the date of termination, December 21, 2017.

14.    With respect to Vanguard's claim that ECU induced NEG to breach the Agreement by conspiring regarding "misappropriation of customers":

    a.  The parties stipulated that Vanguard's customers had the right to choose to move their business from Vanguard to ECU. Stip., DE 189 at § 6 ¶ 48.

b.  The parties also stipulated that Plaintiff Vanguard's damage claims are not based upon the loss of any specific individual customers. Stip., DE 189 at § 6 ¶ 53.

c.  Vanguard identifies nothing in the Agreement that gives it any exclusive rights with respect to any particular customers, and none exists. ECU could not have induced NEG to breach the Agreement with respect to something not contained in the Agreement.

d.  Additionally, there is no evidence that Vanguard had any separate, exclusive agreements with any customers. To the contrary, customers in this industry have an independent right to choose to move their business from Vanguard to ECU, or elsewhere (Dkt. 129-3 (VLS Resp. to RFA Nos. 60-61)), due to competitive pricing, better servicing and route systems, or any number of "permissible" reasons that may explain the alleged harm. See Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC, 2019 WL 13045054 at *3.

15.    Vanguard has, therefore, has failed to establish the third and fourth elements of its claim.

16.    Moreover, even if Vanguard had met its burden with respect to the third and fourth elements, there is no evidence that Vanguard lost any business or customers as a result of any breach of the Agreement.

17.    Vanguard stipulated that it is not seeking damages for any lost business occurring before the date NEG sent the termination letter: December 21, 2017.  Stip., DE 189 at § 6 ¶ 55.

18.    Vanguard relies only upon its experts to try to demonstrate that reduced customer sales due to a supposed lack of opportunity were caused by a lack of 90 days' notice, but its experienced-based expert (Greg Howard) has no opinion about whether Vanguard lost business or customers due to any lack of 90 days' termination notice from NEG. (Vanguard presents no damages evidence separate and apart from

- 19 -

the issues regarding the 90-day notice.) The same expert, Mr. Howard, concluded that "there is no way" to separate out alleged wrongful conduct from other permissible ways that could have caused the alleged harm.

19.    Indeed, there is substantial evidence that Vanguard did not lose any customer opportunities, had numerous meetings and opportunities to quote rates and compete for business, and did retain substantial business from even customers that kept some of their business with NEG or shifted some to ECU.

20.    No customers testified that they moved business from Vanguard because of any lack of 90 days' notice. To the contrary, there is extensive evidence that customers moved their business solely for permissible competitive reasons.

21.    Similarly, Vanguard's damages expert, Dr. Barbara Luna, did not analyze nor account for any other causes that explained reductions in VLS's sales or income, after termination.  She assumed, relying solely on Mr. Howard to provide some conclusion as to causation, that all reductions in sales were only due to the alleged lack of 90-days' notice.  Dr. Luna's damages opinion did not rely upon losses relating to other income or business or fees or additional costs, and relied solely on a comparison by customer code for a subset of the business and income covered by the Agreement, before and after termination.

22.    In sum, Vanguard did not present evidence that customers refused to meet with Vanguard or consider competitive bids, and thus that Vanguard had "lost opportunities" with customers.  Other than a customer-code analysis with no connection to the alleged lack of 90-days' notice, Vanguard did not present evidence of any other categories of damages.  And, Vanguard did not analyze or account for permissible reasons that customers chose to move business from one competitor to another.

23.    Vanguard, therefore, additionally fails to meet the fifth and sixth elements of its claim.

24.    Accordingly, as to Count VII of Vanguard's Second Amended Complaint, the Court finds for ECU.

**8th Cause of Action: Interference with Contractual Relations**

25.    The elements required for Vanguard to establish its claim against ECU for interference with contractual relations are:

     i.   That there was a contract between VLS and NEG;

     ii.   That ECU knew of the contract;

     iii.   That ECU's conduct prevented performance or made performance more expensive or difficult;

     iv.   That ECU intended to disrupt the performance of this contract or knew that disruption of performance was certain or substantially certain to occur;

     v.   That VLS was harmed; and

     vi.   That ECU's conduct was a substantial factor in causing VLS's harm.

CCAI 2201; *Ixchel Pharma, LLC v. Biogen, Inc*., 9 Cal. 5th 1130, 1141 (2020) (citation omitted).

26.    "The economic relationship between parties to contracts that are terminable at will is distinguishable from the relationship between parties to other legally binding contracts." *Ixchel*, 9 Cal. 5th at 1144-45 (citing *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1151 (2004)).

27.    For a claim for interference with an at-will contract, the plaintiff must prove the additional element of independently wrongful conduct. *Ixchel*, 470 P. 3d at 1148. An act is independently wrongful only if it is proscribed by some determinable legal standard. *Id.* at 1142.

28.    As with Claim 7, the interference torts require that a plaintiff prove causation by showing that the conduct of a defendant is a substantial cause of the

alleged damage. *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 391 (2004).

29.    Vanguard claims that the same conduct supporting Claim 7 support Claim 8: "VLS alleges that ECU engaged in intentional wrongful acts designed to induce a breach or disruption of the contractual relationship between VLS and NEG, which acts are described above in Claim 7 (including breach of contract)." DE 175 at 70-71. In the Pretrial Conference Order, Vanguard repeats the allegations for Claim 7 in Claim 8: "ECU engaged in intentional wrongful acts designed to induce a breach or disruption of the contractual relationship between VLS and NEG, which acts include: (a) conspiring with NEG to misappropriate customers of VLS; (b) conspiring with NEG to breach the AGENCY AGREEMENT during the term of the AGENCY AGREEMENT; (c) inducing NEG to become the representative of ECU without the prior written consent of plaintiff as required by Section 2.01(b) of the AGENCY AGREEMENT; (d) inducing NEG to terminate the AGENCY AGREEMENT without providing ninety (90) days written notice as required by Section 3.03(c) of the AGENCY AGREEMENT; and (e) conspiring with NEG to breach the AGENCY AGREEMENT without required notice."

30.    There is, again, no dispute that Vanguard has met the first and second elements of the claim: there was a contract – the Agreement – between Vanguard and NEG, and ECU knew about that Agreement.

31.    The parties stipulated that NEG and ECU would have been able to legally discuss the possibility of doing business together while the Agency Agreement was still in effect if NEG and ECU had done so in a manner consistent with NEG's duties under the Agency Agreement and applicable law. Stip., DE 189 at § 6 ¶ 46. As with Claim 7, this Court finds that there is no evidence that ECU's discussions with NEG were inconsistent with NEG's duties under the Agency Agreement.

32.    As with Claim 7, there is no evidence that ECU's conduct prevented performance of the Agreement or made performance of those provisions more expensive or difficult:

    a.  With respect to breach of the 90-day notice provision contained in Section 3.03(b), there is no evidence that ECU told NEG not to provide proper notice of termination under the Agreement, and there is no evidence that ECU provided any opinion, advice, or feedback whatsoever about the language in the termination notice or the form of termination. The only evidence establishes that ECU encouraged NEG to comply with the requirements of the Agreement. Vanguard has not, therefore, established that that ECU's conduct prevented performance of the 90-day notice provision or made performance of the notice provision more expensive or difficult.

    b.  With respect to breach of the "exclusive agent" provision contained in Section 2.02(b) of the Agreement, there is no evidence that NEG acted as ECU's agent prior to the date of termination, when the Agreement was no longer in effect.

    c.  With respect to Vanguard's claim that ECU induced NEG to breach the Agreement by conspiring regarding "misappropriation of customers," the parties stipulated that Vanguard's customers had the right to choose to move their business from Vanguard to ECU. Stip., DE 189 at § 6 ¶ 48. Vanguard identifies nothing in the Agreement that gives it any exclusive rights with respect to any particular customers, and none exists.

33.    Vanguard also fails to establish it suffered harm for the same reason it failed to do so with respect to Claim 7: there is no evidence that Vanguard lost any business or customers as a result of any breach of the Agreement.

34.    Whether or not Vanguard established all of the elements of the claim, however, the claim fails because Vanguard failed to establish independently wrongful conduct, which is required to state a claim for this tort under *Ixchel*, 470 P. 3d at 1148.

35.    Vanguard alleges no fraud, misrepresentations, illegal or illicit conduct such as bribes or other crimes, or any other conduct that is wrongful pursuant to a "determinable legal standard." *Ixchel*, 470 P. 3d at 1148.

36.    The Agreement between NEG and Vanguard was terminable at will, and ECU is a competitor of Vanguard. ECU and NEG exchanged proposals, considered doing business in the future, and negotiated for future business prospects. There is no legal prohibition on preparing to do business in the future or exchanging the terms of future dealings in a draft memorandum of understanding, or agreeing to provide future loans if the relationship went forward.

37.    In fact, California law makes abundantly clear that competitive business behavior such as the behavior NEG and ECU engaged in here is lawful. *See PMC, Inc. v. Saban Entm't*, 45 Cal. App. 4th 579, 603 (1996), disapproved in part on other grounds by *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003). "In the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability. Such acts merely maximize competition in a competitive marketplace." 45 Cal. App. 4th at 603 (citation omitted).

38.    Thus, none of the actions that VLS describes is proscribed by some determinable legal standard, and none of acts qualify as independently wrongful.

39.    Additionally, even though the evidence demonstrates that ECU did not induce NEG to breach the Agreement, an inducement to breach cannot be a basis

- 24 -

establishing independently wrongful conduct. Otherwise, the *Ixchel* requirement of independently wrongful conduct would have no meaning.

40.    Thus, whether or not NEG breached the Agreement, ECU's conduct in dealing with NEG and customers in the New England market was lawful competition as opposed to independently wrongful conduct. Vanguard, therefore, has not established its claim for interference with contractual relations.

41.    Accordingly, as to Count VIII of Vanguard's Second Amended Complaint, the Court finds for ECU.

**The Non-Compete Provision of the Agreement is Unenforceable**

42.    Vanguard's claims against ECU are not based on any alleged violation by NEG of the non-compete contained in Section 2.02(a) of the Agreement, which provides:

> a. During the term of this Agreement and thereafter for a period of one (1) year after termination of the Agreement, NEG-shall not, and shall not permit any of its employees . . . to engage, as an agent, officer, director, shareholder, owner, partner, joint venturer, lender or in any capacity, whether as an employee, independent contractor, consultant or advisor, or as a sales representative, of any business selling any products or services in direct or indirect competition with the business of [Vanguard] located or operating within (100) miles of any facility of [Vanguard]."

Ex. 75 § 2.02(a).

43.    In response to the Defendants' motion in limine to exclude evidence pertaining to a violation of the non-compete, Vanguard stated it is "not pursuing a claim for damages based on a theory of breach of the post-termination noncompete provisions of Sec. 2.02(a). Rather, VLS's claim for damages is based on NEG's breach of the 90 day notice of termination provision in Sec. 3.03(c) and its tort claims. In fact, it is VLS's position that NEG has never properly terminated the Agency

1  Agreement, and it is possible that the post-termination non-compete language in Sec.
2  2.02(a) may not yet come into play." DE 172 at 5.

3      44.    Vanguard argues that "NEG's violation of the post-termination non-
4  compete is relevant to rebut defendants' argument that it was not reasonably
5  foreseeable that NEG's breach of the 90 day notice provision would cause VLS to
6  suffer more than 90 days of damages." DE 172 at 5.

7      45.    As explained above, there is no evidence that Vanguard lost any business
8  or customers as a result of the breach of the 90-day notice provision of the Agreement.
9  The enforceability of the non-compete is, therefore, irrelevant.

10      46.    Moreover, the Agreement does not define "facility," but the closest
11  Vanguard "locations" to Boston, as identified by Vanguard on its website, are New
12  York and Montreal, neither of which is within 100 miles of Boston. *See*
13  https://www.vanguardlogistics.com/contact/locations (last visited October 7, 2022).
14  The non-compete, therefore, does not apply to NEG and ECU's business in Boston.

15      47.    In any event, the non-compete contained in the Agreement is
16  unenforceable under California law, which strongly disfavors restraints on trade.

17      48.    In California, "every contract by which anyone is restrained from
18  engaging in a lawful profession, trade, or business of any kind is to that extent void."
19  Cal. Bus. & Prof. Code § 16600. "The statute embodies the settled public policy in
20  California that favors open competition." *Nulife Ventures, Inc. v. Avacen, Inc*., No.
21  20-CV-2019-BAS-KSC, 2020 WL 7318122, at *11 (S.D. Cal. Dec. 11, 2020).

22      49.    Upon certification by the Ninth Circuit, the California Supreme Court
23  clarified that "section 16600 applies to business contracts," and is not limited to
24  employment contracts. *Ixchel*, 470 P. 3d at 1149-50.

25      50.    Under section 16600, "covenants not to compete are generally
26  unenforceable," save for the exceptions listed in sections 16601 through 16603. *Nulife*
27  *Ventures, Inc.*, 2020 WL 7318122 at *11. Those exceptions apply to contracts
28  governing (1) sales of goodwill of a business or disposition of ownership interest in

the business entity; (2) dissolution of the partnership or dissociation of the partnership or dissociation of a partner from the partnership; and (3) dissolution or sale of a limited liability company. *Id*. (citing Cal. Bus. & Prof. Code §§ 16601–03.)

51.    None of those exceptions applies here.

52.    "Where, as here, no exceptions to section 16600 apply, the court must apply the reasonableness standard and examine whether the contractual restraint unreasonably deters competition given the purpose and effect of each contract." *Nulife Ventures, Inc.*, 2020 WL 7318122 at *11 (citing *Ixchel*, 470 P. 3d at 1150). That inquiry, known as the "rule of reason," asks "whether an agreement harms competition more than it helps" by considering "the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption." *Ixchel*, 470 P. 3d at 1150.

53.    "[A]n employer cannot by contract restrain a former employee from engaging in his or her profession, trade, or business . . . ." Edwards v. Arthur Andersen, 44 Cal. 4th 937 (2008) (citing *Ixchel*, 470 P. 3d at 1158). "[T]he rationale in Edwards focused on policy considerations specific to employment mobility and competition." The non-compete contained in the Agreement here, as it relates to NEG employees is void and unenforceable under *Edwards*.

54.    The VLS non-compete as relates to NEG as a company is also void because the restriction "harms competition more than it helps." It harms competition because it would remove NEG from the marketplace for a year, denying people in New England the experience of NEG. It would also deny companies the opportunity to use NEG's warehouse with NEG also acting as an agent.

55.    In *NuLife Ventures*, the court held that NuLife, a multi-level marketing company, did not demonstrate the ability of prevailing on the merits of breach of contract claims grounded on non-compete clauses because they were unenforceable. The clauses restricted the ability of an independent brand partner to practice their sales

DEFENDANT ECONOCARIBE CONSOLIDATORS, INC.'S
PROPOSED FINDING OF FACT AND CONCLUSIONS OF LAW

profession in the industry, which rely on a sales agent's recruitment of new sales agents. *Nulife Ventures, Inc.*, 2020 WL 7318122 at *11. The same is true here.

**ECU's Affirmative Defenses**

56.    The Court finds for ECU on Counts VII and VIII. However, for purposes of completeness, even if VLS were able to establish any liability under Counts VII and VIII, that liability is avoided by ECU's affirmative defenses.

57.    ECU pursues the following affirmative defenses to avoid liability: (i) Second Affirmative Defense: Estoppel; (2) Third Affirmative Defense: Waiver; (3) Fourth Affirmative Defense: Laches; (4) Seventh Affirmative Defense: Unclean Hands; (5) Ninth Affirmative Defense: Failure to Mitigate Damages; (6) Tenth Affirmative Defense: Litigation Privilege; (7) Eleventh Affirmative Defense: Competition Privilege; (8) Thirteenth Affirmative Defense: Competition; (9) Seventeenth Affirmative Defense: Prior Breach; (10) Eighteenth Affirmative Defense: Prevention; and (11) Nineteenth Affirmative Defense: Acquiescence.

**Second Affirmative Defense: Estoppel, Third Affirmative Defense: Waiver, and Fourth Affirmative Defense: Laches**

58.    To prevail on its estoppel defense, ECU must demonstrate that (1) VLS knew the facts; (2) VLS intended that its conduct be acted upon, or acted so that ECU had the right to believe that it was so intended; (3) ECU was ignorant of the true state of facts; and (4) ECU relied upon VLS' conduct to its injury. *Migliore v. Mid-Century Ins. Co.*, 97 Cal.App.4th 592, 606 (2002).

59.    The waiver defense requires ECU to establish (1) that VLS knew NEG was required to give 90 days' notice of termination of the agency agreement; and (2) that VLS freely and knowingly gave up its right to have NEG perform this obligation. CACI No. 336.

60.    The Court finds that VLS waived any and all arguments that 90 days' notice was required for NEG to terminate: (a) by not asking NEG to make the date of termination 90 days after the notice, (b) by not telling NEG or ECU that VLS did not

consider the notice effective for 90 days, (c) by not making any effort to coordinate on the CFS or agency transition, and (d) by taking affirmative steps to terminate the agreement immediately, including by cutting off NEG's computer access. The Court further finds that VLS is estopped from arguing that it was entitled to 90 days' notice based on its conduct when it received NEG's notice on December 21, 2017. Lastly, the Court finds that VLS unreasonably delayed notifying NEG or ECU of any change in VLS's position on termination and thus its claims are barred by laches.

### Seventh Affirmative Defense: Unclean Hands

61.    To establish unclean hands, ECU must demonstrate that VLS acted unfairly or fraudulently as to the controversy in issue. *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*, 517 F.Supp.3d 994, 998 (2021).

62.    The Court finds that VLS knew about the discussions between ECU and NEG prior to December 21, 2017 and knew that VLS considered the activity to be a material breach of the agreement (even though that belief was wrong) but failed to notify NEG and ECU. VLS's conduct is inconsistent with trying to enforce its interpretation of the agreement and consistent with a plan to sue NEG and VLS. VLS is guilty of unclean hands, including representing that it "had no choice" but to terminate the agreement on December 21, 2017 when, in fact, it had other choices that it intentionally abandoned. VLS knew from the summer of 2017 that is wanted to alter its business relationship with NEG and proceeded to carefully implement that plan by trying to force NEG to give up income under the existing agreement, by taking away NEG's CFS business. VLS took away NEG's warehouse/CFS business, knowing that it was a substantial part of NEG's income, as a part of an intentional tactic to force NEG to re-negotiate the Agency Agreement and provide more income to VLS. VLS's conduct was a breach of the Agency Agreement and a breach of its duty of good faith and fair dealing.

### Ninth Affirmative Defense: Failure to Mitigate Damages

- 29 -

63.     Even if the Court had found NEG breached the contract and the breach caused harm, ECU asserts as a defense that VLS is not entitled to recover damages for harm that VLS could have avoided with reasonable efforts or expenditures. CACI 358; *Agam v. Gavra*, 236 Cal.App.4th 91, 111 (2015).

64.     The Court finds that VLS did not adequately prove any damages that occurred from any breach by NEG. VLS could have but did not work with NEG to have a transition. Instead, VLS disconnected NEG's computers. VLS could have but did not competently handle its decision to change warehouses in December 2017, and refused to coordinate any CFS transition. VLS sent out multiple notice of the change of warehouses and failed to mention NEG at all. This confused customers and disrupted the market. Further, VLS failed to take steps to maintain a presence in the New England market, and intentionally did not open a Boston office, even though it knew a local presence was important. VLS knew, as early as September 2017, that there was a risk that its decision to take away NEG's CFS/warehouse business could cause VLS to lose business and NEG routings if the Agency Agreement were terminated, and VLS did not adequately make efforts to mitigate any damages.

**Tenth Affirmative Defense: Litigation Privilege**

65.     "Under [the litigation privilege] privilege, which courts interpret broadly, defendants are immunized from tort liability for any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action. The primary purpose of [the litigation] privilege is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Nelson v. Tucker Ellis, LLP*, 262 Cal. Rptr. 3d 250, 265 (Ct. App. 2020) (citation omitted).

66.     The Court finds that the Joint Defense Agreement between NEG and ECU is not evidence of wrongful conduct because it was only entered into after the

filing of this lawsuit. Further, discussions about legal matters and potential litigation are privileged under California Civil Code section 47.

**Eleventh Affirmative Defense: Competition Privilege and Thirteenth Affirmative Defense: Competition**

67.    The Court finds that the competition privilege is truly an element of Plaintiff's claim as Plaintiff must prove independent wrongfulness. Nonetheless, even if treated as an affirmative defense, California law clearly provides the following: One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if:  (a) the relation concerns a matter involved in the competition between the actor and the competitor, and (b) the actor does not employ improper means, and (c) the actor does not intend thereby to create or continue an illegal restraint of competition, and (d) the actor's purpose is at least in part to advance his interest in his competition with the other. *Charles C. Chapman Bldg. Co. v. California Mart*, 2 Cal. App. 3d 846, 855–56, 82 Cal. Rptr. 830, 836 (Ct. App. 1969); Restatement (Second) of Torts § 768 (1979); *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture Partners*, 52 Cal. App. 4th 867, 880, 60 Cal. Rptr. 2d 830 (1997); *San Francisco Design Ctr. Assocs. v. Portman Cos.*, 41 Cal. App. 4th 29, 40, 50 Cal. Rptr. 2d 716 (1995), dismissed, remanded and ordered published, 911 P.2d 1373 (Cal. 1996).

68.    Similarly, the Court must find for ECU if it is established that ECU's motives in executing the challenged conduct was to further the economic interests of ECU in competition with VLS unless the conduct was unlawful. 13 Bus. & Com. Litig. Fed. Cts. § 138:60 (5th ed.).

69.    The Court finds that ECU's acts are not actionable because they are privileged under the competition privilege and to hold otherwise would be a restraint of trade. VLS admits that NEG and ECU had the right to discuss a business relationship at all times. Thus, VLS concedes at least some, if not all, of the

- 31 -

communication between NEG and ECU was proper. VLS admits that it did not suffer any damages before December 21, 2017, the date of termination, yet it still contends that there must have been some wrongful conduct prior to that date. ECU's conduct was entirely proper. ECU had a right to meet with NEG and to offer NEG more favorable terms than VLS. It had a right to plan with NEG for an orderly transition given VLS's decision to terminate the NEG warehouse/CFS relationship on December 11, 2017 and VLS's ability and threat to terminate the agreement immediately. And there is no evidence whatsoever that ECU encouraged NEG not to give 90 days' notice of termination, or breach the agency agreement in any other way. At bottom, ECU's business activity was privileged as fair competition and VLS's effort to punish that behavior would act as a restraint of trade. Every party to an at-will agreement should understand that the other party can terminate and can, before such termination, consider alternatives.

### Seventeenth Affirmative Defense: Prior Breach, Eighteenth Affirmative Defense: Prevention, and Nineteenth Affirmative Defense: Acquiescence

70.    A plaintiff's prior breach of a material term of a contract excuses a contractual counter-party's subsequent breach. *Mardiros v. City of Hope*, 2020 WL 8175604, *22 (C.D. Cal. 2020).

71.    Additionally, under California law, if one contracting party prevents the other from performing a condition precedent, the party that is subject to the condition is excused from performing it. *Bugarin v. All Nippon Airways Co., Ltd.*, 513 F. Supp. 3d 1172, 1182 (N.D. Cal. 2021); *see also City of Hollister v. Monterey Ins. Co.*, 81 Cal. Rptr. 3d 72, 100 (Ct. App. 2008) ("It is hornbook law that where one contracting party prevents the other's performance of a condition precedent, the party burdened by the condition is excused from performing it, and the benefitted party's duty of performance becomes unconditional.").

72.    Furthermore, an abandonment of a contract may be implied from the acts of the parties and this may be accomplished by the repudiation of the contract by one

1  of the parties and by the acquiescence of the other party in such repudiation.

2  Abandonment is not an 'alteration' or modification of a contract. Abandonment of a

3  contract terminates it and entirely abrogates so much of it as is unperformed. *Collins*

4  *v. Wolf*, 591 B.R. 752, 772 (S.D. Cal. 2018) (citation omitted).

5      73.    The Court finds that the claims against ECU based on NEG's breach of

6  the Agreement are barred by the defenses of prior breach, prevention, and

7  acquiescence. VLS itself breached their agreement, or at a minimum breached its duty

8  of good faith and fair dealing, by terminating NEG's CFS business, knowing it was

9  an important and valuable part of the overall relationship.  The CFS business and CFS

10 compensation was specifically described in the Agency Agreement.  Part of the very

11 reason that VLS was dissatisfied with the Agency Agreement was that it wanted larger

12 "rebate" payments from NEG in connection with NEG's CFS warehouse business.

13 VLS needed to negotiate a change to the Agency Agreement in order to obtain these

14 additional payments from NEG.  VLS's own breaches and actions prevented NEG

15 from performing and ECU cannot be held responsible for VLS's actions. VLS

16 intentionally terminated NEG's CFS business for an improper purpose to try to force

17 NEG to make concessions and pay more to VLS under the Agreement, while knowing

18 that the termination would cause severe economic consequences for NEG, and likely

19 force NEG to terminate its agency relationship with VLS. In fact, VLS consented in

20 the termination by its conduct on December 21, 2017.

21                                        ***

22      IT IS, THEREFORE, after consideration of the extensive evidentiary record, the

23 testimony at trial, and argument of counsel, **ORDERED AND ADJUDGED** as

24 follows:

25      1.    ECU is entitled to final judgment in its favor as to Count VII of the

26 Second Amended Complaint.

27

28

- 33 -

1       2.    ECU is entitled to final judgment in its favor as to Count VIII of the

2  Second Amended Complaint.

3

4  **DONE AND ORDERED**, this _____ day of _____ 2022.

5

6                                       _____

7                                  HON. DALE S. FISCHER

8                                  DISTRICT COURT JUDGE

9

10  Dated: October 11, 2022          IRELL & MANELLA LLP
Bruce A. Wessel

11                            By: /s/ Bruce A. Wessel

12                              Bruce A. Wessel
Attorneys for Defendant

13                              EconoCaribe Consolidators, Inc.

14                        STEARNS WEAVER MILLER
WEISSLER ALHADEFF &

15                        SITTERSON, P.A.

16                        By: /s/ Darrell Payne

17                              Darrell Payne

18                        By: /s/ Veronica L. de Zayas

19                        *Pro Hac Vice* Counsel for

20                        Defendant EconoCaribe Consolidators, Inc.

21  _____

22

23

24

25

26

27

28

# **PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 1800 Avenue of the Stars, Suite 900, Los Angeles, California 90067-4276.

On October 11, 2022, I served the foregoing document described as Defendant Econocaribe Consolidators, Inc.'s Proposed Finding Of Fact And Conclusions Of Law on each interested party, by email, as follows:

| | | |
|---|---|---|
| David S Porter, Esq.<br>Law Offices of David S. Porter<br>17011 Beach Blvd.,<br>Suite 900,<br>Huntington Beach, CA 92647 | Telephone: (714) 444-5992 Fax: (714) 960-9229<br>Email: dporter@dporterlaw.com | Attorneys for Plaintiff, Vanguard Logistics Services (USA), Inc. |
| Merak Eskigian<br>Mark Goshgarian<br>Goshgarian and Associates PLC<br>23901 Calabasas Road, Suite 2073<br>Calabasas, CA 91302-1542 | Telephone: (818) 519-9000<br>Fax:  (818) 591-0810<br>Email: meskigian@gmlawplc.net<br>Email:<br>mgoshgarian@gmlawplc.net | Attorneys for Plaintiff, Vanguard Logistics Services (USA), Inc. |
| Adam P. Zaffos, Esq.<br>Fernald Law Group APC<br>15910 Ventura Blvd., Ste. 1702<br>Encino, CA  91436 | Telephone: (323) 410-0320<br>Facsimile: (323) 410-0330<br>Email:<br>adam@fernaldlawgroup.com | Attorneys for Groupage Services of New England, LLC a Massachusetts limited liability company |
| Darrell Payne, Esq.<br>Veronica de Zayas, Esq.<br>Stearns Weaver Miller Weissler<br>Alhadeff & Sitterson, P.A.<br>150 W. Flagler Street<br>Suite 2200<br>Miami, FL 33130 | Telephone: (305) 789-3200<br>Fax: 305-789-2650<br>Email:<br>dpayne@stearnsweaver.com<br>vdezayas@stearnsweaver.com | Attorneys for Econocaribe Consolidators, Inc. |
| Bruce Wessel, Esq.<br>Irell & Manella LLP<br>1800 Avenue of the Stars<br>Suite 900<br>Los Angeles, CA 90067 | Telephone: (310) 203-7045<br>Email: BWessel@irell.com | Attorneys for Econocaribe Consolidators, Inc. |

(BY MAIL) I placed a true copy of the foregoing document in a sealed envelope addressed to each interested party, as stated on the attached service list. I placed each such envelope, with postage thereon fully prepaid, for collection and mailing at Irell & Manella LLP, Los Angeles,

- 35 -

California. I am readily familiar with Irell & Manella LLP's practice for
collection and processing of correspondence for mailing with the United
States Postal Service. Under that practice, the correspondence would be
deposited in the United States Postal Service on that same day in the
ordinary course of business.

☒   (BY ELECTRONIC MAIL) I caused the foregoing document to be
served electronically by electronically mailing a true and correct copy
through Irell & Manella LLP's electronic mail system to the e-mail
address(es), as stated on the attached service list, and the transmission
was reported as complete and no error was reported.

Executed on October 11, 2022, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that
the foregoing is true and correct.

Bruce A Wessel                         /s/ Bruce A. Wessel
(Type or print name)                      (Signature)

## MAILING LIST

| | | |
|---|---|---|
| David S Porter, Esq.<br>Law Offices of David S. Porter<br>17011 Beach Blvd.,<br>Suite 900,<br>Huntington Beach, CA 92647<br>(by e-mail only) | Telephone: (714) 444-5992<br>Fax: (714) 960-9229<br>Email:<br>dporter@dporterlaw.com | Attorneys for Plaintiff,<br>Vanguard Logistics<br>Services (USA), Inc. |
| Adam P. Zaffos, Esq.<br>Fernald Law Group APC<br>15910 Ventura Blvd., Ste. 1702<br>Encino, CA  91436 | Telephone: (323) 410-0320<br>Facsimile: (323) 410-0330<br>Email:<br>adam@fernaldlawgroup.com | Attorneys for<br>Groupage Services of<br>New England, LLC a<br>Massachusetts limited<br>liability company |
| Darrell Payne, Esq.<br>Stearns Weaver Miller Weissler<br>Alhadeff &<br>Sitterson, P.A.<br>150 W. Flagler Street<br>Suite 2200<br>Miami, FL 33130 | Telephone: (305) 789-3200<br>Fax: 305-789-2650<br>Email:<br>dpayne@stearnsweaver.com | Attorneys for<br>Econocaribe<br>Consolidators, Inc. |
| Bruce Wessel, Esq.<br>Irell & Manella LLP<br>1800 Avenue of the Stars<br>Suite 900<br>Los Angeles, CA 90067 | Telephone: (310) 203-7045<br>Email: BWessel@irell.com | Attorneys for<br>Econocaribe<br>Consolidators, Inc. |

DEFENDANT ECONOCARIBE CONSOLIDATORS, INC.'S
PROPOSED FINDING OF FACT AND CONCLUSIONS OF LAW