**FERNALD LAW GROUP APC**
ADAM P. ZAFFOS (BAR NO. 217669)
SASHA N. BROWER (BAR NO. 221198)
15910 Ventura Blvd., Suite 1702
Encino, California 91436
Telephone:    (323) 410-0327
Facsimile:     (323) 410-0330
E-Mail:     adam@fzlaw.com
                 sasha@fzlaw.com

*Attorneys for Defendant and Counterclaimant,*
*Groupage Services of New England, LLC*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANGUARD LOGISTICS SERVICES (USA), INC., a California corporation, formerly known as NACA LOGISTICS (USA), INC., a California corporation,<br><br>                Plaintiffs,<br><br>    v.<br><br>GROUPAGE SERVICES OF NEW ENGLAND, LLC, a Massachusetts limited liability company; ECONOCARIBE CONSOLIDATORS, INC., d/b/a ECU WORLDWIDE & ECU WORLDWIDE (USA); and DOES 1-10, inclusive,<br><br>                Defendants. | Case No.  2:18-cv-00517-DSF-GJS<br><br>**DEFENDANT GROUPAGE SERVICES OF NEW ENGLAND, LLC'S CLOSING ARGUMENT**<br><br>TRIAL DATE:<br>October 18, 2022<br>Judge: Hon. Dale S. Fischer<br>Ctrm: 7D |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................. - 1 -

II. RECAP OF UNDISPUTED TESTIMONY AND EVIDENCE ................. - 2 -

   A. THE PARTIES AND THEIR RELATIONSHIP ................................. - 2 -

   B. SUMMER OF 2017 ........................................................................ - 3 -

   C. THE END OF 2017 AND THE VANGUARD/NEG RELATIONSHIP ................................................................................. - 4 -

III. VANGUARD'S CLAIMS ...................................................................... - 6 -

   A. VANGUARD'S BREACH OF CONTRACT CLAIM ......................... - 6 -

   B. VANGUARD'S CLAIMS FOR BREACH OF THE FIDUCIARY AND LOYALTY DUTIES ............................................ - 8 -

   C. VANGUARD'S PURPORTED DAMAGES ...................................... - 8 -

IV. NEG'S COUNTERCLAIMS ................................................................ - 10 -

   A. THE UNREBUTTED TESTIMONY ESTABLISHED THAT NEG WAS DENIED THE FULL BENEFIT OF ITS BARGAIN UNDER THE AGREEMENT WITH VANGUARD. ................................................................................. - 10 -

   B. TESTIMONY FROM NEG'S EXPERT WITNESS REGARDING ITS DAMAGES. ....................................................... - 12 -

V. CONCLUSION ................................................................................... - 12 -

Defendant and Counterclaimant Groupage Services of New England, LLC ("NEG") hereby submits the following closing argument in support of its claims and defenses at trial:

## I. INTRODUCTION

Following the demise of their long-term business relationship, Vanguard Logistics Services (USA), Inc. ("Vanguard") sued NEG. NEG in turn countersued. NEG seeks damages suffered at Vanguard's hands during the relationship, while Vanguard seeks alleged damages purportedly suffered after the split.

After several rejiggerings of its primary claims, and dismissal of its frivolous trade secret claims, Vanguard's main contention at its core is that on December 21, 2017, NEG terminated the Agreement[1] without giving Vanguard 90 days' notice as purportedly required by their Agreement. More specifically, Vanguard deemed the letter from NEG's counsel (advising of Vanguard's own breach) to itself to be a breach of the Agreement. That lack of 90 days' notice purportedly impaired Vanguard's ongoing business in Boston to the point that it seeks to recover 10 years of lost profits. Setting aside the plain legal infirmities and rank speculation of such a claim, Vanguard utterly failed to prove its case at trial and instead only showed why its claim failed on its face.

NEG on the other hand, with *unrebutted testimony*, proved at trial that for years, Vanguard systematically worked to undermine NEG's ability to earn the commissions and income it was entitled to under the Agreements, to the tune of over $2 million dollars (NEG's counterclaims). Moreover, despite years of commission short pay and other Agreement breaches by Vanguard to NEG's detriment, still not satisfied with the deal it had negotiated for itself, Vanguard, in late 2017, announced that it was taking away a substantial portion of the revenue that NEG earned under the Agreement (the CFS services) because NEG would not eat costs and take

---

[1] Agreement or Agreements refer to the 2008 Agency Agreement and the 2013 renewal of the Agency Agreement.

significant cuts to its commissions and income because Vanguard wanted to make more money than the Agreements provided. Deeming this a material breach of the Agreement justifying immediate termination and facing the prospect of being put out of business in weeks and not months, NEG finally turned to work with ECU after Vanguard shut off its computer systems rendering further work for Vanguard impossible.

Although the volume of evidence is substantial, the issues in dispute are actually quite narrow.

## II.   RECAP OF UNDISPUTED TESTIMONY AND EVIDENCE

### A. The Parties and their Relationship

At its core we have a global logistics company that decided in the summer of 2017 that one of its single-location NVO/CFS agents was making more than its share of the pie on shipments to Boston and decided it would force the issue to a head once and for all. This was after Vanguard had for years been nickel and diming NEG by shortchanging and not paying commissions properly, causing NEG to eat certain costs and unilaterally ignoring or modifying terms of its Agreements with NEG all in an effort to make itself more money at the expense of its agent, NEG.

Vanguard is a global shipping company, with over 3,000 employees and locations in 30+ countries. Vanguard brought in to testify its former CEO Charles Brennan, Regional Managing Director Hal Donahue, Regional Vice-President Karl Laufer, Regional Vice President of Operations (USA and Canada) David Sanchoyerto, and Vice President and Global Controller Sheena Wiraatmadja. The witnesses were quick to point out that Boston was just a tiny part of Vanguard's overall business, barely worthy of concern in the grand scheme of things.

NEG is a family owned and operated business with just one location and about 10 employees. For NEG, its witnesses were Joe Meunier, accompanied by his wife and business partner Janice, and NEG's longtime general manager, David Peters.

Vanguard and NEG were in business together for over 30 years, including 9 years with the Meuniers owning NEG and subject to the Agreements at issue (Ex. 27 and 75). NEG served as Vanguard's Boston location, handling both bookings and cargo. NEG loaded and unloaded cargo that came into its CFS Boston warehouse, booked shipments of that cargo and also booked shipments for cargo elsewhere in the Vanguard network.

**B. Summer of 2017**

The Vanguard/NEG relationship was admittedly strained for many years due primarily to Vanguard's unilateral breaches of the Agreements to profit itself, but NEG had committed to trying make the relationship work and Vanguard had had promised to correct many of the ongoing issues. Things, however, became increasingly strained in the summer of 2017 as Vanguard began to push NEG to essentially entirely renegotiate the Agreements, all to the benefit of Vanguard. In June 2017, Vanguard engaged with NEG in negotiations over the inland points intermodal ("IPI") refund that NEG provided to Vanguard. In Section 6.02 of the Agreement it stated that "NEG will refund to NACA $ 25 per IT import international shipments and $ 40 for 3rd party IPI shipments (such as H&M and APA), Maximum $ 250.00 per trailer." The majority of this IPI business came from trucking cargo to and from Vanguard's own facility in New Jersey to NEG's facility in Boston.

Vanguard asked NEG to agree to modify this contract term to increase the refund back to Vanguard to $45 per HB/L and to remove the per trailer maximum. In essence, Vanguard was simply proposing to shift the profit percentage on IPI shipments to be more in its favor at NEG's expense. NEG refused and suggested Vanguard pass the cost on to the customer by charging a $35 fee.

Over the next several months, Vanguard did its best to leverage NEG into accepting its terms, including an abrupt change in its payment of commissions, causing NEG an $80,000 cash crunch. At the end of the day, Vanguard deemed Mr. Meunier "difficult" because he would not renegotiate written terms of the Agreement

- 3 -

so that Vanguard could make more money all at NEG's expense. So, what then was Vanguard's solution? To take away business and income away until it pushed NEG so far it was on the brink of being put out of business. *That* was Vanguard's solution to gain an extra $5/truck refund.

During this time, Vanguard worked out a deal with Boston Freight Terminals ("BFT"), a CFS competitor to NEG. Allegedly BFT could give Vanguard a better deal on imports (although this turned out not to be true after Vanguard switched), but NEG still had the better pricing on exports. As Vanguard's internal emails show, the idea was to leverage Vanguard's position, switch the imports to BFT (on the mistaken belief it could do so without breaching the Agreement), and see if it could get a better deal out of NEG as it did not like the deal it had negotiated with NEG on the Agreements. This is literally a textbook example of a breach of the covenant of good faith and fair dealing.

Tellingly, none of Vanguard's improper efforts to squeeze NEG so it could change the terms of the Agreements are disputed. Vanguard's witnesses readily admitted, as was evident from their internal emails, that this was the plan for their "good faith business negotiations" with NEG. Amazingly, they never gave any thought that their actions may put NEG out of business or whether their actions were in blatant violation of the Agreements.

**C. The End of 2017 and the Vanguard/NEG Relationship.**

With a plan in place, on November 27, 2017, Vanguard's Mr. Sanchoyerto called Mr. Meunier and let him know Vanguard was switching its import CFS to BFT by the end of the year.

The news was devastating to NEG. "Shocked, to say the least" as Mr. Meunier testified. He told Vanguard he believed the move violated the Agreement—in fact, Mr. Meunier viewed this as the final breach of the Agreement given all of the other issues that are the subject of the NEG's counterclaims. The loss of the import CFS meant NEG would be out of business in two to three weeks. And Vanguard knew

- 4 -

that at the very least that change would cause massive strain to NEG; that was the point of leveraging their position on the imports.

On December 11, 2017, without any advance warning to NEG at all, Vanguard sent out an industry-wide email blast announcing the change in its CFS station to BFT effective December 18, 2017. Vanguard's witnesses confirmed that there was no effort to coordinate a transition with NEG which admittedly confused and angered customers. Again, this is all undisputed and confirmed by the documents in evidence and the witnesses themselves.

Cutoff from its primary revenue stream and faced with the prospect of being put out of business, on December 21, 2017, NEG's counsel sent a letter to Vanguard contending that Vanguard was in material breach of the Agreement with the switch to BFT and its December 11, 2017 notice. (Ex. 1019.) This is where the apparently pivotal 90 days' notice comes into play. Section 3.03 of the Agreement allowed either party to terminate on 90 days' notice, while Vanguard also had the right to immediately terminate in the event of NEG's breach.

Vanguard's response was to reject any effort at a cordial wind-down of their relationship and instead fully and immediately cutoff NEG's computer access, unequivocally ceasing NEG's operations and rendering it impossible for it to do any further work for Vanguard or the customers. That same day, Vanguard's own counsel declared that NEG was in breach of the Agreement and directed NEG to discontinue printing or issuing Vanguard brand bills of lading (Ex. 1020), Vanguard shut off NEG's computer access, and Vanguard issued yet another industry notice about the shift of CFS in Boston to BFT.  At that point, the Agreement was terminated and the relationship between Vanguard and NEG was over.

Again, Vanguard witnesses confirmed all of these facts and there is no dispute about this sequence of events.

### III. VANGUARD'S CLAIMS

Vanguard's remaining claims are for breach of contract, breach of fiduciary duty, breach of the duty of loyalty and declaratory relief. Ultimately, Vanguard's claims boiled down to one basic issue, whether NEG breached the Agreement by having its lawyer send a letter on December 21, 2017 and whether it was damaged thereby. Vanguard concedes there is no evidence of wrongdoing by NEG, and stipulated that it does not seek damages for anything that happened, prior to that letter on December 21, 2017.

At the close of Vanguard's case, NEG filed a Motion for Judgment on Partial Findings to conclusively establish, among other things, that this 90-day notice issue was the sole remaining component of Vanguard's contentions. NEG's motion sought a finding on four issues: (1) that Vanguard's contract damages, if any, are limited to the 90-day notice period; (2) that Vanguard admittedly does not seek damages for any breach of Section 2.02 (the non-compete clause); (3) that Vanguard does not seek to recover any damages sustained prior to its revocation of NEG's agency therefore Vanguard failed to establish damages proximately caused by any breach of the fiduciary or loyalty duties; and (4) with no viable tort claims, there is no basis for punitive damages. Dkt. 225.

**A. Vanguard's Breach of Contract Claim**

Vanguard alleges a panoply of contractual obligations that NEG purportedly breached. But, as noted in NEG's Motion, Vanguard's claims come down only to this issue of whether NEG's letter of December 21, 2017 constitutes a breach of the Agreement that caused damages.

The first, and fatal, issue with Vanguard's breach of contract claim is that Vanguard materially breached the Agreement by unilaterally terminating the Agreement without proper notice to NEG first. It is undisputed that Vanguard told NEG it was moving the imports to BFT and did so just three weeks later. Vanguard's theory relies heavily on the idea that CFS is not actually part of the Agreement (it

- 6 -

plainly was) and that it was entitled to terminate the contract at any time (it was not). It maintains this position by asserting that CFS services (including the IPI) were not an exclusive part of the Agreement, so it was permissible to terminate just that "part" of the Agreement. Yet those services were indisputably part of the parties 30-year course of performance and the Agreement plainly provides for the amounts NEG was entitled to receive and obligated to refund for such services and that certain additional refunds were provided to Vanguard when CFS services were provided by NEG—i.e., consideration was provided for CFS to be an integral part of the Agreements. Because Vanguard materially breached the Agreement before the 90 day issue ever even arose, Vanguard simply failed to prove a necessary element of its claim, its own performance.

The second, equally fatal, issue with Vanguard's breach of contract claim is that there is admittedly no breach by NEG. Vanguard presented no other evidence that NEG breached the terms of the Agreement prior to that time.[2] There was no evidence presented to show that NEG failed to satisfy any of its contractual obligations prior to Mr. Fencer's December 21, 2017. There was simply a failure of proof on that necessary element of the claim.

Third, it was Vanguard that shut off NEG's access to its computer systems and demanded that NEG return the modem etc. and stop issuing bills of lading on behalf of Vanguard.  Even if Vanguard had not materially breached the Agreement by switching CFS providers (which it did), it was Vanguard that ultimately chose to forgo any alleged 90-day notice period.

Based on the totality of the evidence, the only party responsible for any profits or customers that Vanguard allegedly lost is Vanguard itself.

///

///

---

[2] After some questioning, Vanguard's witnesses admitted that ECU and NEG talking, not surprisingly, was not a breach of the Agreements.

### B. Vanguard's Claims for Breach of the Fiduciary and Loyalty Duties

Vanguard has attempted to bootstrap certain contract obligations into torts. Where there was no breach of the contractual obligations, there certainly can be no breach of any fiduciary or loyalty duties.

Vanguard argued at trial, after the fact, that NEG had engaged in some conspiracy with ECU to work out a deal and damage Vanguard. However, that contention proved to be utterly unfounded. Vanguard's witnesses admitted that they had no personal knowledge that NEG was working for ECU prior to December 21, 2017. NEG and ECU's witnesses testified no such work took place. And there was no evidence of any breach of NEG's duties to Vanguard prior to December 21, 2017. Once the Agreement terminated on December 21, 2017, NEG axiomatically no longer owed any fiduciary or loyalty duties to Vanguard. Coupled with the stipulated fact that Vanguard was not seeking any damages for conduct occurring prior to December 21, 2017, its tort claims are moot and fail as a matter of law.

Any contention that alleged breaches of duties owed by NEG caused Vanguard damage are simply unfounded and untenable as a matter of law as Vanguard is admittedly not seeking any damages that occurred prior to its unconditional revocation of NEG's authority and termination of NEG's duties when the Agreement terminated on December 21, 2017.

### C. Vanguard's Purported Damages

Even if NEG was somehow found to have breached the Agreement, Vanguard failed to establish any damages caused by the lack of 90 days' notice. Vanguard brought in two purported experts to trial, Mr. Howard to opine on causation and Dr. Luna to opine on the measure of lost profits. Mr. Howard opined, without any methodological or analytical basis, that, because 90-days' notice of termination is allegedly important, Vanguard *must* have suffered irreversible loss of all customer "opportunities" in the Boston market.

The opinion is not only wildly speculative and unfounded but contradicted by Vanguard's own hiring of Mr. Pimentel on December 21, 2017 to organize a Boston sales team and contact customers. In other words, Vanguard did talk to all of the customers. The opinion is further refuted by NEG's own customer witnesses, Messrs. Zarach, Chrisom and Wyndom who all confirmed that notice would have no bearing on freight customers' choice of NVO. Rather freight customers considered pricing, availability, customer service, personal relationships and reputation/prior experience and utilized multiple NVOs at the same time. Vanguard's own witnesses agreed, admittingly that who talks to a customer first is irrelevant to which carrier that customer does business with.

Putting aside Vanguard's abject failure to establish causation, there are also serious issues with the "evidence" presented on the measure of alleged damages. Ignoring that the Agreement was at-will and could be terminated with 90 days' notice at any time, Dr. Luna calculated 10 years of alleged damages for the period of 2018-2027 using a construct she referred to as "shipper codes". However, Ms. Wiraatmadja, Vanguard's Vice President and Global Controller, testified that "shipper codes" was not something utilized in Vanguard's own records and she didn't even know what they really mean.

Ms. Wiraatmadja also confirmed that, based on the very numbers she provided to Dr. Luna for her analysis, that Vanguard made *more* on FCL shipments after the end of the relationship with NEG and saw, *at best,* roughly no more than a about $180,000 decline in LCL profits in 2018 without any analysis of why.

Ultimately, Vanguard failed to demonstrate a breach by NEG that caused damages. Even if it had, those damages are necessarily limited to 90 days after December 21, 2017. The applicable case law is abundantly clear that that the measure of damages for any breach of a contract that is terminable upon the giving of notice is limited to the period of the notice – here that is 90 days. Vanguard had no right to

expect performance beyond that notice period, so any damages beyond that time were not foreseeable contract damages and plainly speculative in any event.

The very best that Vanguard could hope to recover, based on Ms. Wiraatmadja's own testimony and calculated out for the 3-month period for which Vanguard is conceivably entitled to recover contract damages, is $180,000/12 months x 3 months; so about $45,000.

## IV. NEG's COUNTERCLAIMS

NEG asserted four counterclaims against Vanguard, specifically: breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and violation of the Massachusetts Consumer Protection Act ("MCPA"). NEG seeks compensatory damages incurred during the term of the Agency Agreements, as well as treble damages and attorneys' fees for the violations of the for the losses that were suffered during their Agreement with Vanguard.

### A. The Unrebutted Testimony Established that NEG was Denied the Full Benefit of its Bargain Under the Agreement with Vanguard.

At trial, Mr. Meunier and Mr. Peters provided detailed and unrebutted testimony concerning the ongoing means and methods that Vanguard used to skim NEG's commissions and avoid paying NEG the full amounts it was entitled to under the Agreements. Vanguard would change commission percentages and hope NEG did not notice, claimed their system did not have the capacity to calculate a commission specifically included in the Agreement, and unilaterally waive pier unloading fees for preferred Vanguard customers forcing NEG to absorb the overhead costs without compensation.

Vanguard's witnesses did not deny any of this and confirmed the "all hands" meeting in July 2015 between Vanguard and NEG to address these took place and admitted that many of the action items brought up by NEG were not resolved. Its witnesses never refuted that NEG raised these issues repeatedly when they came up

or the substance of Mr. Meunier and Mr. Peters' testimony regarding these issues. A few of the more notable examples include:

1. Vanguard was required to "pay NEG $5 CBM for any LCL NEG routings to the USA, except final destination Boston." It admittedly failed to do so, claiming there was no way to retrieve the information necessary for the commission from Vanguard's computer system.
2. NEG was entitled to a Pier Unloading Fee that was only to be waived on occasion. Vanguard's witnesses did not deny that the fee was waived, but claimed it was just something that did not exist in the market anymore (despite it plainly existing in the Agreement).
3. NEG was entitled to 60% net profit on FCL shipments. Yet Vanguard routinely only paid NEG 25% rather than the 60% NEG was owed.

Again, its witnesses did not deny any of these accounting issues. Mr. Laufer and Mr. Sanchoyerto, in particular, acknowledged that there were problems for years and that many of the issues just never got fixed.

In sum, Vanguard's efforts, with underpayments, waivers of fees, and flat-out refusal to pay commissions owed constituted material breaches of the terms of the Agreements. This was not simply an oversight by Vanguard to pay some amounts owed, but an out and out failure and in fact plan by Vanguard that denied NEG the full extent of the benefits it was entitled to under the terms of the Agreements.

Finally, years into the case, Vanguard's lawyers first raised the idea that Section 5.07 of the Agreement required NEG to make a "claim" within 90 days of each quarter. That was the first time that the issue had been raised, ever.

Either way, the unrebutted evidence and testimony from Mr. Meunier and Mr. Peters confirmed that NEG regularly and immediately contacted Vanguard to address accounting and other issues with payments due under the Agreements and that such issues were brought to Vanguard's attention on an ongoing basis. Not once since entering the first Agreement in 2008 did Vanguard claim that NEG had waited too

- 11 -

long to address any of the issues outlined in the counterclaims. And not one Vanguard witness testified that Vanguard had refused to pay any commissions or fees to NEG because they were too stale or untimely or that NEG didn't bring these issues up immediately upon discovery (which they did).

### B. Testimony from NEG's Expert Witness Regarding its Damages.

NEG's General Manager David Peters (as well as Mr. Meunier) testified to several categories where NEG had either not been paid the full amount due or where Vanguard had failed to live up to its obligations under the Agreements. Based on the information provided by NEG, Mr. Goetz (NEG's accounting and damages expert) testified and provided his analysis of the damages NEG sustained due to Vanguard's actions. Amazingly, Vanguard did not have its own damages expert offer any rebuttal opinions to NEG's damages and Vanguard did not refute any of Mr. Goetz's calculations.

Mr. Goetz's *unrebutted* testimony established that NEG suffered $2,337,065 in damages due to Vanguard's conduct.

## V. CONCLUSION

With regard to the claims for breach of contract and breach of the fiduciary and agency duties alleged in Vanguard's Second Amended Complaint, NEG respectfully requests that the Court find in its favor and against Vanguard and enter final judgment in its favor. NEG further requests that the Court exercise its discretion and decline to make a declaration with respect to Vanguard's sixth cause of action.

As to NEG's counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, declaratory relief, and violation of the Massachusetts Consumer Protection Act, NEG respectfully requests that the Court: (1) find in favor of NEG and against Vanguard; (2) award NEG compensatory damages in the amount of $2,337,065, plus prejudgment interest; (3) declare that the terms of the written Agency Agreement and/or the parties' course of conduct establish that import customers are covered by the contractual relationship between the parties; (4) find

that NEG is entitled to treble damages based on Vanguard's willful and knowing violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11 in the amount of $7,011,195; and (5) award NEG reasonable attorneys' fees and costs pursuant to Mass. Gen. Laws ch. 93A, § 11.

DATED: April 5, 2023       **FERNALD LAW GROUP APC**
ADAM P. ZAFFOS

By: _____
Adam P. Zaffos, Esq.

Attorneys for Defendant and Counterclaimant,
Groupage Services of New England, LLC

- 13 -

# CERTIFICATE OF SERVICE

I, Jordan Patronete, declare that I am over the age of eighteen years and not a party to this action. I am employed in Los Angeles County, and my business address is: Fernald Law Group APC, 15910 Ventura Blvd., Suite 1702, Encino, California 91436.

On **April 5, 2023**, I hereby certify that a true and complete copy of the foregoing documents:

**DEFENDANT GROUPAGE SERVICES OF NEW ENGLAND, LLC'S CLOSING ARGUMENT**

have been served by forwarding said copy by electronic submission through my email the documents listed above to:

| | |
|---|---|
| Mark Goshgarian, State Bar No 105703<br>Merak Eskigian, State Bar No 115579<br>**GOSHGARIAN & ASSOCIATES, PLC**<br>23901 Calabasas Road, Suite 2073<br>Calabasas, California 91302-1542<br>Tel: (818) 591-9000<br>Fax: (818) 591-0810<br>Email: meskigian@gmlawplc.net<br>          mgoshgarian@gmlawplc.net<br><br>David S Porter, State Bar No 95989<br>**LAW OFFICES OF DAVID S. PORTER**<br>6522 Doral Dr.<br>Huntington Beach, California 92648<br>Tel: (714) 369-6068<br>Fax: (714) 444-0176<br>Email: dporter@dporterlaw.com | ***Attorneys for Plaintiff/ Counter Defendant***<br>***Vanguard Logistics Services (USA), Inc.*** |
| Bruce A. Wessel, Esq.<br>**IRELL & MANELLA LLP**<br>1800 Ave of Stars, Suite 900<br>Los Angeles, CA 90067<br>Tel: (310) 277-1010<br>Fax: (310) 203-7199<br>Email: bwessel@irell.com | ***Attorneys for Defendant/ Counter Claimant***<br>***Econocaribe Consolidators, Inc. dba ECU Worldwide and ECU Worldwide (USA)*** |

Darrell W. Payne, Esq.
**STEARNS WEAVER MILLER WEISSLER ALHADEFF AND SITTERSON PA**
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Tel: (305) 789-3200
Fax: (305) 789-2650
Email: dpayne@stearnsweaver.com
cveguilla@stearnsweaver.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: April 5, 2023

_____
Jordan Patronete

- 3 -