1

2

3

4

5

6

7

8

9

**FERNALD LAW GROUP APC**
ADAM P. ZAFFOS (BAR NO. 217669)
SASHA N. BROWER (BAR NO. 221198)
15910 Ventura Blvd., Suite 1702
Encino, California 91436
Telephone:      (323) 410-0320
Facsimile:      (323) 410-0330
E-Mail:    adam@fzlaw.com
               sasha@fzlaw.com

*Attorneys for Defendant and Counterclaimant,*
*Groupage Services of New England, LLC*

10

11

12

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| Vanguard LOGISTICS SERVICES (USA), INC., a California corporation, formerly known as NACA LOGISTICS (USA), INC., a California corporation, <br><br> Plaintiffs, <br><br> v. <br><br> GROUPAGE SERVICES OF NEW ENGLAND, LLC, a Massachusetts limited liability company; ECONOCARIBE CONSOLIDATORS, INC., d/b/a ECU WORLDWIDE. & ECU WORLDWIDE. (USA); and DOES 1-10, inclusive, <br><br> Defendants. | Case No.  2:18-cv-00517-DSF-GJS <br><br> **PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANT AND COUNTERCLAIMANT GROUPAGE SERVICES OF NEW ENGLAND, LLC'S COUNTERCLAIMS** <br><br> TRIAL DATE: <br> October 18, 2022 <br> Judge: Hon. Dale S. Fischer <br> Ctrm: 7D |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................... - 1 -

II.  FINDINGS OF FACT ........................................................................... - 3 -

A. THE PARTIES AND THEIR BUSINESS ........................................... - 3 -

B. THE AGREEMENTS ......................................................................... - 3 -

C. TERMS OF THE AGREEMENT FOR NVO AND CFS
SERVICES ........................................................................................ - 4 -

D. THE ROCKY RELATIONSHIP BETWEEN VANGUARD
AND NEG ......................................................................................... - 6 -

E. VANGUARD ATTEMPTS TO FORCE NEG TO
RENEGOTIATE SPECIFIC AGREEMENT TERMS........................ - 8 -

F. VANGUARD SWITCHES THE CFS/WAREHOUSE
SERVICES FROM NEG TO BFT AND THE
RELATIONSHIP BETWEEN VANGUARD AND NEG
BREAKS DOWN............................................................................. - 11 -

G. NEG'S COUNSEL NOTIFIES VANGUARD THAT NEG
IS TERMINATING THE AGREEMENT ......................................... - 15 -

H. NEG'S DAMAGES ......................................................................... - 16 -

   1)  Failure to Build Direct Services - $219,938 ................................ - 17 -

   2)  Failure to Pay CBM Commissions - $243,092 ............................ - 18 -

   3)  Abuse of Waiver of Pier Unloading Fees - $598,527
       - 19 -

   4)  Loss of Kravet Commissions - $352,771 ..................................... - 20 -

i

5)   Failure to Pay Full Commission on FCL Imports -
$96,356 ........................................................................ - 20 -

6)   Improper Termination of CFS Services and Agency
Agreement - $67,267 .................................................. - 21 -

7)   Vanguard Forced NEG to Absorb Costs for Certain
Customers - $360,310 ................................................. - 21 -

8)   Purge of Lost Revenue – $398,805 ............................. - 22 -

9)   NEG's Incurred Damages ............................................ - 23 -

III.   CONCLUSIONS OF LAW REGARDING NEG'S
COUNTERCLAIMS ................................................................. - 23 -

A. NEG'S 1ST CAUSE OF ACTION: BREACH OF
CONTRACT ....................................................................... - 23 -

B. NEG'S 2ND CAUSE OF ACTION: BREACH OF THE
COVENANT OF GOOD FAITH AND FAIR DEALING ................ - 26 -

C. NEG'S 4TH CAUSE OF ACTION: DECLARATORY
JUDGMENT (28 U.S.C. § 2201(A)) ..................................... - 30 -

D. NEG'S 5TH CAUSE OF ACTION: VIOLATION OF
MASSACHUSETTS CONSUMER PROTECTION
ACTION (M.G.L. C. 93A §§ 2 AND 11) ............................... - 30 -

ii

## I.  INTRODUCTION

Plaintiff Vanguard Logistics Services (USA), Inc., formerly known as NACA Logistics (USA), Inc.'s ("VLS" or "Vanguard") sued Defendant Groupage Services of New England, LLC ("NEG") and Defendant EconoCaribe Consolidators, Inc. d/b/a ECU Worldwide & ECU Worldwide (USA) ("ECU"), for various claims relating to the termination of the agreement for NEG to act as a local agent for VLS's shipping business, and ECU's involvement with NEG, before and after termination. NEG filed counterclaims against Vanguard to recover damages sustained during its agreement with Vanguard, including fees and commissions that were due and owing to NEG.

A bench trial was conducted before this Court on October 18-22, 2022. [1] NEG has, jointly with ECU, submitted Defendants' Joint Proposed Findings of Fact and Conclusions of Law concerning the claims at issue as alleged in the Second Amended Complaint (Dkt. 97) filed by Plaintiff Vanguard Logistics Services (USA), Inc., formerly known as NACA Logistics (USA), Inc.'s ("Vanguard").

NEG also submitted this Proposed Findings of Fact and Conclusions of Law with respect to the counterclaims at issue as alleged by NEG. Dkt. 98. The following findings and conclusions concern only NEG's counterclaims against Vanguard for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and violation of the Massachusetts Consumer Protection Act. [2]

The claims between Vanguard and NEG are based predominately on the Agency Agreements (Ex. 27 and 75) pursuant to which, and in accordance with the

---

[1] The parties stipulated to 56 separate facts as set forth in the Pretrial Conference Order, Dkt. 189, §6 at p. 2:26-8:19. The witnesses' direct testimony was provided by written witness statement, pursuant to the Court's direction. Dkt. 201-207, 211, 213-223, 225-228. The parties also submitted deposition designations. Dkt. 226-230.

[2] There is a substantial overlap in the facts at issue with respect to Vanguard's claims and NEG's counterclaims. The Findings of Fact set forth in Defendants' Joint Proposed Findings of Fact and Conclusions of Law are incorporated herein by reference. See Dkt. 278 at Section III(A)-(O). Every effort has been made to avoid repetition or duplication of those Findings of Fact, however, for the sake of context, there is there is some duplication in the findings below.

- 1 -

long-standing course of conduct, NEG provided agency, CFS and generally cargo shipping services. The evidence and legal issues relative to Vanguard's claims are set forth in the Joint Proposed Findings of Fact and Conclusions of Law filed by NEG and ECU.

On the counterclaims, NEG contends that, for years and years, Vanguard systematically worked to undermine NEG's ability to earn the commissions and income it was entitled to under the Agreements. NEG maintains that Vanguard's ongoing failure to comply with the terms of the Agreements and pay NEG the fees and commissions it was expressly entitled to in those Agreements, interfered with NEG's right to receive the benefits of the Agreements. By the time Vanguard terminated the Agreements and the NEG/Vanguard relationship in December 2017, NEG claims to have incurred damages totaling over $2 million dollars.

Having conducted the trial, having heard and reviewed testimony and evidence, and having considered the parties' pre and post-trial submissions, and having observed the credibility of the witnesses, and being otherwise fully advised, the Court finds as follows:

(1) in favor of NEG and against Vanguard on NEG's counterclaims for breach of contract, breach of the covenant of good faith and fair dealing and violation of the Massachusetts Consumer Protection Act;

(2) NEG shall recover compensatory damages in the amount of $2,337,065, plus prejudgment interest;

(3) the terms of the written Agency Agreement and/or the parties' course of conduct establish that import customers are covered by the contractual relationship between the parties;

(4) NEG is entitled to treble damages based on Vanguard's willful and knowing violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11 in the amount of $7,011,195;

(5) NEG is entitled to reasonable attorneys' fees and costs pursuant to Mass. Gen. Laws ch. 93A, § 11; and

(6) Final judgement to be entered as such against Vanguard.

In support of that finding, the Court makes the following findings of fact and conclusions of law as set forth below.

## II. FINDINGS OF FACT

### A. The Parties and their Business

1.    Vanguard and ECU are non-vessel operating common carriers, more commonly referred to as an NVOCC (and may be referred to as an NVO). ECU and Vanguard are major competitors of each other. Stip., Dkt. 189 at § 6 ¶1-3.

2.    NEG is also a licensed NVOCC that has operated in the Boston and New England region for approximately 30 years. Stip., Dkt. 189 at § 6 ¶4. NEG was a representative agent for Vanguard, and provided CFS services for Vanguard, for many years. Stip., Dkt. 189 at § 6 ¶13.

3.    Boston Freight Terminal ("BFT") also operates a CFS warehouse in Boston and provides CFS services to different NVOCC's. Stip., Dkt. 189 at § 6 ¶12.

### B. The Agreements

4.    NEG was a representative agent for Vanguard and provided CFS services for Vanguard for many years. Dkt. 189 at § 6, ¶14. NEG had served as the CFS station and NVOCC for Vanguard for more than 30 years. Dkt. 225 at ¶6 [Meunier]. NEG provided CFS services exclusively for Vanguard. Dkt. 270 at p. 545:19-546:3 [Meunier].

5.    When the Meuniers purchased NEG in 2008, they took out a sizable loan from Brookline Bank and the bank required an agreement be in place. Dkt. 225 at ¶¶ 2, 11 [Meunier].

6.    The agency agreements were entered into on April 17, 2008, and on December 12, 2013 ("Agreement"). The 2013 agreement was effectively a

- 3 -

continuation of the 2008 agreement and is the operative agreement for this dispute. Exs. 27; 75; Dkt. 390:5-391:13 [Laufer].

7. The Agreement was a boilerplate agency agreement that Vanguard prepared and provided it to Mr. Meunier. Ex. 25, Dkt. 269 at p. 459:15-25, 461:14-17 [Meunier]; Tudor Depo. p. 28:18-29:17. Meuniers did not have a lawyer in negotiating the Agreements. Dkt. 270 at p. 650:23-651:3 [Meunier].

**C. Terms of the Agreement for NVO and CFS Services**

8. The Agreement was an at-will agreement, as it provided that either NEG or Vanguard could terminate the agreement "at any time upon ninety (90) days prior notice." Ex. 75 §§ 3.03(b) and (c).

9. The Agreement appointed NEG as Vanguard's representative for ocean exports and imports within New England, pursuant to section 2.01(a). NEG agreed "to act exclusively as NACA's representative pursuant to section 2.01(a) and agrees not to act as a representative for any other exporter and/or importer of goods or any other NVOCC without NACA's prior written consent." Ex. 75 § 2.01(b). NEG's responsibilities included the normal services provided by a local independent NVO, such as sales, customer service, issuing transportation documentation, and coordination regarding shipments of cargo. Ex. 75.

10. The Agreement also contemplated that NEG would provide similar services relating to export air shipment and that NEG would be compensated for that work. Ex. 75 § 6.03.

11. The Agreement also contained a warehouse services provision, in which NEG agreed to provide Vanguard CFS services, such as loading and unloading cargo into trucks at NEG's CFS warehouse, where freight is consolidated into a container for ocean shipping export or deconsolidated from a container after importation. Ex. 75 §§ 6; 7.05. The parties agreed to certain compensation to be paid to NEG for these CFS services. *Id.* NEG was obligated to pay back a "refund" to Vanguard on some of the charges NEG collected from customers for CFS services. Ex. 75 § 6.02.

- 4 -

12.    The Agreement contained a "non-compete," which provides: During the term of this Agreement and thereafter for a period of one (1) year after termination of the Agreement, NEG-shall not, and shall not permit any of its employees . . . "to engage, as an agent, officer, director, shareholder, owner, partner, joint venturer, lender or in any capacity, whether as an employee, independent contractor, consultant or advisor, or as a sales representative, of any business selling any products or services in direct or indirect competition with the business of [Vanguard] located or operating within (100) miles of any facility of [Vanguard]." Ex. 75 § 2.02(a).

13.    The Agreement incorporates CFS operations in several ways, including: (1) Section 1.04, (a) "NEG declares that it possesses the financial and physical resources to represent NACA's interest in all matters"; (2) Section 4.01 "On exports, NEG will attend to and be responsible for receiving cargo, packing of container and stop-off trucks"; (3) 4.01 (a) "arranging for containers to be loaded or cargo to be received and freight checked against the manifest at the time of container/stop-off container or truck loading."; (4) 4.01 (b) Paraphrase: NEG is responsible to VLS for holding and releasing import cargo; (5) 4.01 (d) Paraphrase: NEG is responsible to VLS for pilfered/damaged cargo claims; (6) Section 6.01 "NACA will pay NEG $ 250.00 per container on truck loaded by NEG."; (7) Section 6.02 "NEG will refund to NACA $ 25 per IT import international shipments and $ 40 for 3rd party IPI shipments (such as H&M and APA), Maximum $ 250.00 per trailer."; (8) Section 7.01 "NACA will pay NEG a commission of $ 5.00/CBM for any LCL NEG routings to the USA, except final destination Boston. Boston destination cargo receives no commission." Dkt. 218 at 15 [Powell]; see Ex. 75.

14.    The financial arrangement was structured in such a way that a significant portion of NEG's income came from these CFS services. Dkt. 225 at 13 [Meunier]. The Agreement provides that "Boston destination cargo receives no commission." Ex. 75 at § 7.01. This made CFS income central to the overall relationship. Dkt. 225 at 13 [Meunier]. For 30 years, NEG provided all necessary

services exclusively for Vanguard, effectively wearing Vanguard's hat in Boston for all services provided. Dkt. 225 at 69 [Meunier]. The Agreement utilizing NEG's CFS in Boston gave Vanguard an advantage in the Boston market for operating an exclusive CFS; a privilege that no one else had established. In addition, the CFS services represented more than 50% of NEG's revenue stream. The Agreement was not viable without the CFS income, and Mr. Meunier testified that he would not have signed either agreement if it did not include the CFS income. Dkt. 270 at p. 633:5-634:6 [Meunier].

15.     NEG issued Vanguard-branded bills of lading (HBLs) whether the shipment included CFS or not. Dkt. 268 at p. 75:24-77:4 [Brennan].

**D. The Rocky Relationship Between Vanguard and NEG**

16.     There was a long history of disputes and issues between Vanguard and NEG, regarding certain payments, commission fees due to NEG, CFS charges, and other matters. Since the first agreement was signed in 2008, there were ongoing accounting issues. Dkt. 223 at ¶4 [Peters]; Dkt. 225 at ¶47 [Meunier].

17.     Vanguard's own witnesses acknowledged the ongoing accounting issues and did not dispute either Mr. Meunier's or Mr. Peter's account of the ongoing issues. DE269 at p. 396:4-397:16 [Laufer]. For that reason, NEG's counterclaims and resulting damages concern the calculation and payment of commissions dating back to 2008. *See generally* Dkt. 220 [Goetz].

18.     Vanguard controlled NEG's cashflow. Dkt. 225 at ¶¶17-18 [Meunier]. Although NEG used Vanguard's system, NEG could only enter an accrual in the system but it was Vanguard that made the decision to issue payments to NEG. Dkt. 270 at p. 641:4-20 [Meunier].

19.     Mr. Peters, NEG's General Manager, dealt extensively with Vanguard regarding invoices, commissions and fees from 2007 through December 2017, the entire period that the Agreements (Ex. 27 and 75) were in place. Mr. Peters routinely ran the various reports to determine commissions owed and refunds due to NEG. He

also brought accounting discrepancies to Vanguard's attention quickly, so quickly that it was a source of contention that NEG demanded payment so often and Vanguard never mentioned that NEG had waived the right to any payments owed. Dkt. 223 at ¶¶9-10 [Peters]; Dkt. 225 at ¶50 [Meunier]. There were often errors and unexpected changes in the methods of calculation and percentages. These were ongoing issues that NEG constantly, repeatedly and immediately raised and which Vanguard promised to fix but never did. Dkt. 223 at ¶¶2-4, 9 [Peters]; Dkt. 270 at p. 665:6-666:3, 674:12-22 [Peters].

20.    There were ongoing communications between Mr. Peters of NEG and Mr. Laufer of Vanguard regarding amounts owed and things not being captured by Vanguard's system. Dkt. 270 at p. 665:6-666:3 [Peters]. NEG submitted invoices to Vanguard on a daily basis. For items that NEG could not invoice, like domestic bookings, NEG created a QuickBooks statement to capture the revenue NEG was not receiving. *Id.* at p. 673:2-674:22. A majority of the communications between Mr. Peters and Mr. Laufer was via phone calls. *Id.* at p. 676:21-1. Issues were always brought to Vanguard's attention within 90 days (Dkt. 223 ¶12 [Peters]) and Vanguard witnesses did not contend otherwise. *See generally* Dkt. 206 [Laufer]. Vanguard witnesses did not deny that there were a bunch of disputes over the agreements, commissions, and fees. Dkt. 269 at p. 391:1-20 [Laufer].

21.    After years of complaints, in July of 2015, Vanguard agreed to try to work out the lingering issues. Dkt. 223 at ¶7 [Peters]; Dkt. 225 at ¶49 [Meunier]. For example, the parties had an extended, "all hands" meeting on July 21, 2015 to try to address their issues. *See, e.g.,* Ex. 2005. Many of the issues were not resolved in the meeting. Dkt. 129 at p. 239:8-240:19 [Sanchoyerto]. Mr. Sanchoyerto of VLS prepared minutes of the meeting and provided a detailed action plan. *See e.g.,* Ex. 2005, 3077.

22.    During this meeting, Vanguard did not tell NEG that any of the issues were too old or too stale to be brought up. Dkt. 269 at p. 238:15-25 [Sanchoyerto].

Many of the issues were not resolved. Dkt. 129 at p. 239:8-240:19 [Sanchoyerto]. While the Agreements were in effect, Vanguard never mentioned Section 5.07, never claimed that NEG had waived the right to any payments owed, never claimed that NEG was not entitled to commissions after 90 days, or that any accounting discrepancies had lapsed. Dkt. 223 at ¶¶10-11 [Peters]; Dkt. 225 at ¶50 [Meunier]. The 2015 minutes (Ex. 3077) makes no reference to any issues being stale and Vanguard employees did not recall ever conveying to NEG that issues were too old to be resolved. Dkt. at p. 399:5-10 [Laufer].

23.    Six months after the "all hands" meeting in July 2015, problems remained, despite continued follow-up and so Mr. Meunier again outlined these problems in an email to Vanguard's Mike Meierkort in December 2015. Mr. Meierkort's response was that perhaps NEG and Vanguard both "need to be honest and think about a different arrangement." Ex. 3088. NEG was dissatisfied with its relationship with Vanguard. Stip., Dkt. 189 at § 6 ¶ 15.

24.    Just weeks later, in January 2016, Mr. Meunier learned that Mr. Laufer's whiteboard in his office displayed the following: "Let's increase NEG's northbound fees. If they refuse, we'll open up Boston." If Vanguard opened a Boston office, they would no longer have a need for NEG's services. Dkt. 225 at ¶52 [Meunier]. That, and the email exchange with Mike Meierkort (Ex. 3088) caused Mr. Meunier to believe he had to prepare for the end of the Vanguard/NEG relationship. Dkt. 270 at p. 631:6-632:19 [Meunier].

25.    Despite the ongoing difficulties NEG experienced with VLS, NEG's intention was always to stay with Vanguard if they could work out their differences. Dkt. 270 at p. 629:23-630:8; 632:3-10 [Meunier].

**E. Vanguard Attempts to Force NEG to Renegotiate Specific Agreement Terms**

26.    Vanguard and NEG were continuing to have disputes, including Vanguard demanding in June 2017 that NEG increase its refund payments to

- 8 -

Vanguard to $45 per HB/L (house waybill), with no per trailer maximum levels. Ex. 3032; *see* Ex. 75, Section 6.02. NEG did not agree to pay more to Vanguard but offered a solution for Vanguard to add this operational cost as a line item on its arrival notice. Ex. 3032.

27.     By August 2017, Vanguard was exploring ways to force NEG to agree to renegotiate the terms of the Agreement to increase Vanguard's compensation, Ex. 1003 ("[NEG] wants to call our bluff???"), Ex. 2008 (Vanguard looking for contact at Boston Freight Terminal ("BFT") for quote on "trucking and wharehousing"), including by using the import CFS as a leverage point. Dkt. 268 at p. 113:22-115:2 [Brennan], p. 175:10-176:17 [Donahue], p. 216:3-19 [Sanchoyerto]; Dkt. 225 at 56 [Meunier]. Vanguard believed there were "more favorable terms in the market and we were just trying to get NEG to agree to the same terms that existed in the market at the time." Dkt. 269 at p. 245:6-22 [Sanchoyerto].

28.     In particular, Vanguard wanted to increase the refund to VLS on IPI (Inland Ports Intermodal) or eliminate the maximum per trailer, terms that had been in the Agreement since 2008. Ex. 3032; Dkt. 269 at p. 409:9-410:3 [Laufer]; Ex. 75 at Section 6.02 ("NEG to refund NACA $25 per IT import international shipments and $40 for 3rd party IPI shipments (such as H&M and APA). Maximum $250.00 per trailer"). Mr. Laufer explained that Vanguard "would like the CFS refund to be in alignment with the market, and they were asking for a $45/HBL and no min/max." Ex. 1003. Vanguard was looking to negotiate with NEG for revised CFS import fees in order to achieve a so-called "win-win" situation (Dkt. 202 at ¶17 [Brennan]), even though the only proposed change from Vanguard would have been for NEG to increase the refunds it was paying to Vanguard. Ex. 1003. Mr. Meunier suggested that VLS add a $35 fee billed to the customers, rather than having NEG pay a higher refund to VLS. Ex. 3032; Dkt. 225 at 53-55 [Meunier]. Vanguard rejected NEG's proposal, but later implemented the very same charge when it switched its CFS to BFT. Dkt. 269 at p. 410:18-411:14 [Laufer]; Dkt. 225 at 56 [Meunier].

29.     Around the same time, and without any notice to NEG, Vanguard changed the payment terms that had been in place for 30 years and went from paying NEG's commissions and fees with a weekly wire transfers on a net zero basis to 45 days. Ex. 1002; Dkt. 269:5-404:6 [Laufer]. NEG had been paid weekly when Vanguard made the change. Dkt. 268 at p. 104:17-106:7 [Brennan]. NEG reached out to Vanguard explaining that this change resulted in an $80,000 cash loss. Ex. 2051. Mr. Donahue proposed negotiating better Agreement terms for Vanguard before Vanguard responded to Mr. Meunier's inquiry about the change in payment terms. Id.; Dkt. 268 at p. 109:5-112:6 [Brennan].

30.     The abrupt change had a significant impact on NEG's cash flow and was detrimental to NEG's operations. After NEG's vehement protests, Vanguard agreed to make payments to NEG on a 30-day term. Dkt. 223 at ¶9 [Peters]; Dkt. 270 at p. 677:15-678:12 [Peters]. This change coincided with Vanguard's ongoing efforts to force NEG to renegotiate the Agreement. Ex. 2051, Ex. 3029.

31.     Vanguard's discussions with BFT, in mid-August 2017, were about BFT providing CFS warehouse services to Vanguard to replace NEG. Exs. 2007; 2008; 2009; see also Stip., Dkt. 189 at § 6 ¶22. Vanguard internally discussed the negative effects a switch to BFT for CFS services would have on NEG, including losing "all the warehouse related charges, including the CFS Import revenue for Boston LOT charges" and "the export D/R charges, export stopoff trailer loading and Pier receiving charges." Ex. 2009.

32.     There is no evidence that Vanguard provided any notice to NEG of its discussions with BFT about replacing NEG's CFS business.

33.     After receiving a quote from BFT to replace NEG's CFS business (Ex. 1005), VLS implemented a strategy to "pull some business" from NEG in order to "push [Mr. Meunier] to renegotiate" and to "force [NEG] to rethink [its] position." Exs. 182 ("He won't negotiate unless we pull some business." [VLS-11532]); Ex. 182 (VLS could advise [Meunier] that VLS has considered "alternatives in Boston that

provide more favorable results" because that "may push [Meunier] to renegotiate the agreement." [VLS-11530]). But VLS planned: "if we can make it work and pull the imports, we won't go back to NEG." Ex. 182

34.    In reference to the warehouse/CFS switch from NEG to BFT, Hal Donahue of Vanguard wrote to David Sanchoyerto and Karl Laufer, also of Vanguard, that "[t]his is heating up pretty quickly so we will need to be able to make a move." Ex. 2009. Vanguard had been contemplating this switch for at least a year. Ex. 2008.

35.    VLS negotiated a deal with BFT that "doubles our CFS refund," resulting in additional profits estimated to be $212,000 per year. Exs. 1002; 1010.

36.    VLS knew that it might lose NEG routings and business from one of its biggest customers if it switched the CFS from NEG to BFT. Ex. 1010 ("We need to think this through . . . . [If] we lose the Kravet business and the NEG routings[, ] it [then] becomes a loss. There has to be a way to just move the imports away."). VLS understood that its action could cause the termination of the Agreement and have consequences for VLS. Ex. 2051 ("My only concern is that we be careful to not push [Meunier] into a negative position as then [Vanguard] face[s] the problem of having to open up ourselves in Boston which I don't believe is worthwhile.").

37.    VLS was prepared to fight for customers, such as Kravet, once it terminated the CFS services at NEG. For example, VLS wrote that "Joe's friend is actually a 3rd party on the deal and doesn't actually control the business. We deal with Kravet directly so we're not sure that he could actually pull the business." Ex. 2013.

## F. Vanguard Switches the CFS/Warehouse Services from NEG to BFT and the Relationship Between Vanguard and NEG Breaks Down

38.    Then, in November 2017, Vanguard made a decision to take CFS business from NEG. On November 11, 2017, Mr. Donahue of Vanguard wrote to Jeff Lee of Vanguard:

I went back and forth with Joe on the imports and refused to budge. We engaged BFT in good faith and I don't think that NEG deserves another chance. We're still getting a bad deal on the exports and pulling the imports may force him to rethink his position.

I believe that we should formally communicate that we are pulling the imports based on his documented unwillingness to negotiate his out of market terms and then make the switch. If we back out of the switch to BFT, we pretty much close that door forever. Ex. 2010.

39.    On November 27, 2017, Mr. Sanchoyerto told Mr. Meunier that Vanguard was changing its Boston CFS facility that receives its IPI cargo in Boston to BFT by January 1, 2017. Dkt. 225 at ¶68 [Meunier]. Mr. Meunier was shocked and informed Mr. Sanchoyerto that this was a violation of the Agreement. *Id.* Under Section 3.03 (Ex. 75), Vanguard was obligated to give NEG 90-days notice if it was terminating the Agreement. The switch was to happen in just over 30 days.

40.    These IPI shipments were cargo moving from New Jersey to Boston. Dkt. 225 at ¶¶53-54 [Meunier]. Dkt. 269 at p. 409:9-19 [Laufer].

41.    Between December 1, and 6, 2017, NEG sent emails contending, among other things, that VLS's intention to change its import CFS to BFT violated the Agency Agreement. Stip., Dkt. 189 at § 6 ¶ 25; *see also* Ex. 94 ("As I said on our phone call and follow-up email I believe this action violates our agreement."); Dkt. 225 at ¶¶ 70-71 [Meunier].

42.    On December 11, 2017, Vanguard made a public announcement to all its customers that BFT would be its new CFS warehouse. The notice specifically mentioned **both** delivering "export cargo" and picking up "import cargo" and thus could be seen to apply to all of NEG's CFS business with Vanguard. Ex. 91. The effective date of the move was not the end of the year (Vanguard had told NEG), but was in only seven days, on December 18, 2017. Stip., Dkt. 189 at § 6 25; Ex. 91; see Dkt. 225 at ¶68 [Meunier]. None of Vanguard's witnesses recalled drafting the notice. E.g., Dkt. 269 at p. 248:21-249:2 [Sanchoyerto].

43.    The December 11, 2017 notice did not mention NEG. Ex. 91. With the notice announcing the change on December 18, NEG had seven days before its

primary revenue stream would cease. Dkt. 225 at ¶ 81 [Meunier]. NEG considered the notice a death sentence for its business operations, as CFS represented more than 50% of NEG's revenue stream, and NEG would have only been able to stay in business for two to three weeks if it lost the CFS stream. In NEG's view, the Agreement was not viable without the CFS. Dkt. 270 at pp. 555:13-18, 556:4-9, 663:5-634:6 [Meunier].

44.    Following the announcement, Mr. Meunier believed that Vanguard would discontinue all import and export operations at NEG on December 18, 2017, despite assurances from Vanguard. Dkt. 270 at p. 635:6-23 [Meunier]. NEG nonetheless continued doing work for Vanguard because NEG believed was in the best interests of NEG, Vanguard, and the client base. Dkt. 270 at p. 636:15-19 [Meunier].

45.    On or about December 14, 2017, Vanguard sent another notice to its customers. Stip., Dkt. 189 at § 6 ¶ 28; Ex. 92. The revised notice removed any reference to exports. Ex. 92.

46.    Neither industry notice mentioned NEG nor explained whether NEG would remain Vanguard's CFS warehouse for either import or expert warehouse pick up and drop off, and consolidation and deconsolidation services; there was no explanation as to whether NEG remained Vanguard's agent for booking and other services. Ex. 91; Ex. 92. A customer testified that the notices "caused significant confusion," as he thought Vanguard "had ended its relationship with NEG and everything was now being routed through BFT" and that "[t]he abrupt change with no warning and apparent lack of notice to NEG caused significant bad will towards VLS.". Dkt. 222 [Wyndham] at ¶¶ 15-16. Numerous customers contacted NEG to ask about cargo in transit and quotes NEG had provided. Mr. Meunier told customers that Vanguard made what "[he] considered an abrupt decision to basically put NEG out of business; and we were hoping we could find a contingency plan to continue to operate." Dkt. 270 at p. 639:20-640:11 [Meunier].

- 13 -

47. NEG was provided no advance warning of the December 11th industry notice of the CFS change. Dkt. 225 at ¶ 74 [Meunier]. VLS never coordinated with NEG on the warehouse transition to BFT. Dkt. 269 at p. 249:3-14. [Sanchoyerto] (Q. "Vanguard was changing its CFS from NEG to BFT. Did you make any effort with NEG or Mr. Meunier to coordinate that change - -" A. "No." Q. - - "so it went smooth." A. "I did not."); Dkt. 268 at p. 183:5-184:13, 187:5-19, 202:6-11 [Donahue] (Q. "Did Vanguard do any transition at all in connection with the CFS import change as it related to NEG?" A. "All we did was advise Mr. Meunier that we were changing the imports. That's all we did."); Dkt. 269 at p. 424:6-18 [Laufer] ("Did you tell Mr. Meunier and work with him to let him know how this [transition from NEG to BFT for CFS] was going to work and how to make it work?" A. "I didn't speak with Joe."); Dkt. 225 at ¶¶ 70-71, 76, 83 [Meunier] ("No one from Vanguard ever told me how the transition would work or how NEG should handle this significant change in operations.").

48. NEG was advised by its lawyer that Vanguard's December 11, 2017 notice was a final breach of the Agreement and that the Agreement was no longer valid. Dkt. 270 at p. 553:14-554:16, 556:4-9 [Meunier].

49. The timing of the December 11, 2017 notice regarding Vanguard's switch to BFT effective December 18, 2017 (Ex. 91) was 100% Vanguard's decision. Dkt. 225 at ¶79 [Meunier]. Coincidentally, the notice contained the same $35 fee that NEG had proposed to Vanguard in July 2017. Dkt. 225 at ¶73 [Meunier].

50. The nature of the Boston market, as well as the lack of mentioning NEG in the notice would have been disconcerting to NEG's customers and required clarification. Dkt. 218 at ¶18 [Powell].

51. NEG had seven days before its primary revenue stream would cease. Dkt. 225 at ¶81 [Meunier]. NEG was under tremendous financial pressure (Dkt. 225 at ¶2[Meunier]), as Vanguard was well aware. Dkt. 202 at ¶40 [Brennan].

52.    Vanguard did not even consider whether these changes in the Agreement terms would make it financially unviable for NEG. Dkt. 269 at p. 419:2-25, 429:15-25 [Laufer].

53.    Vanguard now maintains that CFS services were not part of the Agreement such that it was not required to give notice of its intention to switch to BFT for import services. Dkt. 202 at ¶¶18-19 [Brennan]. But Mr. Sanchoyerto also testified NEG may not necessarily be able to move CFS for anyone, such as a direct competitor. Dkt. 269 at p. 246:14-247:14 [Sanchoyerto].

54.    Even though Vanguard had made a public announcement of the change in CFS which would have effectively put NEG out of business in 2-3 weeks, and even though Mr. Meunier anticipated that notice of termination of the Agreement would prompt Vanguard to turn off NEG's computer system, Mr. Meunier continued to hope that Vanguard would come to their senses on the change to the CFS. Dkt. at p. 582:13-24 [Meunier].

## G. NEG's Counsel Notifies Vanguard that NEG is Terminating the Agreement

55.    On December 21, 2017, NEG's counsel sent a letter to Vanguard giving notice that it was terminating the Agreement. The letter gave notice that "Vanguard is in material breach of the Agreement based upon, inter alia, Vanguard's abrupt and unilateral relocation of its import Container Freight Station ("CFS") in Boston to Boston Freight Terminals, and its abrupt and unilateral notification to third parties of the same, notably concerning both imports and exports…" Counsel further advised that NEG would "longer accept newly ordered Vanguard exports at its facility" …. but "in order to facilitate the orderly wind down of the parties' relationship and currently ordered exports in transit, NEG will cooperate in the disposition of Vanguard exports now on site." Ex. 69.

56.    Vanguard's counsel immediately responded to NEG's termination letter, telling NEG to "discontinue" doing work for Vanguard. Ex. 1020.

57.    VLS did not take NEG up on its offer to cooperate during the transition. Dkt. 268 at p. 145:6-9 [Brennan]; Dkt. 269 at p. 251:16-25 [Sanchoyerto]. Nor did VLS ask ECU to coordinate any transition for NEG. Dkt. 217 at ¶38 [Abisch].

58.    That same day, on December 21, 2017, after VLS received the letter from NEG's counsel, VLS terminated NEG's access to VLS's VPN, cut off NEG's access to VLS's computer systems, disabled NEG's access to VLS's network, and cut off NEG's access to emails directed to NEG through any VLS email address. Stip., Dkt. 189 at § 6 ¶ 35.

59.    As a result, NEG lost access to all its files and emails, causing a significant disruption in its ability to conduct business. Dkt. 225 at ¶104 [Meunier]; Dkt. 220 at ¶48(k) [Goetz]. The losses NEG incurred as a result are set out in the subsection below concerning NEG's Damages.

**H. NEG's Damages**

60.    Although NEG alleges separate claims for relief, the damages NEG incurred as a result of Vanguard's wrongful conduct resulted in damages of the same nature and amount. NEG does not seek duplicative damages.

61.    NEG's General Manager David Peters is familiar with and involved in all aspects of NEG"s operations and finances. His duties include invoices for CFS fees and LCL commissions and he dealt extensively with Vanguard regarding the invoices, fees and commissions between 2007 and December 2017. Dkt. 223 at ¶¶2 [Peters]. When litigation commenced, Mr. Peters was tasked with locating the necessary documents to establish the damages NEG had sustained as a result of Vanguard's ongoing accounting and system issues. Dkt. 223 at ¶13 [Peters]. Mr. Peters listed several categories where NEG had either been not paid the full amount due or where Vanguard had failed to live up to its obligations under the Agreement. Dkt. 223 at ¶¶13-15 [Peters]. Mr. Peters gathered the invoices, emails and records (Ex. 3082) that establish the ongoing damages that NEG sustained and provided these

records to NEG's expert. *Id.* at ¶16.  He also testified about them. Dkt. 270 at p. 673:2-19, 681:22-685:2 [Peters].

62.    In support of its damages, NEG presented unrebutted expert testimony from Mr. Luke Goetz. Dkt. 220. Mr. Goetz identified and analyzed the categories identified by Mr. Peters and presented his opinions on the lost profits that NEG suffered as a result of Vanguard's conduct. Those categories include (1) failure to build direct services, (2) failure to pay CBM commissions, (3) abuse of waiver of pier unloading fees, (4) loss of Kravet commissions, (5) failure to pay full commission on FCL imports, (6) improper termination of CFS services and Agency Agreement, (7) Vanguard forcing NEG to absorb costs for certain customers and (8) purge of loss of revenue. Dkt. 220 at ¶42 [Goetz].

63.    On certain categories, Mr. Goetz's calculations included a portion of 2018, after the Agreement had terminated. At the time Vanguard cutoff NEG's computer access, there were still shipments in process and revenue to be processed, particularly with respect to the purged loss of revenue that occurred only every six months. This post-termination time is included to allow all outstanding items to move through the system and be fully digested. The damages incurred post-termination were minimal compared to the overall damages, in the $130,000 range. Dkt. 271 at p. 852:12-853:23 [Goetz].

### 1) Failure to Build Direct Services - $219,938

64.    Vanguard and NEG agreed to "work together on building direct services ex. Boston on the export side and direct boxes to Boston on the import side in order to enhance profitability on all traffic. Ex. 75 at § 7.03.

65.    NEG offered multiple direct services proposals that would grow NEG's business and Vanguard' business in Boston, all of which were rejected by Vanguard. Exs. 170, 2049; Dkt. 225 at ¶¶ 19-25 [Meunier]; Dkt. 220 at ¶43(a) [Goetz]. In particular, NEG worked to establish the foundation for building routes from Ningbo and Shanghai to Boston. Ex. 3028.

66.     Since 2018, NEG has been able to establish these direct services under its agreement with ECU, averaging 43 containers a year. Dkt. 225 at ¶25[Meunier]; Dkt. 220 at ¶43(d) [Goetz].

67.     Mr. Goetz looked solely at the Shanghai route for calculating the damages NEG incurred. Mr. Goetz calculation was conservative because he used only the one route (Boston-Shanghai) that NEG had successfully instituted after the switch to ECU. Dkt. 271 at p. 851:6-852:11[Goetz].

68.     Mr. Goetz concluded that NEG suffered $219,938 in damages as a result of Vanguard's failure to work to implement the Shanghai to Boston route. Dkt. 220 at ¶43(e) [Goetz].

**2) Failure to Pay CBM Commissions - $243,092**

69.     Vanguard was required to "pay NEG $5 CBM for any LCL NEG routings to the USA, except final destination Boston.". Ex. 75 at § 7.01.

70.     These CBM commissions were on freight that NEG had sold directly that arrived in any other port in the USA except for Boston. Boston was excluded from CBM commissions because NEG was able to gain revenue from the CFS operation to offset that commission. NEG had no way to track information on the CBM commissions and Vanguard claimed they couldn't track it either despite it being in the Agreement. Dkt. 270 at p. 641:21-642:8 [Meunier].

71.     As early as 2014, Mr. Meunier discovered that NEG was not receiving these commissions on a large number of transactions and brought it to Mr. Laufer's attention. Dkt. 225 at ¶27[Meunier]. This problem occurred on an ongoing basis despite NEG's repeated requests that this be fixed in Vanguard's system. *Id.;* Ex. 3069. NEG even provided Consignee Controlled Profiles for shipments on which commissions were owed, but never received those commissions. Dkt. 225 at ¶29 [Meunier]. Although Vanguard's system captured the data necessary to calculate the fees owed to NEG, Vanguard claimed there was no way to retrieve it. *Id.*; Dkt. 220 at ¶45(d) [Goetz].

72.    On the CMB calculations, Mr. Goetz used the post-termination ECU numbers as a proxy for what Vanguard should have been paying NEG for CBM and excluded destination Boston from the calculation. Dkt. 271 at p. 854:23-855:7 [Goetz]. This is a conservative calculation because NEG's shipping volumes with Vanguard were greater than its shipping volumes with ECU. Dkt. 220 at ¶45(e) [Goetz].

73.    NEG's total estimated CBM volume with Vanguard for the years 2008 – 2018 was 48,618 CBMs. At $5 per CBM, NEG should have earned a total of $243,092 in additional profits. Dkt. 220 at ¶45(e) [Goetz].

### 3) Abuse of Waiver of Pier Unloading Fees - $598,527

74.    Per the Agreement, NEG was allowed to invoice origin shippers a Pier Unloading Fee. Ex. 75 at § 7.05. Under the terms of the Agency Agreement, Vanguard could request a waiver of the Pier Fee only "on occasion" and NEG could agree to the waiver only from "time to time" and "under special circumstances." However, NEG was not required to agree to a waiver if it would cause "business disruption" to NEG. *Id.*; Dkt. 225 at ¶32 [Meunier].

75.    Vanguard routinely unilaterally waived or discounted the Pier Fees on its end by 50% without consulting NEG. Dkt. 225 at ¶33 [Meunier]; Dkt. 223 at ¶6 [Peters]. When Vanguard waived Pier Fees, Vanguard lost nothing however NEG incurred overhead costs in having to perform the CFS services for a customer's cargo (handling, consolidation and deconsolidation). Dkt. 225 at ¶34[Meunier]. As a result, NEG was forced to handle cargo coming into its CFS station without any compensation. Dkt. 269 at p. 242:24-244:15 [Sanchoyerto]. This caused a significant reduction in profits to NEG. *Id.*; Dkt. 271 at p. 855:25-856:13; Dkt. 220 at ¶45(c) [Goetz].

76.    In total, Mr. Goetz determined that NEG is owed $530,224 in Pier Fees. Dkt. 220 [Goetz] at ¶45(e) [Goetz]. In addition, Vanguard did not pay NEG $68,303

in lost profits for domestic bookings. *Id.* at ¶45(f). Combined, NEG suffered losses of $598,527. *Id.*

### 4) Loss of Kravet Commissions - $352,771

77.    With respect to the Kravet Title business, Section 7.01 of the Agreement provides that Vanguard will pay NEG a 25% commission for all imports originating anywhere except Italy, and a 15% on Italy originating business. Ex. 75 at § 7.01. NEG worked to maintain this Kravet business, even alerting Vanguard to the possibility that Vanguard and NEG would lose the Kravet business if they could not offer better rates. Exs. 11, 2002.

78.    In 2015, NEG discovered it was receiving far less than the 25% of net revenue it was entitled to on the Kravet business. Ex. 3068. Although Vanguard acknowledged the unfair profit split and pledged to correct the problem, nothing was done to fix the issue, causing a significant loss in profits to NEG. Dkt. 225 [Meunier] at ¶39; Dkt. 220 [Goetz] at ¶46(b)-(c).

79.    Mr. Goetz calculated the unpaid Kravet commissions based upon § 7.01 and documents showing the Kravet annual net revenues in the range of $275,000 to $351,000. Dkt. 271 at p. 856:14-858:16 [Goetz]. NEG's expert utilized two sources for the annual net revenue from the Kravet business, (1) an email between NEG and Vanguard stating the Kravet annual net revenue was ~$275,000 and (2) the 2015 Net Revenue Report listing the Kravet annual net revenue at $351,369. Dkt. 220 at ¶46(d) [Goetz]; Ex. 2012, 3082. Utilizing the midpoint of figures, and accounting for commissions that were paid, NEG is owed an additional $352,771 for commissions on the Kravet Textiles revenue. *Id.*

### 5) Failure to Pay Full Commission on FCL Imports - $96,356

80.    NEG was entitled to 60% of the net profit for each FCL shipment. Ex. 75 at § 7.01.

81.    Although the commission rate was specifically set forth in the Agreement, NEG routinely received only 25% of the net profits, rather than the 60%

it was entitled to. Dkt. 225 [Meunier] at ¶41; Dkt. 220 [Goetz] at ¶47(b). Even though Vanguard was made aware of this error, it never corrected it or paid NEG for the commissions NEG was entitled to. *Id.*

82.    In 2020, NEG's net profits from FCL imports at ECU was $20,027. Using that figure as an estimate for annual net profits for FCL imports with Vanguard and given the much larger volume with them, NEG is entitled to $96,356 for the balance of commissions owed by Vanguard. Dkt. 220 [Goetz] at ¶47(d).

### 6) Improper Termination of CFS Services and Agency Agreement - $67,267

83.    There is no dispute that Vanguard cutoff all NEG access to its computer system on December 21, 2017. As a result, NEG lost access to all its files and emails, causing a significant disruption in its ability to conduct business. Dkt. 225 [Meunier] at ¶104; Dkt. 220 [Goetz] at ¶48(k). The abrupt termination left many unresolved accounting issues, with NEG owed money on recent invoices. *Id.*

84.    From January to March 2017, NEG worked to resolve the outstanding balance of over $87,000. Dkt. 225 [Meunier] at ¶105. This amount was in addition to past commissions which were still in dispute. *Id.*

85.    After the litigation commenced, NEG received a total of $27,600.35 from Vanguard, however to date, NEG has not been fully compensated on the outstanding invoices. Dkt. 225 [Meunier] at ¶105.

86.    As a result, NEG continues to have $67,267 in unpaid and outstanding invoices with Vanguard. Dkt. 220 [Goetz] at ¶47(m).

### 7) Vanguard Forced NEG to Absorb Costs for Certain Customers - $360,310

87.    NEG only received commissions for freight that it booked. Ex. 75 at ¶7.01. Nothing in the Agreement required NEG to handle these "gateway bookings" for Vanguard. *Id.* For these certain customers, such as Panalpina, Vanguard would book the freight and NEG would have to handle it for free. Dkt. 269 at p. 242:10-

243:10 [Sanchoyerto]. Vanguard would book "gateway bookings" through NEG's CFS and NEG would have to receive the cargo, segregate it by destination, verify hazardous material labelling and store for unlimited amounts of time but would not get any commission or handling fees. *Id.* at p. 430:4-25 [Laufer]; Dkt. 225 [Meunier] at ¶¶43, 57. If NEG challenged it, Vanguard would indicate that this is what Vanguard had to do to gain this business. Dkt. 269 at p. 243:11-244:15 [Sanchoyerto]. Based on Vanguard's agreement with these customers, NEG was required to manage the freight without being able to charge its standard CFS fees, thereby requiring NEG to work for free and absorb the expense of handling this cargo. Dkt. 225 [Meunier] at ¶¶42-43; Dkt. 220 [Goetz] at ¶49(a).

88.    Mr. Geotz calculated the costs NEG was forced to absorb for just six specific customers at $36,031 in 2010. That figure was used to extrapolate the costs for the remaining period (i.e., 2009 and 2011-2018). Dkt. 220 [Goetz] at ¶50(c). As a result, NEG is owed $360,310 by Vanguard. *Id.*

89.    Mr. Goetz's calculations were based on a lower number as it was limited to only certain customers (in the range of $36,000 per year for certain customers as compared to $100,000 for all customers). Dkt. 271 at p. 856:14-858:16 [Goetz].

### 8) Purge of Lost Revenue – $398,805

90.    Vanguard had a policy of purging expenses that were not paid to Vanguard by the customer after 4-6 months. Dkt. 225 [Meunier] at ¶44; Dkt. 220 [Goetz] at ¶50(a). When Vanguard purged unpaid accrued expenses, the revenue typically goes back to the booking station with Vanguard's revenue increasing from those expense purges. *Id.*

91.    Vanguard failed to calculate or pay NEG its share of the additional net profit that Vanguard realized from the pursing of accrued, unpaid expenses on the FCL shipments. *Id.* at ¶50(b).

92.    Mr. Peters gathered the information that ECU pays NEG on the purge commissions because NEG did not have access to Vanguard's numbers. Dkt. 270 at

p. 683:21-685:2 [Peters]. Mr. Goetz utilized the purged payables from 2019 and 2020 as a proxy to calculate the annual purged payables by Vanguard between 2008 and 2018. Based on an annual average of purged payables of $60,425, and using a commission rate on net profit of 60%, NEG is owed $398,805 by Vanguard. *Id.* at ¶50(c).

**9) NEG's Incurred Damages**

93.     Based on Mr. Goetz analysis and the testimony of Mr. Meunier and Mr. Peters, along with the documents gathered, NEG suffered $2,337,065 in damages from Vanguard's conduct. Dkt. 220 at ¶42.

94.     This is unrebutted testimony. Vanguard's expert, Dr. Luna did not offer any rebuttal to Mr. Goetz opinions in her witness statement. Dkt. 201 [Luna], Dkt. 269 at p. 308:25-309:19 [Luna]. Vanguard's fact witnesses also did not refute any of NEG's damage claims or their basis. Mr. Laufer and Mr. Brennan briefly addressed the direct services routes, rejecting the idea of Boston routes because of the negative impact on Vanguard's New York volume. Dkt. 206 at ¶¶20-21 [Laufer]; Dkt. 202 at ¶42 [Brennan]. Mr. Donahue addressed the pier unloading fee only to state that he was not involved. He also mentioned Panalpina, but does not dispute the fact that NEG was handling the Panalpina cargo for free. Dkt. 204 at ¶¶22-23 [Donahue].

## III.  CONCLUSIONS OF LAW REGARDING NEG'S COUNTERCLAIMS

1.     NEG asserts four counterclaims against Vanguard, specifically: breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and violation of the Massachusetts Consumer Protection Act.

### A. NEG's 1st Cause of Action: Breach of Contract

2.     "[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis West Realty, LLC v. Goldman,* 51 Cal.4th 811, 821 (2011).

Element 1 – Existence of an Agreement

3.      There is no dispute that NEG and Vanguard were parties to the Agreement[s] and in business for nearly 30 years. During that time, NEG represented Vanguard throughout the NEG Region. Their relationship was governed by the Agency Agreements since 2008. Ex. 27 and 75. The Agreement at issue had been in place since December 2013. Ex. 75.

4.      The 2013 agreement was effectively a continuation of the 2008 agreement and is the operative agreement for this dispute. Exs. 27; 75; Dkt. 390:5-391:13 [Laufer]. For that reason, and because of the ongoing failure to pay NEG the amounts it was entitled to under the agreements, NEG's counterclaims and resulting damages concern the calculation and payment of commissions dating back to 2008. *See generally* Dkt. 220 [Goetz].

Element 2 – NEG's Performance or Excuse for Nonperformance

5.      Even though NEG considered the Agreement breached by Vanguard by December 11, 2017, NEG continued to meet its obligations under the Agreement. Dkt. 225 at ¶97 [Meunier]; Dkt. 270 at p. 636:15-23 [Meunier]. NEG performed all conditions of the Agreement until NEG gave notice that it was terminating the Agreement and Vanguard cutoff NEG's computer access thereby preventing, and excusing, further performance by NEG. Exs. 1019 and 1020.

Element 3 – Vanguard's Breach

6.      Vanguard materially breached the Agreement by terminating the Agency Agreement by notice to the industry on December 11, 2017 and again on December 21, 2017. Exs. 91, 93.

7.      Vanguard also breached the Agreement by failing to perform its obligations under the Agreement, including the timely and proper payment of amounts due to NEG. The Agreement (Ex. 75) provided the various commissions and fees owed between Vanguard and NEG. NEG's CEO Mr. Meunier and its general manager, Mr. Peters, dealt extensively with Vanguard regarding the invoices, fees and commissions between 2007 and December 2017. Mr. Peters world routinely run

- 24 -

reports to ensure NEG was receiving the full amount of the commissions owed and
the refunds due. On numerous occasions, NEG would discover discrepancies in the
amounts NEG was owed and the amounts it actually received from Vanguard.

8.      The accounting problems were so extensive that Vanguard and NEG
personnel had an "all hands" meeting in July 2015 to try to address the various
commission issue. While certain problems were addressed, many more went
unresolved. Vanguard consistently had excuses for errors, but routinely drug its feet
remedying the problems. Numerous emails between NEG and Vanguard confirm
these ongoing issues. As a result of these ongoing issues, NEG lost out on a
substantial amount of income and commissions it was owed. Mr. Goetz has
calculated the losses NEG sustained as a result. Dkt. 220.

9.      At trial during opening statements (but not with any witness or
documentary testimony), Vanguard contended that NEG did not timely raise any
discrepancies within ninety (90) days of the end of each calendar quarter as stated in
Section 5.07 of the Agreement. The unrebutted actual evidence from Mr. Meunier
and Mr. Peters however confirms that NEG regularly and immediately as soon as
they learned about the issue contacted Vanguard to address accounting issues and
that matters were addressed on an ongoing basis. Not once since entering the first
Agreement in 2008 did Vanguard claim that NEG had waited too long to address
accounting issues. At this point, Vanguard waived, and is estopped from asserting,
Section 5.07 even if it were applicable which it is not. *Wind Dancer Prod. Grp. v.
Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 79.

10.     Vanguard also breached the Agreement by informing NEG it was
switching its CFS station for imports without 90 days' notice and by terminating the
Agreement by the industry-wide notice sent out on December 11, 2017. Ex. 91.
Vanguard's switch to BFT for CFS services was a breach of the Agreement and
Vanguard failed to provide NEG with 90 days' notice of its intention to terminate.
The switch to BFT for import CFS occurred just three weeks (and far less than 90

- 25 -

days) after Mr. Sanchoyerto first informed Mr. Meunier on November 27, 2017 and just one week after the industry-wide announcement (Ex. 91).

11. Vanguard contends that the CFS services were not in fact part of the Agreement. That contention is not supported by the language of the contract or the parties' course of performance. The Agreement provides for NEG to act "exclusively as NACA's representative" for "ocean exports and imports" in the NEG Region. Ex. 75, Section 2.01. Representative is not defined in the agreement, however that position is explained by the long-standing course of performance. *Code Civ. Proc.* §1856(c); *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 798 [course of performance evidence 'is entitled to great weight' in resolving a dispute about the meaning of a contract].). For 30 years, and certainly since the first agreement was signed in 2008, NEG acted as Vanguard's exclusive representative for CFS services to all Vanguard import and export customers. Dkt. 226 at ¶69 [Meunier]. No Vanguard witness contended otherwise. It was only when Vanguard wanted to force NEG to renegotiate the Agreement that Vanguard took the position that CFS services were not.

12. Vanguard's breach of the Agreement left NEG with just a few weeks to act to save its entire operation. At that point, NEG started to make arrangements to switch to a new NVOCC, ECU.

Element 4 – Resulting Damages

13. NEG presented the unrebutted expert testimony of Mr. Goetz (along with the testimony of Messers. Meunier and Peters). Mr. Goetz analyzed the identified categories of damages sustained by NEG over its relationship with Vanguard and concluded that NEG suffered a total of $2,337,065 in lost profits/damages in the course of its relationship with Vanguard. Dkt. 220 at ¶42.

**B. NEG's 2nd Cause of Action: Breach of the Covenant of Good Faith and Fair Dealing**

14.    The same findings and conclusions noted in the breach of contract claim applies here. In addition to the breaches of the Agreement, Vanguard also denied NEG the benefit of the bargain it was entitled to under the Agreement.

15.    The elements of a cause of action for breach of contract and for breach of the implied covenant of good faith and fair dealing are similar. (Compare CACI No. 303 [factual elements of breach of contract] with CACI No. 325 [factual elements of breach of the implied covenant of good faith and fair dealing].) Both require proof that the parties entered into a contract and that the plaintiff performed under the contract. While the third element of a breach of contract cause of action requires proof that the defendant breached an express contractual covenant; i.e., "failed to do something that the contract required it to do" or did something that the contract prohibited it from doing (CACI No. 303), the third element of a breach of the implied covenant of good faith and fair dealing cause of action requires proof that the defendant "unfairly interfered with [the plaintiff's] right to receive the benefits of the contract." (CACI No. 325.)

16.    Like all contracts, the Agreement contains an implied covenant of good faith and fair dealing that ensures "neither party will do anything that injures the right of the other to receive the benefit of [their] bargain." *Comunale v. Traders General Ins. Co*., 50 Cal. 2d 654, 358 (1958).

17.    A breach of the implied covenant of good faith and fair dealing is also a breach of the contract, but a specific provision of the contract is not necessary to the claim because the covenant of good faith and fair dealing is implied by law in every contract. *Thrifty Payless, Inc. v. The Americana at Brand, LLC,* 218 Cal.App.4th 1230, 1244 (Cal. Ct. App. 2013).

18.    NEG contends that Vanguard breached the covenant of good faith and fair dealing by (1) not providing notice to NEG of Vanguard's termination of the Agency Agreement knowing that it would interfere with NEG's operations, (2) failing to use NEG as a CFS facility in Boston knowing that NEG was prohibited under the

Agency Agreement from acting as a representative for any other NVOCC, (3) failing to work with NEG to create direct routes to Boston knowing it would harm NEG's business and was in direct violation of the terms of the Agency Agreement, (4) knowingly reducing NEG's commissions without notice or justification, (5) passing off Vanguard costs to NEG rather than increasing fees to Vanguard customers despite adding those same fees in other locations, (6) systematically increasing its accessorial fees to customers knowing that NEG does not receive a commission on those fees causing a reduction in revenue to NEG and increase in revenue to Vanguard, (7) regularly charging its customers far more than NEG's standard fees for the services being provided by NEG resulting in a loss to NEG of both revenue and goodwill, (8) representing that Vanguard would correct the shortfalls in commissions on the Kravet business but never doing it, (9) waiving NEG's Pier Fees regularly and without requiring special circumstances, resulting in additional revenue and goodwill to Vanguard at the expense of NEG, and (10) failing to recalculate NEG's share of the net profit owed for FCL shipments after purging its unpaid accrued expenses and keeping the revenue from those purges, all of which denied NEG the benefit of the bargain it was entitled to under the Agreement.  Dkt. 98 at ¶¶110-129.

Element 1 – Existence of an Agreement

19.     Like the contract claim, there is no dispute that NEG and Vanguard were parties to the Agreements and in business for nearly 30 years. The last Agreement at issue had been in place since December 2013. Ex. 75.

Element 2 – NEG's Performance or Excuse for Nonperformance

20.     NEG performed all conditions of the Agreement until NEG gave notice that it was terminating the Agreement and Vanguard cutoff NEG's computer access thereby preventing, and excusing, further performance by NEG. Exs. 1019 and 1020.

Element 3 – Vanguard's Alleged Breach

21.     Vanguard's conduct denied NEG the benefit of Agreement, thereby breaching the implied covenant of good faith and fair dealing.

22.    During the contractual relationship, Vanguard failed to work with NEG to obtain certain benefits contemplated by the Agreement. For instance, the Agreement provided that NEG's "sales commission and agency fees are based on the premise that Vanguard/NEG will work together on building direct services ex. Boston on the export side and direct boxes to Boston on the import side in order to enhance profitability on all traffic." Dkt. 97 at Ex. 2 at Section 7.03. Vanguard rebuffed NEG's attempts to build direct services, even stating that "why would we want to support any initiatives that generate revenue for your warehouse." The evidence and testimony confirm that time and again Vanguard blocked NEG's efforts to expand business which would have increased revenues on both sides.

23.    Near the ultimate end of the relationship, Vanguard breached the covenant by switching the CFS to BFT without providing 90 days' notice. This change, which prevented NEG from earning the CFS revenues it had enjoyed for 30 years and which would have put NEG out of business in 2-3 weeks' time, denied NEG the benefit of the bargain.

24.    Conveniently, Vanguard has claimed after the fact that the Agreement was not exclusive with respect to CFS services. The Court concludes that this position is contrary to the terms of the Agreement and contrary to the parties long-standing business relationship.

25.    The evidence also demonstrates that Vanguard intended this change in import CFS to have a crippling effect on NEG. It sought to use the import CFS as leverage to force NEG to negotiate a new Agreement with better terms for Vanguard. Vanguard's own emails and witness testimony confirm the plan to take away import CFS income to force NEG's hand in either renegotiating or terminating the Agreement.

26.    In addition, Vanguard was well aware that taking away the CFS would substantially reduce NEG's income and that there was no conceivable way for NEG to provide CFS services for other NVOCCs that when its entire business ran on

Vanguard's computer network. NEG was at Vanguard's mercy and Vanguard exploited its leverage in every way possible to deny NEG the benefit of its bargain.

Element 4 – Resulting Damages

27.    NEG presented the unrebutted expert testimony of Mr. Goetz. Mr. Goetz analyzed the identified categories of damages sustained by NEG over its relationship with Vanguard and concluded that NEG suffered a total of $2,337,065 in lost profits/damages in the course of its relationship with Vanguard. Dkt. 220 at ¶42.

**C. NEG's 4th Cause of Action: Declaratory Judgment (28 U.S.C. § 2201(a))**

28.    Declaratory Judgment Act provides that in "a case of actual controversy … any court of the United States … may declare the rights and legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a)

29.    NEG is entitled to a declaration of the parties' rights and obligations. There was a legally binding contract between Vanguard and NEG (Ex. 75) and an actual controversy regarding their rights under that Agreement with respect to whether the services provided to Vanguard customers by NEG for imports are covered by the Agency Agreement.

30.    In November 2017, Vanguard claimed that CFS services were not exclusive or part of the Agreement and that Vanguard was free to contract with another entity, BFT, for CFS services in the NEG Region.

31.    Based on the language and terms of the Agreement, and evidence concerning the parties' course of conduct established over a 30 year period, the Court finds that import and export customers and CFS services are within the scope of the contractual relationship between the parties.

**D. NEG's 5th Cause of Action: Violation of Massachusetts Consumer Protection Action (M.G.L. C. 93A §§ 2 and 11)**

32.    Massachusetts General Laws c. 93A, §§ 2 and 11 make unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce" between two

businesses. Section 11 of Chapter 93A states in relevant part that: "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice ... may ... bring an action ... for damages and such equitable relief ... as the court deems to be necessary and proper." Mass. Gen. Laws ch. 93A, § 11.

33.    The applicability of Chapter 93A, §§ 2(a) and 11 to interaction between two parties requires a dual inquiry: first, the court assesses whether the interaction is "commercial" in nature, and second, it evaluates whether the parties were both engaged in "trade or commerce," and therefore acting in a "business context." *Linkage Corporation v. Trustees of Boston University,* 425 Mass. 1, 23 (Mass. 1997) (affirming trial court's conclusion that the arrangement between the university and the management company was an arm's-length transaction between two corporations).

34.    There is ample support in the record for the conclusion that the interaction between NEG and Vanguard was a "commercial transaction" for the purposes of G. L. c. 93A. These were dealings between discrete, independent business entities. *Szalla v. Locke*, 421 Mass. 448, 451 (1995). There is also ample support to conclude that NEG and Vanguard were acting in a business context. The activities each engaged in were commercial in nature and in the ordinary course of their respective businesses. The Court finds that the parties were engaged in commerce in a business context within the meaning of the statutes.

35.    To recover under § 11, NEG must demonstrate (1) the existence of an unfair or deceptive act or practice, (2) a loss, and (3) the causation of one by the other. *Stamatakis v. Metro. Prop. Cas. Ins. Co.,* 2011 Mass. App. Div. 174, 178 (Mass. Dist. Ct. App. 2011).

36.    The Court finds that Vanguard engaged in unfair acts and practices in its relationship with NEG. Based on the facts detailed herein, Vanguard engaged in an ongoing pattern of conduct that denied NEG the benefits it was entitled to under the Agreements. Vanguard further sought to leverage its superior position over NEG to force a renegotiation of that Agreement to give Vanguard more favorable terms.

37.    The very conduct that gives rise to the breach of contract claim also serves as the misconduct giving rise to breach of G.L.c. 93A. It is appropriate, where the same conduct giving rise to a breach of contract claim also constitutes a violation of G. L. c. 93A and where that violation was willful and knowing, to apply double or treble damages. *T. Butera Auburn, LLC v. Williams*, 83 Mass. App. Ct. 496 (2013) (upholding the doubling of breach of contract damages, in light of a violation of G. L. c. 93A).

38.    The evidence established that Vanguard violated the Massachusetts Consumer Protection Act Massachusetts's General Laws c. 93A, §§ 2 and 11 in the following ways: by failing to work with NEG to build direct services with the intent to limit the revenue generated by NEG; by terminating the Agency Agreement suddenly and without notice knowing that it would interfere with NEG's operations and cause confusion to customers; by failing to use NEG as a CFS facility in Boston knowing that NEG was prohibited under the Agency Agreement from acting as a representative for any other NVOCC; by knowingly reducing NEG' s commissions without notice or justification; by passing off Vanguard costs to NEG rather than increasing fees to Vanguard customers despite adding those same fees in other locations; by systematically increasing its accessorial fees to customers knowing that NEG does not receive a commission on those fees causing a reduction in revenue to NEG and increase in revenue to Vanguard; by unilaterally changing the payment terms knowing it would significantly harm NEG's cash flow and ongoing operations; by regularly charging its customers far more than NEG' s standard fees for the services being provided by NEG resulting in a loss to NEG of both revenue and

goodwill; by falsely representing that Vanguard would correct the shortfalls in commissions on the Kravet business but never doing it; by forcing NEG to handle freight for certain customers not covered by the Agency Agreement at great expense to NEG; by intentionally reducing the business routed through Boston in an effort to increase business in New Jersey; by systematically reducing NEG's revenue in an effort to force NEG out of business; by regularly waiving NEG's Pier Fees to its customers without requiring special circumstances, resulting in additional revenue and goodwill to Vanguard at the expense of NEG; and by failing to recalculate NEG's share of the net profit owed for FCL shipments after purging its unpaid accrued expenses and keeping the revenue from those purges.

39.    NEG presented unrebutted expert testimony establishing that NEG suffered $2,337,065 in damages from Vanguard's conduct. Dkt. 220 at ¶42. These are losses that NEG sustained as a result of Vanguard's unfair and deceptive acts and practices.

40.    The Court further finds that Vanguard engaged willful and/or knowing violations of Mass. Gen. Laws ch. 93A, § 2. Vanguard's unfair practices were done willfully and knowingly, with the intention of making additional money for Vanguard at NEG's expense. Not only did Vanguard engage in a years-long campaign to deny NEG the full measure of compensation it was entitled to under the Agreement, at the end it used its superior position and grip on NEG's cashflow in hopes of forcing NEG's hand to renegotiate. Vanguard wanted NEG to reduce certain commissions it was owed and CFS fees it charged in order to bolster Vanguard's profit margins at NEG's expense. When it became clear that NEG would not accept Vanguard's proposed terms, Vanguard launched its plan to "take something away" from NEG, namely the CFS business, to force NEG to capitulate. As such, NEG is entitled to treble damages for Vanguard's willful and knowing violations in the amount of $7,011,195.

41.     The choice of law provision in the Agreement does not usurp NEG's ability to bring a statutory claim under Massachusetts law. The choice of law provision in the Agreement applies solely to the interpretation of the Agreement.

42.     The Court further finds that NEG is entitled to reasonable attorneys' fees and costs in accordance with Mass. Gen. Laws ch. 93A, § 11.

Dated: April 5, 2023                               Respectfully Submitted,

                                   **FERNALD LAW GROUP APC**

                                   By:_____
                                          Adam P. Zaffos, Esq.

                                   Attorneys for Defendant and Counterclaimant,
                                   Groupage Services of New England, LLC

\*\*\*

IT IS, THEREFORE, after consideration of the extensive evidentiary record, the testimony at trial, and argument of counsel, **ORDERED AND ADJUDGED** as follows:

1.     The Court finds for NEG and against Vanguard on each of NEG's counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and violation of the Massachusetts Consumer Protection Act.

2.     NEG shall recover compensatory damages in the amount of $2,337,065, plus prejudgment interest from Vanguard.

3.     The Court declares that the terms of the written Agency Agreement and/or the parties' course of conduct establish that import customers are covered by the contractual relationship between the parties.

4.     NEG is entitled to recover treble damages based on Vanguard's willful and/or knowing violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11 in the amount of $7,011,195.

5.     For Vanguard's violations of Mass. Gen. Laws ch. 93A, § 2, NEG shall be awarded reasonable attorneys' fees and costs pursuant to Mass. Gen. Laws ch. 93A, § 11. NEG shall make a motion for attorney's fees and costs following entry of this order.

**DONE AND ORDERED**, this _____ day of _____ 2023.

_____
HON. DALE S. FISCHER
DISTRICT COURT JUDGE

# CERTIFICATE OF SERVICE

I, Jordan Patronete, declare that I am over the age of eighteen years and not a party to this action. I am employed in Los Angeles County, and my business address is: Fernald Law Group APC, 15910 Ventura Blvd., Suite 1702, Encino, California 91436.

On **April 5, 2023**, I hereby certify that a true and complete copy of the foregoing documents:

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANT AND COUNTERCLAIMANT GROUPAGE SERVICES OF NEW ENGLAND, LLC'S COUNTERCLAIMS**

have been served by forwarding said copy by electronic submission through my email the documents listed above to:

| | |
|---|---|
| Mark Goshgarian, State Bar No 105703<br>Merak Eskigian, State Bar No 115579<br>**GOSHGARIAN & ASSOCIATES, PLC**<br>23901 Calabasas Road, Suite 2073<br>Calabasas, California 91302-1542<br>Tel: (818) 591-9000<br>Fax: (818) 591-0810<br>Email: meskigian@gmlawplc.net<br>        mgoshgarian@gmlawplc.net<br><br>David S Porter, State Bar No 95989<br>**LAW OFFICES OF DAVID S. PORTER**<br>6522 Doral Dr.<br>Huntington Beach, California 92648<br>Tel: (714) 369-6068<br>Fax: (714) 444-0176<br>Email: dporter@dporterlaw.com | ***Attorneys for Plaintiff/ Counter Defendant***<br>***Vanguard Logistics Services (USA), Inc.*** |
| Bruce A. Wessel, Esq.<br>**IRELL & MANELLA LLP**<br>1800 Ave of Stars, Suite 900<br>Los Angeles, CA 90067<br>Tel: (310) 277-1010<br>Fax: (310) 203-7199<br>Email: bwessel@irell.com | ***Attorneys for Defendant/ Counter Claimant***<br>***Econocaribe Consolidators, Inc. dba ECU Worldwide and ECU Worldwide (USA)*** |

Darrell W. Payne, Esq.
**STEARNS WEAVER MILLER WEISSLER ALHADEFF AND SITTERSON PA**
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Tel: (305) 789-3200
Fax: (305) 789-2650
Email: dpayne@stearnsweaver.com
        cveguilla@stearnsweaver.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: April 5, 2023

_____
Jordan Patronete