STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON P.A.
Darrell W. Payne, *pro hac vice*
Fla. Bar No. 773300
dpayne@stearnsweaver.com
Veronica L. de Zayas, *pro hac vice*
Florida Bar No. 91284
Alejandro D. Rodriguez, pro hac vice
Florida Bar No. 124493
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-2650

IRELL & MANELLA LLP
Bruce A. Wessel, SBN 116734
bwessel@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:    (310) 277-1010
Facsimile:    (310) 203-7199

Attorneys for Defendant
Econocaribe Consolidators, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANGUARD LOGISTICS SERVICES (USA), INC., formerly known as NACA LOGISTICS (USA), INC.,<br><br>Plaintiff,<br><br>vs.<br><br>GROUPAGE SERVICES OF NEW ENGLAND, LLC; ECONOCARIBE CONSOLIDATORS, INC., d/b/a ECU WORLDWIDE & ECU WORLDWIDE (USA); and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:18-CV-00517-DSF-GJS<br><br>DEFENDANT ECONOCARIBE CONSOLIDATORS, INC.'S WRITTEN CLOSING ARGUMENT<br><br>Trial Date: October 18, 2022<br>Judge: Hon. Dale S. Fischer<br>Ctrm: 7D |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................ 1

VANGUARD FAILED TO PROVE THE ONLY REMAINING CLAIMS AGAINST ECU, FOR INDUCEMENT TO BREACH (CLAIM 7) AND INTERFERENCE (CLAIM 8) ............................................................................. 3

I.     There Was No Conspiracy to Breach the Agreement ............................ 4

II.    ECU's Contacts and Dealings with NEG Were Permissible Competition ........................................................................................... 5

III.   NEG Finally Chose to Do Business with ECU, But Only after Vanguard Took Away NEG's CFS Business ........................................... 8

IV.    The Transportation Market Is Competitive and Mobile, with Sophisticated, Price-Sensitive Customers That Regularly Apportion Shipments to Different NVOs ................................................................. 9

V.     The Agreement Was Terminated on December 21, 2017 ..................... 11

VI.    There Were No Bookings and No Business between NEG and ECU before Termination ............................................................................... 13

VII.   ECU Did Not Induce NEG to Breach; ECU Did Not Interfere ............ 14

       A.    No Inducement or Interference Relating to the 90-Day Notice ........................................................................................... 14

       B.    Pre-Termination Dealings Were Not Inducement or Interference .................................................................................. 15

       C.    The Draft MOU Was Non-Binding; There Is No Prohibition on Proposing Terms for Future Business ..................................... 16

       D.    ECU Did Not Induce A Breach of Loyalty or Fiduciary Obligation .................................................................................... 17

       E.    A Lack of Notice Did Not Cause Any Lost Customer Opportunities .............................................................................. 18

       F.    No Other Acts by ECU Caused Harm ......................................... 20

VIII.  Vanguard's Expert Testimony Is Inadmissible and Hopelessly Flawed; There Is No Evidence of Causation or Any Proper Calculation of Lost Net Profits ............................................................ 21

IX.    Any Damages Should Be Limited to 90 Days ...................................... 22

CONCLUSION ........................................................................................................ 23

DEFENDANT ECONOCARIBE CONSOLIDATORS, INC.'S WRITTEN CLOSING ARGUMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **INTRODUCTION**

This case is about free and robust competition.

Vanguard imagines a grand conspiracy, one carefully planned and calibrated over multiple years, to steal Vanguard's customer opportunities.  It demands a 10-year, multi-million dollar judgment for the termination of an at-will agreement in which both sides had an absolute right to terminate. There was no "notice-and-cure" period; rather, NEG had the right to terminate, albeit with 90-days' notice. Vanguard seeks to create law that would prohibit competitors from evaluating offers, discussing future opportunities, and preparing for potential dealings.  In doing so, Vanguard seeks to restrict and limit competition.

On the facts proven at trial, Vanguard promised too much and delivered too little.  There was no scheme to wrongfully steal customers and business from Vanguard.  There was no evidence that ECU encouraged NEG to terminate without complying with its contract or providing notice. Rather, the sporadic communications between ECU and NEG in 2015 through 2017 confirm that ECU wanted only that NEG "professionally terminate" (Ex. 57) its Agreement, which NEG had a right to do and which conclusion NEG came to on its own after years of dissatisfaction with Vanguard. The evidence also shows that there was no agreement between NEG and ECU until after Vanguard publicly cut off NEG's CFS business and the Vanguard Agreement was terminated on December 21, 2017. The evidence unquestionably confirms that ECU did not start doing business with NEG until after NEG was cut off

DEFENDANT ECONOCARIBE CONSOLIDATORS,
INC.'S WRITTEN CLOSING ARGUMENT

from being able to continue as Vanguard's agent. In sum, the evidence shows that ECU fairly competed for NEG's business.

On the law, Vanguard also overpromised and under-delivered. Vanguard seeks to punish NEG and ECU for evaluating legal options and possible business terms. But doing so would upend the well-established public policy in favor of free competition. *See A-Mark Coin Co. v General Mills, Inc.*, 195 Cal. Rptr. 859, 867 (Cal. Ct. App. 1983) ("free competition" is "proverbially [ . . .] the life of trade") (quoting *Prosser, The Law of Torts* (4th ed. 1971) § 130, pp. 954-955)). Better terms and compensation, secret negotiations, legal evaluations of void non-compete language, preparation for future business by providing software training – none of this constitutes wrongful or illicit business practices.  "In short, it is no tort to beat a business rival to prospective customers." *Id.*

Critically, Vanguard also did not present evidence that a lack of 90-days' notice, or any other supposedly wrongful acts by ECU, caused the loss of a single customer, any customer "opportunities," or any lost business at all.  Vanguard ignores the realities of the highly fluid and competitive market for transportation services in New England. Customers choose their NVO based on normal competitive considerations, such as pricing, routing and availability, quality of service, relationships and loyalty.  Because there are no exclusive contracts, freight forwarder customers are free to choose – and do choose – to normally spread out bookings and

business between various competitors, including NVOs, like ECU, Vanguard, Shipco, and CaroTrans. Vanguard did not present evidence from any customer that chose to shift business because of any sort of 90-day "head start."

Vanguard's inflated damages arguments expressly disregard actual net post-termination profits. The unrebutted evidence shows that Vanguard had opportunities and met with customers, and continued to secure substantial business with after termination. The Court should enter judgment in favor of ECU.

## VANGUARD FAILED TO PROVE THE ONLY REMAINING CLAIMS AGAINST ECU, FOR INDUCEMENT TO BREACH (CLAIM 7) AND INTERFERENCE (CLAIM 8)

The only surviving claims against ECU are for inducement to breach the Vanguard-NEG Agreement (Claim 7) and for interference with that Agreement (Claim 8). Vanguard failed to prove the elements for both claims.

In light of that failure, Vanguard shrouded its presentation at trial with claims that have been dismissed or abandoned. For example, Vanguard's trade secret and confidentiality claims were dismissed with prejudice, so Vanguard cannot attempt to revive those flawed claims by suggesting there was an exchange of confidential information that is proof of breach or wrongful conduct. Similarly, this Court dismissed Vanguard's unjust enrichment claims on summary judgment, yet Vanguard's financial expert, Dr. Luna, purporting to calculate unjust enrichment damages. Arguments based on these claims, and all the other dismissed claims, must be summarily rejected.

## I.    There Was No Conspiracy to Breach the Agreement

Vanguard asserts a multi-year conspiracy between ECU and NEG to breach the *at-will* Agreement. While ECU did court NEG sporadically between late 2015 through 2017, ECU's efforts were for naught: NEG never agreed to any deal with ECU before termination. By announcing on December 11, 2017, that NEG's long-standing CFS business was shifting to Boston Freight Terminal ("BFT"), Vanguard intended to force NEG to capitulate to a re-negotiated, more favorable contract, but it actually caused NEG – for its own survival – to run into ECU's arms.

The timeline is important:

| | |
|---|---|
| January 2016 | NEG and ECU first consider possible interest |
| July 12, 2016 | ECU asks NEG for legal opinion on non-compete |
| November 1, 2016 | NEG forwards legal opinion |
| December 6, 2016 | ECU's attorneys agree non-compete is void |
| August 2017 | NEG expresses renewed interest, proposed terms (only after unresolved disputes with VLS) |
| December 11, 2017 | VLS announces CFS change |
| December 13, 2017 | Draft non-binding MOU |
| December 21, 2017 | NEG's termination letter |

Months elapsed between communications between NEG and ECU. There is no evidence of organizing any effort to effectuate a conspiracy to deprive Vanguard of notice or to "misappropriate" non-exclusive customers who were free to do

business with whomever they chose. Indeed, NEG's August 2017 communications with ECU specifically contemplated providing 90-days' notice. It was not until after Vanguard's December 11, 2017 CFS announcement that NEG obtained advice from legal counsel that 90-days' notice was not required because Vanguard anticipatorily breached the agreement. More importantly, all of the competent evidence demonstrates that ECU did not participate in NEG's unilateral decision on what type of notice to give and when. And there was no evidence of any improper customer contacts or efforts to switch business to ECU prior to termination of the Agreement on December 21, 2017.

This timeline, the communications, and the evidence of the parties' actions in obtaining legal counsel regarding what was determined to be an void non-compete clause, confirm that ECU's intention was to always move forward in a professional and legally appropriate manner.

## II. ECU's Contacts and Dealings with NEG Were Permissible Competition

ECU's pre-termination dealings with NEG – whether analyzed as part of Vanguard's obligation to prove wrongful conduct as part of its case in chief or as part of ECU's competition affirmative defense – were entirely proper and constitute proper competition.

The controlling authority is clear as to what conduct does – and does not – cross the line. Impermissible acts include fraud, misrepresentation, intimidation, coercion, obstruction or molestation of a rival or his servants or workmen, or the procurement

of the violation of the contractual relationship. *See C. Pappas Co., Inc. v. E. & J. Gallo Winery*, 610 F. Supp. 662, 669 (E.D. Cal. 1985), *aff'd.* 801 F.2d 399 (9th Cir. 1986). There is no proof of any such acts by ECU.

On the other hand, the sort of conduct that courts squarely hold does *not* cross the line, and is permissible competition, would include a defendant seeking to increase business by cutting rates or prices, by allowing discounts or rebates, and even by entering into secret negotiations behind the plaintiff's back. *PMC, Inc. v. Saban Entm't, Inc.*, 45 Cal. App. 4th 579, 603-604 (1996) (*citing A-Mark Coin*, 148 Cal. App. 3d at 323-324).

These examples specifically include some of the conduct that Vanguard claims is improper here. In particular, there is no legal prohibition on ECU offering better rates or prices, such as offering post-termination financing to assist with expected cash flow issues. Likewise, because there is no bar on secret negotiations, there is no legal prohibition on exchanging proposed future business terms, whether sent by fax, discussed orally, or included in a draft memorandum of understanding ("MOU"). There is no proscription on NEG beginning to prepare for a business transition – and the possibility that Vanguard may act precipitously by immediately cutting NEG off from its customers, business and booking management software, and other computer systems – by obtaining training on ECU's software and securing access to laptops, if needed. In addition to controlling legal authority that expressly blesses ECU's

conduct as fair competition, there are no prohibitions in the Vanguard Agreement that bar such conduct. It is not the role of this Court to create new obligations, and impediments to competitive activity, that are not found in the contract and not supported by the law. Importantly, Vanguard provides no case law that would expand the categories of illicit conduct to include secret negotiations, offers/proposals, draft MOUs, and actions to prepare for future business.

What is true in the market at large is also true in the highly competitive, and mobile, transportation/logistics industry. Senior employees, partners, and agents regularly change jobs and alignments. The parties normally coordinate any transition, by acting in the best interests of the customers to ensure that any transition is as smooth and seamless as possible. There is no practical reason that Vanguard could not have demanded or agreed that NEG continue to serve as its agent for a 90-day notice or other transition period. It is normally in everyone's interest to not disrupt relationships and business with the underlying customers.

But, Vanguard was the one that chose a different route. It alone made the strategic decision to immediately cut off NEG, to demand that NEG no longer issue waybills, and to prevent NEG from performing services as Vanguard's agent for even one additional day. Vanguard chose to confirm termination of the agreement as of December 21, 2017.

ECU's conduct and its dealings with NEG were not improper, but "merely maximize[d] competition in a competitive marketplace." *PMC, Inc.*, 45 Cal. App. 4th at 604.  "Ours is a competitive economy in which business entities vie for economic advantage." *Buckaloo v. Johnson*, 14 Cal. 3d 815, 828 (1975).  ECU did no more than engage in proper, legal and robust competition.

### III.   NEG Finally Chose to Do Business with ECU, But Only after Vanguard Took Away NEG's CFS Business

The evidence shows that NEG only decided to move forward with ECU after Vanguard announced the CFS change on December 11, 2017.

Vanguard was frustrated it had not convinced NEG to re-negotiate to provide more income for Vanguard. Vanguard then made the strategic decision in August of 2017 to pivot to negotiations with BFT about taking over NEG's CFS business, because Vanguard wanted to create leverage, and believed that NEG "won't negotiate unless we pull some business." Ex. 182 (at VLS-11532).  (Of course, these Vanguard communications with BFT were kept secret from NEG, as was Vanguard's right to do.)  Vanguard calculated the CFS change would result in additional income of $212,000. This was incentive for Vanguard to pressure NEG.

Vanguard's own scheme was to force NEG to capitulate.  Vanguard's former president, Mr. Charlie Brennan, believes that is the way business is done:

> "…I mean that's just business.  We're not looking to end the relationship.  I mean, you know, using leverage.  ***Everyone uses leverage.  That's how business works.***"

Dkt. 268, p. 114: 9-11 [Brennan].

Vanguard was not looking to hold NEG to its bargain; rather, it was using leverage in a misguided attempt to bully its longstanding partner to succumb to Vanguard's demands for a more favorable agreement. When Vanguard announced the change in CFS business over NEG's objections, this was the final act that compelled NEG to decide to move forward with ECU.

**IV.    The Transportation Market Is Competitive and Mobile, with Sophisticated, Price-Sensitive Customers That Regularly Apportion Shipments to Different NVOs**

Vanguard's case theory ignores the fundamental realities of the transportation logistics market in New England and elsewhere.  Customers are sophisticated freight forwarders that do not enter into exclusive contracts.  Customers are free to choose and assign business between different NVOs, based on price, routings, service and other competitive factors.  And they do so.  Customers constantly shop for the best rates and service.  NVOs have to compete for business daily, but there are no barriers to entry in Boston or other markets.

This makes sense when considering the overall market.  *See* **Exhibit 1, attached (Opening Demonstrative No. 1).**  NVOs (like Vanguard and ECU) are hired by freight forwarder customers (like Dachser and FedEx) to arrange for cargo shipments by separate carriers (usually ships, but also trucks, air freight, and rail).  In turn, the freight forwarders are usually acting on behalf of the underlying customer that wants to ship the cargo.  NVOs also have local offices or agents (like NEG, in

the Boston area) that represent the NVO for shipments and customers in that region. Customers do not care who makes the arrangements, so long as they can get a good price and the cargo is transported timely and correctly. It is a complex market, but Vanguard's suggestion that customers are uniquely tied to one NVO is completely inconsistent with market realities. Customers are not "owned" by Vanguard or NEG or ECU or Shipco.

Likewise, the market for good agents, sales people, senior executives, and good talent is vibrant, competitive and highly mobile. *See e.g.* Dkt. 268, p. 152:13 - 23 [Brennan]. For example, before being acquired by Vanguard in 1998, Mr. Brennan's company, Brennan International Transport, actually served as ECU's U.S. agent. Dkt. 268, pp. 151:12 – 152:12 [Brennan]. Then, ECU served as Vanguard's Europe agent, until Vanguard bought ConFrieght, which replaced ECU. *Id.* Mr. Abisch explained that, "These sorts of shifts and changes in business partners regularly occur in the transportation industry. Everyone knows everyone else, and you may be working with someone one day, and then competing against them for business the next." Dkt. 217 at ¶ 53 [Abisch]

Vanguard faced the risk that NEG would terminate their agreement if it was dissatisfied, and ECU had every right to compete for NEG's business. Likewise, NEG was always at risk that Vanguard would terminate their contract and secure a new agent or a new CFS. As the California Supreme Court explained, "in an at-will

contract, the parties' expectations are of continuity unless one party terminates the contract, whereas the expectations of a continued relationship are more speculative where no contract exists. But from the perspective of third parties, there is no legal basis in either case to expect the continuity of the relationship or to make decisions in reliance on the relationship." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1147 (2020). The competition was robust, but no one is irrevocably foreclosed from the market.

### V.    The Agreement Was Terminated on December 21, 2017

There can be no serious contention that the Agency Agreement with NEG was not terminated on December 21, 2017. *See e.g.* Dkt. 268, p. 149: 23-25 [Brennan]. After Vanguard notified the industry that BFT would be its new CFS, the market correctly understood that the NEG – Vanguard relationship was over.

Upon receiving NEG's notice, Vanguard could have declared the termination ineffective or demanded NEG's performance for 90 days, while cooperating on a transition.[1] But, Vanguard rejected that option by cutting off NEG's ability to conduct business for Vanguard.  While Vanguard had the right to proceed the way it chose, it cannot claim that the Agreement was never terminated.

---

[1] While NEG's notice suggested only limited opportunities for cooperation in the transition, there was certainly nothing that prohibited Vanguard from demanding more from NEG and there is no showing that any amount of cooperation from NEG would have been acceptable to Vanguard.  Rather, Vanguard clearly decided to cut off all contact and any ability of NEG to act as Vanguard's agent, after termination.

Vanguard's suggestion that it was somehow "forced" to terminate NEG's access is also wrong. Vanguard assumed that NEG and ECU were doing business together, but that assumption was woefully mistaken. The evidence at trial was clear that NEG and ECU did not book cargo, take customer orders, nor allow access to ECU's own booking systems until ***after*** Vanguard cut off NEG's access to its customers and computer systems. There was no evidence to the contrary.

Vanguard may have assumed that ECU was obtaining sensitive confidential information from NEG, but that assumption proved wrong as well.  More than a year prior to termination, in December 2016, ECU made clear to NEG that if the parties did move forward, they should not share confidential information, and they did not do so.  *See* Ex. 17B.  ECU even counseled NEG against making announcements to customers and the industry regarding the agency change until after Vanguard reacted to NEG's termination letter.  Ex. 84. ECU wanted to wait to see how Vanguard would react and if it would cooperate in a mutually beneficial transition period, but Vanguard chose to proceed with termination.

The only testimony at trial was that industry parties often cooperate on such transitions.   Where everyone knows everyone else, reputational concerns and customer needs are usually paramount. It can be expected that each party will continue to observe any obligations regarding confidentiality and business information, during any transition period. Vanguard had every opportunity to ask for information to

address any concerns and to require NEG to continue to perform during a transition period.  It is wrong to say that Vanguard had "no choice."  Vanguard could have simply held NEG to their bargain and Vanguard would have remedies if NEG in fact ever violated confidentiality obligations. It did not. But, Vanguard made the strategic decision, based on its own incorrect assumptions, to immediately confirm termination by cutting off NEG's ability to perform and acquiescing to NEG's notice.

## VI. There Were No Bookings and No Business between NEG and ECU before Termination

The evidence at trial belies any claim from Vanguard that NEG breached the contract by secretly doing business with ECU before termination, or that ECU induced or participated in such a scheme.  There were no customer bookings, no orders taken, no cargo received, and no changes to ECU actually using NEG's CFS warehouse, until after Vanguard confirmed the December 21, 2017 termination.  ECU helped provide some computer training and laptops, but only as a backup plan, "like having a generator available in the case of a loss of power," but did not activate that plan until after termination.  ECU would not allow and did not allow NEG to have access to ECU's own booking and cargo management systems and software, unless and until the relationship with Vanguard was terminated.  NEG did not provide agent services or begin "working with" ECU, until after the termination.  Dkt. 217, at ¶¶ 32, 34, 41, 44-47, 54-55  [Abisch].

Vanguard's concession that no damages are sought for the period prior to termination confirms that no business was lost during this period. Thus, by not engaging in business prior to termination, ECU and NEG proceeded properly.

### VII.  ECU Did Not Induce NEG to Breach; ECU Did Not Interfere

Vanguard's burden is more substantial than simply making general claims and unsupported arguments about its contrived conspiracy theories (without even alleging any claims for actual conspiracy, which it knows it cannot prove). In order to prevail on its claims, Vanguard was required to prove that ECU induced NEG to breach the at-will Agency Agreement, and that ECU interfered with and disrupted that Agreement by engaging in independently wrongful conduct. NEG's independent decision to terminate the at-will agreement, alone, is not actionable.

### A.  No Inducement or Interference Relating to the 90-Day Notice

Vanguard's primary breach claim is that NEG failed to give 90-days' notice of termination. But ECU never asked, demanded, nor required that NEG dispel with 90-days' notice. There is no dispute that ECU wanted and required NEG to terminate the agreement, before the parties did business. Whether, when, and how to terminate, however, was always within NEG's sole control. ECU relied upon NEG to "professionally terminate" the Agreement pursuant to its terms. ECU properly relied upon NEG's representations that its legal counsel had concluded that Vanguard's taking away the CFS business was a breach, and that NEG was could immediately terminate.

Fundamentally, ECU had no business or economic incentive to have NEG ignore any notice obligations. ECU wanted to compete fairly and did not want to harm its reputation in the eyes of its customers. ECU believed that this competition was "a marathon not a sprint." Ex. 84.  Because customers were already doing business with other competitors, like Shipco and CaroTrans, the parties would have risked alienating customers and risking loss of business if there was customer confusion caused by NEG dispensing with any notice obligations.  A rushed and chaotic transition, would not benefit the customers and would ultimately make life more difficult and more complex for all parties.

**B.**  Pre-Termination Dealings Were Not Inducement or Interference

Vanguard's claim that the parties' communications and dealings pre-termination constitute inducement or interference is flatly wrong. ECU did not induce NEG to provide confidential information; rather, it specifically requested that NEG not provide anything confidential.  Of course, because Vanguard's trade secret and confidentiality claims were abandoned and dismissed with prejudice, claims about "confidential" information cannot be the basis for liability.

Vanguard's other argument seems to be that the extended time period for NEG's and ECU's communications or their secretive nature constitutes wrongful intent.  Of course, it is the substance, not the timing and extent, of communications and the conduct that would relevant. And, private or secret negotiations are expressly permitted.  NEG did not want Vanguard to know it was considering business with a

competitor, just as Vanguard did not want NEG to know it was considering CFS business with NEG's CFS competitor, BFT.

**C.** The Draft MOU Was Non-Binding; There Is No Prohibition on Proposing Terms for Future Business

The evidence is clear that the redlined MOU exchanged between NEG and ECU on December 13, 2017, was considered non-binding by both parties. The MOU was not evidence of inducement or interference. NEG and ECU did later begin to do business under the MOU but – critically – that only occurred after termination of the Agreement.  There is no legal or contractual prohibition on NEG and ECU exchanging proposed terms for future business dealings.

Further, although the parties did not reach a binding agreement before termination, there is nothing that would prohibit such an agreement, so long as there was no performance under the new agreement until after the Vanguard agreement was terminated, and so long as NEG did not fail to perform under the Vanguard agreement. Of course, the idea that a party cannot consider or negotiate for future business, while still serving as an agent for its current business partner, would be contrary to the important public policy of fair and robust competition.  Imposing an obligation to bar consideration of competing offers would force NEG to remain ignorant of the market for its services and impermissibly restrict NEG's ability to participate in the marketplace, causing it to be a mere "captive" agent for Vanguard.  It would directly suppress competition.

**D.** ECU Did Not Induce A Breach of Loyalty or Fiduciary Obligation

Vanguard's conclusory claims of inducing a breach of duty of loyalty or of a fiduciary obligation are nothing more than meaningless words unless the words are connected to wrongful acts and damages, which they are not. NEG fully performed all duties and obligations to Vanguard before termination by booking cargo, selling customers, and managing shipments, all for the sole benefit of Vanguard. In fact, Vanguard recognized that, in the fall of 2017, NEG was "doing pretty good." There is no evidence that NEG diverted even a single customer before termination.

Vanguard's complaint about computer training and laptops has no merit. Vanguard's main argument seems reliant on the physical proximity of Vanguard's existing computer and cargo management systems siting "side by side" with the laptops brought by ECU's IT people, after Vanguard's December 11th CFS change notice. Dkt. 268 at 18:4-20 [Goshgarian opening statement]. Of course, the trial evidence proved the fact that NEG kept the two systems entirely separate. The ECU laptops were kept over to one side, separate and apart from the other side of the NEG offices and its ongoing business for Vanguard. NEG properly maintained a "Chinese wall" between the two. ECU never activated the "backup generator" to allow NEG access to its systems until after termination. The evidence demonstrated that NEG was "professional". *Id.* at 18:18. Even though the trade secret and confidentiality claims are dismissed, NEG did "protect" any Vanguard information. *Id.* at 18:17.

Both the backup plan and the future loan amount to offers from ECU that were effectively better terms for doing business than offered by Vanguard. ECU is expressly permitted to compete for NEG's business in this way. Importantly, the backup plan that was not activated until, as NEG feared, Vanguard chose to precipitously terminate NEG's own computer access and ability to do business. Likewise, the loan would not be and was not provided until after termination and after ECU and NEG began doing business together. Similarly, any suggestion that the Joint Defense Agreement, which was only entered into *after the lawsuit was filed*, was somehow wrongful has no merit nor any basis in the law.

**E.** A Lack of Notice Did Not Cause Any Lost Customer Opportunities

Vanguard wholly failed to come forward with evidence that a lack of notice, be it for 90-days or some other period, had any impact whatsoever on Vanguard's opportunities with its customers.

First, the evidence demonstrated that Vanguard did in fact have a full and fair opportunity with customers. It was not shut off from the opportunity to meet with customers, offer quotes for services, and to retain business or win new business. Indeed, there is ultimately no evidence of any real loss of customers or customer opportunities. In fact, the primary exhibit that Vanguard's expert, Dr. Luna, relied upon showed increases in customer counts in the first years after termination, and no material decreases, even after three years. *See* **Exhibit 2 hereto** (**Opening Demo. No. 2**); *see* Ex. 111 (AEO VLS-45829-49230). This data also belies the notion that

Vanguard suffered an immediate loss of opportunity due to any lack of notice. The fact that Vanguard's customer counts or codes only started to decrease after two years is more consistent with the idea that Vanguard's position only slightly eroded due to the cumulative and ongoing effects of legitimate competition, and not due to any lack of notice.

Second, not a single customer testified that a lack of 90 days' notice determined their business allocation decisions. There is substantial evidence of customer communications, including regular sales reports identifying customers by name, and identifying business lost, gained, and the various challenges to competitive success. No customer mentioned any sort of "head start" as a reason that Vanguard would be refused an opportunity to earn business.

Third, Vanguard had sales teams shortly after termination. Mr. Brennan, as early as August 2017, knew there was a risk of pushing NEG too far. If NEG went out of business, NEG would have to be replaced in the market and Vanguard did not want to open its own office in Boston. Mr. Pimentel was hired to be Vanguard's Boston sales representative, and by early January, he and other representatives were meeting with customers, and providing regular updates. Mr. Pimentel was experienced and well-regarded in Boston, and Mr. Pimentel was Vanguard's choice. Even if Vanguard's expert was critical of Mr. Pimentel or Vanguard later decided to change course, that cause of lost business cannot be attributed to the defendants.

Fourth, there is extensive evidence of customer contact demonstrating why and how customers did make their business decisions.  Based on Vanguard's own internal reports and its communications with customers, and the independent percipient fact customer witness testimony, customers' principal considerations are pricing, routes, service, relationships and loyalty.  None of this evidence reflects that a lack of 90-day notice caused lost customer opportunities.

Fifth, there was also extensive evidence of other reasons for any loss of business by Vanguard: customer complaints, Vanguard's pricing and service, and Vanguard's failure to open its own Boston office. Vanguard made the strategic decision to not open a Boston office, as it had promised customers.  Vanguard then made the decision to fire Mr. Pimentel and not replace him, and to manage Boston from Vanguard's New York office, despite believing that Boston customers could be "parochial."  The CFS change also had an impact on customers.

The evidence is that these strategic decisions, and normal competition, caused any losses in Vanguard's business, not any issue with a lack of notice.

**F.**  No Other Acts by ECU Caused Harm

Vanguard did not present competent evidence of any other actions by ECU that caused harm or loss of business. Because no Vanguard percipient fact witness competently testified that business was lost because of a lack of 90-days' notice or any other wrongful act, Vanguard's claims must fail for failure to establish causation.

**VIII. Vanguard's Expert Testimony Is Inadmissible and Hopelessly Flawed; There Is No Evidence of Causation or Any Proper Calculation of Lost Net Profits**

Vanguard's lack of causation and damages evidence is not rescued by its experts. As noted in the defendants' motions to exclude Vanguard's experience-based expert, Mr. Howard, and its financial expert, Dr. Luna, neither witness satisfies the standard for reliable and helpful expert testimony.

Mr. Howard did not have any methodology or rational basis for his conclusions and did not have a basis for concluding that customer opportunities were lost or business was lost. He conducted no studies; he ignored the actual evidence from customers about why customers may have moved business from one NVO to another. He did not tie any of his conclusions about a lack of notice to any actual customer behavior. His testimony should be excluded or given no weight at all. His legal arguments and conclusory statements do not provide the necessary connective tissue to establish causation.

Because Dr. Luna, the proffered financial expert, relied solely on Mr. Howard for causation, her opinion must likewise be excluded or given no weight. Further, she failed to consider or account for actual market factors that actually impacted customer decisions and shifts in business. A so-called expert is not helpful if that expert remains willfully blind to the actual available evidence regarding competition, customer preferences, shifts in the market, customer complaints, and other factors. Dr. Luna ignored that even Mr. Howard admitted that there was no "lost opportunity"

- 21 -

if a customer did any business at all (even a reduced amount of business) with Vanguard, after termination. Dr. Luna's figures impermissibly seek recovery for the reduced (but not eliminated) sales that even Mr. Howard admits should be excluded. Dr. Luna did not properly calculate lost net profits because she ignored actual transactions and actual sales and income, post-termination, from certain customers and customer codes. By ignoring actual customers and actual post-termination business, Dr. Luna presented an incomplete and misleading analysis that is woefully speculative.

Vanguard's claims must fail because it failed to establish any damages.

## IX.   Any Damages Should Be Limited to 90 Days

Vanguard should not prevail because it has not proven the elements of its claims. But, if this Court were to find otherwise, any damages must be reasonably limited to the 90-day period that Vanguard claims constitutes the primary basis for its breach of contract claims. Because the Agreement was at-will, with a 90-day notice provision, there could be no expectation that NEG would continue to perform services and be obligated to be Vanguard's agent for any period longer than 90 days after notice.

Vanguard certainly had the opportunity to negotiate for an annual contract or any longer contract term, or for a longer notice or transition period. Vanguard and NEG mutually agreed otherwise, and the 90-day period is a cap on any damages. At the outside boundary, a ten-year damages period for an at-will contract is completely

speculative and improper, and any damages must be limited by the 1-year non-compete, if the Court disagrees that the 90-day period should govern. (Of course, ECU believes that Vanguard should be awarded no damages whatsoever.) Therefore, it is fundamentally unreasonable for Vanguard to expect or recover damages for any longer period.

## **CONCLUSION**

To encourage fair and robust competition, this Court should not expand the law to create new standards, untethered to the facts or any legal analysis, to reward Vanguard with a windfall for its own business failings and strategic decisions. Vanguard engaged in a strategy of trying to create leverage against its own business partner and agent, and to extract more profit at NEG's expense. Vanguard may consider it "just business," but Vanguard cut off the most significant source of NEG's income (the CFS business), knowing and intending that it would cause great financial pain to NEG and did not coordinate in any way for the transition after many, many years of customers using NEG as Vanguard's CFS. These decisions carried great risk that NEG would be forced to move on from Vanguard. The results of Vanguard's strategy are not unexpected. When NEG made the reasonable decision to explore competitive alternatives, and ultimately to terminate the Agreement, as it always had the right to do, it did so properly and legally. Vanguard's final strategic error was to presume wrongful conduct by ECU and NEG, during the days after the December 11th CFS change notice and before termination, and to immediately cut off NEG and

prevent any further agency services. This confirmed termination of the Agreement, and relieved NEG of further obligation to Vanguard, foreclosing Vanguard from creating the circumstances for the chaotic transition and recovering a multi-million dollar windfall.

ECU did not induce any breach nor interfere with the agency agreement, and did not cause harm. Rather, the evidence shows any loss of customer business suffered by Vanguard was purely of its own instigation and its own doing.

The Court should enter judgment in favor of ECU on both of the remaining claims.

1  Dated:  April 5, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IRELL & MANELLA
LLP  Bruce A. Wessel


By: /s/ Bruce A. Wessel
    Bruce A. Wessel

    Attorneys for Defendant
    Econocaribe Consolidators, Inc.


STEARNS WEAVER MILLER WEISSLER
ALHADEFF &
SITTERSON, P.A.


By: /s/ Darrell Payne
    Darrell Payne


By: /s/ Veronica L. de Zayas
    Veronica L. de Zayas

By: /s/ Alejandro D. Rodriguez
    Alejandro D. Rodriguez


    *Pro Hac Vice* Counsel for Defendant
    Econocaribe Consolidators, Inc.

# **PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 1800 Avenue of the Stars, Suite 900, Los Angeles, California 90067-4276.

On April 5, 2023, I served the foregoing document described as Motion to Exclude on each interested party, by email, as follows:

| | | |
|---|---|---|
| David S Porter, Esq.<br>Law Offices of David S. Porter<br>17011 Beach Blvd., Suite 900,<br>Huntington Beach, CA 92647 | Telephone: (714) 444-5992<br>Fax: (714) 960-9229<br>Email:<br>dporter@dporterlaw.com | Attorneys for Plaintiff, Vanguard Logistics Services (USA), Inc. |
| Merak Eskigian<br>Mark Goshgarian<br>Goshgarian and Associates PLC<br>23901 Calabasas Road, Suite 2073<br>Calabasas, CA 91302-1542 | Telephone: (818) 519-9000<br>Fax:  (818) 591-0810<br>Email:<br>meskigian@gmlawplc.net<br>Email:<br>mgoshgarian@gmlawplc.net | Attorneys for Plaintiff, Vanguard Logistics Services (USA), Inc. |
| Adam P. Zaffos, Esq.<br>Fernald Law Group APC<br>15910 Ventura Blvd., Ste. 1702<br>Encino, CA  91436 | Telephone: (323) 410-0320<br>Facsimile: (323) 410-0330<br>Email:<br>adam@fernaldlawgroup.com | Attorneys for Groupage Services of New England, LLC a Massachusetts limited liability company |
| Darrell Payne, Esq.<br>Veronica de Zayas, Esq.<br>Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.<br>150 W. Flagler Street<br>Suite 2200<br>Miami, FL 33130 | Telephone: (305) 789-3200<br>Fax: 305-789-2650<br>Email:<br>dpayne@stearnsweaver.com<br>vdezayas@stearnsweaver.com | Attorneys for Econocaribe Consolidators, Inc. |

| Bruce Wessel, Esq.<br>Irell & Manella LLP<br>1800 Avenue of the Stars<br>Suite 900<br>Los Angeles, CA 90067 | Telephone: (310) 203-7045<br>Email: BWessel@irell.com | Attorneys for<br>Econocaribe<br>Consolidators, Inc. |
|---|---|---|

(BY MAIL) I placed a true copy of the foregoing document in a sealed envelope addressed to each interested party, as stated on the attached service list. I placed each such envelope, with postage thereon fully prepaid, for collection and mailing at Irell & Manella LLP, Los Angeles, California. I am readily familiar with Irell & Manella LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service. Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

[X] (BY ELECTRONIC MAIL) I caused the foregoing document to be served electronically by electronically mailing a true and correct copy through Irell & Manella LLP's electronic mail system to the e-mail address(es), as stated on the attached service list, and the transmission was reported as complete and no error was reported.

Executed on April 5, 2023, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

|  |  |
|---|---|
| Bruce A. Wessel | */s/* Bruce A. Wessel |
| (Type or print name) | (Signature) |

## MAILING LIST

| | | |
|---|---|---|
| David S Porter, Esq.<br>Law Offices of David S. Porter<br>17011 Beach Blvd.,<br>Suite 900,<br>Huntington Beach, CA 92647<br>(by e-mail only) | Telephone: (714) 444-5992<br>Fax: (714) 960-9229<br>Email:<br>dporter@dporterlaw.com | Attorneys for Plaintiff, Vanguard Logistics Services (USA), Inc. |
| Adam P. Zaffos, Esq.<br>Fernald Law Group APC<br>15910 Ventura Blvd., Ste. 1702<br>Encino, CA  91436 | Telephone: (323) 410-0320<br>Facsimile: (323) 410-0330<br>Email:<br>adam@fernaldlawgroup.com | Attorneys for Groupage Services of New England, LLC a Massachusetts limited liability company |
| Darrell Payne, Esq.<br>Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.<br>150 W. Flagler Street<br>Suite 2200<br>Miami, FL 33130 | Telephone: (305) 789-3200<br>Fax: 305-789-2650<br>Email:<br>dpayne@stearnsweaver.com | Attorneys for Econocaribe Consolidators, Inc. |
| Bruce Wessel, Esq.<br>Irell & Manella LLP<br>1800 Avenue of the Stars<br>Suite 900<br>Los Angeles, CA 90067 | Telephone: (310) 203-7045<br>Email: BWessel@irell.com | Attorneys for Econocaribe Consolidators, Inc. |