1   STEARNS WEAVER MILLER
2   WEISSLER ALHADEFF & SITTERSON
    P.A.
3   Darrell W. Payne, pro hac vice
    Fla. Bar No. 773300
4   dpayne@stearnsweaver.com
    Veronica L. de Zayas, pro hac vice
5   Florida Bar No. 91284
    vdezayas@stearnsweaver.com
6   Alejandro D. Rodriguez, pro hac vice
    Florida Bar No. 124493
7   arodriguez@stearnsweaver.com
8   150 West Flagler Street, Suite 2200
    Miami, FL 33130
9   Telephone: (305) 789-3200
    Facsimile: (305) 789-2650
10
11  IRELL & MANELLA LLP
    Bruce A. Wessel, SBN 116734
12  bwessel@irell.com
13  1800 Avenue of the Stars, Suite 900
    Los Angeles, California 90067-4276
    Telephone:    (310) 277-1010
14  Facsimile:    (310) 203-7199
15
    Attorneys for Defendant
16  Econocaribe Consolidators, Inc.

FERNALD LAW GROUP APC
Adam P. Zaffos (Bar No. 217669)
Sasha N. Brower (Bar No. 221198)
15910 Ventura Blvd., Suite 1702
Encino, California 91436
Telephone: (323) 410-0320
Facsimile: (323) 410-0330
E-Mail: adam@fernaldlawgroup.com
E-Mail: sasha@fernaldlawgroup.com
Attorneys for Defendant and Counterclaimant
Groupage Services of New England, LLC

17                    UNITED STATES DISTRICT COURT

18                    CENTRAL DISTRICT OF CALIFORNIA

19

20   VANGUARD LOGISTICS SERVICES        )   Case No. 2:18-cv-00517-DSF-GJS
     (USA), INC., formerly known as NACA )
21   LOGISTICS (USA), INC.,             )   DEFENDANTS' JOINT PROPOSED
                                        )   FINDING OF FACT AND CONCLUSIONS
22          Plaintiff,                  )   OF LAW ON PLAINTIFF'S CLAIMS
                                        )
23      vs.                             )   TRIAL DATE:
                                        )   October 18, 2022
24   GROUPAGE SERVICES OF NEW           )   Judge: Hon. Dale S. Fischer
25   ENGLAND, LLC; ECONOCARIBE          )   Ctrm: 7D
     CONSOLIDATORS, INC., d/b/a ECU     )
26   WORLDWIDE & ECU WORLDWIDE          )
     (USA); and DOES 1-10, inclusive,   )
27                                      )
            Defendants.                 )
28

1

2      Defendants New England Groupage, LLC ("NEG") and Econocaribe

3  Consolidators, Inc. ("ECU") submit this proposed Findings of Fact and Conclusions

4

5  of Law, as to Plaintiff's claims in the Second Amended Complaint ("SAC").[1]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
_____

24      [1] The Defendants have coordinated to jointly submit this proposed order to

25  address only the Plaintiff's claims in the Second Amended Complaint ("SAC"), Dkt.

26  97. Because Defendant NEG's counterclaims do not involve ECU, NEG is submitting
   separate proposed findings of fact and conclusions of law as to those counterclaims.

27  The Defendants have attempted to simplify and avoid repetition, to the extent

28  possible, in connection with these separate filings.

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

# TABLE OF CONTENTS

**Page**

I.    FINDINGS ON VANGUARD'S SECOND AMENDED COMPLAINT ........................................................................1

II.   INTRODUCTION ..................................................................2

III.  FINDINGS OF FACT .............................................................4

    A.   The Parties and their Business ...................................4

    B.   The Agreement .............................................................10

    C.   CFS Services in the Agreement ...................................12

    D.   By Late 2015, There Was Dissatisfaction with and Difficulty in the Relationship between Vanguard and NEG .............13

    E.   Because of NEG's Dissatisfaction with Vanguard, NEG Discussed the Possibility of Becoming ECU's Agent in the Future ........................................................14

    F.   Because ECU Wanted Any Possible Future Agreement with NEG Be "Proper and Professional," ECU Requested Legal Opinions about the Vanguard "Non-Compete" ........................15

    G.   Both ECU's and NEG's Lawyers Separately Concluded the Vanguard Non-Compete Was Not Valid nor Enforceable; ECU Also Instructed That NEG Should Not Provide Confidential Vanguard Information ........................17

    H.   The Relationship between Vanguard and NEG Breaks Down; Vanguard Contacts BFT to Replace NEG's CFS Business ........................................................18

    I.   NEG Expresses More Interest in Working with ECU ........................20

    J.   Vanguard Planned to Pull Business from NEG to Push NEG to Renegotiate; Vanguard's Deal with BFT Would Be Substantially More Profitable; There Were Risks the Vanguard-NEG Agreement Would Be Terminated ............................22

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

1
2

| | | | **Page** |
|---|---|---|---|

K.   NEG and ECU Engage in Intermittent Discussions about Potential Future Business........................................................23

L.   Vanguard Takes Away CFS Business from NEG and Makes Public Announcement of the CFS Change That Causes Significant Confusion ...........................................24

M.   Vanguard's Decision to Take Away NEG's CFS Business Prompts Further Internal and External Discussions and Exchange of Proposals between NEG and Vanguard about Future Business ................................................................28

N.   NEG Sends a Termination Notice and Vanguard Accepts the Termination ....................................................................31

O.   Prior to the December 21st Termination, NEG Never Provided Services to ECU nor Acted as ECU's Agent; NEG Had No Access to ECU's Computer Systems and Never Booked Business Prior to Termination ...................................35

P.   The Parties after the December 21st Termination: Fair Competition for Customers in the Marketplace...................36

IV.   CONCLUSIONS OF LAW..................................................................41

A.   Vanguard's Experts Are Disqualified.................................41

(1)   Legal Standard........................................................41

(2)   Vanguard's Causation Expert, Greg Howard, Is Disqualified...............................................................43

(3)   Vanguard's Damages Expert, Barbara Luna, Is Disqualified...............................................................47

(4)   Because Vanguard Failed to Establish Causation and Damages, the Defendants Prevail on All Claims. ......................................................................53

B.   Claims against NEG.............................................................54

- ii -

**Page**

(1)  Vanguard's First Cause of Action: Breach of Contract.................................................................54

a.    Element 1 – Existence of an Agreement ........................55

b.    Element 2 – Vanguard's Performance or Excuse for Nonperformance.............................................55

c.    Element 3 – NEG's Alleged Breach .............................57

d.    Element 4 – Resulting Damages ....................................61

(2)  Vanguard's Second Cause of Action: Breach of Fiduciary Duty .................................................................63

a.    Element 1 – Existence of a Fiduciary Relationship.................................................................64

b.    Element 2 – Breach of a Fiduciary Duty.......................65

c.    Element 3 – Damages Caused by NEG's Alleged Breach .................................................................67

(3)  Vanguard's Third Cause of Action: Breach of Duty of Loyalty.................................................................68

a.    Element 1 – Existence of a Duty of Loyalty .................69

b.    Element 2 – Breach of the Duty of Loyalty ..................69

c.    Element 3 – Damages Caused by NEG's Alleged Breach .................................................................69

(4)  Vanguard's Sixth Cause of Action: Declaratory Relief.................................................................70

C.    NEG's Affirmative Defenses ..............................................71

(1)  Doctrines of Waiver, Estoppel, Laches, and Unclean Hands (Third Affirmative Defense) ...........................72

11210169.4 07

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

**Page**

(2)   Prior Breach and Breach of the Covenant of Good
Faith and Fair Dealing (Fourth and Seventeenth
Affirmative Defenses) ...............................................72

(3)   Setoff and/or Recoupment (Eighth Affirmative
Defenses) .................................................................73

(4)   Failure of Condition Precedent (Twelfth Affirmative
Defenses) .................................................................74

(5)   Failure to Mitigate Damages (Thirteenth
Affirmative Defense).................................................74

(6)   Doctrines of Economic Duress, Impossibility,
Impracticability and Frustration of Purpose
(Fourteenth, Twenty-Second, Twenty-Third, and
Twenty-Fourth Affirmative Defenses)........................75

(7)   Good Faith (Sixteenth Affirmative Defense). .............76

(8)   Superseding and/or Supervening Causes (Eighteenth
Affirmative Defenses) ...............................................76

(9)   Litigation Privilege (Nineteenth Affirmative
Defense)....................................................................77

D.   Claims against ECU .........................................................77

(1)   Seventh Cause of Action: Inducement to Breach
Contract....................................................................78

a.   The Record Evidence Shows That ECU Did
Not Intend to Cause NEG to Breach and
ECU's Conduct Did Not Cause Any Breach. ...............80

(i)   There Is No Evidence That ECU Induced
NEG to Breach the 90-Day Notice Provision;
in Fact, the Evidence Reflects the Contrary ........81

(ii)   There Is No Evidence That ECU
"Misappropriated" Any Customers....................87

- iv -

1
                                                                    **Page**

2

3          (iii)   There Is No Evidence That NEG Worked as
                   ECU's Agent or Was Employed by ECU
4                  Prior to Termination.............................................88

5       b.   Even If Vanguard Could Establish That ECU
6            Caused NEG to Breach, the Records Shows
             That Vanguard Did Not Establish a Causal
7            Link for Its Claimed Damages. ....................................94

8
9    (2)   Eighth Cause of Action: Interference with
           Contractual Relations....................................................98

10
11      a.   The Record Evidence Shows That ECU's
             Conduct Did Not Prevent NEG from
12           Performing the Agency Agreement and That
             Such Conduct Was Not Done with the
13           Intention to Disrupt NEG's Performance.....................99

14      b.   The Record Evidence Shows That Vanguard
15           Did Not Suffer Harm as a Result of ECU's
             Conduct...........................................................................101

16
17      c.   The Record Evidence Shows That ECU Did
             Not Engage in any Independent Wrongful
18           Conduct...........................................................................101

19   E.   ECU's Affirmative Defenses ............................................103

20
21   (1)   Second Affirmative Defense: Estoppel; Third
           Affirmative Defense: Waiver; and Fourth
22         Affirmative Defense: Laches....................................103

23   (2)   Seventh Affirmative Defense: Unclean Hands.......................104

24   (3)   Ninth Affirmative Defense: Failure to Mitigate
25         Damages.........................................................................105

26   (4)   Tenth Affirmative Defense: Litigation Privilege ..................106

27

28

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

**Page**

(5) Eleventh Affirmative Defense: Competition Privilege and Thirteenth Affirmative Defense: Competition ..........................................................................107

(6) Seventeenth Affirmative Defense: Prior Breach, Eighteenth Affirmative Defense: Prevention, and Nineteenth Affirmative Defense: Acquiescence ..................108

F.   The Non-Compete Is Unenforceable ................................................110

G.   Punitive Damages ............................................................................115

H.   Alternative Damages Limitations ....................................................116

(1) In the Alternative, Vanguard's Damages Are Limited to the 90-Day Notice Period .....................................116

(2) In the Alternative, Vanguard's Damages Are Limited to the One-Year Non-Compete Period......................122

11210169.4 07

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACO Pac. v. ACO,*
  70 F.3d 1277 (9th Cir. 1995) ........................................................ 79, 93

*Agam v. Gavra,*
  236 Cal. App. 4th 91 (2015) .............................................................. 105

*Am. Nat. Petroleum Co. v. Transcon. Gas Pipe Line Corp.,*
  798 S.W. 2d 274 (Tex. 1990) ............................................................ 121

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,*
  7 Cal. 4th 503 (Cal. 1994) ................................................................. 61

*Associated Gen. Contractors of Cal., Inc. v. Cal. St. Council of
  Carpenters,*
  459 U.S. 519 (1983) ............................................................... 67, 79, 98

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
  17CV205-MMA, 2020 WL 2553181
  (S.D. Cal. May 20, 2020) .................................................................. 42

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture
  Partners,*
  52 Cal. App. 4th 867 (1997) .............................................................. 107

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.,*
  226 Cal. App. 3d 442 (1990) .............................................................. 48

*Brown v. Grimes,*
  192 Cal. App. 4th 265 (2011) ....................................................... 73, 74

*Bugarin v. All Nippon Airways Co., Ltd.,*
  513 F. Supp. 3d 1172 (N.D. Cal. 2021) ............................................. 108

*C. Pappas Co., Inc. v. E. & J. Gallo Winery,*
  610 F. Supp. 662 (E.D. Cal. 1985),
  *aff'd.* 801 F.2d 399 (9th Cir. 1986) ................................................. 102

|  | Page(s) |
|---|---|

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*,
   222 Cal. App. 3d 1371 (1990).................................................................73

*Charles C. Chapman Bldg. Co. v. Cal. Mart*,
   2 Cal. App. 3d 846 (1969)...................................................................107

*Cheung v. Daley*,
   35 Cal. App. 4th 1673 (1995)..............................................................115

*Citri-Lite Co. v. Cott Beverages, Inc.*,
   721 F. Supp. 2d 912 (E.D. Cal. 2010)..................................................118

*City of Hollister v. Monterey Ins. Co.*,
   165 Cal. App. 4th 455 (2008)..............................................................108

*City of Vernon v. City of L.A.*,
   45 Cal. 2d 710 (1955).........................................................................75

*Collins v. Wolf*,
   591 B.R. 752 (S.D. Cal. 2018).............................................................109

*Constr. Protective Servs., Inc. v. Tig Specialty Ins.*,
   29 Cal. 4th 189 (2002).........................................................................73

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir. 1994)..........................................................42, 46

*Davoodi v. Imani*,
   No. C11-0260 SBA, 2011 WL 577414
   (N.D. Cal., Feb. 9, 2011).........................................................56, 73, 74

*Dryden v. Tri-Valley Growers*,
   65 Cal. App. 3d 990 (1977)..................................................................79

*Durell v. Sharp Healthcare*,
   183 Cal. App. 4th 1350 (2010)...................................................56, 73, 74

*E.E.O.C. v. Farmer Bros. Co.*,
   31 F.3d 891 (9th Cir. 1994)...................................................................4

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

1

2

**Page(s)**

*Edwards v. Arthur Andersen,*
    44 Cal. 4th 937 (2008) ................................................................ 114

*Falcon v. Long Beach Genetics, Inc.,*
    224 Cal. App. 4th 1263 (2014) ...................................................... 77

*Fed. Na'l Mortg. Ass'n. v. Bugna,*
    57 Cal. App. 4th 529 (1997) .......................................................... 55

*Fowler v. Varian Assocs., Inc.,*
    196 Cal. App. 3d 34 (1987) ........................................................... 69

*Franklin v. Dynamic Details, Inc.,*
    116 Cal. App. 4th 375 (2004) ........................................... 79, 98, 99

*Gen. Elec. Co. v. Joiner,*
    118 S.Ct. 512 (1997) ..................................................................... 46

*Habitat Tr. for Wildlife, Inc. v. City of Rancho Cucamonga,*
    175 Cal. App. 4th 1306 (2009) ...................................................... 75

*Haurat v. Superior Ct.,*
    241 Cal. App. 2d 330 (1966) ......................................................... 69

*Hollinger v. United States,*
    651 F.2d 636 (9th Cir. 1981) ........................................................... 4

*Huong Que, Inc. v. Luu,*
    150 Cal. App. 4th 400 (2010) ........................................... 67, 68, 69

*Imperial Ice v. Rossier,*
    18 Cal. 2d 33 (1941) ...................................................................... 79

*In re Ahn,*
    Case No. 2:13-bk-15807-WB
    (Bankr. C.D. Cal. Feb. 6, 2014) ..................................................... 74

*In re Lithium Ion Batteries Antitrust Litig.,*
    2017 WL 1391491 (N.D. Cal. April 12, 2017) .............................. 46

11210169.4  07

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

**Page(s)**

*In re Tamen*,
  22 F.3d 199 (9th Cir. 1994) .................................................................. 120

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods.*
  *Liab. Litig.*,
  517 F. Supp. 3d 994 (2021) ................................................................... 104

*Ixchel Pharma, LLC v. Biogen, Inc.*,
  470 P.3d 571 (Cal. 2020) ................................................................*passim*

*J.M. Leasing, Inc. v. J.M. Smucker Co.*,
  61 F.3d 911 (9th Cir. 1995) .................................................................. 117

*JRS Prods., Inc. v. Matsushita Elec. Corp. of Am.*,
  115 Cal. App. 4th 168 (2004) ................................................................. 61

*Kappe v. AXA Equitable Life Ins. Co.*,
  Case No. CV 09-03459 ODW (AGR),
  2010 WL 11597481 (C.D. Cal. Nov. 9, 2010) ...................................... 115

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ....................................................................... 102

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................................ 42, 46

*Lewis George Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
  34 Cal. 4th 960 (2004) ........................................................................... 79

*Lunada Biomedical v. Nunez*,
  230 Cal. App. 4th 459 (2014) ................................................................. 77

*Mad River Lumber Sales, Inc. v. Willburn*,
  205 Cal. App. 2d 321 (1962) .................................................................. 56

*Mamou v. Trendwest Resorts, Inc.*,
  165 Cal. App. 4th 686 (2008) ................................................................. 66

*Mardiros v. City of Hope*,
  2020 WL 8175604 (C.D. Cal. 2020) .................................................... 108

- x -

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

**Page(s)**

*Martin* v. *U-Haul Co. of Fresno*,
    204 Cal. App. 3d 396 (1988) ...................................................... 80, 117, 118, 120

*Meridian Fin. Servs., Inc. v. Phan*,
    67 Cal. App. 5th 657 (2021) ................................................................................ 72

*Migliore v. Mid-Century Ins. Co.*,
    97 Cal. App. 4th 592 (2002) ............................................................................ 104

*Mintz v. Mark Bartelstein and Assocs., Inc.*,
    906 F. Supp. 2d 1017 (C.D. Cal. 2012) ............................................................ 69

*Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*,
    2019 WL 13045054 (C.D. Cal. Feb. 28, 2019) ........................................... 87, 88

*Mother Cobb's Chicken Turnovers v. Fox*,
    73 P.2d 1185 (Cal. 1937) ................................................................................. 115

*N.B. Scrivner & Wilson, Inc. v. Mobil Oil Corp.*,
    914 F.2d 263 (9th Cir. 1990) ................................................................... 118, 123

*Navellier v. Sletten*,
    262 F.3d 923 (9th Cir. 2001) .......................................................................... 116

*Nelson v. Tucker Ellis, LLP*,
    262 Cal. Rptr. 3d 250 (Ct. App. 2020) ........................................................... 106

*Nuasive, Inc. v. Madsen Med., Inc.*,
    2015 WL 10943609 (S.D. Cal. 2015) ...................................................... 120, 121

*Nulife Ventures, Inc. v. Avacen, Inc.*,
    No. 20-CV-2019-BAS-KSC, 2020 WL 7318122
    (S.D. Cal. Dec. 11, 2020) ..................................................... 113, 114, 115

*Nygard, Inc. v. Uusi–Kerttula*,
    159 Cal. App. 4th 1027 (2008) ......................................................................... 65

*Oakley, Inc. v. Nike, Inc.*,
    988 F. Supp. 2d 1130 (C.D. Cal. 2013) ............................................................ 85

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

11210169.4  07

1

2

**Page(s)**

*Oasis West Realty, LLC v. Goldman,*
   51 Cal. 4th 811 (2011)..................................................................55, 64

*Oosten v. Hay Haulers Dairy Emp. & Helpers Union,*
   45 Cal. 2d 784 (1955)..........................................................................75

*Pac. Gas & Elec. Co. v Bear Stearns & Co.,*
   50 Cal. 3d 1118 (1990).........................................................................79

*Pierce v. Lyman,*
   1 Cal. App. 4th 1093 (1991)..................................................................64

*PMC, Inc. v. Saban Entm't,*
   45 Cal. App. 4th 579 (1996).........................................................101, 102

*Quelimane Co. v. Stewart Title Guar. Co.,*
   19 Cal. 4th 26 (1998), *as modified* (Sept. 23, 1998) ...........................78

*Reeves v. Hanlon,*
   33 Cal. 4th 1140 (2004).......................................................................98

*RGJ Assocs., Inc. v. Stainsafe, Inc.,*
   300 F. Supp. 2d 250 (D. Mass. 2004)................................................118

*San Francisco Design Ctr. Assocs. v. Portman Cos.,*
   41 Cal. App. 4th 29, 40 (1995),
   dismissed, remanded and ordered published,
   911 P.2d 1373 (Cal. 1996).................................................................107

*Sebastian Int'l, Inc. v. Russolillo,*
   Case No. CV 00-3476 SVW JWJX,
   2005 WL 1323127 (C.D. Cal. Feb. 22, 2005)......................................97

*Shaffer v. Debbas,*
   17 Cal. App. 4th 33 (1993)...................................................................74

*Sole Energy Co. v. Petrominerals Corp.,*
   128 Cal. App. 4th 212 (2005).............................................................115

*Strategic Concepts, LLC v. Beverly Hills Unified Sch. Dist.,*
   232 Cal. Rptr. 3d 579 (Ct. App. 2018)......................................118, 123

- xii -

**Page(s)**

*Thrifty Payless, Inc. v. The Americana at Brand, LLC,*
    218 Cal. App. 4th 1230 (2013)..................................................................73

*Tribeca Cos., LLC v. First Am. Title Ins. Co.,*
    239 Cal. App. 4th 1088 (2015)..................................................................76

*U.S. v. Valencia-Lopez,*
    971 F.3d 891 (9th Cir. 2020) ...................................................41, 42, 53

*US Ecology, Inc. v. State,*
    129 Cal. App. 4th 887 (2005)..............................................................61, 68

*Van De Kamp v. Bank of Am.,*
    204 Cal. App. 3d 819 (1988) .....................................................................67

*Waller v. Truck Ins. Exch., Inc.,*
    11 Cal. 4th 1 (1995)...........................................................................58, 72

*Whitney Inv. Co. v. Westview Dev. Co.,*
    273 Cal. App. 2d 594 (1969) .....................................................................57

**Statutes**

18 U.S.C. § 1836..........................................................................................123

Cal. Bus. & Prof. Code § 16600 .......................................................113, 114

Cal. Bus. & Prof. Code §§ 16601–03 ........................................................113

Cal. Civ. Code § 47............................................................................77, 106

Cal. Civ. Code § 1649..................................................................................55

Cal. Civ. Code § 1654..................................................................................55

Cal. Civ. Code § 2355..................................................................................64

Cal. Civ. Code § 2356..................................................................................64

Cal. Civ. Code § 3294................................................................................115

Cal. Civ. Code § 3301..................................................................................80

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

11210169.4  07

**Page(s)**

Cal. Civ. Code § 3426.4.....................................................................123

Cal. Civ. Code § 3517.........................................................................72

Cal. Code Civ. Proc. § 431.70 ...........................................................73

**Rules**

Fed. R. Evid. 403 ................................................................................43

Fed. R. Evid. 702 ...........................................................41, 42, 43, 53

**Other Authorities**

13 Bus. & Com. Litig. Fed. Cts. § 138:60 (5th ed.) .........................107

https://www.vanguardlogistics.com/contact/locations
    (last visited October 7, 2022) .....................................................112

Judicial Council of California Civil Jury Instruction No. 2200
    (September 2003) ...........................................................................78

Judicial Council of California Civil Jury Instruction No. 336
    (September 2003) .........................................................................104

Judicial Council of California Civil Jury Instruction No. 358
    (September 2003) .........................................................................105

Judicial Council of California Civil Jury Instruction No. 4401
    (December 2014) ............................................................................97

NATIONAL PUBLIC RADIO (last visited Jan. 5, 2023),
    https://www.npr.org/2023/01/05/1147138052/workers-noncompete-
    agreements-ftc-lina-khan-ban...................................................113

RESTATEMENT (SECOND) OF TORTS § 768 (1979)...................................107

RESTATEMENT (SECOND) OF TORTS § 774A cmt. b ...............................121

State Bard of California Standing Committee on Professional
    Responsibility and Conduct, Formal Opinion Interim No. 19-0003...............113

- xiv -

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

## I.    FINDINGS ON VANGUARD'S SECOND AMENDED COMPLAINT

In this case, Plaintiff Vanguard Logistics Services (USA), Inc., formerly known as NACA Logistics (USA), Inc.'s ("VLS" or "Vanguard") sued Defendant Groupage Services of New England, LLC ("NEG") and Defendant Econocaribe Consolidators, Inc. d/b/a ECU Worldwide & ECU Worldwide (USA) ("ECU"), for various claims relating to the termination of the agreement for NEG to act as a local agent for VLS's shipping business, and ECU's involvement with NEG, before and after termination.

This cause came before the Court for a non-jury trial commencing on October 18, 2022. Having conducted the trial, heard and reviewed the evidence, considered the parties' post trial submissions, and observed the credibility of the witnesses,[2] and being otherwise fully advised in these premises, the Court makes the findings of fact and conclusions of law set forth below.[3]

The Court finds in favor of Defendant NEG on the remaining claims by VLS for breach of contract (Count 1), breach of fiduciary and loyalty duties (Counts 2 and 3), and declaratory relief (Count 6).

The Court also finds in favor of Defendant ECU on VLS's remaining claims for inducing breach of contract (Count 7) and interference with contractual relations (Count 8).[4]

---

[2] The witnesses' direct testimony was provided by written witness statement, pursuant to the Court's direction.

[3] Any finding of fact deemed to be a conclusion of law is incorporated into the conclusions of law.  Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.  All factual findings are by a preponderance of the evidence unless otherwise noted.

[4] The Court tried those issues, claims, and defenses that were reflected in the Final Pretrial Conference Order [Dkt. 189].  All other claims have either been dismissed or resolved on summary judgment.  *See* Dkt. 189 (Final Pretrial Conference Order); Dkt. 153 (Summary Judgment Order); and Dkts. 96-97 (dismissal of trade secrets claims with prejudice). In pertinent part, the Court hereby incorporates its

- 1 -

## II.   INTRODUCTION

Vanguard's theory of the case relies upon a finding by the Court that NEG and ECU secretly engaged in a two-year, extended conspiracy and scheme to breach and interfere with the Agreement between Vanguard and NEG.   Vanguard's primary claim is that, at ECU's behest, NEG failed to give 90-days' notice of termination under the Agreement and thus gained an irreversible and improper advantage in the Boston market for non-vessel operating common carriers ("NVOs"), freight forwarders and other cargo customers.

Vanguard's claims fail because the evidence demonstrates, to the contrary, that all of the communications and conduct in 2016 and 2017, prior to the termination of the Agreement, were part of normal, robust competition.   There is no legal or contractual prohibition on NEG considering competitive alternatives to its business with Vanguard, and ECU acted properly in maximizing competition by trying to earn the business of NEG from its rival, Vanguard.   Just as Vanguard secretly negotiated with Boston Freight Terminals ("BFT") about taking over NEG's CFS warehouse business, NEG was permitted to fully evaluate other business opportunities with ECU. The sporadic communications, over the course of nearly two years, confirm that the Defendants never reached any agreement, nor engaged in any long-running conspiracy, and Vanguard presented no evidence nor claim for damages prior to the termination date.

Ultimately, the evidence at trial was that it was Vanguard's December 11, 2017 public notice of the change in the CFS business to BFT that was the final triggering event or cause of NEG's decision to send its December 21, 2017 notice of termination. ECU did not provide feedback nor direction on the timing or content of the form of termination.   Prior to that date, NEG had made no commitment to ECU.   It was only

---

Order Re Motions for Summary Judgment (Dkts. 128, 130, 131), dated February 8, 2022 [Dkt. 153] ("MSJ Order").

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

after December 11th that NEG and ECU exchanged formal terms in a redlined draft of a non-binding memorandum of understanding. It was only after that date that ECU provided computer training to prepare if NEG were abruptly cut-off from the Vanguard systems that it was reliant upon. None of the conduct prior to termination was wrongful or improper. In particular, it is in the interests of fair competition for participants to fully evaluate and be aware of their legal and contractual obligations. Vanguard's claims rely on the flawed assumption that it is wrongful for its agent, and for a competitor such as ECU, to obtain legal advice concerning the Agreement, and in particular, the unenforceable non-compete provisions in the Agreement. California law imposes no such prohibition; rather, the defendants' actions in separately obtaining legal analysis is to be encouraged.

Vanguard's claims fail because NEG did not begin to represent ECU nor become engaged by ECU, and did not divert any customers or business from Vanguard, until after termination of the Agreement. Vanguard itself made the decision to confirm termination of the Agreement – without the need for a 90-day notice or transition period – by cutting off NEG's access to Vanguard's computer systems and cargo tracking software, and by preventing NEG from continuing to serve as Vanguard's agent, as of December 21, 2017. Vanguard also failed to satisfy its burden of proving that it suffered the loss of any customer "opportunities," or any customer business, because of the lack of 90-days' notice or any other alleged breach or tort. The overwhelming evidence at trial was that the Boston market is highly competitive, and there are no "exclusive" customer contracts. The only customer evidence confirmed that pricing, service, routings, relationships and loyalty are the primary considerations—no customer shifted its business because of the 90-days' notice issue or any other alleged breach or tort. Vanguard had full and fair "opportunities" with customers, and had representatives meeting with customers shortly after termination. Vanguard's expert analyses did not meet the rigorous

standards for admissibility and did not prove the required causal connection between any wrongful conduct and the alleged damages.

### III.    FINDINGS OF FACT[5]

**A.    The Parties and their Business**

1.    Vanguard is a non-vessel operating common carrier, more commonly referred to as an NVOCC (and may be referred to as an NVO) and is licensed with the Federal Maritime Commission ("FMC"). Stip., Dkt. 189 at § 6 ¶ 1.

2.    ECU is also an NVOCC and is licensed with the FMC. Stip., Dkt. 189 at § 6 ¶ 2.

3.    ECU and Vanguard are major competitors of each other. Stip., Dkt. 189 at § 6 ¶ 3.

4.    NEG is also a licensed NVOCC that has operated in the Boston and New England region for approximately 30 years. Stip., Dkt. 189 at § 6 ¶ 4.

5.    NVOCCs generally arrange for shipments in containers that are used for intermodal transport (i.e., transfer from one mode of transportation to another). Stip., Dkt. 189 at § 6 ¶ 5.

6.    NVOCCs commonly appoint agents throughout different geographical areas to provide sales and marketing services and support, promote their NVOCC's

---

[5] The parties have asserted a series of objections to exhibits, deposition designations, and witness statements. *See* Dkt. 226, 227, 228, 229, 230, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 248, 249, 251, 256, 257, 258, 259, 260, 261, 262, 263, and 265. "In non-jury cases, the district judge is given great latitude in the admission or exclusion of evidence." *Hollinger v. United States*, 651 F.2d 636, 640 (9th Cir. 1981). "[I]n a bench trial, the risk that a verdict will be affected unfairly and substantially by the admission of irrelevant evidence is far less than in a jury trial." *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994). Consequently, to the extent Court relies on exhibits or testimony to which a party has made an objection, the Court hereby exercises its broad discretion to overrule such objections, as the Court has considered and determined the appropriate weight such evidence should be given in rendering its final decision.

service offerings, serve as the local representation and the face of the NVOCC services and handle the paperwork and transactions for shipments, including preparation of house bills of lading (or "HBLs") to be issued to shippers/customers. Stip., Dkt. 189 at § 6 ¶ 6.

7.    An NVOCC issues paperwork, including the HBL, documenting its obligation to carry goods from origin to destination, using primarily sea transit. Cargo is also carried by rail, air and truck. To accomplish the physical handling and transport of goods, NVOCCs often hire third-party providers such as ocean carriers, rail carriers, air carriers and motor truck carriers. Stip., Dkt. 189 at § 6 ¶ 9.

8.    Some shipments require physical consolidation into the container at origin and deconsolidation of cargo from the containers at destination. These consolidation/deconsolidation services typically are provided by a Container Freight Station ("CFS"). Stip., Dkt. 189 at § 6 ¶ 10.

9.    In various different markets, an NVO may own its own CFS; it may have a representative operate a CFS for the NVO; it may use an independent CFS operator that accepts shipments from a variety of NVOs; it may have some combination of some or all these options for each market. Stip., Dkt. 189 at § 6 ¶ 11.

10.    The distinction between an NVOCC agent and CFS facility is that the former handles paperwork and the latter provides third-party physical handling services related to transit. Dkt. 202 at ¶ 9 [Brennan]. NEG did both under its Agreement with VLS. Dkt. 225 at ¶ 6 [Meunier].

11.    Boston Freight Terminal ("BFT") operates a CFS warehouse in Boston and provides CFS services to different NVOCCs. Stip., Dkt. 189 at § 6 ¶ 12.

12.    NEG was a representative agent for VLS, and provided CFS services for VLS, for many years. Stip., Dkt. 189 at § 6 ¶ 13.

13.    The transportation logistics business is extremely competitive. The major NVO competitors in the industry include ECU, Vanguard, Shipco, and

Carotrans, as well as other smaller players. Competition is particularly fierce because NVOs all do business with the same customers and customer base, and often use the same carriers or vessels. Dkt. 217 at ¶¶ 6, 8 [Abisch]; *see also* Dkt. 229 at 42:17-19; 42:24-43:7 [Pimentel]; Dkt. 221 at ¶ 9 [Chrisom]; Dkt. 222 at ¶ 7 [Wyndham]; Dkt. 219 at ¶ 14 [Zarach]; Dkt. 268 at 135:12-22 [Brennan]; Dkt. 216 at ¶ 5 [Camaraza]; Dkt. 213 at ¶ 6 [Broder]; Dkt. 225 at ¶ 7 [Meunier].[6]

14.    The customers are almost always non-exclusive. Dkt. 217 at ¶ 6 [Abisch]; *see also* Dkt. 229 at 51:3-18; 128:4-16 [Pimentel]; Dkt. 268 at 135:12-136:15 [Brennan]; Dkt. 225 at ¶¶ 7, 9 [Meunier]. The transportation industry is heavily regulated by the Federal Maritime Commission, and freight forwarder and other customers are well-known to the NVO competitors. Dkt. 217 at ¶ 6 [Abisch].

15.    Freight forwarder customers are sophisticated and knowledgeable about the market and use different NVOs for different shipments, depending on the particular route, cargo, timing, customer service, and price. Major customers include well-known national companies like FedEx, but local or regional freight forwarders are an important part of the business as well. Dkt. 217 at ¶ 6 [Abisch]; *see also* Dkt. 219 at ¶ 9 [Zarach]; Dkt. 221 at ¶ 13 [Chrisom]; Dkt. 222 at ¶ 11 [Wyndham]; Dkt. 225 at ¶ 7 [Meunier]. Very few shippers use the same NVOCC exclusively or consistently. *See* Dkt. 218 at ¶ 20 [Powell].

16.    All of the customer testimony provided to the Court was that 90 days' notice of an agency change (or the lack thereof) had no bearing on their decision to use one NVO over another, and did not cause any shifts or losses in customer business. *See* Dkt. 219 at ¶¶ 9, 13-14 [Zarach]; Dkt. 221 at ¶¶ 11, 16 [Chrisom]; Dkt. 222 at ¶¶ 9-10, 13-14 [Wyndham].  For customers, it is not relevant which NVO reaches out to the customer first. *Id.*

---

[6] In lieu of live direct witness testimony, this Court ordered the parties to submit written declarations.

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

17.    The primary factors affecting customer decisions are: pricing, availability and routing (to transport the particular cargo at the preferred time, via a direct box, to/through a certain port, etc.), customer service, personal relationships and trust, reputation of the carrier, and whether the customer experience with the NVO was good or bad.  *See* Dkt. 219 at ¶ 9 [Zarach]; Dkt. 221 at ¶ 13 [Chrisom]; Dkt. 222 at ¶¶ 10-11 [Wyndham].

18.    Nearly all customers use multiple NVOs at the same time, and customers aggressively compare and negotiate pricing and service with the NVOs. Dkt. 217 at ¶ 7 [Abisch]; *see also* Dkt. 227 at 101:21-102:1 [Sweeney] (Q. "Is it your experience that customers using transportation services normally will go from company to company to get the best price and the best service?" A. "Yes. Sometimes a nickel moves business and sometimes it's $5. No rhyme or reason by the majority of people will move - -"); Dkt. 221 at ¶ 14 [Chrisom]  ("Moreover, it is often the case that I am using multiple different carriers (including VLS and ECU) at any given time, and I can and do switch as I see fit."); Dkt. 222 at ¶ 12 [Wyndham] ("If a competitor (another forwarder) was moving a customer that we (as a forwarder was targeting) and we wanted to get the business – we often would approach another/different NVOCC and try to get better rates/service with them to try and get a chance to move that customers freight. . . . I always maintained and used 2 NVOCC's as far back as I can remember. This was actually common knowledge with the sales reps for each of the NVOCC's that called on me. They would constantly come to me and thank me for the business I gave them and then ask for more business that I gave to their competitor.").

19.    Customers also switch carriers at any given time as they see fit and are not obligated to stay with any particular NVO. Dkt. 219 at ¶¶ 10-12, 14 [Zarach] ("I use who I want when I want depending on the factors outlined above. I can and do switch often, depending upon the particular circumstances . . . . Customers like me

are well aware of all the carriers/players in the market, like VLS and ECU etc., and can choose to use any of them at any time."); Dkt. 221 at ¶¶ 12, 14-16 [Chrisom] ("The idea that as a customer I am locked into a carrier/vendor because they called me first, or because I previously did business with them is simply NOT how I do business, nor any of my colleagues. I decide which carrier/vendor is awarded the business, when I want, depending on the factors outlined above. I do not subscribe to putting all of my 'eggs in one basket' as a business model – thus I can and do switch carriers/vendors often."); Dkt. 222 at ¶¶ 12-14 [Wyndham].

20.    Vanguard's former Global CEO, Charles Brennan, concurred that customers use multiple NVOCCs at any one time, shop around for rates and availability, and that there are no exclusive contracts with any particular carriers. Dkt. 268 at p. 135:17-136:15 [Brennan] (Q. "Customers in the industry, are they exclusive to a single NVOCC?" A. "No." Q. "They can go with whoever they want?" A. "Yes." Q. "At any time they want?" A. "Yes." Q. "And, in fact, they often shop around or use multiple NVOCCs at any one time; correct?" A. "Depending on the region, yes." Q. "And most customers, there's no exclusive contract with any of the carriers?" A. "No, there are volume incentive discounts . . . ." Q. "And customers, when they're shopping around for a carrier, they often will seek - - look at rates; right?" A. "Yes." Q. "Availability?" A. "Yes." Q. "And whether they have a personal relationship with the carrier?" A. "Yes."); *see* Dkt. 202 at ¶ 2 [Brennan].

21.    And Vanguard's expert, Greg Howard, testified that customers can "absolutely" choose to do business with whichever NVO they would like to, and in fact they often do business with multiple NVOs at the same time and shift their business back and forth. Dkt. 269 at p. 340:20-341:21 [Howard] (Q. "Okay. You agree that customers could choose to do business with whichever NVO they would like to; correct?" A. "Absolutely." Q. "And in fact they often do; right? Those customers will do business with multiple NVOs at the same time. They will - - Sorry. They will shift

their business back and forth; correct? A. "That's correct." Q. And the decision on where to shift business is ultimately up to the customers; correct? A. "The customers will select an NVO based on price, based on schedule, based on transit time, based on cargo availability . . . ." Q. "[B]ut you agree Vanguard doesn't own the customers; correct? It's the customers' decisions to make those decision[s]; correct?" A. "That's correct.").

22. It is a "regular occurrence" for NVOs and "agencies [to] change partners in this industry." Dkt. 270 at 780:16-18 [Abisch]; *see* Dkt. 217 at ¶ 53 [Abisch].

23. It is also common in the NVO and transportation industry for salespeople, agents, and managers to move between different NVOs and freight forwarders. Dkt. 229 at 41:19—42:1 [Pimentel]; Dkt. 228 at 90:6-17 [Tudor]; Dkt. 217 at ¶¶ 10, 53 [Abisch] ("These sorts of shifts and changes in business partners regularly occur in the transportation industry. Everyone knows everyone else and you may be working with someone day, and then competing against them for business the next."); Dkt. 213 at ¶¶ 14-15 [Broder]; *see also* Dkt. 225 at ¶ 9 [Meunier]; Dkt. 268 at p. 151:12—152:23 [Brennan] (testifying that before being acquired by Vanguard in 1998, Mr. Brennan's company, Brennan International Transport, actually served as ECU's U.S. agent; then, ECU served as Vanguard's Europe agent until Vanguard bought ConFreight, which replaced ECU). When these salespeople move between competitors, they often take with them their experience and the relationships they have built with customers over time. Dkt. 229 at 45:4-8 [Pimentel]. In the transportation industry, many executives have worked at more than one NVO in their careers, and it is not uncommon for competing NVOs to work together as appropriate to ensure that goods in transit are properly tracked and delivered. Dkt. 213 at ¶ 15 [Broder].

**B.     The Agreement**

24.     This litigation arises out of an at-will agency agreement between NEG and Vanguard. NEG was a representative agent for Vanguard and provided CFS services for Vanguard for many years. Stip., Dkt. 189 at § 6, ¶¶ 14, 13.

25.     The agency agreements were entered into on April 17, 2008, and on December 12, 2013 ("Agreement"). The 2013 agreement was effectively a continuation of the 2008 agreement and is the operative agreement for this dispute. Exs. 27, 75; Dkt. 390:5-391:13 [Laufer].

26.     Joe Meunier is a co-owner, along with his wife Janice Meunier, and the CEO of NEG. Dkt. 225 at ¶¶ 1-2 [Meunier]. The Meuniers did not have a lawyer in negotiating the Agreement. Dkt. 270 at p. 650:23-651:3 [Meunier]. The Agreement was a boilerplate agency agreement that Vanguard prepared and provided to Mr. Meunier. Ex. 25, Dkt. 269 at p. 459:15-25, 461:14-17 [Meunier]; Dkt. 228 at p. 28:18-29:17 [Tudor].

27.     The Agreement was an at-will agreement, as it provided that either NEG or Vanguard could terminate the agreement "at any time upon ninety (90) days prior written notice." Ex. 75 §§ 3.03(b) and (c). This mutual provision permitting termination was intended to allow "the party receiving notice of termination," whether VLS or NEG, "a reasonable opportunity to protect its competitive interests and to enable an orderly transition for the parties, their customers, vendors, and other third parties." Dkt. 202 at ¶ 16 [Brennan].

28.     In addition, the Agreement gave Vanguard immediate termination rights if "NEG shall breach, default, or fail to observe or violate any term, covenant or agreement contained in this Agreement." Ex. 75 § 3.03(b)(A). There was no comparable right expressly granted to NEG. Dkt. 218 at ¶ 11 [Powell].

29.     The Agreement appointed NEG as Vanguard's representative for ocean exports and imports within New England, pursuant to section 2.01(a). NEG agreed

"to act exclusively as NACA's representative pursuant to section 2.01(a) and agrees not to act as a representative for any other exporter and/or importer of goods or any other NVOCC without NACA's prior written consent." Ex. 75 § 2.01(b). NEG's responsibilities included the normal services provided by a local independent NVO, such as sales, customer service, issuing transportation documentation, and coordination regarding shipments of cargo. Ex. 75.

30.    The Agreement also contemplated that NEG would provide similar services relating to export air shipment and that NEG would be compensated for that work. Ex. 75 § 6.03.

31.    The Agreement also contained a warehouse services provision, in which NEG agreed to provide Vanguard CFS services, such as loading and unloading cargo into trucks at NEG's CFS warehouse, where freight is consolidated into a container for ocean shipping export or deconsolidated from a container after importation. Ex. 75 §§ 6, 7.05. The parties agreed to certain compensation to be paid to NEG for these CFS services. *Id.* NEG was obligated to pay back a "refund" to Vanguard on some of the charges NEG collected from customers for CFS services. Ex. 75 § 6.02.

32.    The Agreement contained a "non-compete," which provides: "During the term of this Agreement and thereafter for a period of one (1) year after termination of the Agreement, NEG shall not, and shall not permit any of its employees . . . to engage, as an agent, officer, director, shareholder, owner, partner, joint venturer, lender or in any capacity, whether as an employee, independent contractor, consultant or advisor, or as a sales representative, of any business selling any products or services in direct or indirect competition with the business of [Vanguard] located or operating within (100) miles of any facility of [Vanguard]." Ex. 75 § 2.02(a).

33.    There is no language in the Agreement identifying the Agreement itself as confidential or a confidential document. Ex. 75.

34.    VLS did not seek to enforce the non-compete by injunction and is not seeking damages for a post-termination violation of the non-compete in this proceeding.

**C.    CFS Services in the Agreement**

35.    NEG had served as the CFS station and NVOCC for Vanguard for more than 30 years. Dkt. 225 at ¶ 6 [Meunier].

36.    NEG provided CFS services exclusively for Vanguard. Dkt. 270 at p. 545:19-546:3 [Meunier].

37.    The Agreement incorporates CFS operations in several ways, including: (1) Section 1.04, (a) "NEG declares that it possesses the financial and physical resources to represent NACA's interest in all matters"; (2) Section 4.01 "On exports, NEG will attend to and be responsible for receiving cargo, packing of container and stop-off trucks"; (3) 4.01 (a) "arranging for containers to be loaded or cargo to be received and freight checked against the manifest at the time of container/stop-off container or truck loading."; (4) 4.01 (b) Paraphrase: NEG is responsible to VLS for holding and releasing import cargo; (5) 4.01 (d) Paraphrase: NEG is responsible to VLS for pilfered/damaged cargo claims; (6) Section 6.01 "NACA will pay NEG $ 250.00 per container on truck loaded by NEG."; (7) Section 6.02 "NEG will refund to NACA $ 25 per IT import international shipments and $ 40 for 3rd party IPI shipments (such as H&M and APA). Maximum $ 250.00 per trailer."; (8) Section 7.01 "NACA will pay NEG a commission of $ 5.00/CBM for any LCL NEG routings to the USA, except final destination Boston. Boston destination cargo receives no commission." Dkt. 218 at ¶ 15 [Powell]; *see* Ex. 75.

38.    The financial arrangement was structured in such a way that a significant portion of NEG's income came from these CFS services. Dkt. 225 at ¶ 13 [Meunier]. The Agreement provides that "Boston destination cargo receives no commission." Ex. 75 at § 7.01. This made CFS income central to the overall relationship. Dkt. 225 at ¶

13 [Meunier]. For 30 years, NEG provided all necessary services exclusively for Vanguard, effectively wearing Vanguard's hat in Boston for all services provided. Dkt. 225 at ¶ 69 [Meunier]. The Agreement utilizing NEG's CFS in Boston gave Vanguard an advantage in the Boston market for operating an exclusive CFS; a privilege that no one else had established. In addition, the CFS services represented more than 50% of NEG's revenue stream. The Agreement was not viable without the CFS income, and Mr. Meunier testified that he would not have signed either agreement if it did not include the CFS income. Dkt. 270 at p. 633:5-634:6 [Meunier].

39.    NEG issued Vanguard-branded bills of lading (HBLs) whether the shipment included CFS or not. Dkt. 268 at p. 75:24-77:4 [Brennan].

**D.    By Late 2015, There Was Dissatisfaction with and Difficulty in the Relationship between Vanguard and NEG**

40.    The history of disputes and issues between Vanguard and NEG regarding certain payments, commission fees due to NEG, CFS charges, accounting issues, and other matters dates back to the inception of the Agreement in 2008.[7] Dkt. 223 at ¶ 4 [Peters]; Dkt. 225 at ¶ 47 [Meunier].

41.    As a result, NEG was dissatisfied with its relationship with VLS. Stip., Dkt. 189 at § 6 ¶ 15.

42.    After years of complaints, in April 2015, NEG sent an email to Vanguard outlining the numerous issues. Ex. 3080.

43.    In July of 2015, Vanguard agreed to try to work out the lingering issues. Dkt. 223 at ¶ 7 [Peters]; Dkt. 225 at ¶ 49 [Meunier]. For example, the parties had an extended "all hands" meeting on July 21, 2015 to try to address their issues. *See*, *e.g.* Ex. 2005. Many of the issues were not resolved in the meeting. Dkt. 129 at p. 239:8-240:19 [Sanchoyerto]. David Sanchoyerto, Vanguard's then-Regional Vice President,

---

[7] These issues are discussed in the separately filed Findings of Fact for NEG's Counterclaims.

1    Chief Operating Officer, and Vice President of Operations, prepared minutes of the
2    meeting and provided a detailed action plan. *See e.g.* Ex. 2005, 3077; Dkt. 269 at p.
3    235:4-8 [Sanchoyerto].

4         44.    Six months after the "all hands" meeting in July 2015, problems
5    remained. Mr. Meunier again outlined the problems in an email to Vanguard's Mike
6    Meierkort in December 2015. Mr. Meierkort's response was that perhaps NEG and
7    Vanguard both "need to be honest and think about a different arrangement." Ex. 3088.

8         45.    Just weeks after Mr. Meierkort's e-mail, in January 2016, Mr. Meunier
9    learned that the whiteboard in the office of Vanguard's Regional Vice President for
10   the East Coast, Karl Laufer, displayed the following: "Let's increase NEG's
11   northbound fees. If they refuse, we'll open up Boston." If Vanguard opened a Boston
12   office, it would no longer have a need for NEG's services. Dkt. 225 at ¶ 52 [Meunier];
13   *see also* Dkt. 206 at ¶ 1 [Laufer]. That, combined with the email exchange with Mike
14   Meierkort (Ex. 3088), caused Mr. Meunier to believe he had to prepare for the end of
15   the Vanguard/NEG relationship. Dkt. 270 at p. 631:6-632:19 [Meunier].

16        46.    Despite the ongoing difficulties NEG experienced with VLS, NEG's
17   intention was always to stay with Vanguard if they could work out their differences.
18   Dkt. 270 at p. 629:23-630:8, 632:3-10 [Meunier].

19   **E.    Because of NEG's Dissatisfaction with Vanguard, NEG Discussed the**
20   **Possibility of Becoming ECU's Agent in the Future**

21        47.    John Abisch was a long-time executive at Defendant Econocaribe
22   Consolidators, Inc. ("ECU"), most recently serving as Regional Chief Executive
23   Office for North America and the Caribbean, from 2013 to 2019. Dkt. 217 at ¶ 2-3
24   [Abisch].

25        48.    Mr. Abisch has known Mr. Meunier for more than 15 years. They have
26   worked together as members of the industry association known as the National

1  Customs Brokerage and Freight Forwarders Association of America. Dkt. 225 at ¶¶
2  1, 2, 59 [Meunier]; Dkt. 217 at ¶ 12 [Abisch].

3      49.    Mr. Meunier and Mr. Abisch talked many times over the years about
4  working together. Dkt. 217 at ¶ 13 [Abisch]; Dkt. 225 at ¶ 60 [Meunier]. Mr. Abisch
5  testified that "the entire time we were soliciting pursuing NEG to become our agent,"
6  he did not know if they would "work with us or not," because he had "been down this
7  road many times before with many agents who expressed an interest in working with
8  us and they ended up staying with their current partner." Dkt. 271 at 743:18-24
9  [Abisch]. From NEG's perspective, while NEG and ECU spoke generally about
10 whether it could be feasible for NEG and ECU to do business together, it was not
11 something NEG was actively pursuing. Dkt. 225 at ¶¶ 61-62 [Meunier].

12     50.    At the end of 2015, Mr. Meunier was in contact with Mr. Abisch and
13 Tim Tudor, CEO of ECU. Among the topics discussed was NEG's dissatisfaction
14 with Vanguard, and the possibility of NEG ending its agreement with Vanguard and
15 entering into an agreement with ECU. Stip., Dkt. 189 at § 6 ¶ 17; *see also* Dkt. 228 at
16 p. 15:23-25 [Tudor]. Mr. Meunier indicated to Mr. Abisch that he thought Vanguard
17 was trying to adjust NEG's deal, particularly as to NEG's warehouse business, and
18 that if Vanguard did their own warehousing, it would allow NEG to terminate the
19 agreement. Ex. 36.

20 **F.    Because ECU Wanted Any Possible Future Agreement with NEG Be**
21 **"Proper and Professional," ECU Requested Legal Opinions about the**
   **Vanguard "Non-Compete"**
22

23     51.    After six months, in July of 2016, Mr. Meunier and Mr. Abisch had more
24 communications about NEG becoming ECU's agent in Boston, and it was Mr.
25 Abisch's intent that "any possible future agreement between ECU and NEG be
26 entirely proper and professional." Dkt. 217 at ¶ 17 [Abisch]. In particular, Mr. Abisch
27 expressed his concern over the non-compete in the Agreement. Ex. 35 ("Have you
28

- 15 -

had any luck to figure out a way out of the VLS non-compete? Hoping to find a way to work closely with you in the future."); Ex. 36 ("We discussed my concern with his non-compete and he told me he believes Vanguard is looking to adjust his deal (in particular do their own warehousing in Boston) and this should allow him to terminate the agreement"). Mr. Abisch testified that he was aware that non-compete provisions are fairly common in the transportation industry, but he understood that they are not always enforceable. Dkt. 217 at ¶ 17 [Abisch].

52.    Mr. Abisch requested that NEG obtain a legal opinion on the enforceability of the non-compete. Ex. 37 (in order to avoid a "legal mess," the parties should "1) Get a legal opinion which will make Ecu Worldwide India feel confident we would not be participating in 'fraudulent conveyance' by entering into an agreement with New England Groupage whom has a very clear non-compete in their current agreement, 2) Create the terms of the agency agreement between New England Groupage and Ecu Worldwide," but that "we must accomplish number 1 above before we spend the time on number 2"); Dkt. 217 at ¶ 15 [Abisch] (concerned about whether Vanguard non-compete provisions "were valid and enforceable").

53.    Mr. Abisch asked Mr. Meunier to get a legal opinion to help ECU's senior officials in India feel confident that there was no legal reason preventing the parties from working together. Ex. 37; *see also* Dkt. 217 at ¶ 15 [Abisch].

54.    NEG also wanted to get a legal opinion to understand the options for NEG in the event that Vanguard decided to change partners, but it was not NEG's intention to enter into an agency agreement with ECU at this time. Dkt. 225 at ¶ 58 [Meunier]; Dkt. 270 at p. 490:13-18 [Meunier].

55.    Three months later, in October of 2016, Mr. Meunier told Mr. Abisch he had a "Legal Pow Wow this week with a new firm that believes we could be good." Ex. 37.

56.    On October 31, 2016, NEG's then counsel, Casner & Edwards, prepared a research memorandum directed to NEG's principal, Mr. Meunier. Stip., Dkt. 189 at § 6 ¶ 18; Ex. 21.

57.    On November 1, 2016, NEG forwarded the Legal Opinion to ECU. Stip., Dkt. 189 at § 6 ¶ 19.

58.    The legal opinion NEG obtained opined that NEG had a right to terminate its at-will agreement with VLS and that the non-compete in the agreement was not enforceable post-termination, because covenants not to compete are generally void in California. Exs. 21, 22, 38, 39. The legal opinion concluded that California law was the applicable law for the agreement. Ex. 22.

59.    ECU also obtained its own legal opinion regarding the enforceability of the non-compete. Ex. 39 (circulating, within ECU, "the opinion of the USA based attorney we hired to review this matter" and the opinion of in-house counsel in India); Ex. 46 ("Similar to the advice you received, our legal believes the California venue is key to the inability for NACA to enforce the noncompete."); Dkt. 217 at ¶ 18 [Abisch] ("To make certain that we proceeded properly, and that NEG would have the right to work with ECU if NEG decided to terminate its agreement, ECU then retained a law firm with a lawyer licensed by the California bar to analyze the non-compete provision. That firm's analysis also concluded that the provision was not enforceable post-termination.").

**G.    Both ECU's and NEG's Lawyers Separately Concluded the Vanguard Non-Compete Was Not Valid nor Enforceable; ECU Also Instructed That NEG Should Not Provide Confidential Vanguard Information**

60.    In early December 2016, Mr. Abisch told Mr. Meunier that ECU's legal counsel agreed the non-compete was not enforceable post-termination. Ex. 17B ("Similar to the advice you received, our legal believes the California venue is key to the inability for NACA to enforce the noncompete."); Dkt. 217 at ¶ 19 [Abisch] ("In

early December 2016, I communicated to Mr. Meunier that our counsel agreed with his counsel's conclusions.").

61.     Thus, both ECU and NEG lawyers separately concluded that the post-termination non-compete provisions in the NEG/Vanguard agreement were not valid and not enforceable under California law. Stip., Dkt. 189 at § 6 ¶ 21. Consistent with this view, VLS did not attempt to enforce the non-compete by an injunction and is not seeking damages for a post-termination violation of the non-compete in this proceeding.

62.     In that same communication, Mr. Abisch told Mr. Meunier in writing that ECU did not want to receive any confidential information from NEG. Ex. 46 ("A key component of this will be for us to not utilize any confidential information you have obtained via your agency relationship with NACA"); Dkt. 217 at ¶ 19 [Abisch] ("I also stressed to Mr. Meunier and his wife, Janice, that ECU did not want NEG to provide any confidential information obtained by NEG via its agency agreement with Vanguard.").

63.     There were no substantive communications between the parties for nearly eight months. Dkt. 217 at ¶ 21 [Abisch] ("Again, there was no real substantive communications after the December 2016 communications, until NEG expressed an interest in proceeding in August 2017.").

64.     Until December 11, 2017, these sporadic few communications were the extent of NEG's involvement with ECU. Dkt. 225 at ¶ 67 [Meunier].

**H.     The Relationship between Vanguard and NEG Breaks Down; Vanguard Contacts BFT to Replace NEG's CFS Business**

65.     Separately, Vanguard and NEG were continuing to have disputes, including Vanguard demanding in June 2017 that NEG increase its refund payments to Vanguard to $45 per HBL (house waybill), with no per trailer maximum levels. Ex. 3032; *see* Ex. 75, Section 6.02. NEG did not agree to pay more to Vanguard, but

offered a solution for Vanguard to add this operational cost as a line item on its arrival notice. Ex. 3032.

66.    By August 2017, Vanguard was exploring ways to force NEG to agree to renegotiate the terms of the Agreement to increase Vanguard's compensation, Ex. 1003 ("[NEG] wants to call our bluff?"), Ex. 2008 (Vanguard looking for contact at Boston Freight Terminal ("BFT") for quote on "trucking and warehousing"), including by using the import CFS as a leverage point. Dkt. 268 at p. 113:22-115:2 [Brennan], p. 175:10-176:17 [Donahue], p. 216:3-19 [Sanchoyerto]; Dkt. 225 at ¶ 56 [Meunier]. Vanguard believed there were "more favorable terms in the market and we were just trying to get NEG to agree to the same terms that existed in the market at the time." Dkt. 269 at p. 245:6-22 [Sanchoyerto].

67.    In particular, Vanguard wanted to increase the refund to VLS on IPI (Inland Ports Intermodal) or eliminate the maximum per trailer, terms that had been in the Agreement since 2008. Ex. 3032; Dkt. 269 at p. 409:9-410:3 [Laufer]; Ex. 75 at Section 6.02 ("NEG to refund NACA $25 per IT import international shipments and $40 for 3rd party IPI shipments (such as H&M and APA). Maximum $250.00 per trailer"). Mr. Laufer explained that Vanguard "would like the CFS refund to be in alignment with the market, and they were asking for a $45/HBL and no min/max." Ex. 1003. Vanguard was looking to negotiate with NEG for revised CFS import fees in order to achieve a so-called "win-win" situation (Dkt. 202 at ¶ 17 [Brennan]), even though the only proposed change from Vanguard would have been for NEG to increase the refunds it was paying to Vanguard. Ex. 1003. Mr. Meunier suggested that VLS add a $35 fee billed to the customers, rather than having NEG pay a higher refund to VLS. Ex. 3032; Dkt. 225 at ¶¶ 53-55 [Meunier]. Vanguard rejected NEG's proposal, but later implemented the very same charge when it switched its CFS to BFT. Dkt. 269 at p. 410:18-411:14 [Laufer]; Dkt. 225 at ¶ 56 [Meunier].

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

68.     Around the same time, and without any notice to NEG, Vanguard changed the payment terms that had been in place for 30 years and went from paying NEG's commissions and fees with weekly wire transfers on a net zero basis to 45 days. Ex. 1002; Dkt. 269:5-404:6 [Laufer]. NEG had been paid weekly when Vanguard made the change. Dkt. 268 at p. 104:17-106:7 [Brennan]. NEG reached out to Vanguard explaining that this change resulted in an $80,000 cash loss. Ex. 2051. Hal Donahue, Vanguard's then-Regional Managing Director of the Americas, proposed negotiating better Agreement terms for Vanguard before Vanguard responded to Mr. Meunier's inquiry about the change in payment terms. *Id.;* Dkt. 268 at p. 109:5-112:6 [Brennan]; *see also* Dkt. 204 at ¶ 2 [Donahue].

69.     The abrupt change had a significant impact on NEG's cash flow and was detrimental to NEG's operations. After NEG's vehement protests, Vanguard agreed to make payments to NEG on a 30-day term. Dkt. 223 at ¶ 9 [Peters]; Dkt. 270 at p. 677:15-678:12 [Peters]. This change coincided with Vanguard's ongoing efforts to force NEG to renegotiate the Agreement. Ex. 2051, Ex. 3029.

70.     Vanguard's discussions with BFT, in mid-August 2017, were about BFT providing CFS warehouse services to Vanguard to replace NEG. Exs. 2007; 2008; 2009; *see also* Stip., Dkt. 189 at § 6 ¶ 22. Vanguard internally discussed the negative effects a switch to BFT for CFS services would have on NEG, including losing "all the warehouse related charges, including the CFS Import revenue for Boston LOT charges" and "the export D/R charges, export stopoff trailer loading and Pier receiving charges." Ex. 2009.

71.     There is no evidence that Vanguard provided any notice to NEG of its discussions with BFT about replacing NEG's CFS business.

## I.     NEG Expresses More Interest in Working with ECU

72.     In August of 2017, during the same time period that Vanguard reached out to BFT about the CFS business, NEG was increasingly frustrated with the

relationship with Vanguard. Dkt. 225 at ¶ 66 [Meunier]. In the preceding months, Vanguard had shifted payment terms, thereby hurting NEG's cash flow (Ex. 1002), and was placing pressure on NEG to change the Agreement terms. Ex. 3029. The parties also continued to have issues, including lingering issues concerning Vanguard's failure to pay NEG CBM commissions, ongoing waiver of the pier loading fees, discrepancies in the commission percentages owed, and more. Dkt. 223 at ¶ 13 [Peters]. NEG reached out to ECU and reinitiated contact on a possible future deal. For the first time, the parties considered specific proposals, with NEG putting together possible terms in its "ECU Outline." Ex. 48.

73.    On August 11, 2017, Mr. Tudor of ECU wrote to his superior, Shashi Kiran Shetty, about an "opportunity" with NEG to "make a proposal," because the relationship between NEG and VLS "is stressed: 1) The agent feels like they don't get support from VLS and all VLS does is squeeze them over and over for less commissions; and 2) (we suspect) VLS is tired of dealing with them and has been looking for ways to open up their own office and warehouse in Boston, are actively (but not aggressively) looking for a change" Ex. 49. As set forth below, Mr. Tudor was correct that VLS was negotiating its own change of warehouse/CFS services away from NEG.

74.    Thus, in August of 2017, NEG and ECU began communicating about a possible new agency agreement and financial terms for NEG to become ECU's representative in Boston. Stip., Dkt. 189 at § 6 ¶ 23; *see also* Dkt. 271 at p. 731:15-24 [Abisch]. NEG was frustrated and Mr. Meunier thought it might be time to consider other options. Dkt. 225 at ¶ 67 [Meunier].

75.    On October 25, 2017, Mr. Abisch wrote to Mr. Tudor and others at ECU that he met with the principals of NEG and that Mr. Abisch had suggestions regarding "how to take the opportunity forward for them to professionally terminate with VLS and become our agent." Ex. 57; *see also* Dkt. 217 at ¶ 22 [Abisch] ("In using the

phrase 'professionally terminate,' I meant that any transition should be done in a legally proper and appropriate way, including following any contract terms regarding notice and going through the customary transition, following normal protocols. This was always our belief and our approach.").

76.    From NEG's perspective, NEG was merely looking at the concept of working as ECU's agent should NEG decide to move on from its relationship with VLS. Dkt. 225 at 67 [Meunier].

77.    ECU never encouraged NEG to not provide VLS 90-days' notice of termination of the VLS Agreement. Dkt. 217 at ¶ 25 [Abisch].

**J.    Vanguard Planned to Pull Business from NEG to Push NEG to Renegotiate; Vanguard's Deal with BFT Would Be Substantially More Profitable; There Were Risks the Vanguard-NEG Agreement Would Be Terminated**

78.    After receiving a quote from BFT to replace NEG's CFS business (Ex. 1005), VLS implemented a strategy to "pull some business" from NEG in order to "push [Mr. Meunier] to renegotiate" and to "force [NEG] to rethink [its] position." Ex. 182 at VLS-11532 ("He won't negotiate unless we pull some business."); Ex. 182 at VLS-11530 (VLS could advise [Meunier] that VLS has considered "alternatives in Boston which provide more favorable results" because that "may push [Meunier] to renegotiate the agreement.").

79.    In reference to the warehouse/CFS switch from NEG to BFT, Mr. Donahue of Vanguard wrote to Mr. Sanchoyerto and Mr. Laufer, also of Vanguard, that "[t]his is heating up pretty quickly so we will need to be able to make a move." Ex. 2009. Vanguard had been contemplating this switch for at least a year. Ex. 2008.

80.    VLS negotiated a deal with BFT that "doubles our CFS refund," resulting in additional profits estimated to be $212,000 per year. Ex. 1002; Ex. 1010.

81.    VLS knew that it might lose NEG routings and business from one of its biggest customers if it switched the CFS from NEG to BFT. Ex. 1010 ("We need to

think this through . . . . [If] we lose the Kravet business and the NEG routings[, ] it [then] becomes a loss. There has to be a way to just move the imports away."). VLS understood, since as early as August 2017, that its action could cause the termination or the ending of the Agreement, and have consequences for VLS. Ex. 2051 ("My only concern is that we be careful to not push [Meunier] into a negative position as then [Vanguard] face[s] the problem of having to open up ourselves in Boston which I don't believe is worthwhile.").

82.     VLS was prepared to fight for customers, such as Kravet, once it terminated the CFS services at NEG. For example, VLS wrote that "Joe's friend is actually a 3rd party on the deal and doesn't actually control the business. We deal with Kravet directly so we're not sure that he could actually pull the business." Ex. 2013.

**K.     NEG and ECU Engage in Intermittent Discussions about Potential Future Business**

83.     During the fall of 2017, there were sporadic communications between ECU and NEG about the possible terms of a future agreement. After Mr. Meunier sent Mr. Abisch the August 7, 2017 fax containing the terms of a potential future agreement between NEG and ECU, Mr. Abisch told Mr. Meunier that he was going to talk to individuals within ECU about the proposed terms, in the event that NEG chose to leave Vanguard. Dkt. 270 at 537:12-17 [Meunier]; *see also* Ex. 48.   Mr. Abisch did so, writing (nearly two months later, on September 27, 2017) within his organization about the "NEG opportunity." Ex. 51.

84.     Mr. Abisch anticipated, at this time, that NEG would be giving 90-days' notice prior to becoming ECU's agent: "Yes. I anticipated they would follow whatever was required in the agreement, yes." DE 271 at 730. Vanguard has also argued that isolated language in a Tim Tudor email on August 11, 2017, supports the idea ECU encouraged NEG to terminate without notice. *See* Ex. 49. The full context of Mr. Tudor's email makes clear that he was suggesting the possibility of a negotiated

solution with Vanguard, given that he understood that Vanguard was "not happy" with NEG. Mr. Tudor never suggested that NEG should not provide notice and there is no discussion of the 90-day period identified in the Agency Agreement. *Id.* In fact, this email specifically presumes that NEG would be giving notice, and there is no showing this internal email was ever sent to NEG. *Id.* This is not evidence that ECU tried to get NEG to ignore contractual notice requirements.

85.    Nearly one month after Mr. Abisch wrote within his organization about the opportunity for potential future business with NEG, on October 25, 2017, Mr. Abisch wrote to individuals within ECU about the "NEG outline of concept and deal" and attached his "suggestion of how to take the opportunity forward for them to professionally terminate with VLS and become our agent." Ex. 57.

86.    NEG did not make any decision to commit to working with ECU. Ex. 48 (proposed terms from NEG; internal ECU comments, as of August 2017); Dkt. 225 at ¶ 67 [Meunier] (discussions about the concept of NEG working as ECU's agent, "in the event NEG decided to move on from its relationship with Vanguard"). NEG was only going to work with ECU if Mr. Meunier chose to leave VLS. Dkt. 270 at p. 537:12-17 [Meunier]; Dkt. 225 at ¶ 67 [Meunier].

87.    ECU's internal emails also reflected that ECU did not believe that there was any deal or agreement with NEG, as of the fall of 2017. See Ex. 51 (internal ECU mail in September 2017 regarding potential relationship with NEG); Ex. 57 (internal ECU email in October 2017 regarding NEG outline of concept and deal, including for NEG to "professionally terminate").

**L.    Vanguard Takes Away CFS Business from NEG and Makes Public Announcement of the CFS Change That Causes Significant Confusion**

88.    Then, in November 2017, Vanguard made a decision to take CFS business from NEG. On November 1, 2017, Mr. Donahue of Vanguard wrote to Jeff Lee of Vanguard:

- 24 -

I went back and forth with Joe on the imports and refused to budge. We engaged BFT in good faith and I don't think that NEG deserves another chance. We're still getting a bad deal on the exports and pulling the imports may force him to rethink his position.

I believe that we should formally communicate that we are pulling the imports based on his documented unwillingness to negotiate his out of market terms and then make the switch. If we back out of the switch to BFT, we pretty much close that door forever.

Ex. 2010.

89.     At trial, Vanguard's former CEO, Mr. Brennan, testified that he saw nothing wrong with Vanguard using leverage to try to force NEG to re-negotiate their agreement, on Vanguard's terms: Vanguard's former CEO, Mr. Brennan, believes that's the way business is done:

> ". . . I mean that's just business. We're not looking to end the relationship. I mean, you know, using leverage. *Everyone uses leverage. That's how business works.*"

Dkt. 268 at p. 114:9-11 [Brennan] (emphasis added).

90.     On November 22, 2017, Vanguard obtained final internal approval for moving its warehouse import business away from NEG and to BFT, after concluding that it would be more profitable for Vanguard and after failing to convince NEG to renegotiate the existing terms in their Agency Agreement. Ex. 2011 ("We are ready to move our imports in Boston away from New England Groupage to Boston Freight Terminals effective December 1st. Karl negotiated a deal with them that doubles our CFS refund . . . . We gave Joe many opportunities to negotiate and I advised that the existing terms were unsustainable but he refused to budge."). Vanguard recognized that moving the warehouse business from NEG to BFT could cause the end of the NEG relationship, because NEG might "retaliate" by moving the separate Kravet business to a competitor, which could cause a loss of $250,000 to $300,000 per year

to Vanguard. *Id*. ("[W]hile I think we should proceed, can we get a determination as to what we make on Kravet for airfreight. He could try to retaliate.").

91.    On November 27, 2017, Vanguard advised NEG orally that it intended to discontinue using NEG's CFS services for import shipments by the end of the year. NEG expressed its objections to Vanguard, saying that this was a violation of the Agency Agreement. Vanguard expressed its disagreement and stated that such a move would not affect NEG's appointment to provide Agent Services under the Agency Agreement. Stip., Dkt. 189 at § 6 ¶ 24; Ex. 3015; Dkt. 225 at ¶ 68 [Meunier]. The switch was to happen in just over 30 days.

92.    Between December 1 and 6, 2017, NEG sent emails contending, among other things, that VLS's intention to change its import CFS to BFT violated the Agency Agreement. Stip., Dkt. 189 at § 6 ¶ 25; *see also* Ex. 94 ("As I said on our phone call and follow-up email I believe this action violates our agreement."); Dkt. 225 at ¶¶ 70-71 [Meunier].

93.    On December 11, 2017, Vanguard made a public announcement to all its customers that BFT would be its new CFS warehouse. The notice specifically mentioned **both** delivering "export cargo" and picking up "import cargo" and thus could be seen to apply to all of NEG's CFS business with Vanguard. Ex. 91. The effective date of the move was not the end of the year (as Vanguard had told NEG), but was in only seven days, on December 18, 2017. Stip., Dkt. 189 at § 6 ¶ 25; Ex. 91; *see* Dkt. 225 at ¶ 68 [Meunier]. The date selected by Vanguard was in the middle of the holiday season. None of Vanguard's witnesses admitted or recalled drafting the notice. *See*, *e.g*., Dkt. 269 at p. 248:21-249:2 [Sanchoyerto].

94.    The December 11, 2017 notice did not mention NEG. Ex. 91. With the notice announcing the change on December 18, NEG had seven days before its primary revenue stream would cease. Dkt. 225 at ¶ 81 [Meunier]. NEG considered the notice a death sentence for its business operations, as CFS represented more than

50% of NEG's revenue stream, and NEG would have only been able to stay in business for two to three weeks if it lost the CFS stream. In NEG's view, the Agreement was not viable without the CFS. Dkt. 270 at pp. 555:13-18, 556:4-9, 663:5-634:6 [Meunier].

95.    Following the announcement, Mr. Meunier believed that Vanguard would discontinue all import and export operations at NEG on December 18, 2017, despite assurances from Vanguard. Dkt. 270 at p. 635:6-23 [Meunier]. NEG nonetheless continued doing work for Vanguard because NEG believed it was in the best interests of NEG, Vanguard, and the client base. Dkt. 270 at p. 636:15-19 [Meunier].

96.    On or about December 14, 2017, Vanguard sent another notice to its customers. Stip., Dkt. 189 at § 6 ¶ 28; Ex. 92. The revised notice removed any reference to exports. Ex. 92.

97.    Neither industry notice mentioned NEG nor explained whether NEG would remain Vanguard's CFS warehouse for either import or expert warehouse pick up and drop off, and consolidation and deconsolidation services; there was no explanation as to whether NEG remained Vanguard's agent for booking and other services. Ex. 91; Ex. 92. A customer testified that the notices "caused significant confusion," as he thought Vanguard "had ended its relationship with NEG and everything was now being routed through BFT" and that "[t]he abrupt change with no warning and apparent lack of notice to NEG caused significant bad will towards VLS.". Dkt. 222 at ¶¶ 15-16 [Wyndham]. Numerous customers contacted NEG to ask about cargo in transit and quotes NEG had provided. Mr. Meunier told customers that Vanguard made what "[he] considered an abrupt decision to basically put NEG out of business; and we were hoping we could find a contingency plan to continue to operate." Dkt. 270 at p. 639:20—640:11 [Meunier].

98.    NEG was provided no advance warning of the December 11th industry notice of the CFS change. Dkt. 225 at ¶ 74 [Meunier]. VLS never coordinated with NEG on the warehouse transition to BFT. Dkt. 269 at p. 249:3-14. [Sanchoyerto] (Q. "Vanguard was changing its CFS from NEG to BFT. Did you make any effort with NEG or Mr. Meunier to coordinate that change - -" A. "No." Q. - - "so it went smooth." A. "I did not."); Dkt. 268 at p. 183:5-184:13, 187:5-19, 202:6-11 [Donahue] (Q. "Did Vanguard do any transition at all in connection with the CFS import change as it related to NEG?" A. "All we did was advise Mr. Meunier that we were changing the imports. That's all we did."); Dkt. 269 at p. 424:6-18 [Laufer] ("Did you tell Mr. Meunier and work with him to let him know how this [transition from NEG to BFT for CFS] was going to work and how to make it work?" A. "I didn't speak with Joe."); Dkt. 225 at ¶¶ 70-71, 76, 83 [Meunier] ("No one from Vanguard ever told me how the transition would work or how NEG should handle this significant change in operations.").

99.    NEG was advised by its lawyer that Vanguard's December 11, 2017 notice was a final breach of the Agreement and that the Agreement was no longer valid. Dkt. 270 at p. 553:14-554:16, 556:4-9 [Meunier].

**M.    Vanguard's Decision to Take Away NEG's CFS Business Prompts Further Internal and External Discussions and Exchange of Proposals between NEG and Vanguard about Future Business**

100.    VLS's decision to terminate NEG's CFS warehouse business finally prompted NEG to move forward with a future agreement with ECU. Dkt. 225 at ¶¶ 68-109 [Meunier]. After Mr. Sanchoyerto told Mr. Meunier in late November 2017 that the CFS imports would be moved to BFT, NEG still had not decided to terminate Vanguard and move to ECU. Dkt. 270 at p. 550:21—551:5 [Meunier]. Vanguard presented no evidence that NEG had made a decision on either termination or doing

1  future business with ECU, until after Vanguard issued its public notice of the switch
2  in its CFS business.

3      101.  Mr. Abisch of ECU testified that "the notification that Vanguard was not
4  going to use NEG as a warehouse was a very, very clear sign that we had a much
5  better chance to work with NEG. Up until that point, although we had been talking,
6  we'd talk for years. We still weren't sure if they were really going to want to work
7  with us or not. Once they lost the warehousing, that significantly improved the chance
8  that they would end up working with us. . . ." Dkt. 271 at 762:9-16 [Abisch]. It was
9  only after Vanguard announced the switch in CFS business to BFT that Mr. Abisch
10 sought and obtained internal approval to move forward with a future deal with NEG.
11 Ex. 62 (email from Mr. Abisch on December 15, 2017 requesting approval to proceed
12 with a future NEG deal in light of Vanguard's change of CFS announcement); Ex. 63
13 (email from Mr. Abisch on December 18, 2017 indicating that ECU had approved a
14 future NEG loan).

15     102.  NEG and ECU exchanged a redlined version of a draft MOU, or
16 Memorandum of Understanding, on December 13, 2017, addressing many of the
17 items originally proposed back in August 2017. Ex. 61; Ex. 48 (proposed terms from
18 NEG; internal ECU comments, as of August 2017). Both NEG and ECU testified that
19 they understood that this was a non-binding MOU, and that either party could still
20 walk away without a commitment. Dkt. 217 at ¶ 41 [Abisch]; Dkt. 225 at ¶ 89
21 [Meunier].

22     103.  ECU agreed to provide an advance to NEG, to help with anticipated cash
23 flow issues, but the advance would only be provided after termination of the Vanguard
24 agreement. ECU wanted to be prepared in the event that Vanguard "terminates
25 immediately." Ex. 62. ECU "wanted to make sure [NEG] could continue to meet
26 payroll and offer the same quality service they were previously." Dkt. 271 at 783:6-
27 13 [Abisch]. No loan was provided until after termination until after NEG became

28

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

ECU's agent and starting booking. Dkt. 217 at ¶¶ 45, 48 [Abisch]; Dkt. 270 at p. 645:14-21 [Meunier].

104.   Following Vanguard's December 11th public announcement about the CFS change, on December 15, 2017, Mr. Abisch wrote internally at ECU: "I expect we will be able to finalize a deal with New England Groupage (NEG) to become both our agent and our warehouse in Boston next week. In summary, Vanguard has made an announcement that they will change their import cfs in Boston away from NEG to Boston Freight Terminal (BFT). BFT is our current export warehouse and the IPI warehouse for our imports from St George." Ex. 62.

105.   By December 15, 2017, NEG transmitted to ECU a draft of a VLS termination letter. Stip., Dkt. 189 at § 6 ¶ 29. There was no communication from ECU to NEG providing feedback on the draft letter, or about the timing and manner of NEG's termination letter. Dkt. 217 at ¶¶ 23-25 [Abisch].

106.   On December 20, 2017, Mr. Abisch of ECU recommended that NEG wait until it learned how VLS reacted to the termination letter before NEG put out any information to customers proactively.  Ex. 84.  Mr. Abisch recognized that they might "lose out on some bookings by postponing the note," but believed it better to wait and see Vanguard's response because "this is a marathon as opposed to a sprint." Ex. 84. Mr. Abisch testified that he wanted to see if Vanguard would cooperate in a transition period before ECU and NEG actually started working together. Dkt. 217 at ¶ 36 [Abisch].

107.   Mr. Meunier explained to Mr. Abisch that he was concerned that VLS would not cooperate in a reasonable transition or wind-down period and that VLS might immediately cut off NEG from all computer systems, booking and tracking software, and NEG's customers. Dkt. 217 at ¶ 32 [Abisch]; Dkt. 225 at ¶¶ 87-88 [Meunier]; Ex. 62 (if Vanguard terminates immediately and cuts NEG off from their software, NEG wanted to be immediately prepared to handle client bookings). NEG

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

1    was completely reliant on VLS for this infrastructure. Dkt. 217 at ¶ 32 [Abisch]; Dkt.

2    225 at ¶¶ 87-88 [Meunier].

3        108.    ECU, therefore, provided computer training and some laptops, to be used

4    only as a backup plan if VLS immediately cut off computer access and decided not to

5    cooperate during the transition period. Dkt. 217 at ¶ 32 [Abisch]; Dkt. 225 at ¶¶ 87-

6    88 [Meunier]. Mr. Abisch described this backup plan "like having a generator

7    available in the case of a loss of power." Dkt. 217 at ¶ 32 [Abisch]. The backup plan,

8    including activation of NEG's access to ECU's shipping tracking software, would not

9    be needed if Vanguard cooperated during the transition period with an agreed date for

10   the effectiveness of termination. *Id.* ECU had its I.T. Vice President and a

11   representative in charge of Training and Development in NEG's offices beginning

12   between December 19-20, 2017. Stip., Dkt. 189 at § 6 ¶ 32. A few ECU email

13   addresses were set up for some NEG employees, but no one from NEG was provided

14   access to ECU's computer systems or software. *Id.*

15       109.    Based on the many delays and many times that NEG did not seem

16   interested in working with ECU, ECU thought there was always a possibility that

17   NEG would change its mind, and either continue to work with Vanguard or decide to

18   become an agent for someone other than ECU. Dkt. 217 at ¶ 33 [Abisch]. If NEG

19   decided not to proceed, ECU would not allow NEG any access to ECU's systems.

20   Dkt. 217 at ¶ 33 [Abisch]. Last minute decision-making by agents or employees is not

21   uncommon in the transportation industry. *Id.*

22   **N.    NEG Sends a Termination Notice and Vanguard Accepts the Termination**

23       110.    On December 21, 2017, NEG's counsel sent a letter to Vanguard giving

24   notice that it was terminating the Agreement. Ex. 69. The letter stated:

25           NEG hereby gives notice that Vanguard is in material breach of
             the Agreement based upon, *inter alia*, Vanguard's abrupt and unilateral
26           relocation of its import Container Freight Station ("CFS") in Boston to
             Boston Freight Terminals, and its abrupt and unilateral notification to
27

28

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

third parties of the same, notably concerning both imports and exports, for which NEG reserves all rights and remedies for any resulting damages to it or its business. As you know, Vanguard's utilization of NEG's facility for both imports and exports is both an express, and a material term of the Agreement, which term is also evidenced by the parties' longstanding course of performance. Since NEG receives no commission on imports terminating in Boston, but relies on warehouse revenue in lieu of such a commission, the warehousing that Vanguard unilaterally terminated was a material benefit of the NEG bargain under the Agreement.

Based upon Vanguard's material breach, NEG hereby terminates the Agreement in all respects, and will no longer accept newly ordered Vanguard exports at its facility. However, as an accommodation, and with no legal obligation to do so, and in order to facilitate the orderly wind down of the parties' relationship and currently ordered exports in transit, NEG will cooperate in the disposition of Vanguard exports now on site.

Ex. 69.

111. Upon receipt of NEG's letter, Vanguard had three options: (a) the parties immediately cease all cooperation, (b) the parties agree to a mutually acceptable cessation schedule, or (c) Vanguard could demand compliance with the terms of the Agreement. Dkt. 218 at ¶ 11 [Powell].

112. In this lawsuit, Vanguard has asserted that NEG was obligated to provide 90-days' notice of the termination date of the Agreement. Dkt. 97 (SAC), ¶¶ 27-28, but on December 21, 2017, Vanguard's counsel immediately responded to NEG's termination letter, telling NEG to "discontinue" doing work for Vanguard. Ex. 1020.

113. That same day, on December 21, 2017, after VLS received the letter from NEG's counsel, VLS terminated NEG's access to VLS's VPN, cut off NEG's access to VLS's computer systems, disabled NEG's access to VLS's network, and cut off NEG's access to emails directed to NEG through any VLS email address. Stip., Dkt. 189 at § 6 ¶ 35. In directing NEG to "discontinue" processing HBLs and cutting off

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

NEG's access to VLS's system, it was clear that Vanguard had elected option "a," immediately ceasing all cooperation with NEG. Dkt. 218 at ¶ 12 [Powell]. Vanguard's witnesses confirmed that once NEG's computer access was cut off, NEG was no longer able to perform agent services for Vanguard. Dkt. 268 at p. 76:15-77:4 [Brennan] (Q. "Okay. But without Vanguard, they could not do any work - - without the Vanguard systems A. "Yeah, I'd agree with that."); Dkt. 269 at p. 443:20-444:5 [Laufer] (Q. "So when . . . VLS . . . cut off NEG's access to the computer system, they could no longer perform any of those services [i.e., issuing bills of lading or booking a shipment] for Vanguard; correct?", they could not do any work for Vanguard?" A. "Yes."); Dkt. 269 at p. 223:25-224:6; 251:16-25 [Sanchoyerto] (Q. "So do you agree that if NEG had to discontinue issuing Vanguard waybills and if NEG no longer had access to Vanguard's computer network, its server, its cargo shipment management system and tracking system, that NEG would be unable to perform any services for Vanguard as of December 21st, 2017; is that correct?" A. "That is correct.").

114.    On December 21, 2017, after VLS received the letter from NEG's counsel, Mr. Sanchoyerto sent an internal email at VLS under the subject line "Boston Restructure Checklist." Stip., Dkt. 189 at § 6 ¶ 36. In that email he wrote: "Hello team, I started a checklist this morning to capture items that need to be actioned due to the change in our Boston CFS and the end of our relationship with NEG." Ex. 1023; Ex. 2018. The list included dozens of items that VLS addressed, internally, to end the NEG relationship. *Id.*

115.    On December 21, 2017, after VLS received the letter from NEG's counsel, VLS sent another notice to its customers. Stip., Dkt. 189 at § 6 ¶ 37; Ex. 93. This notice clearly advised customers that all CFS warehouse business for VLS in Boston would now be handled by BFT. Ex. 93.

116.    The next day, on December 22, 2017, counsel for NEG and counsel for VLS exchanged further letters. Stip., Dkt. 189 at § 6 ¶ 43; Exs. 1021; 1022.

117.    Vanguard's counsel's letter to NEG demanded that NEG return electronic equipment, such as a phone and a router. Ex. 1022.

118.    After December 22, 2017, NEG returned a VLS phone, and cooperated with a VLS vendor to remove VLS's Cisco router from NEG's premises, as requested by VLS. Stip., Dkt. 189 at § 6 ¶ 44.

119.    Beginning on or after December 21, 2027, VLS never asked NEG to continue doing business with VLS. Stip., Dkt. 189 at § 6 ¶ 38.

120.    VLS did not take NEG up on its offer to cooperate during the transition. Dkt. 268 at p. 145:6-9 [Brennan]; Dkt. 269 at p. 251:16-25 [Sanchoyerto]. Nor did VLS ask ECU to coordinate any transition for NEG. Dkt. 217 at ¶ 38 [Abisch].

121.    Beginning on or after December 21, 2017, VLS never asked NEG to rescind any notice of termination of the Agreement. Stip., Dkt. 189 at § 6 ¶ 39.

122.    At no point did Vanguard insist that NEG perform the Agreement, for the 90-day notice period or otherwise. Taken together, all of the events of December 21 and 22, 2017—the letters in addition to Vanguard's cutting off NEG's access to Vanguard's computers and databases—constituted a termination of the Agreement, with the explicit and implicit agreement of both NEG and Vanguard. Dkt. 225 at ¶¶ 90-99 [Meunier], 106; *see also* Dkt. 217 at ¶¶ 31, 34 [Abisch].[8]

---

[8] There is some suggestion by Vanguard that the Agency Agreement was never terminated and continues in effect. As discussed herein, however, the record evidence belies any such assertion because both Vanguard and NEG treated the agreement as terminated, with VLS acknowledging NEG's termination letter as constituting the "end of [VLS's] relationship with NEG," Exs. 1023, 2018. And at no point after NEG's termination letter did VLS insist or demand that NEG perform the agreement or provide any services to VLS.

**O.    Prior to the December 21st Termination, NEG Never Provided Services to ECU nor Acted as ECU's Agent; NEG Had No Access to ECU's Computer Systems and Never Booked Business Prior to Termination**

123.    Prior to termination on December 21, 2017, NEG never provided services to ECU nor acted as ECU's agent. *See* Dkt. 268 at p. 220:23-221:11 [Brennan]; Dkt. 270 at p. 636:24-637:5 [Meunier]; Dkt. 217 at ¶¶ 34-37 [Abisch].

124.    To the contrary, NEG and ECU witnesses testified that NEG did not have access to ECU's computer system and did not book business for ECU until after December 21, 2017. Dkt. 217 at ¶ 34 [Abisch]; Dkt. 225 at ¶ 97 [Meunier]; Dkt. 223 at ¶ 17 [Peters]; Dkt. 217 at ¶¶ 34-37, 46 [Abisch]; Dkt. 213 at ¶ 8 [Broder]. Vanguard presented no evidence rebutting this testimony. In fact, Vanguard witnesses conceded that they did not have personal knowledge of bookings or access to ECU's system prior to December 21, 2017. Dkt. 268 at p. 142:13-16, 143:4-6, 143:10-14 [Brennan]; Dkt. 268 at p. 187:24-188:4, 188:5-10, 188: 20-22 [Donahue]; Dkt. 268 at 220:22-221:1, 223:2-15 [Sanchoyerto]. Vanguard witnesses had merely speculated about the bookings based on a screenshot of ECU's website, which indicated NEG's location as ECU's "Ocean Receiving Location" in Boston. Ex. 3016; Dkt. 268 at 188: 15-22 [Donahue]; Dkt. 269 at p. 251:21-252:9 [Sanchoyerto]. But there was no evidence that NEG actually did do any CFS services for ECU prior to termination. *See* Dkt. 268 at p. 223:2-15 [Sanchoyerto]. And Vanguard witnesses testified that the NEG-Vanguard Agreement was not exclusive as to CFS, which is separate from the exclusive agency services governed by the Agreement. Dkt. 269 at p. 246:2-247:9 [Sanchoyerto] (testifying that CFS is not part of the Agency Agreement and that NEG could move CFS for anyone).

125.    There is no evidence that NEG failed to fully perform its obligations to book and manage exports (and imports) for Vanguard prior to termination. In fact, to the contrary, an internal Vanguard email noted, in the fall of 2017, that Vanguard had

- 35 -

"been watching [NEG's] export volumes and their export engagement and they've actually been doing pretty well." Ex. 182 at VLS-11530. Vanguard noted that NEG "did extremely well on FCL exports in September." *Id.*

126.    At trial, Vanguard attempted to argue that NEG acted as ECU's agent prior to the December 21, 2017 termination because, between December 13 and 14, 2017 (following the announcement in Vanguard's CFS change), Stephen Mario of NEG responded to a customer's request for a quote for a direct route from Shanghai, which only ECU – not Vanguard – offered. *See* Ex. 181; DE 270 at 580-582 [Meunier]. But that e-mail proves the opposite.  On December 15, 2017, following provision of the quote, to which the customer replied "I got the quote and details," Stephen Mario wrote to the customer, "I'll be in touch sooner than later with the official announcement." Ex. 181. There is no indication in this e-mail (or elsewhere) that NEG accepted the booking or acted as ECU's agent or diverted any business from Vanguard.  Of course, because Vanguard did not provide the direct Shanghai service, NEG could not fulfill the customer's request and there was no business that could have been diverted.

**P.    The Parties after the December 21st Termination: Fair Competition for Customers in the Marketplace**

127.    After termination, Vanguard immediately hired Joseph Pimentel to be a sales representative in Boston and to meet with customers. Dkt. 268 at p. 94:2-6; 95:5-10; 136:23-25; 137:1-4 [Brennan] ("Mr. Pimentel worked [for Vanguard] from roughly the end of '17 or beginning of 2018 . . . .").

128.    By stipulation, Vanguard is not seeking damages for any lost business occurring before the December 21, 2017 termination (the "Termination Date"). Stip., Dkt. 165 at ¶ 3. Vanguard presented no evidence showing any customer or business losses occurring prior to the Termination Date, and no evidence of any loss due to any conduct occurring prior to the Termination Date.

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

129.    Seven days after NEG was cut off from VLS's systems, on December 28, 2017, NEG's banker, Ms. Bezemes of Brookline Bank, asked for information about the change from Vanguard to ECU. Ex. 2B. She was following up on a yearly request for the Meuniers to provide personal financial statements because of the loan they had taken to buy NEG. Dkt. 225 at ¶ 101 [Meunier]. Mr. Meunier provided her an update on the situation, attempting to be hopeful and provide a positive forecast for NEG, in describing what customer business he believed NEG would retain. *Id.* at ¶ 102; Dkt. 270 at p. 646:21-15 [Meunier]; Ex. 2B. In his testimony, Mr. Meunier stated that some of the statements in his December email to the bank were misrepresented or incorrect: he explained that ECU and NEG had conversations, not negotiations, over the course of 2 years, and that it was incorrect that law firms for both NEG and ECU provided a review of both the non-compete and the term of notice to dissolve the agreement. Dkt. 270, at pp. 611:19-23; 613:5-15 [Meunier].

130.    NEG and ECU did not enter into a final agreement until May of 2018, well after Vanguard cut off NEG's customer and computer access, and after ECU understood that Vanguard had terminated the Agency Agreement, and that agreement had additional, different terms than some of the basic terms listed in the memoranda of understanding they exchanged during negotiations. Ex. 72; Dkt. 217 at ¶¶ 42-44 [Abisch].

131.    Vanguard did not contact ECU in December 2017, nor did it send ECU a "cease-and-desist" letter on December 21, 2017 or even copy ECU on Vanguard's termination and cut off letter to NEG. Dkt. 217 at ¶ 49 [Abisch]. ECU heard nothing from Vanguard in the weeks that followed December 21, 2017. Dkt. 217 at ¶ 49 [Abisch]. Vanguard never sent a letter notifying ECU that NEG was violating a non-compete by working with NEG after December 21, 2017. Dkt. 217 at ¶ 49 [Abisch]. No one from Vanguard called ECU to ask that ECU not work with NEG until the end

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

of any notice period. Dkt. 217 at ¶ 49 [Abisch]. Vanguard did not seek an injunction to enforce the non-compete in this proceeding or in any other proceeding.

132.    In the weeks after December 21, 2017, Vanguard had the opportunity to meet with its customers and did so. Ex. 3012 (January 17, 2018 e-mail from Nick Iosue recapping phone calls and reporting "business as usual" and "no routings have changed" for various customers); Ex. 2041 (Feb. 2, 2018, Pimentel: "Have gone through the top 60 accounts with synopsis of visits to date, and those still needing to be called. Will make sure to see all of the accounts not yet visited, as soon as possible." Attaching spreadsheet containing list of customers and status of meetings); Ex. 2042, Ex. 2043 (Feb. 5 and 26, 2018, sales activity reports with notes); Ex. 2071 (July 2018 monthly sales report with notes).

133.    In fact, Vanguard had a group of employees working to get business for Vanguard in Boston in January 2018, including operations personnel Mr. Donahue and Mr. Sanchoyerto and salespeople Nick Iosue and Salvador Camaraza. Dkt. 268 at p. 145:14-146:12 [Brennan]; Dkt. 268 at p. 190:5-191:8 [Donahue]. Vanguard also hired Mr. Pimentel to seek business for VLS from customers handled by NEG and customers who were not handled by NEG. *Id.*; *see also* Dkt. 229 at 10:16-18, 21:7-16, 28:15-29:2, 122:1-11 [Pimentel]; Dkt. 216 at ¶ 6 [Camaraza]. When employed by Vanguard, Mr. Pimentel was in charge of overseeing Vanguard's sales in New England for LCL and FCL import and exports. Dkt. 229 at 32:12-33:24, 61:16-20 [Pimentel]. Mr. Pimentel had extensive experience in the NVO and transportation industry, particularly in the New England area, and developed extensive relationships with the customers and businesses, primarily freight forwarders, in that region. Dkt. 229 at 20:5-21:16, 23:5-10, 14-24, 24:1-24l 25:1, 17-24 [Pimentel].

134.    Customers were willing to meet with Vanguard (Dkt. 268 at p. 191:6-12, 192:19-193:7 [Donahue]; Dkt. 268 at p. 146:6-16 [Brennan]), and Vanguard did not identify a single customer that refused to meet with Vanguard's team or that moved

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

their business as a result of the lack of 90-days' notice, Dkt. 268 at p. 146:17-147:1 [Brennan]; *see also* Dkt. 269:17-21 [Laufer] (Q. "[No] customer ever told you that they weren't going to continue doing business with VLS in the Boston region because NEG didn't provide the requisite notice under the agency agreement; correct?" A. "No customer said that to me.").

135.   VLS retained business with many of those customers, usually on a non-exclusive basis, as in the past. Ex. 2039 (List of "Customers Staying with VLS"); Ex. 2057 (April 2018 Monthly Sales Report); Ex. 2068 (May 2018 Monthly Sales Report); Ex. 3012 (January 17, 2018 e-mail from Nick Iosue recapping phone calls and reporting "business as usual" and "no routings have changed" for various customers); Ex. 3013; *see also* Stip., Dkt. 189 at § 6 ¶ 42; Dkt. 227 at 54:6-23; 62:16-18; 97:7-23; 99:20-25; 108:21-109:19; 116:4-117:6; 118:11-119:16 [Sweeney] (VLS retaining Kravet business by remaining competitive, even though NEG brought that business for Vanguard initially and received a commission for it). Nearly all customers were continuing to do business with Vanguard, willing to continue doing business, and were booking FCL or LCL, were booking imports and exports, were requesting quotes or rates, or willing to provide opportunities to Vanguard. Dkt. 216 at ¶¶ 7-8 [Camaraza]. The transition from Vanguard using NEG as its agent to having a local sales representative and handling the sales and customer service out of Vanguard's New Jersey Office was quite routine and didn't impact services. Dkt. 215 at ¶ 5 [Haddock].

136.   The evidence shows that Vanguard lost business following the switch from NEG to BFT due to normal competitive reasons, such as lack of competitive pricing, inferior servicing and route systems, and inferior customer service. Ex. 2025 (Customer: "Horrible turnaround for a quote. Both Shipco and ECU where [*sic*] back to me last night."); Ex. 2028 (Customer: "As discussed today, there was some communication issues that caused us to go with another carrier. . . . Rates are good,

response time is not good at all."); Ex. 2044 (Pimentel: "All three are saying that our charges are much higher than the competition."); Ex. 2058 (Haddock (of VLS): "We are struggling to grow the volume as Shipco offer lower LOT fee and NEG offering lower on case by case basis."); Ex. 2069 (Pimentel: "Dascher had complained about not receiving timely information from customer service, causing a problem with several shipments."); *see also* Dkt. 229 at 52:13-56:23, 57:3-60:20, 62:14-66:1, 66:5-68:7, 68:16-70:10, 73:15-74:5, 74:8-75:15, 76:24-87:10, 89:1-17, 89:18-22, 90:1-6, 98:15-100:22 [Pimentel]; Dkt. 216 at ¶¶ 7-8, 11 [Camaraza]; Dkt. 215 at ¶¶ 6-10 [Haddock]; Dkt. 213 at ¶¶ 11-12 [Broder]; Dkt. 221 at ¶¶ 13-15 [Chrisom]; Dkt. 219 at ¶ 9 [Zarach]; Dkt. 222 at ¶ 11, 16-17 [Wyndham].

137.    VLS ultimately terminated Mr. Pimentel in 2018 after only 11 months, deciding it did not need any representation in Boston. Dkt. 229 at 21:17-21 [Pimentel]. After his termination, VLS did not hire a replacement for Mr. Pimentel and, in spite of Vanguard's own recognition of the need for an office in the New England area and Mr. Pimentel's recommendations regarding that need, particularly where Mr. Pimentel had office space and essential employees, VLS ultimately decided to not open a Boston office. Dkt. 269 at p. 446:6-11 [Laufer]; Dkt. 229 at 30:11-31:7, 71:20-72:17, 80:9-17, 83:24-84:17, 90:20-92:13, 131:17-132:11 [Pimentel]; Dkt. 216 at ¶ 14 [Camaraza]. VLS decided to continue to run its New England business from its New York/New Jersey office, despite local Boston customers preferring a local office and direct service to Boston, instead of routing shipments through New York. Dkt. 229 at p. 36:18-22, 37:6-11, 62:6-13 [Pimentel]; Dkt. 216 at ¶ 15 [Camaraza]. Evidence from one customer was that, other than Mr. Pimentel's efforts in early 2018, VLS did not reach out to customers, such as Edward J. Zarach and Seko, and VLS did not try to "get our business back." Dkt. 222 at ¶ 17 [Wyndham].

138.    Because the transportation logistics business is a competitive market, both in Boston, the eastern region of the U.S. and elsewhere, Vanguard regularly had

to reduce its prices to compete for business. Dkt. 216 at ¶¶ 5, 12 [Camaraza]. Most pricing in the transportation industry is well known, and many prices are publicly posted as tariffs or otherwise available. Dkt. 215 at ¶ 4 [Haddock].

139.    ECU never asked nor suggested that NEG divert customers or business from Vanguard to ECU. Dkt. 217 at ¶ 47 [Abisch]. It was only after termination of the Agency Agreement that NEG began working with ECU to fairly and properly compete for customers and business. Dkt. 217 at ¶ 47 [Abisch]. The amount of business that NEG generated initially was somewhat lower than expected, and it only grew over time, over the next one to two years. Dkt. 217 at ¶ 60 [Abisch]. ECU had its own business in Boston and New England, before doing business with NEG, and brought those customer relationships and business to help build NEG's business, including NEG's warehouse business. Dkt. 217 at ¶ 61 [Abisch].

# IV.    CONCLUSIONS OF LAW

## A.    Vanguard's Experts Are Disqualified

1.    Vanguard proffered two experts in support of its claims: Greg Howard and Barbara Luna. As set forth below, the Court excludes both of their opinions.

### (1)    Legal Standard

2.    Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is inadmissible if it fails to satisfy four critical factors, including whether the expert's "specialized" knowledge will help the trier of fact to understand the evidence or determine a fact in issue and whether his testimony is the product of reliable principles being applied appropriately to sufficient facts. Fed. R. Evid. 702. "Under Rule 702, before admitting expert testimony, 'the district court must perform a gatekeeping role [to] ensur[e] that the testimony is both relevant and reliable.'" *U.S. v. Valencia-Lopez*, 971 F.3d 891, 897 (9th Cir. 2020) (internal quotation marks and citation omitted).

3.    Expert opinion testimony is relevant if the knowledge underlying it has a "valid connection to the pertinent inquiry" and reliable if the knowledge underlying it has "a reliable basis in the knowledge and experience" of the expert's discipline. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (citation omitted).

4.    An evaluation of reliability requires a court to assess the expert's reasoning or methodology in light of various factors such as "testing, peer review and publication, known or potential rate of error, and general acceptance in the relevant scientific community." *Valencia-Lopez*, 971 F.3d at 898. The "reliability inquiry is a flexible one" and the district court has "broad latitude to determine what factors in *Daubert*, if any, are relevant to the reliability determination." *Id.* (citation and quotation marks omitted). But the "flexibility afforded to the gatekeeper goes to *how* to determine reliability, not *whether* to determine reliability." *Id.* (emphasis in original).

5.    The "gatekeeping obligation [under Rule 702] 'applies to all (not just scientific) expert testimony.'" *Valencia-Lopez*, 971 F.3d at 897. "Experience-based experts may testify on matters within their expertise," but such testimony is unreliable if the expert's knowledge does not have a "basis in the knowledge and experience of the relevant discipline." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 17CV205-MMA (MDD), 2020 WL 2553181, at *4-5 (S.D. Cal. May 20, 2020) (citation omitted). "'Knowledge' requires more than a subjective belief or an unsupported speculation; it requires an appropriate level of validation." *Aya*, 2020 WL 2553181, at * 4. Indeed, it may be said "that reliability becomes *more*, not less, important when the 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis, like science-based expert testimony." *Valencia-Lopez*, 971 F.3d at 898 (emphasis added).

(2)     Vanguard's Causation Expert, Greg Howard, Is Disqualified

6.     VLS put forth Greg Howard as an experienced-based expert in the transportation industry in Boston, primarily to try to establish a causal link between lost business and its claim that NEG failed to provide a 90-day termination notice under the Agency Agreement. Mr. Howard proffered three opinions:

> By failing to provide 90 days written notice (as stipulated in the Agency Agreement with VLS), NEG deprived VLS of the opportunity to protect its interests and allowed NEG and ECU to wrongly obtain substantially all of the business that VLS would have otherwise retained under its Agency Agreement with NEG.

> VLS had no viable options to mitigate the damages VLS suffered due to NEG terminating the Agency Agreement without providing 90 days written notice to VLS.

> The manner in which NEG and ECU communicated and strategized about going into business together was carefully orchestrated well in advance. It is not consistent with industry standards and was a calculated "hit job" on VLS.

Dkt. 157, ECU's Motion in Limine regarding Howard ("Howard MIL"), Ex. A., Howard Report at ¶¶ 29, 30, and 31; *see also* Dkt. 205 at ¶¶ 2, 39, 35, and 39 [Howard].

7.     Mr. Howard's opinions, however, suffer from foundational defects that render his testimony inadmissible under Rules 403 and 702 of the Federal Rules of Evidence.

8.     At trial, Mr. Howard had no opinion about whether Vanguard lost business or customers as a result of a lack of 90 days' notice because "that's not what I was engaged for." Dkt. 269 at p. 316:14-17 [Howard]; *see also* Dkt. 157, Howard MIL, Ex. B, Howard Dep. at 161:7-161:10. When asked: "Are you making any conclusion that the lack of 90-day notice . . . caused Vanguard to actually lose some

business or lose some customers?" Howard said "I don't have any evidence, I don't have anything[.] I wasn't looking for that specific thing . . . that's not what I was contracted to do." Howard MIL, Ex. B, Howard Dep. at 160:20-161:6.

9.      Instead, Mr. Howard was asked to provide an expert opinion relating to the 90-day notice termination provision and NEG's and ECU's conduct surrounding the termination and lost "opportunities." Howard MIL, Ex. A, Howard Report.at ¶ 1. Mr. Howard, however, presented no rational methodology or basis for the idea that VLS lost "opportunities" or lost business as a result of any lost opportunities. Mr. Howard's opinion does not rely on any actual surveys, statistical analyses, studies, or information about particular dealings between any customers and VLS, NEG, or ECU. He did not conduct any independent analysis of the Boston market. He did not consider any facts or evidence about the actual reasons customer chose to have different NVOs transport their cargo, as was each customer's right. At trial, Mr. Howard disclosed no methodology to support his views on causation:

- Mr. Howard admitted he did not speak with any customers, do any customer surveys, do any regression analysis to compare the effects of pricing and whether customers made switches based on pricing, and did not compare data about the termination of NVO agency agreements as to whether a 30-day notice or a 60-day notice made any difference in customer retention. Dkt. 269 at p. 316: 18- 318:21 [Howard].

- Mr. Howard admitted he did not look at any data that compared orderly transitions to abrupt transitions, did not look at any specific customer lists to compare what was happening to customers before and after termination, and did not look at Vanguard's financials or its own booking and shipment records to see which customers of others reduced business and which maintained business. Dkt. 269 at p. 321:3-24 [Howard].

- Mr. Howard admitted he did not do any sort of analysis or comparison to see how new charges by BFT, to whom Vanguard changed its CFS, affected customers coming or going from Vanguard. Dkt. 269 at p. 323:11-24 [Howard].

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

1
2
3

- Mr. Howard admitted he did not know if there was any drop in VLS's business after termination and he did not even look "at the volume before or after the termination." Dkt. 269 at p. 352:10-17 [Howard].

4    10.    Mr. Howard did not account for the substantial evidence that Vanguard

5    had numerous meetings and opportunities to quote rates and compete for business and

6    did retain substantial business from customers. At trial:

7
8
9

- Mr. Howard admitted that "the lack of 90-days' notice didn't prevent Vanguard from actually going in and calling on customers which they did a couple weeks after the termination." Dkt. 269 at p. 334:16-19 [Howard].

10
11
12
13
14
15
16
17
18
19

Mr. Howard made multiple admissions leading to the conclusion that any lost opportunities were of Vanguard's own making. Mr. Howard testified that, following the split, one of the people Vanguard chose to hire to have sales calls with customers in Boston was "past his best by date" (63 or 64 years old) and the other "did not perform." Dkt. 269 at p. 330:12-16 [Howard]. Vanguard chose to hire these salespeople—and not open a Boston office—in spite of the fact that, as Mr. Howard testified, Boston is not unique in its lack of experienced salespeople and "there's office space available." Dkt. 269 at p. 334:3-15 [Howard]; see also Dkt. 269 at p. 446:6-11 [Laufer] (testifying Vanguard never opened a Boston office even though "[t]here was nothing, you know, legally preventing us from opening an office").

20
21
22
23

Mr. Howard admitted that, "if customers continue to do any level of business with Vanguard after termination, then by definition Vanguard had an opportunity to protect its interest with those customers." Dkt. 269 at p. 344:17-345:4 [Howard].

24    11.    Nor did Mr. Howard account for the extensive evidence that customers

25    moved their business solely for permissible competitive reasons.

26
27
28

- Mr. Howard admitted that you cannot "separate out Vanguard's lack of a Boston office from the other factors that customers are driven by like pricing, service, location of the CFS facility, [and] routing." Dkt. 269 p. at 348:25-349:5 [Howard].

- 45 -

- Mr. Howard testified that he was not engaged to try to assess how many customers were driven by Vanguard's move in the CFS station (to BFT) versus the lack of 90 days' notice or pricing. Dkt. 269 at p. 351:2-6 [Howard].

- Mr. Howard testified that he did not look into, or talk to any customers about, whether or not they left Vanguard simply because they just liked Joe Meunier more. Dkt. 269 at p. 358:9-14 [Howard].

- Mr. Howard also testified that "in a breakup between agents, nobody ever retains all the business if it's done the right way." Dkt. 269 at p. 352:18-21 [Howard].

12.    Mr. Howard's opinion, which lacks any methodology or analytical basis, boils down to an unfounded assertion that, because 90-days' notice of termination is important, VLS *must* have suffered irreversible loss of all customer "opportunities" in the Boston market. This is wrong. The United States Supreme Court addressed this concern in *Gen. Elec. Co. v. Joiner*, 118 S.Ct. 512, 519 (1997), when it held that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Mr. Howard's testimony confirms that his opinions are clear examples of the sort of dogmatic and unproven statements that are inadmissible. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1994) (need to explain expert methodology and point to any external validation). Mr. Howard simply has no data connecting a lack of notice to the loss of any "opportunities."

13.    Moreover, the fact that Mr. Howard is an experience-based expert does not alleviate him of him the requirements of *Daubert* and *Kumho Tire*. *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *17, fn. 16 (N.D. Cal. April 12, 2017) (rejecting the argument that an industry expert is "not subject to the exacting standards in *Daubert* and *Kumho Tire*"). Without a methodology or analytical basis for his specific causation opinions, they are unreliable.

14.    In sum:  Mr. Howard did not do any analysis of or investigation into VLS's customers; did not conduct any separate studies or analysis; did not apply any recognized technique or methodology for assessing causation and so-called lost customer "opportunities"; did not have any particular knowledge and experience with the actual customer decisions about increasing or decreasing business with VLS or ECU, after termination; and did not do any inquiry to determine whether business opportunities were, in fact, lost as a result of the lack of 90-day notice for termination. Mr. Howard did not employ ***any*** methodology, much less a sound methodology, in reaching his unsupported opinions about causation, or the practical impact of the 90-day notice issue. Having some transportation industry experience is not a license to opine about subjective beliefs and unsupported speculation concerning causation and mitigation, without knowledge of decisions in the market by the customers at-issue.

15.    Mr. Howard's opinions are, therefore, excluded.

(3)    Vanguard's Damages Expert, Barbara Luna, Is Disqualified

16.    By stipulation, Vanguard is not seeking damages for any lost business occurring before the December 21, 2017 (the "Termination Date"). Stipulation Dkt. 165 at ¶ 3. Vanguard's damages claims are stated in Dr. Barbara Luna's Expert Report as supported by Greg Howard's Expert Report. *Id.* at ¶ 2.

17.    Vanguard has the burden of proof to show damages that were caused by the allegedly actionable conduct. A standard approach to such proof would be to compare Vanguard's business before and after the actionable conduct and show that "but for" the conduct, the business after that date would have been higher than it was. This requires examining other factors that may have caused the change in business. *See* Dkt. 214 at ¶¶ 10-21 [Miller] (addressing factors other than the alleged wrongful conduct that could have caused a change in the business). This standard approach was not followed by Dr. Luna, who largely ignored the actual business of Vanguard after the termination, and thus failed to properly consider actual offsets and Vanguard's

- 47 -

legal obligation to mitigate by properly accounting for actual post-termination net profits. *See Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 464-68 (1990) (recognizing that "profit plaintiff eventually earned in its attempt to mitigate damages should have been applied as an offset against plaintiff's loss of profits from the contract breach" and therefore remanding for trial court to determine "the exact net profit earned by plaintiff from mitigation efforts"—a failure to consider profits actually earned from mitigation efforts "would result in a double recovery for plaintiff").

18.    Dr. Luna assumed liability and causation and offered no opinions on those topics. Dkt. 269 at p. 267:10-16; 267:25—268:4 [Luna]. She relied only on Vanguard's other expert Greg Howard on the issue of causation. She assumed that whatever change occurred in Vanguard's business after the Termination Date was caused only due to allegedly wrongful acts of Defendants. Thus, she did not consider other factors that could have caused Vanguard's business to change, such as the change in warehouse location and the increase in fees. Because Dr. Luna's causation assumption rests entirely on Mr. Howard's opinion, there is no need to reach Dr. Luna's opinions. They must be rejected because of the unreliability of Mr. Howard's opinion on causation.

19.    Dr. Luna did not allocate damages between the two defendants and did not allocate damages among the different causes of action in the proceeding. Dkt. 269 at p. 268:5-13 [Luna].

20.    Dr. Luna chose to limit her damages analysis to just exports, so there is no basis for or reason to consider any possible damages related to anything other than exports. Dkt. 269 at p. 270:15-20 [Luna] (only looked at exports, not imports).

21.    Dr. Luna did not use the standard damages approach of comparing Vanguard's business before and after the allegedly actionable conduct. Rather, she took the "before" business and then assumed business would continue forward ten

years, adjusting the number upwards based on economic conditions. Dkt. 269 at p. 282:12—287:21 [Luna]; see Ex. 193, p. 5.22 (captioned "Calculation of Vanguard's Lost Incremental Profits form Export Shipments Considering Mitigation"); Dkt. 269 at p. 279:4-13 [Luna] ("Q: Do you agree with me that this page [Ex. 193, p. 5.22] is probably the most important schedule in your report? A: For lost profits. Q: For the profits not unjust enrichment. A: Correct"). She did not opine on the appropriate length of damages, leaving that decision to the trier of fact. Dkt. 201 at ¶ 26 [Luna]. ECU's expert opined that damages, are at most, 90 days. Dkt. 214 at ¶¶ 22-25 [Miller].

22.    Rather than look at all of Vanguard's business after the termination, for mitigation, she only considered post-termination business from the "shipping codes" that had business pre-termination. Dkt. 269 at p. 287:22—288:13 [Luna]. She considered the amount of the post-termination business from the pre-termination "shipping codes" as "mitigation" and reduced her projected damages by that amount. She only showed part of the business in the mitigation column. *Id.* at p. 289:21-23 ("Q: And you only show part of the business in the mitigation column. A: Yes. It had to have the same shipper codes."). Aside from these shipping codes, she did not examine Vanguard's post-termination business. She did not do her analysis on a customer-by-customer (or shipper-by-shipper) basis. Dkt. 269 at p. 271:2-25 [Luna] ("I didn't do my analysis . . . on a customer-by-customer basis") and 273:11-21 ("Q: You didn't compare shipper names? A: Right. We were just looking at codes.").

23.    Dr. Luna's Witness Statement is inaccurate by her own admission because she incorrectly references reducing damages "by mitigation from common shippers" when she did not examine common shippers pre- and post-termination, but only shipping codes. Dkt. 201 at ¶ 27 [Luna]. At trial she admitted that was not accurate: "Q: Let's just look at the witness statement, paragraph 27 of the witness statement, and it's on line 9. A: Okay. Q: You say 'Are reduced by mitigation from common shippers'? A: Right. Q: You really mean to say 'common shipping codes';

correct? A: Correct. Yes. Q: Because you didn't compare the names of the shippers. You just compared the codes. A: Looked at the codes." Dkt. 269 at p. 302:7-19 [Luna]; *see also* Dkt. 269 at 303:9—304:1 [Luna].

24.    Dr. Luna's approach was unreliable because there is no evidence of what the shipping codes at the center of Dr. Luna's analysis were used for. An expert cannot rely on "shipping codes" as the core of her damages analysis if Vanguard's fact witness admits that such codes are not used in the business and that fact witness does not know what they are. Sheena Wiraatmadja, Vanguard's Vice President and Global Controller, testified that shipper codes are "not a field that we usually look at in our monthly analysis." Dkt. 268 at p. 159:18-19 [Wiraatmadja]. When asked: "My question is on the column that says 'shipper codes' and looking at those numbers, do you have any information about what shipper codes are in Exhibit 1111 and how they are used?" Ms. Wiraatmadja answered: "No." Dkt. 268 at p. 159:5-9 [Wiraatmadja]. She explained that shipper codes are "not one of the fields we usually look at so I can't remember off the top of my head. We usually look at shipper name, not shipper code." Dkt. 268 at p. 158:10-12 [Wiraatmadja]. Dr. Luna did not look at shipper names, again making her analysis unreliable. Dr. Luna admits that she relied on Ms. Wiraatmadja and that Ms. Wiraatmadja knows more about the data than Dr. Luna. Dkt. 269 at p. 274:7-17 [Luna].

25.    Ms. Wiraatmadja confirmed the obvious—the name of a shipper or customer is what is important. In her witness statement, Ms. Wiraatmadja confirmed that the data in evidence includes the "SHIPPER NAME (meaning the shipping company that is VLS's customer)." Dkt. 207 [Wiraatmadja] at ¶ 4 at p. 3, lines 13-14. Thus, Dr. Luna could have compared the business of particular customers of Vanguard before and after the termination date but she did not do so, inexplicably preferring the "shipper code" comparison.

26.    Even if Vanguard had a customer who continued after the termination, its continuing business would not be considered mitigation by Dr. Luna if that same customer, for whatever reason, used a different shipping code after the Termination Date. Dkt. 269 at p. 307:23—308:15 [Luna].

27.    An additional flaw in Dr. Luna's analysis is that she ignored any new customers Vanguard may have won as a result of its changes in warehouses locations and representatives. Dkt. 269 at p. 275:13-19 [Luna] ("Q: And do you know how much new business it [Vanguard] had for new customers? A: I don't. I didn't look at that because of the assumption I made."). Dr. Luna "assumes" that any new business Vanguard obtained after the termination it would have obtained even if there had been no termination, ignoring that Vanguard likely obtained new customers as a result of changing warehouses from NEG to BFT and changing representatives from NEG to Joe Pimentel. Dr. Luna's approach was to exclude new codes and customers who were part of Vanguard's post-termination business. Dkt. 269 at p. 275:23—276:3 [Luna] ("Q: Did you look at codes that were created in 2018 for new customers? A: If it's a new customer and the code didn't exist pre-2018, we would not have included it. Q: You excluded that. A: I did.")[9]

_____

[9] An additional reason that Dr. Luna's opinions are unreliable is that she admitted at trial that her mitigation numbers are too low and damages number are too high because the pre-termination numbers, including areas outside New England, and the post-termination mitigation did not. She explained on questioning from the Court: "Overall for the ten-year period is 88,000 . . . So the damages would be 88,000 less." Dkt. 269 at p. 293:14—294:1 [Luna]. The error affected three schedules. Dkt. 269 at p. 294:11 [Luna]. She discovered the error in the days before trial. Dkt. 269 at p. 296:20—297:17 [Luna]. Dr. Luna explained: "I looked at a sensitivity analysis just in case so the trier of fact can decide" . . . should credit only be given against shipments out of the New England area . . . as mitigation or should it be for the same codes nationwide Dkt. 269 at p. 296: 24—297:3 [Luna]. None of this information is in Dr. Luna's report, and none of it is in her witness statement. This makes those documents unreliable.

28.     Dr. Luna clearly explains what she did and did not do. She did not look at all of Vanguard's business before and after the termination date. She excluded all business from new customers and she excluded all business from pre-termination customers that used new shipping codes (a code that was never explained at trial). Each of these exclusions served to inflate the claimed damages number.

29.     In contrast to Dr. Luna's analysis, which excluded much of Vanguard's post-termination business, there is evidence in the record as to what actually happened. Plaintiff's Full Container Load ("FCL") business in New England increased after the termination date and the Less Than Container Load ("LCL") business dropped only slightly. Dkt. 268 at p. 164:23—165:14 and 162:17-24 [Wiraatmadja] (referencing Dkt. 207 [Wiraatmadja] at ¶¶ 6-7). This is another reason Dr. Luna's opinions are unreliable.

30.     At the start of Dr. Luna's testimony, she corrected a "typo" in her witness statement at paragraph 15. Her witness statement said that Exhibit 111 contained all of Plaintiff's LCL New England exports, including the "names of every customer" and the "net revenue from every shipment," from 2018 to 2020. She testified that the correct date range was 2015 to 2020. Dkt. 269 at p. 265:7-13 [Luna] (referencing Dkt. 201 [Luna] at ¶ 15). The significance of this correction is one could, using only Exhibit 111, compare profit from LCL shipments for New England for the three-year pre-termination period 2015-2017 with the exact same thing for the three years following termination—2018 to 2020. Dkt. 269 at p. 266:19-25 [Luna]. That would have shown, as Ms. Wiraatmadja's witness statement shows, that the change in LCL profits was negligible, and certainly could have been explained by factors other than the alleged wrongful conduct.

31.     ECU's damages expert George Miller and NEG's damages expert Mr. Goetz explain in detail the flaws in Dr. Luna's approach to damages. Dkt. 214 at ¶¶ 26-34 [Miller]; Dkt. 220 at ¶¶ 54-96 [Goetz]. Dr. Luna did not offer any rebuttal to

Mr. Goetz's opinions in her witness statement. Dkt. 201 [Luna]; Dkt. 269 at p. 308:25—309:19 [Luna].

32.    In sum, the primary reasons that Dr. Luna's proffered testimony is not "relevant and reliable," *Valencia-Lopez*, 971 F.3d at 897, as required by Rule 702, is that:

- The damages opinion relies on Mr. Howard's inadmissible opinions for the causation element and is thus irrelevant without a basis for the causation assumptions.

- The damages opinion does not address nor allocate for any other actual and likely causes for reduction in profits, including normal permissible competition, pricing, routing, service, customer preference and loyalty, the change in the CFS location, and customer preference for Vanguard to have a Boston office.

- The damages opinion is unreliable because it relies solely on customer codes, without considering actual customers nor reconciling customers with multiple codes or new codes, while failing to account for new customers or new customer codes and other additional income that mitigated damages.

- There is no methodology or rationale for a 10-year damages period, particularly where the agreement was terminable-at-will.

33.    Therefore, the opinions of Dr. Luna as to damages are excluded.

(4)    <u>Because Vanguard Failed to Establish Causation and Damages, the Defendants Prevail on All Claims.</u>

34.    Because both of Vanguard's expert opinions are excluded, Vanguard cannot satisfy the causation and damages elements of its claims, and this Court thus must find in favor of the defendants as to all remaining claims.  However, the Court also analyzes the remaining aspects of Vanguard's claims below.

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

**B.    Claims against NEG**

35.    The Court granted partial summary judgment in favor of NEG and ECU in its order dated February 8, 2022. Dkt. 153 at p. 15. Defendants' respective motions for summary judgment as to VLS's claim for interference with prospective economic advantage were granted. *Id.* Defendants' motions were also granted as to VLS's claim for equitable relief under the UCL. *Id.* at p. 22. In that order, the Court found "VLS is not entitled to equitable relief amounting to 'all amounts that defendants have obtained as a result of their wrongful conduct.'" *Id.* at p. 21.

36.    VLS abandoned its fifth cause of action for unfair competition. VLS also confirmed it was not pursuing the claim and did not present evidence in support of the claim at trial. Dkt. 189 (Final Pretrial Conference Order).

37.    VLS has four remaining claims against NEG: Claim 1 for breach of contract, Claim 2 for breach of fiduciary duty, Claim 3 for breach of the duty of loyalty, and Claim 6 for declaratory relief.

(1)    Vanguard's First Cause of Action: Breach of Contract

38.    VLS claims that NEG breached the Agreement by (a) failing to give 90 days' notice of termination, (b) conspiring with ECU in direct competition with VLS while the Agreement was still in force, (c) becoming a representative of ECU without VLS's written consent as required by Section 2.01, (d) breaching Section 2.02 of the Agency Agreement while it was still in force and without providing written notice that NEG was terminating and/or repudiating the Agreement without regard to the severable provisions, (e) conspiring with ECU to breach the Agreement during the term of the Agreement and (f) conspiring with ECU to breach the Agreement without notice. Dkt. 97 at ¶ 32.

39.    To establish its claim for breach of contract, VLS must prove: (1) the existence of the contract, (2) VLS's performance or excuse for nonperformance, (3)

NEG's breach, and (4) the resulti**ng** damages to VLS. *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

a. Element 1 – Existence of an Agreement

40. There is no dispute that the first element, the existence of a contract, is satisfied. Exs. 27, 75.

41. The Agreements were prepared by VLS. Dkt. 269 at p. 459:15-25, 461:14-17 [Meunier]; Dkt. 228 at 28:18—29:17 [Tudor]. The Agreements are to be construed against VLS, in view of the facts of the case. Cal. Civ. Code § 1649, 1654. Any ambiguities in the Agreements, including interpretation of the provisions regarding the CFS services, are construed against VLS. *Fed. Na'l Mortg. Ass'n. v. Bugna*, 57 Cal. App. 4th 529, 535 (1997).

b. Element 2 – Vanguard's Performance or Excuse for Nonperformance

42. As for the second element, VLS is barred from recovering on the claim because VLS failed to perform and breached the Agreement prior to the ultimate termination of the Agreement on December 21, 2017. VLS's ongoing failure to perform its obligations under the Agreement, including its failure to pay NEG the amounts owed, are addressed in detail in NEG's counterclaims.

43. VLS was only entitled to terminate the Agreement upon either (1) 90 days' prior written notice to NEG or (2) upon written notice to NEG *and* the occurrence of any of the enumerated "Agent Default" events. Dkt. 97 at Ex. 2 at Section 3.03(b).

44. VLS cannot recover on a claim for breach of contract because it materially breached the Agreement by failing to provide NEG 90 days' notice of its intention to switch its CFS services to BFT. That breach temporally preceded NEG's alleged breach on December 21, 2017. "Generally, a plaintiff who has not performed under a contract is foreclosed from suing another for breach of that agreement."

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

*Davoodi v. Imani*, No. C11-0260 SBA, 2011 WL 577414, at *4 (N.D. Cal., Feb. 9, 2011) (citing *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367 (2010)).

45.     VLS also cannot recover on its claim for breach of contract because it constructively terminated the Agreement on December 11, 2017 when it sent notice that it was terminating NEG's CFS services prior to NEG's alleged breach on December 21, 2017. VLS thus consented to immediate termination, waived its rights to 90 days' notice, and cannot take advantage of its own wrong. *See Mad River Lumber Sales, Inc. v. Willburn*, 205 Cal. App. 2d 321, 324-25 (1962) (the plaintiff prevented Mad River from correcting its deficiencies when she blocked access to the road, and as such she was precluded from seeking a judicial determination that the contract had been terminated by any breach of Mad River).

46.     VLS argues that it is entitled to unilaterally terminate CFS services solely because the Agreement does not explicitly require that VLS actually use NEG as its CFS and for CFS services in the Boston area.  This argument is not persuasive because: (1) the Agreement specifically contemplates and delineates numerous mutual obligations relating to CFS and CFS-related services; (2) the underlying compensation provisions are structured in a manner such that the majority of NEG's income was derived from CFS-related services, while NEG was not directly compensated for other services provided; (3) the parties' custom and usage was that CFS-related services were always an integral part of the Agreement; and (4) removing CFS-related services would have upended both of the parties' business models, as well as customer expectations about how cargo would be actually delivered, picked-up, consolidated and de-consolidated.  Therefore, at a minimum, VLS's conduct in unilaterally terminating NEG as its CFS (whether for imports only, or exports as well), with only 7 days' notice, was a breach of VLS's duty of good faith and fair dealing.

47.    And, VLS cannot recover on its claim for breach of contract because it constructively terminated the Agreement on December 21, 2017 when it cut off NEG's access to its systems and directed NEG to cease printing VLS HBLs.

48.    VLS's breach(es), which predates any alleged breach by NEG, preclude VLS from enforcing the contract.

c.    Element 3 – NEG's Alleged Breach

49.    As for the third element, viewing each alleged breach independently, only <u>one</u> of the six alleged breaches presents a potentially viable claim, the so-called lack of 90 days' notice of termination as alleged in ¶ 32(a). However, NEG was not contractually obligated to give notice given VLS's prior breach. *Whitney Inv. Co. v. Westview Dev. Co.,* 273 Cal. App. 2d 594, 602 (1969) ("A breach does not terminate a contract as a matter of course but is a ground for termination at the option of the injured party.").

50.    NEG deemed the switch to BFT a breach of the Agreement and made the final decision to terminate the Agreement after the December 11, 2017 notice. After VLS had announced a switch of its CFS import station to BFT, and after VLS had actually switched its import CFS to BFT, on December 21, 2017, NEG's counsel Mr. Fencer sent a letter to VLS advising that VLS was in material breach for its "abrupt and unilateral relocation" of the CFS and notification to third parties of the same. Ex. 1019. NEG's actions were consistent with NEG's duties under the at-will Agreement and applicable law. *See, e.g.*, *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 578 (Cal. 2020) ("As for the future hopes he has no legal right but only an expectancy; and when the contract is terminated by the choice of [a contracting party] there is no breach of it.") (citation omitted).

51.    In response to Mr. Fencer's letter, Vanguard claimed, in part, that NEG breached the Agreement by rejecting Vanguard's shipments. Ex. 1020 ("[B]y rejecting Vanguard shipments. . . NEG has materially breached the Agreement[.]").

Yet, VLS has taken the position that CFS is not part of the Agreement and was not exclusive. Under VLS's own construct of the Agreement, acceptance of physical shipments for export at NEG's facility was not part of the Agreement. VLS cannot claim that CFS is not part of the Agreement, but also claim that rejection of shipments at NEG's CFS station constitutes a breach of the Agreement. Whether it was, or was not, part of the Agreement is immaterial for the analysis of this element because VLS presented no evidence at all indicting that NEG was in breach of the Agreement as of December 21, 2017.

52.    On receipt of Mr. Fencer's letter on December 21, 2017, Vanguard could have demanded NEG honor the 90-day provision and continue processing VLS shipments, or it could accept the termination and move forward with BFT. NEG offered to work with VLS to wind down in an orderly fashion because they had mutual customers and freight in the pipeline. Dkt. 268 at p. 638:15-24 [Meunier]. Mr. Sanchoyerto of Vanguard even admitted that NEG, in its termination letter, offered to continue to work with Vanguard to have an orderly wind-down, Dkt. 268 at 251:16-18 [Sanchoyerto], but that it was his decision to disconnect NEG from Vanguard's network. *Id.* at p. 253:12-16 [Sanchoyerto]. As a result, NEG could not do any work for VLS after the systems were shut off. Dkt. 270 at p. 639:2-19 [Meunier].

53.    Vanguard chose to fully and finally sever the relationship, demanding NEG cease agent services, cutting off NEG's computer access and directing NEG to stop issuing Vanguard bills of lading. Ex. 1020 ("Further, NEG is to discontinue printing or issuing any Vanguard brand bills of lading."). VLS also sent another industry-wide notice confirming the CFS switch to BFT. Ex. 93. To the extent VLS was still entitled to enforce Section 3.03, its conduct following receipt of Mr. Fencer's letter indicates a clear waiver of any rights to 90-days' performance from NEG. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 31 (1995).

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

54.     Vanguard suggests that it was somehow forced to cut off NEG's ability to continue to serve as its agent, because Vanguard suspected that NEG was now working with ECU, its competitor.   The evidence demonstrates that Vanguard was wrong.   NEG and ECU did not start doing business together until after Vanguard cut off NEG's ability to serve Vanguard.   Vanguard did not demand nor seek more detailed information as to whether NEG and ECU were doing business, before cutting off NEG.   It is correct that NEG's termination letter strongly suggests that NEG might not continue to perform, but Vanguard simply made no effort whatsoever to require NEG to continue to perform as Vanguard's agent on December 21st, much less for another 90 days.   Vanguard took the risk that its presumptions and suppositions might prove to be incorrect.

55.     There was no contractual or legal prohibition on NEG considering or making arrangements for future business dealings with ECU, while continuing to perform all of its obligations and duties to Vanguard.   The evidence before the Court was that such arrangements – where an agent or employee provides notice, but continues to work for the principal or employer – are not unusual.   Dkt. 217 at ¶¶ 36, 38-39 [Abisch] ("fairly common" for parties to address transition when employee or agent changes partners); ¶ 55 [Abisch] (regular changes in business partners; may be working with someone one day and competing with them the next).   The agent, of course, remains obligated to continue to perform and to not begin work with its new business partner, during the notice or wind-down period.   It was ultimately Vanguard that made the decision to cut off the relationship and prevent NEG from performing, and Vanguard must bear the consequences of that decision, without later claiming it was entitled to performance by NEG for an additional 90 days.

56.     The allegations in SAC ¶¶ 32(c) and (d) would require that NEG was acting as the agent of ECU during the term of the Agreement. VLS failed to demonstrate that NEG engaged in any conduct that could constitute a breach prior to

the December 21, 2017 termination of the Agreement. Prior to December 21, 2017, ECU and NEG only sought to determine whether the non-compete in the Agreement was void under *Ixchel*—it was. Moreover, the alleged breaches for violation of Section 2.02 are negated by the fact that VLS does not claim any damage prior to December 21, 2017 and by the fact that Vanguard admits that it is not seeking to enforce the non-compete provision of Section 2.02(a) for conduct after the termination of the Agreement. Dkt. 165 at ¶ 3. VLS also offered no evidence which would support this alleged breach. Mr. Meunier testified that, prior to termination on December 21, 2017, NEG did not do any work for ECU, did not issue any bills of lading, and did not have access to ECU's computer system. Dkt. 270 at p. 636:21-637:5 [Meunier]. In fact, Mr. Meunier testified that he had no intention of leaving VLS even after the December 11, 2017 notice (Ex. 91) went out and hoped they could work out their differences. Dkt. 270 at p. 637:23-638:8 [Meunier]. He also testified that he did not starting trying to make sales for ECU until after the December 21, 2017 termination notice was sent to Vanguard. Dkt. 270 at 645:13-22 [Meunier]. NEG did not, in any way, act as the agent for or representative of ECU while the VLS/NEG Agreement was still in effect. In fact, NEG and ECU did not enter into a formal relationship until May 2018, well after this litigation commenced. Moreover, the geographic scope of the non-compete was 100 miles and VLS did not have a facility within 100 miles of NEG. Dkt. 268 [Brennan] at p. 138:14-23; Dkt. 269 at p. 393:13-22 [Laufer].

57.    As for the allegations in SAC ¶ 32(b), (e) and (f), allegations that NEG conspired with ECU are either legally untenable or without evidentiary support. First, the assertion that NEG conspired with ECU to breach the Agreement (premised on ¶ 32(b), (e) and (f)), is fundamentally irreconcilable with contract law. The law is abundantly clear that NEG cannot conspire to breach the Agreement. "Because a party to a contract owes no tort duty to refrain from interference with its performance, he

or she cannot be bootstrapped into tort liability by the pejorative plea of conspiracy." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 504 (Cal. 1994). "One contracting party owes no general tort duty to another not to interfere with the performance of the contract; its duty is simply to perform the contract according to its terms." *Id.* at 514; *see also JRS Prods., Inc. v. Matsushita Elec. Corp. of Am.*, 115 Cal. App. 4th 168, 181 (2004) (explaining that the California Supreme Court essentially "rejected the notion that a party to a contract could tortiously conspire with another to breach the contract.") (citing *Applied Equip. Corp*, 7 Cal. 4th at 514).

58.    And, VLS has conceded any damages it might have had with respect to ¶ 32(b) by acknowledging that its "damage claims are not based upon the loss of any specific individual customers" and that it "is not seeking damages for any lost business occurring before December 21, 2017." Dkt. 165 at ¶¶ 1, 3.

### d.    Element 4 – Resulting Damages

59.    Damages are a necessary element of the claim. Damages must have been proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain. *US Ecology, Inc. v. State,* 129 Cal. App. 4th 887, 909 (2005). A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage. *Id.*

60.    The sole basis for VLS's alleged damages is that the lack of 90-day notice caused VLS to lose the opportunity to contact its customers (not customers themselves). VLS failed to establish that the lack of 90 days' notice precluded VLS from any opportunity to contact customers.

61.    The 90-day "time out" period would have had no meaningful impact on the final results of the VLS/NEG relationship because factors other than immediacy of solicitation drive customer decision-making and customers are always reevaluating their carrier relationships. Dkt. 218 at ¶ 20 [Powell]. Notice, or lack of notice, has no bearing on a customer's decision to use one NVO. Rather customers consider pricing,

availability, customer service, personal relationships and reputation/prior experience. Customers also use multiple different carriers at any given time and switch as they see fit. Dkt. 219 at ¶¶ 8, 11-14 [Zarach]; Dkt. 221 at ¶¶ 11, 13, 14 [Chrisom]; Dkt. 222 at ¶¶ 9, 11, 12 [Wyndham]. VLS's own witnesses confirmed as much, with Mr. Brennan and Mr. Howard testifying that customers are not exclusive to a single NVO, that customers shop around and use multiple NVOs at the same time and shift their business back and forth. Dkt. 268 at p. 135:12-22 [Brennan]; Dkt. 269 at p. 340:20-341:5 [Howard]. And no customer ever told VLS they were not going to continue doing business with VLS in Boston because NEG did not provide 90-days' notice. Dkt. 269 at p. 17-21 [Laufer]. Even VLS's expert, Mr. Howard, admitted that that "there is no way" to separate out alleged wrongful conduct from other permissible ways that could have caused the alleged harm.

62.    VLS has not presented evidence from a single customer that stayed with NEG because of any improper conduct. Admittedly, VLS cannot so demonstrate, and has stipulated that its "damages claims are not based upon the loss of any specific individual customers." Dkt. 165 at ¶ 1. Moreover, Mr. Howard admitted that the lack of 90-days' notice did not prevent VLS from opening an office in Boston or from going in and calling on customers which they actually did just weeks after the termination. Dkt. 269 at p. 334:12-19 [Howard].

63.    The only evidence of damages put forth by VLS was from Dr. Luna, who assumed liability and offered no opinion as to whether ECU or NEG was the proximate cause of any damages. Dkt. 201 at ¶ 9 [Luna]. Dr. Luna did not analyze and did not account for any other causes that explained reductions in VLS's sales or income after December 21, 2017.

64.    In any event, VLS's own actions rendered the lack of notice immaterial. Instead of utilizing the 90-day notice period to effect a smooth transition, VLS opted

1  to terminate NEG's computer access on December 21, 2017, and never asked NEG to

2  continue doing work with Vanguard or to rescind any notice of termination.

3      65.    As a result, any damages purportedly resulting from the lack of 90-day

4  notice period were not proximately caused by NEG.

5      66.    Even if VLS had presented evidence of a breach by NEG, or proven

6  resulting damages, the damages would necessarily be limited as set forth in Section

7  IV(H)(1) and IV(H)(2), *infra*.[10]

8      67.    The Court finds that VLS is barred from recovering on the claim because

9  VLS failed to perform its obligations under the Agreement and breached the

10  Agreement prior to its ultimate termination of the Agreement on December 21, 2017.

11  The Court further finds that VLS failed to demonstrate any breach of the Agreement

12  by NEG that proximately caused damages to VLS.

13      (2)    <u>Vanguard's Second Cause of Action: Breach of Fiduciary Duty</u>

14      68.    VLS alleges that NEG breached its fiduciary duty to VLS by (a) failing

15  to provide 90 days' notice of termination of the Agreement; (b) entering into a secret

16  agreement with ECU in direct competition with VLS while the Agency Agreement

17  was still in force; (c) becoming a representative of ECU without obtaining VLS's

18  prior written consent as required by Section 2.01(b); (d) breaching Section 2.02 of the

19  Agreement while it was still in force without providing written notice; and (e)

20  conspiring with ECU to breach the Agreement during its term and (f) conspiring with

21  ECU to breach the Agreement without notice. Dkt. 97 at ¶ 36. These alleged breaches

22

23

_____

24      **10** VLS's witness, Ms. Wiraatmadja, confirmed that VLS actually made more

on FCL shipments after termination ($72,000 in 2015-2017 compared to $95,000 in

25  2018-2020). Dkt. 268 at p. 163:14—165:11 [Wiraatmadja]. She also testified that

VLS's profits on the LCL shipments was $701,000 in 2017 with NEG compared to

26  $501,000 in 2018. Dkt. 268 at p. 161:1—163:1 [Wiraatmadja]. VLS's own numbers

27  show a total decrease of $200,000 in LCL shipments, which calculates to losses of

28  $16,666 per month, or $50,000 for the 3-month period following termination.

of fiduciary duty overlap substantially, if not entirely, with the alleged contract breaches. VLS did not prove this cause of action.

69.    The elements of a cause of action for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach. *Oasis West Realty, LLC*, 51 Cal. 4th at 820. The absence of any one of these elements is fatal to the cause of action. *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101 (1991).

a.    Element 1 – Existence of a Fiduciary Relationship

70.    NEG was acting as the agent for VLS under the terms of the Agreement. However, the Agreement and relationship were terminated no later than December 21, 2017. NEG's duties ceased then.

71.    An agency is terminated by an agent's renunciation by the agency (Cal. Civ. Code § 2355) or by the death of or revocation by the principal, unless the agent has an interest in the subject of the agency (Cal. Civ. Code § 2356).

72.    The agency was potentially revoked by VLS on December 11, 2017 when it sent out an industry-wide notice that VLS was switching the CFS to BFT and made no mention of continuing to do business with NEG in any manner, and effectively revoking NEG's agency.

73.    But it is indisputable that any duties that NEG owed were terminated by VLS, as the principal, on December 21, 2017 when VLS revoked NEG's agency authority. VLS specifically directed NEG to cease issuing bills of lading and opted to cut off all NEG's computer access effectively terminating NEG's ability to perform. Ex. 1020 ("Further, NEG is to discontinue printing or issuing any Vanguard brand bills of lading."), 1022 ("NEG has in its possession a Samsung phone belonging to Vanguard, which NEG needs to return immediately. . . . Finally, Vanguard needs to arrange with NEG to have a vendor come onto NEG's premises and uninstall

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

1  Vanguard's Cisco router to be returned to Vanguard."). VLS's revocation and cutting
2  off NEG's access prevented NEG from providing further agent services.

3       74.    At that point, no later than December 21, 2017, by virtue of VLS's
4  renunciation of NEG's agency, NEG no longer had authority to act for VLS and the
5  agency terminated.

6       75.    What's more, VLS again issued a third notice confirming that VLS was
7  switching all CFS to BFT as of December 21, 2017, shifted all agency functions to its
8  New York office *and* hired Joe Pimentel to secure any and all available business in
9  the NEG Region. The December 21, 2017 notice was a definitive and public
10  pronouncement of VLS's intention to fully and completely sever the agency
11  relationship and thus terminated any duty that NEG might have owed.

12                    b.    Element 2 – Breach of a Fiduciary Duty

13       76.    Because there is substantial overlap in allegations for the breach of
14  contract and breach of duty claims, the same findings and conclusions are applicable.

15       77.    The Agreement between NEG and Vanguard was terminable at will.
16  NEG could not, therefore, have breached any duty to VLS merely by terminating the
17  Agreement. Since Mr. Fencer's December 21, 2017 letter cannot constitute a breach
18  of the Agreement, VLS's breach of duty claims must also fail because the underlying
19  acts for each of the claims is that there was a purported breach of contract. *Nygard,*
20  *Inc. v. Uusi–Kerttula*, 159 Cal. App. 4th 1027, 1046 (2008) (because defendant did
21  not breach his employment contract, the court "necessarily conclude[d]" that he did
22  not breach the duty of loyalty). The Agreement terminated no later than December
23  21, 2017 and, thereafter, NEG was not contractually bound to obtain written consent
24  from VLS and was free to act as the agent of another.

25       78.    There is no evidence that NEG was competing with VLS while the
26  Agreement was in force. Mr. Meunier and Mr. Abisch confirmed that there was no
27  business between ECU and NEG, and NEG did not have access to ECU's system until

28

after NEG was cutoff by VLS. Dkt. 270 at 777:10-20 [Abisch]; Dkt. 270 at 636:21-637:5, 645:13-22 [Meunier]. And VLS presented no evidence to the contrary, with its own witnesses testifying that they did not have personal knowledge of bookings or access to ECU's system prior to December 21, 2017. Dkt. 268 at p. 142:13-16, 143:4-6, 143:10-14 [Brennan]; Dkt. 268 at p. 187:24-188:4, 188:5-10, 188: 20-22 [Donahue]; Dkt. 268 at 220:22-221:1, 223:11-15 [Sanchoyerto]. VLS presented no evidence that NEG acted as ECU's representative, or provided services for any other NVOCC, or engaged in any conduct contrary to the duties it owed VLS prior to December 21, 2017.

79.    Additionally, VLS stipulated that NEG and ECU would have been able to legally discuss the possibility of doing business together while the Agency Agreement was still in effect if done in a manner consistent with NEG's duties under the Agency Agreement and applicable law. Dkt. 189 at ¶ 46. In 2016, with no urgency or plan in place, NEG obtained a legal opinion regarding the enforceability of the non-compete clause in the Agreement and was advised the clause was not enforceable. Dkt. 225 at ¶¶ 59-67 [Meunier]. Prior to December of 2017, NEG and ECU only sporadically discussed, in general terms, the possibility of working together. NEG did not even consider actually terminating the Agreement with VLS until VLS announced its CFS plan that would have put NEG out of business in just weeks. *Id.* at ¶¶ 80-81.

80.    Moreover, the conversations between NEG and ECU were permissible preparatory communications, as NEG was permitted to take steps in preparation for the end of the at-will relationship. In the context of an employer/employee duty of loyalty, an employee does not breach his duty of loyalty by preparing to compete with his employer. *Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 691 (2008). Courts have held that an employee may set up a competing organization without breaching the duty of loyalty. *Id*. at 433–34.  The same is applicable here. NEG did not breach any duty in preparing for termination of the at-will contract. The only

contact between NEG and ECU while NEG was under any duty to VLS was completely permissible and not a breach of any duty.

81.    NEG did not act in its own interest or adversely to VLS's interest in any transaction *connected with its agency*; NEG only so acted after the termination of the agency relationship. *Van De Kamp v. Bank of Am.,* 204 Cal. App. 3d 819, 861 (1988). *See also* Dkt. 218 at ¶ 18 [Powell].

c.    Element 3 – Damages Caused by NEG's Alleged Breach

82.    The damages Vanguard sustained must have been proximately caused by the acts of NEG. *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (2010) (causation in breaches of fiduciary and loyalty duties). Vanguard must prove, with certainty, both the existence of damages and the causal connection between the wrong and the injury. *Associated Gen. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 532-33 n. 26 (1983).

83.    Even if NEG had breached a fiduciary duty to VLS, it is still incumbent on VLS to prove it sustained damages from that breach. It has not met that burden.

84.    The only damages VLS seeks to recover are lost profits incurred after termination of the agency or unjust enrichment for profits NEG obtained after termination of the agency (which, as discussed below, is improper). VLS does not seek any damages prior to the termination of the agency agreement on December 21, 2017, and its damage claims are not based upon the loss of any specific customer. Based on these concessions, VLS cannot establish that NEG acted in its own interest or adversely to VLS's interest in a transaction *connected with its agency* prior to December 21, 2017. *Van De Kamp*, 204 Cal. App. 3d at 861.

85.    VLS has not sustained damages proximately caused by the alleged breaches of NEG's fiduciary duty. VLS admits as much, having stipulated that it does not seek damages prior to December 21, 2017. Dkt. 165 at ¶ 3. In addition, the damage claims VLS seeks "are stated in Barbara Luna's Expert Report . . . ." *Id.* at ¶ 2. Dr.

Luna's statement provides that "VLS has lost net profits subsequent to December 21, 2017 . . . ." Dkt. 201 [Luna] at ¶ 26. VLS also agreed to dismissal of its trade secret claims with prejudice by filing the Second Amended Complaint. That is to say, VLS sustained no damages as a result of any alleged breach of duty by NEG.

86.    Because VLS has not demonstrated a breach of any duty prior to December 21, 2017, and has stipulated that it sustained no damages prior to December 21, 2017, even had there been a breach by NEG, there were no damages proximately caused by that breach. Damages that VLS sustained after it opted to sever all ties with NEG cannot be construed as damages caused by NEG.

87.    For these reasons, VLS cannot recover on the claim because it failed to establish that NEG proximately caused the damage that VLS claims to have sustained. *US Ecology, Inc.*, 129 Cal. App. 4th at 909 (causation in contract claims); *Huong Que, Inc.*, 150 Cal. App. 4th at 410 (causation in breaches of fiduciary and loyalty duties).

(3)    <u>Vanguard's Third Cause of Action: Breach of Duty of Loyalty</u>

88.    VLS alleges that, by entering into the Agency Agreement, NEG agreed to act exclusively as VLS's agent thereby imposing a duty of loyalty on NEG. Dkt. 97 at ¶ 41. The alleged breaches of that duty repeat, nearly verbatim, the allegations for breach of contract. *Id.* at ¶¶ 32, 36 and 42. As such, the same findings noted in the prior sections are equally applicable here. VLS did not prove this cause of action.

89.    "The elements of a cause of action for breach of a duty of loyalty, by analogy to a claim for breach of fiduciary duty, are as follows: (1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach." *Huong Que, Inc.*, 150 Cal. App. 4th at 410. "The duty of loyalty arises not from a contract but from a relationship — here, the relationship of principal and agent." *Id.*

90.    "The principal has a cause of action either for a breach of contract or for a tort as a remedy for damage caused by the violation of any duty of loyalty on the part of an agent." *Haurat v. Superior Ct.,* 241 Cal. App. 2d 330, 334 (1966).

a.    Element 1 – Existence of a Duty of Loyalty

91.    NEG was acting as the agent for VLS under the terms of the Agreement. As the agent, NEG owed VLS a duty of loyalty during the period of the agency relationship. However, the Agreement and relationship were terminated by VLS no later than December 21, 2017. The duties ended then.

b.    Element 2 – Breach of the Duty of Loyalty

92.    The same findings and conclusions noted above are applicable to this duty of loyalty claim. As VLS concedes, NEG was entitled to prepare for the end of its relationship with VLS provided it did not breach any duties while the relationship was still in existence. NEG's interactions with ECU made in preparation to compete do not support an inference that NEG transferred its loyalty to ECU before VLS's breach of the Agreement or before the Agreement was otherwise terminated. *Mintz v. Mark Bartelstein and Assocs., Inc.,* 906 F. Supp. 2d 1017, 1037-38 (C.D. Cal. 2012); *see also Huong Que, Inc.*, 150 Cal. App. 4th at 413-14 (recognizing *Fowler v. Varian Assocs., Inc.,* 196 Cal. App. 3d 34, 41 (1987). permits employees to make preparations to compete).

93.    There is no evidence that NEG engaged in any conduct that could be deemed a breach of the duty of loyalty during its relationship with VLS.

c.    Element 3 – Damages Caused by NEG's Alleged Breach

94.    Any duty of loyalty that NEG owed VLS necessarily terminated when the contract was terminated on December 21, 2017.

95.    VLS "is not seeking damages for any lost business occurring before December 21, 2017." Dkt. 165 at ¶ 3.

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

96.    Because VLS has not demonstrated a breach of any duty prior to December 21, 2017, and has stipulated that it sustained no damages prior to December 21, 2017, even had there been a breach by NEG, there were no damages proximately caused by that breach.

97.    For these reasons, VLS cannot recover on the claim because it failed to establish a breach of any duty that was the proximate cause of any damages.

(4)    Vanguard's Sixth Cause of Action: Declaratory Relief

98.    VLS seeks six different declarations concerning the obligations under the Agreement, specifically that: (1) NEG was required to provide 90 days' notice prior to terminating the Agency Agreement; (2) the Agreement did not grant NEG an exclusive right to provide import CFS services to VLS's customers; (3) VLS was entitled to change CFS locations under the Agency Agreement; (4) NEG was prohibited from terminating the Agreement until after it provided 90 days' notice of termination; (5) NEG was prohibited from directly or indirectly competing with VLS during the term of the Agreement; and (6) NEG was prohibited from directly or indirectly competing with VLS for one year following termination of the Agreement. (Dkt. 97, SAC ¶ 60(a-f)).

99.    VLS's claim for declaratory relief is superfluous to its other claims and does not state an actual controversy. The first five declarations deal with matters of contract interpretation that are necessarily resolved as part of VLS's claim for breach of contract. To the extent those claims are separately viable, the same evidence and conclusions stated above with respect to the breach of contract claim are applicable here.

100.    The last subparagraph, in effect, seeks a declaration regarding the enforceability of the non-compete provision. The non-compete is addressed in detail in Section IV(F), *infra*. Those findings are equally applicable to VLS's claim for declaratory relief and incorporated in full. Additionally, because VLS has admitted

that its breach of contract claim is not based on and does not allege a breach of Section 2.02(a) – the non-compete clause – for conduct that occurred *after* the term of the Agreement (except with respect to the now dismissed misappropriation of trade secrets claims), Ex. 2029, Response No. 3, there is no actual controversy to be determined. The contract was terminated at the end of 2017 and the non-compete by its terms ended at the end of 2018. VLS did not seek an injunction to enforce the non-compete in 2018 and is not seeking damages for a breach of the non-compete post-termination. Issues relating the enforceability of the non-compete in 2018 are irrelevant to the remaining issues in this case. Vanguard cannot properly seek an advisory opinion on the enforceability of its non-compete under California law today.

101. To the extent an actual controversy was presented, the Court exercises its discretion and concludes a declaration or determination is not necessary or proper.

## C.    NEG's Affirmative Defenses

102. The Court has found for NEG on all of VLS's remaining claims. Even if VLS had established any liability for its claims, the applicable affirmative defenses would relieve NEG of any potential liability.

103. NEG asserted the following defenses: (1) 3rd Affirmative Defense: waiver, estoppel, laches, and unclean hands; (2) 4th Affirmative Defense: Prior Breach; (3) 8th Affirmative Defense: Setoff; (4) 12th Affirmative Defense: Unsatisfied condition precedent; (5) 13th Affirmative Defense: Failure to mitigate; (6) 14th Affirmative Defense: Economic duress; (7) 16th Affirmative Defense: Good faith; (8) 17th Affirmative Defense: Breach of covenant of good faith and fair dealing; (9) 18th Affirmative Defense: Superseding and/or supervening causes; (10) 19th Affirmative Defense: Litigation Privilege, (11) 22nd Affirmative Defense: Impossibility, (12) 23rd Affirmative Defense: Impracticability and (14) 24th Affirmative Defense: Frustration of Purpose.

(1)    Doctrines of Waiver, Estoppel, Laches, and Unclean Hands (Third Affirmative Defense)

104.    The Court finds that VLS is barred, in whole or in part, from obtaining relief by the doctrines of waiver, estoppel, laches, and unclean hands. "Waiver is the intentional relinquishment of a known right after knowledge of the facts." *Waller*, 11 Cal. 4th at 31. VLS waived any damages from the 90-day notice period before termination because it terminated without notice. Accordingly, VLS has waived any rights it may have had under the Agreement and thus should be estopped from claiming damages for that period.

105.    Furthermore, VLS materially breached its contract with NEG. It cannot seek relief from this Court when it committed the wrong that precipitated this action. *See* Cal. Civ. Code § 3517 ("No one can take advantage of his own wrong"). *See also Meridian Fin. Servs., Inc. v. Phan*, 67 Cal. App. 5th 657, 685 (2021) ("He who comes into Equity must come with clean hands. The doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim") (citations omitted). VLS unreasonably delayed in seeking to enforce, or otherwise notify NEG that it intended to seek to enforce, the 90-day notice of termination provision, to the extent VLS had not already breached the Agreement. Thus, its claims are barred by laches.

(2)    Prior Breach and Breach of the Covenant of Good Faith and Fair Dealing (Fourth and Seventeenth Affirmative Defenses)

106.    The Court finds that VLS is barred from recovering on any contract claims by its own prior, unexcused, material breaches of one or more agreements and based on VLS's breach of its covenant of good faith and fair dealing with NEG.

107.    "When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to

- 72 -

perform under the contract." *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (2011). "Generally, a plaintiff who has not performed under a contract is foreclosed from suing another for breach of that agreement." *Davoodi*, 2011 WL 577414, at *4 (citing *Durell*, 183 Cal. App. 4th at 1367).

108.   "'The [implied] covenant of good faith and fair dealing [is] implied by law in every contract.'" *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013) (citation omitted). A breach of the implied covenant of good faith and fair dealing, by itself, will support a contract action. *See Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1393 (1990). "When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract." *Brown*, 192 Cal. App. 4th at 277.

109.   VLS cannot maintain a claim for breach of contract because it materially breached the Agreement by failing to provide NEG 90 days' notice of its intention to switch its CFS services to BFT. "Generally, a plaintiff who has not performed under a contract is foreclosed from suing another for breach of that agreement." *Davoodi*, 2011 WL 577414, at *4 (citing *Durell*, 183 Cal. App. 4th at 1367).

### (3)   Setoff and/or Recoupment (Eighth Affirmative Defenses)

110.   The Court finds that VLS is barred, in whole or in part, from obtaining relief by the doctrines of setoff and/or recoupment. Applying Cal. Code Civ. Proc. § 431.70, NEG may assert any claims it has against VLS as a setoff to VLS's damages, even if those claims are barred by the statute of limitations. "One important function of the section 431.70 setoff procedure is to provide partial relief from the statute of limitations." *Constr. Protective Servs., Inc. v. Tig Specialty Ins.*, 29 Cal. 4th 189, 195 (2002). Where such cross-demands exist, relief by way of setoff is limited to reducing or defeating VLS's claim. *Id.* "The question is not whether the claims co-existed at the time the complaint was filed but whether the claims co-existed at a time when

neither was barred by the statute of limitations." *In re Ahn,* Case No. 2:13-bk-15807-WB, at *6 (Bankr. C.D. Cal. Feb. 6, 2014, 2:13-bk-15807-WB), p. 1. NEG is entitled to establish amounts owed that effectively constitute prior payment for VLS's damages.

### (4)    Failure of Condition Precedent (Twelfth Affirmative Defenses)

111.    The Court finds that VLS is barred, in whole or in part, from obtaining relief by an unsatisfied condition precedent to performance. NEG's performance was conditioned on VLS's performance and VLS materially breached the contract. "When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract." *Brown*, 192 Cal. App. 4th at 277. VLS cannot maintain a claim for breach of contract because it materially breached the Agreement by failing to provide NEG 90 days' notice of its intention to switch its CFS services to BFT. "Generally, a plaintiff who has not performed under a contract is foreclosed from suing another for breach of that agreement." *Davoodi*, 2011 WL 577414, at *4 (citing *Durell*, 183 Cal. App. 4th at 1367).

### (5)    Failure to Mitigate Damages (Thirteenth Affirmative Defense).

112.    The Court finds that even if VLS had established a breach of the Agreement by NEG, VLS is barred from obtaining relief because of its failure to mitigate damages. "A plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided." *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 41 (1993). VLS made no effort whatsoever to mitigate its damages and instead seeks to recover damages that, to the extent there are any, were entirely self-inflicted. VLS could have avoided the entirety of its alleged damages by giving NEG notice of its intention to switch to BFT, engaging in a proper (rather than secret) transition of the CFS services, accepting NEG's renunciation of

the Agreement as 90-days' notice and commenced an orderly transition, and simply performing all of its obligations under the Agreement with NEG. Instead, VLS opted to cutoff NEG's computer access, send out multiple conflicting notices to its customers regarding its shift to BFT, and failed to take steps to establish a Boston office even though it maintains that a local presence was vital to ongoing business.

> (6)   Doctrines of Economic Duress, Impossibility, Impracticability and Frustration of Purpose (Fourteenth, Twenty-Second, Twenty-Third, and Twenty-Fourth Affirmative Defenses)

113.   The Court finds that VLS is barred from obtaining relief by the doctrines of economic duress which here includes impossibility, impracticability and frustration of purpose. "Impossibility is defined . . . as not only strict impossibility but a[n] impracticability because of extreme and unreasonable difficulty, expense, injury, or loss involved." *Oosten v. Hay Haulers Dairy Emp. & Helpers Union*, 45 Cal. 2d 784, 788 (1955). "[A] thing is impracticable when it can only be done at an excessive and unreasonable cost." *City of Vernon v. City of L.A.*, 45 Cal. 2d 710, 720 (1955). "[W]here performance remains possible, but the reason the parties entered the agreement has been frustrated by a supervening circumstance that was not anticipated, such that the value of performance by the party standing on the contract is substantially destroyed, the doctrine of commercial frustration applies to excuse performance." *Habitat Tr. for Wildlife, Inc. v. City of Rancho Cucamonga*, 175 Cal. App. 4th 1306, 1336 (2009).

114.   Here, VLS switched CFS from NEG to BFT, thereby constructively terminating the contract with NEG and crippling NEG's economic ability to perform on the contract.  VLS's conduct rendered NEG's further performance impossible and impracticable, if any further performance were due at all. Moreover, terminating NEG's computer access constructively terminated the Agreement thereby frustrating the purpose of the Agreement and excusing further performance by NEG.

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

(7)    <u>Good Faith (Sixteenth Affirmative Defense).</u>

115.    The Court finds that VLS is barred from recovery because the actions alleged in the Second Amended Complaint were undertaken in good faith and in the absence of any malicious intent to injure VLS and constituted lawful, proper and justified business actions which were authorized by law. NEG had the right to terminate the Agreement without cause and was excused from further performance after VLS's breach. The actions NEG took after VLS's breach were justified and authorized by law.

(8)    <u>Superseding and/or Supervening Causes (Eighteenth Affirmative Defenses)</u>

116.    The Court finds that VLS is barred, in whole or in part, from obtaining relief because VLS's claims are barred because any losses suffered by VLS were not directly or proximately caused by NEG, but were the result of independent, superseding and/or supervening causes, including VLS's own acts and/or the acts of others. An essential element of a breach of contract claim is "that a defendant's alleged misconduct was the cause in fact of the plaintiff's damage." *Tribeca Cos., LLC v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1102-03 (2015). Here, VLS breached the contract by terminating NEG's CFS services under the Agreement, thus itself causing any harm it is alleging. Even if VLS's conduct in switching CFS without notice is not construed as a material breach, VLS decided to terminate the Agreement based on a concocted breach by NEG and shutting off NEG's access to the computer system rendering further performance impossible. VLS itself caused the termination and inability for NEG to perform further. In addition, the customer's decision to leave or stay with VLS or NEG is an independent act that in no way stems from the alleged lack of 90-day notice. VLS has admitted that customers were free to choose a different NVOCC and often did choose to switch NVOCC per shipment based solely on cost.

(9)    <u>Litigation Privilege (Nineteenth Affirmative Defense)</u>

117.    The Court finds that, even if otherwise actionable, the communications between NEG and ECU are protected by the litigation privilege as provided by California Civ. Code § 47.   The litigation privilege "is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards." *Falcon v. Long Beach Genetics, Inc.*, 224 Cal. App. 4th 1263, 1272 (2014). Here, NEG and ECU had lawyers analyze the  post-termination  non-compete  provisions  in  the  NEG/VLS agreement, and those lawyers concluded the provisions were  not  valid  and  not  enforceable. This is privileged communicative conduct. *See Lunada Biomedical v. Nunez*, 230 Cal. App. 4th 459, 479 (2014) ("[T]he litigation privilege shields a [person] from liability *based on* the communication") (citation omitted) (italics added by court). The Agreement at Section 2.03(c) refers to the possibility that the non-compete might be "unreasonable or excessive" and "unenforceable" as to scope or duration. This underscores why it was proper for the defendants to research the enforceability of the non-compete.

**D.    Claims against ECU**

118.    Vanguard has two remaining claims against ECU: Claim 7 is for inducing breach of the Agreement between Vanguard and NEG, and Claim 8 is for interference with  the  same  Agreement.  The  Court  must  analyze  the  claims independently of the Court's conclusions regarding Vanguard's claims against NEG. In particular, even if the Court had found that NEG breached the Agreement, ECU will not be liable unless Vanguard established that ECU induced that breach or interference with the Agreement.

119.    As discussed below, the evidence does not support VLS's theory of a long-running conspiracy or improper, pre-termination conduct between ECU and NEG. Rather, there was no contractual or legal restriction that prevented NEG from considering future business opportunities with ECU, including making proposals,

considering proposals from ECU, and preparing to do business with ECU after termination of the Agreement on December 21, 2017.  Moreover, there was no impropriety based on any exchange of information between NEG and ECU, particularly in light of this Court's dismissal with prejudice of VLS's trade secrets and confidentiality claims.  Dkt. 96 (court order); *compare* First Amended Complaint ("FAC"), Dkt. 49 (e.g. ¶¶ 21, 28, 37-46) *with* Dkt. 97 (SAC) (deleting allegations regarding confidentiality and trade secrets).  Further, the unrebutted evidence demonstrates that NEG and ECU did not begin doing business together until after termination of the Agreement. Lastly, Vanguard failed to prove any causal link with a reasonable certainty that ECU's conduct, even if tortious, caused it harm. Instead, the evidence ultimately shows that any loss of business Vanguard may have sustained was the result of its own actions, as well as other normal and permissible market factors.

(1)    <u>Seventh Cause of Action: Inducement to Breach Contract.</u>

120.    The elements required for Vanguard to establish its claim against ECU for inducing breach of contract are:

- That there was a contract between Vanguard and NEG;

- That ECU knew of the contract;

- That ECU intended to cause NEG to breach the contract;

- That ECU's conduct caused NEG to breach the contract;

- That VLS was harmed; and

- That ECU's conduct was a substantial factor in causing VLS's harm.

*See* Judicial Council of California Civil Jury Instruction No. 2200 (September 2003);

*Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998), *as modified*

(Sept. 23, 1998); *Pac. Gas & Elec. Co. v Bear Stearns & Co.*, 50 Cal. 3d 1118, 1129 (1990).

121.   The inducement element requires plaintiff to show that the defendant actively and affirmatively induced a breach. *Imperial Ice v. Rossier*, 18 Cal. 2d 33, 37 (1941).

122.   "One does not induce another to commit a breach of contract with a third person ... when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person. . . . For instance, B is under contract to sell certain goods to C. He offers to sell them to A, who knows of the contract. A accepts the offer and receives the goods. A has not induced the breach and is not subject to liability." *ACO Pac. v. ACO*, 70 F.3d 1277, at *1 (9th Cir. 1995) (citation omitted) (applying California law).

123.   The causation element requires that a plaintiff prove causation by showing that the conduct of a defendant is a substantial cause of the alleged damage. *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 391 (2004). A plaintiff seeking to hold one liable for unjustifiably inducing another to breach a contract must establish that "the contract would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof." *Dryden v. Tri-Valley Growers*, 65 Cal. App. 3d 990, 997 (1977); *see Franklin*, 116 Cal. App. 4th at 393-94 (for purposes of proving causation, a plaintiff cannot simply advance "a cause and effect relationsip based upon [ ] a temporal sequence"—that is "a classic example of the logical fallacy of post hoc, ergo propter hoc (literraly, 'after this, therefore because of this').)"

124.   Proof of damages cannot be speculative. *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 532-33 n.26. Lost profits damages must be proven to be certain as to their occurrence and their extent. *Lewis George Constr. Mgmt., Inc. v. Pomona*

*Unified Sch. Dist.*, 34 Cal. 4th 960, 975 (2004). No damages can be recovered for breach of contract that are not clearly ascertainable in both their nature and origin. Cal. Civil Code section 3301. Moreover, damages resulting from any breach of contract that is terminable upon the giving of notice is limited to the period of the notice. *Martin* v. *U-Haul Co. of Fresno*, 204 Cal. App. 3d 396, 407 (1988).

125.    There is no dispute that the first and second elements are satisfied. There was a contract – the Agreement – between Vanguard and NEG, and ECU knew about that Agreement.

126.    Vanguard fails, however, to establish the third and fourth elements: that ECU intended NEG to cause NEG to breach and that ECU's conduct caused a breach.

a.    The Record Evidence Shows That ECU Did Not Intend to Cause NEG to Breach and ECU's Conduct Did Not Cause Any Breach.

127.    Vanguard's breach of contract claim against NEG has been based solely on the 90-day notice period set forth in Section 3.03(b) of the Agreement. *See, e.g.*, Dkt. 172 at 5. However, in the Pretrial Conference Order, Vanguard appears to now argue ECU intended to induce other breaches of the contract:

128.    Vanguard claims that ECU "engaged in intentional wrongful acts designed to induce a breach or disruption of the contractual relationship between VLS and NEG, which acts include: (a) conspiring with NEG to misappropriate customers of VLS; (b) conspiring with NEG to breach the AGENCY AGREEMENT during the term of the AGENCY AGREEMENT; (c) inducing NEG to become the representative of ECU without the prior written consent of plaintiff as required by Section 2.01(b) of the AGENCY AGREEMENT; (d) inducing NEG to terminate the AGENCY AGREEMENT without providing ninety (90) days written notice as required by Section 3.03(c) of the AGENCY AGREEMENT; and (e) conspiring with NEG to breach the AGENCY AGREEMENT without required notice. ECU's wrongful

conduct caused NEG to breach the AGENCY AGREEMENT." Dkt. 189 at 38 [VLS's summary of evidence ("VLS Summary") regarding Claim No. 7 for inducing breach].

129.    While these positions are inconsistent, the Court will address all of Vanguard's arguments for the sake of completeness.

130.    The parties stipulated that NEG and ECU would have been able to legally discuss the possibility of doing business together while the Agency Agreement was still in effect if NEG and ECU had done so in a manner consistent with NEG's duties under the Agency Agreement and applicable law. Stip., Dkt. 189 at § 6 ¶ 46. This Court finds that there is no evidence that ECU's discussions with NEG were inconsistent with NEG's duties under the Agency Agreement or applicable law.

> (i)    <u>There Is No Evidence That ECU Induced NEG to Breach the 90-Day Notice Provision; in Fact, the Evidence Reflects the Contrary</u>

131.    With respect to breach of the 90-day notice period set forth in Section 3.03(b) of the Agreement or any conspiracy to breach the notice period (VLS's Summary, above, items (d) and (e), Dkt. 189 at 38), the evidence does not reflect such a breach.  Further, the evidence reflects that ECU did not induce NEG to breach the 90-day notice provision.

132.    The Agreement was an at-will Agreement and NEG had a right to terminate the Agreement.

133.    There is no evidence that ECU told NEG not to provide proper notice of termination under the Agreement.

134.    There is no evidence that ECU provided any opinion, advice, or feedback whatsoever about the language in the termination notice or the form or timing of termination.

135.    To the contrary, the evidence shows that, throughout the sporadic communications between NEG and ECU in 2016 and 2017, ECU encouraged NEG

to terminate the Agreement in a professional manner, which constitutes a tacit encouragement that NEG follow the requirements in the contract relating to termination.

136.    Indeed, the fax outlining the terms of a potential future agreement between NEG and ECU contemplates that NEG would follow the terms of its Agreement and provide 90 days' notice. Ex. 49; Ex. 87; Dkt. 270 at p. 530:3-7.

137.    At trial, Mr. Abisch testified that he did not suggest or encourage NEG to terminate without 90 days' notice, and that it was not part of the deal or a condition of the deal, and that, to the contrary, he was "consistent throughout that we wanted to make sure everything was parted on a proper and professional manner." Dkt. 271 at p. 785:22-786:5 [Abisch].

138.    On October 25, 2017, Mr. Abisch of ECU wrote to Mr. Tudor and others at ECU that he met with the principals of NEG and that Mr. Abisch had suggestions regarding "how to take the opportunity forward for them to *professionally* terminate with VLS and become our agent." Ex. 57 (emphasis added). The evidence shows that Mr. Abisch always let Mr. Meunier know that ECU wanted NEG to comply with its contractual obligations to VLS. Dkt. 217 at ¶¶ 20, 22, 24-25 [Abisch]; *see also* Dkt. 271 at p. 730:3-7 [Abisch] (testifying that he "anticipated they would follow whatever was required in the agreement"). This was consistent with all of the evidence regarding the communications between NEG and ECU, prior to Vanguard issuing public notice of the CFS change on December 11, 2017.  There is no evidence establishing nor suggesting that ECU requested, encouraged, or demanded that NEG ignore the notice provisions of the Agreement.

139.    At trial, Mr. Abisch testified that he intended for NEG to give 90-days' written notice of its intent to terminate the agency agreement as provided for in the Agency Agreement. Dkt. 270 at p. 745:4-18 [Abisch]. *See also* Dkt. 270 at p. 754:13-24 [Abisch] (testifying that he would have expected NEG to provide the proper notice,

"would have wanted NEG to give proper notice," and testifying "I don't know if I would have needed to see the notice but I would have wanted to make sure that they did it correctly").

140.   He also testified that, throughout ECU's negotiations with NEG, "we knew that and we had every expectation that there would be -- if there ever was a termination, it would be done professionally." Dkt. 270 at p. 750:2-4 [Abisch].

141.   Mr. Abisch explained that, in the common situation of a NVO and agent parting ways, it is in both parties' interest to "follow the terms of the agreement" and ensure an orderly transition because "cargo can be in the system for more than a month" and both parties want to be able to keep that cargo moving and keep the clients notified of where the cargo is "at all times during the transition time." Dkt. 270 at p. 781:7-21 [Abisch]. Similarly, Mr. Meunier of NEG explained that when NEG sent the December 21, 2017 termination letter to Vanguard, NEG offered to continue to work with Vanguard "because we had mutual customers, freight in the pipeline. We had inbound, freight in my warehouse outbound; and I thought it was prudent for both of us to protect the best interest of our actual mutual clients and complete the transactions that were at hand." Dkt. 270 at p. 638: 15-21 [Meunier].

142.   Mr. Abisch testified that he expected that the 90-day notice period requirement would be followed. Dkt. 271 at p. 782:24-783:2 [Abisch]. He explained that it is "very common" that the separation between principal and agent "be done properly," where "the parties follow the terms of the agreement" because "both of the parties wants to remain in business and have relationships with their clients," and "both parties want to make sure they can look their clients in the eye and say: I did the best job I could for you in keeping your cargo moving and keeping you notified of where your cargo was at all times during the transition time." Dkt. 271 at p. 780:22-782:9 [Abisch]. He explained that "whatever concerns are about competitive pressures are far outweighed by the idea to make sure you keep your clients happy,"

so there is typically "a commitment by both sides to make it amicable so the client doesn't get caught in the bloodbath between two parties if it is an ugly separation." Dkt. 271 at p. 782:10-23 [Abisch]. During that 90-day transition, Mr. Abisch testified that he expected that "[w]e would continue to be on the sideline doing the business that we did in Boston as we had been before and cooperation between NEG and Vanguard would continue on as it had before and both parties would be getting prepared for, at the end of the 90 days, of what their new world would look like but they would continue to cooperate and we would have just been business as usual." Dkt. 271 at p. 783:3-11 [Abisch].

143.   ECU did not have an incentive to rush the process, as ECU has "relationships with these clients all over" and it is "very much in [ECU's] best interest" to "set a good example for the agents and for our clients," since the industry will all "know the whole story of what happened" and ECU wants to do things "properly and professionally." Dkt. 271 at p. 783:23-784:5 [Abisch].

144.   Indeed, Mr. Sanchoyerto of Vanguard admitted that NEG, in its termination letter, offered to continue to work with Vanguard to have an orderly wind-down, Dkt. 268 at p. 251:16-18 [Sanchoyerto], and that it was his decision to disconnect NEG from Vanguard's network. Dkt. 268 at p. 253:12-24 [Sanchoyerto] (Q. "So NEG had offered to continue to work with Vanguard to make it an orderly transition?" A. "That's correct." A. "But it was your decision to turn it off and be done?" A. "It was my decision to disconnect the network, yes." Q. "Okay. Did you call Mr. Meunier at this point?" A. "No." Q. "And, in fact, at this point it was your decision to completely end it and be done?" A. "It was my decision to disconnect them from the network.").

145.   With respect to the 90-day notice, Mr. Abisch was assured by NEG that the termination was being performed properly. At trial, when Mr. Abisch was asked whether he has ever done an investigation into whether or not NEG gave 90 days'

notice to Vanguard, Mr. Abisch testified that when the separation actually happened, "it was my understanding from Joe from his legal counsel that it was not required because of the way that Vanguard moved on the warehousing. So I certainly had conversations to make sure it was still being done correctly and legally and my understanding is that it was." Dkt. 270 at p. 773:21-774:5 [Abisch]. The evidence demonstrates that ECU did not want to proceed with NEG until it was free to do business with ECU.  ECU had the right to rely on the statements from NEG, and such reliance is evidence that ECU did not intend to induce NEG to breach.  *See Oakley, Inc. v. Nike, Inc.*, 988 F. Supp. 2d 1130, 1135-36, 1138 (C.D. Cal. 2013) (granting summary judgment on inducement claim because "no reasonable fact finder could conclude that Nike 'form[ed] an intent to harm' the Oakley-McIlroy agreement," where McIlroy's Agent told Nike that McIlroy could enter into a deal with Nike; whether Agent's statement was accurate did not affect outcome of motion because Nike had the right to rely on Agent's statement).

146.   Mr. Abisch also testified that it was his "understanding that they were eligible to work with us right away. They didn't have to give any notice because Vanguard had breached the agreement." Dkt. 270 at p. 778:2-9 [Abisch]. ECU relied on NEG (and NEG's decisions made in conjunction with its legal counsel) to determine how NEG would comply with the requirements of its Agreement with Vanguard. Mr. Abisch's belief that NEG was free to work with ECU after termination, relying on the statements from NEG that no further notice was required, is evidence that ECU did not intend that NEG breach, and did not induce NEG to breach, the 90-day notice provision. *See Oakley, Inc.*, 988 F. Supp. 2d  at 1138  (no "intent to harm").

147.   Mr. Meunier consistently testified at trial that, pursuant to advice of counsel, "on December 11th, I was under the impression and belief that Vanguard had breached the agreement and the agreement no longer existed." Dkt. 269 at p. 465:19—

466:5 [Meunier]. Mr. Meunier testified that he communicated this understanding to Mr. Abisch. Dkt. 270 at p. 558:17-23 [Meunier].

148.   Mr. Abisch testified that he never suggested or encouraged NEG to terminate without 90 days' notice, that termination without 90 days' notice was not part of the deal between ECU and NEG, and that, "[i]n fact, I was pretty consistent throughout that we wanted to make sure everything was parted on a proper and professional manner." Dkt. 270 at p. 785:22-786-5 [Abisch].

149.   Even though Vanguard does not base its claim against ECU on breach of the non-compete in the Agreement, ECU's conduct with respect to the non-compete further evidences that ECU encouraged NEG to govern itself professionally and in accordance with the Agreement. ECU not only encouraged NEG to obtain a legal opinion to ensure the non-compete was unenforceable (and therefore unlikely to be enforced by VLS) prior to finalizing any negotiations, but obtained its own legal opinion to ensure that NEG would not violate the non-compete provision by becoming ECU's agent following termination. ECU also told NEG, in writing, that ECU did not want to receive any confidential information from NEG. *See* Ex. 46 (Abisch to Meuniers: "A key component of this will be for us to not utilize any confidential information you have obtained via your agency relationship with NACA.").

150.   It is clear—and there is no evidence to the contrary—that NEG made the decision as to the form and notice of termination on its own. The evidence also reflects that NEG made that decision in conjunction with its legal counsel and informed ECU that the termination was being performed properly.

151.   Thus, whether or not NEG breached the agreement by failing to give 90 days' written notice of termination, ECU—which encouraged an orderly, proper transition—is not liable for inducing any such breach.

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

(ii)    There Is No Evidence That ECU "Misappropriated" Any Customers

152.    With respect to Vanguard's claim that ECU induced NEG to breach the Agreement by conspiring regarding "misappropriation of customers," (VLS's Summary, item (a), Dkt. 189 at 38), the evidence does not reflect any misappropriation and there is no evidence of ECU inducing NEG to misappropriate customers. Dkt. 217 at ¶ 47 [Abisch] (no diversion of customers; fair competition only after termination).

153.    Mr. Brennan, former Global CEO of Vanguard, admitted that customers in this industry are not exclusive to a single NVOCC, can go with whomever they want, and, depending on the region, often shop around or use multiple NVOCCs at any one time. Dkt. 268 at 135:12-22 [Brennan].

154.    Vanguard's expert, Greg Howard, testified that customers can "absolutely" choose to do business with whichever NVO they would like to, and in fact they often do business with multiple NVOs at the same time and shift their business back and forth. Dkt. 269 at 340:20-341:5 [Howard].

155.    Additionally, there is no evidence that Vanguard had any separate, exclusive agreements with any customers. To the contrary, customers in this industry have an independent right to choose to move their business from Vanguard to ECU, or elsewhere (Dkt. 129-3 (VLS Resp. to RFA Nos. 60-61)), due to competitive pricing, better servicing and route systems, or any number of "permissible" reasons that may explain the alleged harm. *See Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*, 2019 WL 13045054 at *3 (C.D. Cal. Feb. 28, 2019).

156.    Additionally, there is no evidence that Vanguard had any separate, exclusive agreements with any customers. To the contrary, customers in this industry have an independent right to choose to move their business from Vanguard to ECU, or elsewhere (Dkt. 129-3 (VLS Resp. to RFA Nos. 60-61)), due to competitive

pricing, better servicing and route systems, or any number of "permissible" reasons that may explain the alleged harm. *See Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*, 2019 WL 13045054 at *3.

(iii)   There Is No Evidence That NEG Worked as ECU's Agent or Was Employed by ECU Prior to Termination

157.   With respect to any argument (VLS's Summary, items (b) and (c), Dkt. 189 at 38) that ECU induced a breach of, or conspired to breach, Section 2.01(b) of the Agreement by NEG improperly acting as ECU's agent, without consent, prior to termination, the evidence reflects no such breach. There is also no evidence that ECU induced NEG to act as ECU's agent before termination.  Rather, ECU consistently required that the NEG – Vanguard relationship first be terminated before ECU would work with NEG.  Dkt. 217, at ¶¶ 21, 22, 44 [Abisch].

158.   NEG and ECU exchanged a draft, redlined Memorandum of Understanding between December 13 and 15, 2017, Ex. 61, Ex. 62, but the evidence shows that NEG did not begin working as ECU's agent until after the December 21, 2017 termination.

159.   At summary judgment, this Court found there was "a triable issue of fact as to whether the Memorandum of Understanding bound the parties or resulted in NEG being employed by ECU or involving itself as ECU's agent." Dkt. 153 at 12.

160.   Once the Agency Agreement was terminated on December 21, 2017, NEG no longer had an obligation to act as Vanguard's exclusive agent. The question is, therefore, whether NEG acted as ECU's agent or was employed by ECU prior to December 21, 2017.

161.   The evidence shows that the Agency Agreement unambiguously terminated on December 21, 2017 (if it was not anticipatorily breached by Vanguard earlier), a week or so after the redline memorandum of understanding was exchanged,

- 88 -

when its legal counsel sent a letter to counsel for Vanguard stating that "NEG hereby terminates the Agreement in all respects[.]" As discussed above, ECU encouraged NEG to terminate in accordance with the provisions of the Agreement and played no role with respect to the form of termination.

162.   Vanguard accepted the termination by telling NEG, on December 21, 2017, to "discontinue" doing work for Vanguard; cutting off NEG from all computer systems, booking and tracking software, and NEG's customers; and demanding that NEG return its electronic hardware. Internally, Vanguard recognized that the relationship was terminated and acted accordingly.

163.   Mr. Sanchoyerto testified that it was his understanding that "they were terminating the agreement" as of December 21, 2017, so he created a checklist to capture items that needed to be actioned due to the termination of the agreement.  Dkt. 268 at p. 217:23—218:9. He also admitted that, once Vanguard disconnected NEG from accessing Vanguard's computer network, NEG was unable to perform any services for Vanguard. Dkt. 268 at p. 223:21—224:6 [Sanchoyerto].

164.   At trial, each of Vanguard's witnesses conceded they had no personal or actual knowledge of NEG booking cargo or otherwise doing work for ECU prior to termination.  Similarly, Vanguard came forward with no evidence from any customer that shifted any business to ECU prior to termination.  Therefore, Vanguard presented no evidence from any percipient fact witness that NEG performed any services or otherwise worked for or was employed or engaged as an agent for ECU before termination of the Agreement.

165.   Mr. Laufer of Vanguard also admitted that NEG needed access to Vanguard's computer systems to perform services for Vanguard. Dkt. 269 at p. 443:24—444:5 [Laufer].

166.   At trial, there was no evidence that, prior to December 21, 2017, NEG provided services to ECU, acted as ECU's agent, or was engaged or employed by

- 89 -

ECU. The only witnesses Vanguard put forth all testified they had no personal knowledge that NEG provided any services for ECU prior to termination.

167.    Charlie Brennan, former Global CEO of Vanguard, admitted he had no knowledge regarding when NEG actually started booking cargo for ECU, turned on the computer system set up by ECU, or booked or handled any cargo for ECU. *See* Dkt. 268 at p. 142:13-16 [Brennan] ("No idea" about when ECU actually started booking cargo through NEG); Dkt. 268 at p. 143:4-6 [Brennan] (no personal knowledge of when ECU turned on its computer system); Dkt. 268 at p. 143:10-14 [Brennan] (no knowledge of any customer that ever booked or handled any cargo through NEG and through ECU before Vanguard cut off NEG's systems).

168.    Mr. Donahue of Vanguard admitted that he had no personal knowledge that NEG was actually taking any orders, booking shipments for customers, or coordinating shipments for ECU at any time prior to December 22 or 23, 2017. Dkt. 268 at 187:24-188:4 [Donahue]. He also admitted he had no personal knowledge that ECU actually turned on its computer systems and allowed NEG access to do any of sort of bookings or use its systems until after Vanguard cut off NEG. Dkt. 268 at p. 188:4-10 [Donahue]. He testified: "I did not see a booking, no." Dkt. 268 at p. 189:1 [Donahue].

169.    Mr. Sanchoyerto of Vanguard admitted that he had no personal knowledge that ECU actually routed or delivered any export cargo to any NEG CFS at any time prior to December 22, 2017. Dkt. 268 at p. 221:2-5; 223:11-14 [Sanchoyerto].

170.    Contrary to Vanguard's argument, the evidence establishes that the day before NEG sent the termination letter, on December 20, 2017, Mr. Abisch of ECU recommended that NEG wait until it learned how VLS reacted to the termination letter before NEG put out any information to customers, even though ECU and NEG would "lose out on some bookings by postponing the note," because "this is a marathon as

opposed to a sprint." Ex. 84. At trial, Mr. Abisch testified that it was his "suggestion to delay sending out an announcement" because, from his "experience dealing with this, it's very possible in the 11th hour the two parties make up and continue to work together." Dkt. 271 at p. 776:22—777:1 [Abisch].

171.   Moreover, ECU did not announce that it was partnering with NEG until January of 2018, well after the December 21, 2017 termination. Ex. 3019.

172.   The only witnesses with any personal knowledge regarding the date that NEG started working for ECU testified that it was not until after the December 21, 2017 termination.

173.   When asked about when NEG could access ECU's systems, Mr. Abisch of ECU testified that "the only time they had the opportunity to access our system was when they were cut out of their system and there are multiple communications communicating that we wouldn't turn on our system and give them access to use our system until -- or if they got locked out of their system." Dkt. 270 at p. 777:10-20 [Abisch].

174.   Mr. Abisch also testified that "NEG became the agency for ECU once they were shut off from Vanguard. So that took place some point on the 21st." Dkt. 270 at p. 779:5-12 [Abisch]. Once that happened, the financial portion of the relationship was governed by the MOU until the financial services agreement was entered into several months later. Dkt. 270 at 779:13-21 [Abisch]. He testified that NEG was not actually "active until the 22nd or 23rd" of December, 2017." Dkt. 270 at p. 777:23-778:1 [Abisch]. The first day NEG issued waybills and started booking cargo and handling cargo for clients of ECU was December 22 or 23, 2017. Dkt. 270 at p. 786:10-14 [Abisch].

175.   Mr. Meunier, principal of NEG, testified that, prior to termination, NEG did not do any work for ECU, did not issue any bills of lading, and did not even have access to ECU's computer system. Dkt. 270 at p. 636:21—637:5 [Meunier]. He also

testified that he did not start trying to make sales for ECU until after the December 21, 2017 termination notice was sent to Vanguard. Dkt. 270 at p. 645:13-22 [Meunier]. Mr. Meunier testified that, before December 21, 2017, "Mr. Abisch would not allow any connectivity to their operating system" and that the system had "absolutely" not been turned on then. Dkt. 270 at p. 640:19—641:3 [Meunier].

176.    To bolster its claim, Vanguard put forth a screenshot of ECU's website, which identified ECU's "Ocean Receiving Location" in Boston, Massachusetts, as "ECU BOS C/O N.E. GROUPAGE 9 Mear Road, HOLBROOK, MA, 02343." Ex. 3016; Dkt. 268 at p. 188:15-22 [Donahue]. But there was no evidence that NEG actually did do any CFS work for ECU prior to termination. *See* Dkt. 268 at p. 223:6-19 [Sanchoyerto]. More importantly, Vanguard's own witness admitted that the NEG-Vanguard Agreement was not exclusive as to CFS, which is separate from the exclusive agency services governed by the Agreement. *See* Dkt. 269 at p. 246:2—247:9 [Sanchoyerto] (testifying that CFS is not part of the Agency Agreement and that NEG could move CFS for anyone). Any CFS services NEG may have performed for ECU prior to termination are, therefore, not a breach of Section 2.02 of the Agreement.

177.    At trial, Vanguard also focused on the fact that ECU trained NEG on its computer systems and set up an email account for Mr. Meunier before NEG sent Vanguard the December 21, 2017 termination letter. *See* Dkt. 270 at p. 576:3-6; 585:9-13 [Meunier]. All of that is irrelevant if NEG did not actually provide any services to ECU prior to termination, and there was no evidence that NEG provided any such services. The evidence demonstrated that NEG did in fact keep its ongoing work with and for Vanguard separate from the training and other preparations for possible future work with ECU. Indeed, the evidence shows that NEG did not actually do business for ECU until after Vanguard cut NEG off its systems after receiving the termination letter. *See* Sections III(O) and III(P), *supra*.

178.   NEG and ECU did not enter into a final, binding agreement until May of 2018, and that agreement had additional, different terms than some of the basic terms listed in the memoranda of understanding they exchanged during negotiations. Dkt. 217 at ¶¶ 41-43 [Abisch] (MOU was not binding; "There were significant material differences between the draft MOU…and the final agreement.").

179.   The evidence reflected that NEG did act as ECU's agent prior to the May 2018 final agreement between the parties, but there is no evidence that NEG acted as ECU's agent or provided services to customers on behalf of ECU before NEG's Agreement with Vanguard was terminated on December 21, 2017.

180.   Moreover, there is no evidence that any customer moved business to ECU prior to the date of termination, December 21, 2017. Accordingly, Vanguard has not asserted any claims for loss of business prior to termination. Stip., Dkt. 189 at § 6 ¶ 55.

181.   Because ECU and NEG did not actually do any business together before termination, and because NEG was not engaged to act as ECU's agent before termination, and because the parties both considered that they could "walk away" from the redlined MOU, the Court finds that the parties were not bound by the MOU and that the MOU did not result in NEG being employed by ECU or involving itself as ECU's agent.

182.   Vanguard has, therefore, failed to establish the third and fourth elements of its inducement claim. All that Vanguard established at trial with respect to ECU was that the parties discussed the possibility of working together, ultimately exchanged a draft, non-binding memorandum of understanding prior to termination, and then prepared to possibly work together, all with the knowledge that the at-will agreement between NEG and Vanguard would have to first be terminated. That does not constitute inducement to breach under California law. *See ACO Pacific*, 70 F.3d at *1-2.

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

b. Even If Vanguard Could Establish That ECU Caused NEG to Breach, the Records Shows That Vanguard Did Not Establish a Causal Link for Its Claimed Damages.

183. Moreover, even if Vanguard had met its burden with respect to the third and fourth elements, there is no evidence that Vanguard lost any business or customers as a result of any breach of the Agreement.

184. Vanguard stipulated that it is not seeking damages for any lost business occurring before the date NEG sent the termination letter: December 21, 2017. Stip., Dkt. 189 at § 6 ¶ 55.

185. Vanguard relies only upon its experts to try to demonstrate that reduced customer sales due to a supposed lack of opportunity were caused by a lack of 90 days' notice. But, as discussed in Section IV(A)(2), *supra*, its experience-based expert (Greg Howard) had no opinion about whether Vanguard lost business or customers due to any lack of 90 days' termination notice from NEG (Vanguard presents no damages evidence separate and apart from the issues regarding the 90-day notice). The same expert, Mr. Howard, concluded that "there is no way" to separate out alleged wrongful conduct from other permissible ways that could have caused the alleged harm.

186. Indeed, there is substantial evidence that Vanguard did not lose any customer opportunities, had numerous meetings and opportunities to quote rates and compete for business, and did retain substantial business from customers that kept some of their business with NEG or shifted some to ECU.

187. Mr. Howard, Vanguard's expert, admitted that the lack of 90-days' notice did not prevent Vanguard from actually going in and calling on customers which they did a couple weeks after the termination. Dkt. 269 at p. 334:16-19 [Howard].

188.    Any lost opportunities were of Vanguard's own making. Mr. Howard testified that, following the split, one of the people Vanguard chose to hire to have sales calls with customers in Boston was "past his best by date" (63 or 64 years old) and the other "did not perform." Dkt. 269 at p. 330:12-16 [Howard]. Vanguard chose to hire these salespeople – and not open a Boston office – in spite of the fact that, as Mr. Howard testified, Boston is not unique in its lack of experienced salespeople and "there's office space available." Dkt. 269 at p. 334:3-15 [Howard]; *see also* Dkt. 269 at p. 446: 6-11 [Laufer] (testifying Vanguard never opened a Boston office even though "[t]here was nothing, you know, legally preventing us from opening an office").

189.    To open a Boston office would cost in the neighborhood of $500,000. Dkt. 269 at p. 353:22—354:2 [Howard]. And Mr. Howard admitted that, even if Vanguard had been given 90-days' notice, it would have had to spend the $500,000 if it wanted to open a Boston office, and he agreed that would be true whether or not the termination was orderly or abrupt. Dkt. 269 at p. 354:22—355:5 [Howard].

190.    Mr. Howard even admitted that, if customers continue to do any level of business with Vanguard after termination, then by definition Vanguard had an opportunity to protect its interest with those customers. Dkt. 269 at p. 344:17—345:4 [Howard].

191.    No customers testified that they moved business from Vanguard because of any lack of 90 days' notice. To the contrary, there is extensive evidence that customers moved their business solely for permissible competitive reasons.

192.    Indeed, Vanguard's own causation expert, Mr. Howard, admitted that you cannot separate out Vanguard's lack of a Boston office from the other factors that customers are driven by like pricing, service, location of the CFS facility, routing. Dkt. 269 at p. 348:25—349:5 [Howard].

193.   Mr. Howard testified that he was not engaged to try to assess how many customers were driven by Vanguard's move in the CFS station (to BFT) versus the lack of 90 days' notice or pricing. Dkt. 269 at p. 351:2-6 [Howard].

194.   Mr. Howard also testified that "in a breakup between agents, nobody ever retains all the business if it's done the right way." Dkt. 269 at p. 352:18-21 [Howard].

195.   Mr. Laufer testified that no customer ever told him that they were not going to continue doing business with Vanguard in the Boston region because NEG failed to provide the requisite notice under the Agency Agreement. Dkt. 269 at p. 444:17-21 [Laufer].

196.   Similarly, as discussed in Section IV(A)(3), *supra*, Vanguard's damages expert, Dr. Barbara Luna, did not analyze nor account for any other causes that explained reductions in VLS's sales or income, after termination; did not address losses relating to other income or business or fees or additional costs and, although she could have examined all of VLS's post-termination business, she did not; and Dr. Luna also failed to allocate damages between the defendants and the causes of action. Dkt. 269 at p. 268:5-10 [Luna].

197.   In sum, Vanguard did not present evidence that customers refused to meet with Vanguard or consider competitive bids, and thus that Vanguard had "lost opportunities" with customers. Other than a customer-code analysis with no connection to the alleged lack of 90-days' notice, Vanguard did not present evidence of any other categories of damages. [11] And, Vanguard did not analyze or account for permissible reasons that customers chose to move business from one competitor to

---

[11] As previously noted herein, Vanguard conceded that its "damage claims are not based upon the loss of any specific individual customers." Dkt. 165, Stip. 1. In any event, Vanguard presented no evidence at trial that Vanguard lost any specific customers as result of ECU's conduct.

another. *See Sebastian Int'l, Inc. v. Russolillo*, Case No. CV 00-3476 SVW JWJX, 2005 WL 1323127, at *6 (C.D. Cal. Feb. 22, 2005) (concluding there was an absence of any evidence that would allow a jury to determine that Plaintiff's loss was caused by defendant's actions and not another cause such as counterfeiting, plaintiff's management turnover, or general market conditions).

198.   Vanguard has repeatedly tried to argue that, even if it cannot prove damages, the court should order the disgorgement of profits from defendants as unjust enrichment or restitution. Unjust enrichment may be a remedy for a theft of trade secrets case, where property has allegedly been stolen, *see* Judicial Council of California Civil Jury Instruction No. 4401 (December 2014), Unjust Enrichment Jury Instruction for Trade Secret Misappropriation, but VLS dismissed its trade secret claims with prejudice. Dkt. 96, p. 6-7. Pretrial, both the Magistrate Judge and this Court ruled that unjust enrichment was not a remedy for the remaining claims in this case.[12] Notably, VLS did not bring a claim for unjust enrichment. Finally, Vanguard did not prove that the defendants were in any way "unjustly" enriched.[13] Whatever benefits NEG and ECU derived from their business relationship were earned and do not belong to Vanguard.

---

[12] As the Court concluded in its Order Granting in Part and Denying in Part Motions *in Limine* (Dkts. 157, 158, 162, 166, 167, 168) [Dkt. 190] ("Oct. 4, 2022 Order"), "testimony on the recovery of damages based on unjust enrichment is irrelevant." *Id.* at 11. Indeed, "in granting summary judgment, the Court found that 'VLS is not entitled to equitable relief amounting to all amounts that defendants have obtained as a result of their wrongful conduct.'" Oct. 4, 2022 Order at 10 (quoting MSJ Order at 21). Vanguard cannot seek damages based on unjust enrichment.

[13] NEG and ECU performed services for customers after the termination, as did VLS (as it continued to do business in New England). NEG and ECU are entitled to keep whatever profits they earned and those profits cannot fairly be taken away and given to VLS. VLS would be unjustly enriched if it were to keep its own profits and then add NEG's and ECU's profits as well.

199.   Vanguard, therefore, additionally fails to meet the fifth and sixth elements of its claim. Vanguard has failed to prove both that ECU was a substantial cause of any damage it suffered, *Franklin*, 116 Cal. App. 4th at 391, and that its damages are not speculative, *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 532-33 n.26.

200.   Accordingly, as to Count VII of Vanguard's Second Amended Complaint, the Court finds for ECU.

(2)    Eighth Cause of Action: Interference with Contractual Relations

201.   The elements required for Vanguard to establish its claim against ECU for interference with contractual relations are:

- That there was a contract between VLS and NEG;

- That ECU knew of the contract;

- That ECU's conduct prevented performance or made performance more expensive or difficult;

- That ECU intended to disrupt the performance of this contract or knew that disruption of performance was certain or substantially certain to occur;

- That VLS was harmed; and

- That ECU's conduct was a substantial factor in causing VLS's harm.

CCAI 2201; *Ixchel*, 470 P.3d at 575.

202.   "[T]he economic relationship between parties to contracts that are terminable at will is distinguishable from the relationship between parties to other legally binding contracts." *Ixchel,* 470 P.3d at 578 (citing *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1151 (2004)).

203.   For a claim for interference with an at-will contract, the plaintiff must prove the additional element of independently wrongful conduct. *Ixchel*, 470 P.3d at

580. An act is independently wrongful only if it is proscribed by some determinable legal standard. *Id.* at 576.

204.  As with Claim 7, the interference torts require that a plaintiff prove causation by showing that the conduct of a defendant is a substantial cause of the alleged damage. *Franklin*, 116 Cal. App. 4th at 391.

205.  Although the lack of 90-day notice is Vanguard's primary complaint, Vanguard claims that the same conduct supporting Claim 7 supports Claim 8: "VLS alleges that ECU engaged in intentional wrongful acts designed to induce a breach or disruption of the contractual relationship between VLS and NEG, which acts are described above in Claim 7 (including breach of contract)." Dkt. 175 at 70-71. In the Final Pretrial Conference Order, Vanguard repeats the exact same allegations for Claim 7 in Claim 8. Dkt. 189 at 39.

206.  Accordingly, for the reasons discussed above, in connection with Claim 7, Vanguard failed to establish that ECU interfered with the Agreement.  However, the Court will discuss the interference claim in greater detail, below.

207.  There is, again, no dispute that Vanguard has met the first and second elements of the claim: there was a contract – the Agreement – between Vanguard and NEG, and ECU knew about that Agreement.

      a.    The Record Evidence Shows That ECU's Conduct Did Not Prevent NEG from Performing the Agency Agreement and That Such Conduct Was Not Done with the Intention to Disrupt NEG's Performance

208.  The parties stipulated that NEG and ECU would have been able to legally discuss the possibility of doing business together while the Agency Agreement was still in effect if NEG and ECU had done so in a manner consistent with NEG's duties under the Agency Agreement and applicable law. Stip., Dkt. 189 at § 6 ¶ 46. As with Claim 7, this Court finds that there is no evidence that ECU's discussions with NEG were inconsistent with NEG's duties under the Agency Agreement.

209.    As with Claim 7, there is no evidence that ECU's conduct prevented performance of the Agreement or made performance of those provisions more expensive or difficult.

210.    With respect to breach of the 90-day notice provision contained in Section 3.03(b), there is no evidence that ECU told NEG not to provide proper notice of termination under the Agreement, and there is no evidence that ECU provided any opinion, advice, or feedback whatsoever about the language in the termination notice or the form of termination. The only evidence establishes that ECU encouraged NEG to comply with the requirements of the Agreement. Vanguard has not, therefore, established that ECU's conduct prevented performance of the 90-day notice provision or made performance of the notice provision more expensive or difficult. *See* Sections III(O) and III(P), *supra*.

211.    With respect to breach of the "exclusive agent" provision contained in Section 2.02(b) of the Agreement, there is no evidence that NEG acted as ECU's agent prior to the date of termination, when the Agreement was no longer in effect. *See* Section III(O), *supra*.

212.    With respect to Vanguard's claim that ECU induced NEG to breach the Agreement by conspiring regarding "misappropriation of customers," the parties stipulated that Vanguard's customers had the right to choose to move their business from Vanguard to ECU. Stip., Dkt. 189 at § 6 ¶ 48. There is no evidence any customer shifted business before termination, and Vanguard identifies nothing in the Agreement that gives it any exclusive rights with respect to any particular customers either before or after termination, and none exists. *See* Sections III(A), III(P), IV(B)(1)(d), IV(D)(1)(a)(ii), *supra*.

b.    The Record Evidence Shows That Vanguard Did Not Suffer Harm as a Result of ECU's Conduct

213.   Vanguard also fails to establish it suffered harm for the same reason it failed to do so with respect to Claim 7: there is no evidence that Vanguard lost any business or customers as a result of any breach of the Agreement or alleged interference. *See* Sections III(P) and IV(A)(2)-(3), *supra*.

c.    The Record Evidence Shows That ECU Did Not Engage in any Independent Wrongful Conduct

214.   Whether or not Vanguard established all of the elements of the claim, however, the claim also fails because Vanguard failed to establish independently wrongful conduct, which is required to state a claim for this tort under *Ixchel*, 470 P.3d at 580.

215.   Vanguard did not allege, nor did it prove, any fraud, misrepresentations, or illegal or illicit conduct such as bribes or other crimes, or any other conduct that is wrongful pursuant to a "determinable legal standard." *Ixchel*, 470 P.3d at 576, 580. ECU did not do anything improper or wrongful, such as making bribes or coercing customers, to encourage NEG to breach or to misappropriate customers.  Dkt. 217, at 55 [Abisch].

216.   The Agreement between NEG and Vanguard was terminable at will, and ECU is a competitor of Vanguard. ECU and NEG exchanged proposals, considered doing business in the future, and negotiated for future business prospects. There is no legal prohibition on preparing to do business in the future or exchanging the terms of future dealings in a draft memorandum of understanding, or agreeing to provide future loans if the relationship went forward.

217.   In fact, California law makes abundantly clear that competitive business behavior such as the behavior NEG and ECU engaged in here is lawful. *See PMC, Inc. v. Saban Entm't*, 45 Cal. App. 4th 579, 603 (1996), disapproved in part on other

grounds by *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003). "In the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability. Such acts merely maximize competition in a competitive marketplace." 45 Cal. App. 4th at 603 (citation omitted).

218. In contrast, there is no evidence of the sort of conduct that has been recognized to be wrongful. Examples of impermissible acts include fraud, misrepresentation, intimidation, coercion, obstruction or molestation of a rival or his servants or workmen, or the procurement of the violation of the contractual relationship. *See C. Pappas Co., Inc. v. E. & J. Gallo Winery*, 610 F. Supp. 662, 669 (E.D. Cal. 1985), *aff'd.* 801 F.2d 399 (9th Cir. 1986). ECU did not commit fraud, bribery, coercion or do anything legally improper or wrongful; Vanguard came forward with no proof of any acts that satisfies the requirement for independently wrongful conduct.

219. Mr. Brennan, Vanguard's former Global CEO, agreed at trial that this industry is very mobile in terms of agencies, senior employees, affiliations; that everyone knows everyone else; that there is competition for good talent, senior executives, salespeople, and good agents—and that that's a good thing. Dkt. 268 at p. 152:10-20 [Brennan].

220. Thus, none of the actions that VLS describes is proscribed by some determinable legal standard, and none of acts qualify as independently wrongful.

221. Additionally, even though the evidence demonstrates that ECU did not induce NEG to breach the Agreement, an inducement to breach cannot be a basis establishing independently wrongful conduct. Otherwise, the *Ixchel* requirement of

independently wrongful conduct would have no meaning and an inducement to breach would always constitute interference, as well.  The claims are separate claims and require separate elements of proof:  An inducement to breach does not satisfy the independently wrongful conduct requirement for an interference claim.

222.   Thus, whether or not NEG breached the Agreement, ECU's conduct in dealing with NEG and customers in the New England market was lawful competition as opposed to independently wrongful conduct. Vanguard, therefore, has not established its claim for interference with contractual relations.

223.   Accordingly, as to Count VIII of Vanguard's Second Amended Complaint, the Court finds for ECU.

**E.     ECU's Affirmative Defenses**

224.   The Court finds for ECU on Counts VII and VIII. However, for purposes of completeness, even if VLS were able to establish any liability under Counts VII and VIII, that liability is avoided by ECU's affirmative defenses.

225.   ECU pursues the following affirmative defenses to avoid liability: (i) Second Affirmative Defense: Estoppel; (2) Third Affirmative Defense: Waiver; (3) Fourth Affirmative Defense: Laches; (4) Seventh Affirmative Defense: Unclean Hands; (5) Ninth Affirmative Defense: Failure to Mitigate Damages; (6) Tenth Affirmative Defense: Litigation Privilege; (7) Eleventh Affirmative Defense: Competition Privilege; (8) Thirteenth Affirmative Defense: Competition; (9) Seventeenth Affirmative Defense: Prior Breach; (10) Eighteenth Affirmative Defense: Prevention; and (11) Nineteenth Affirmative Defense: Acquiescence.

(1)   <u>Second Affirmative Defense: Estoppel; Third Affirmative Defense: Waiver; and Fourth Affirmative Defense: Laches</u>

226.   To prevail on its estoppel defense, ECU must demonstrate that (1) VLS knew the facts; (2) VLS intended that its conduct be acted upon, or acted so that ECU had the right to believe that it was so intended; (3) ECU was ignorant of the true state

1  of facts; and (4) ECU relied upon VLS's conduct to its injury. *Migliore v. Mid-*
2  *Century Ins. Co.*, 97 Cal. App. 4th 592, 606 (2002).

3      227.   The waiver defense requires ECU to establish (1) that VLS knew NEG
4  was required to give 90 days' notice of termination of the agency agreement; and (2)
5  that VLS freely and knowingly gave up its right to have NEG perform this obligation.
6  Judicial Council of California Civil Jury Instruction No. 336 (September 2003). The
7  laches defense similarly requires that VLS unreasonably delayed in notifying NEG or
8  ECU of any change in its position on termination.

9      228.   The Court finds that VLS waived any and all arguments that 90 days'
10 notice was required for NEG to terminate: (a) by not asking NEG to make the date of
11 termination 90 days after the notice, (b) by not telling NEG or ECU that VLS did not
12 consider the notice effective for 90 days, (c) by not making any effort to coordinate
13 on the CFS or agency transition, and (d) by taking affirmative steps to terminate the
14 agreement immediately, including by cutting off NEG's computer access and ability
15 to continue to serve as VLS's agent. The Court further finds that VLS is estopped
16 from arguing that it was entitled to 90 days' notice based on its conduct when it
17 received NEG's notice on December 21, 2017. Lastly, the Court finds that VLS's
18 claims are barred by laches because VLS unreasonably delayed notifying NEG or
19 ECU that it considered the Agreement to not be terminated as of December 21, 2017,
20 and never suggested nor permitted that NEG should continue to perform under the
21 Agreement after that date.

22          (2)    Seventh Affirmative Defense: Unclean Hands

23     229.   To establish unclean hands, ECU must demonstrate that VLS acted
24 unfairly or fraudulently as to the controversy in issue. *In re Volkswagen "Clean*
25 *Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, 517 F. Supp. 3d 994, 998
26 (2021).

27
28

230.   VLS is guilty of unclean hands, including representing that it "had no choice" but to terminate the agreement on December 21, 2017 when, in fact, it had other choices that it intentionally abandoned. VLS knew from the summer of 2017 that it wanted to alter its business relationship with NEG and proceeded to carefully implement that plan by trying to pressure NEG to give up income under the existing agreement, by taking away NEG's critical CFS business. VLS took away NEG's warehouse/CFS business, knowing that it was a substantial part of NEG's income, as a part of an intentional tactic to force NEG to re-negotiate the Agency Agreement and provide more income to VLS. VLS's conduct was a breach of the Agency Agreement and a breach of its duty of good faith and fair dealing.  The Court finds that VLS knew about the discussions between ECU and NEG prior to December 21, 2017 and knew that VLS considered the activity to be a material breach of the agreement (even though that belief was wrong) but failed to notify NEG and ECU. VLS's conduct is inconsistent with trying to enforce its interpretation of the agreement and consistent with a plan to sue NEG and ECU.

(3)    Ninth Affirmative Defense: Failure to Mitigate Damages

231.   Even if the Court had found NEG breached the contract and the breach caused harm, ECU asserts as a defense that VLS is not entitled to recover damages for harm that VLS could have avoided with reasonable efforts or expenditures. Judicial Council of California Civil Jury Instruction No. 358 (September 2003); *Agam v. Gavra*, 236 Cal. App. 4th 91, 111 (2015).

232.   The Court finds that VLS did not adequately prove any damages that occurred from any breach by NEG. VLS could have but did not work with NEG to have a transition.  *See* Dkt. 217, at ¶¶ 38-39 [Abisch] (If Vanguard would have requested coordination "during a transition or notice period," ECU would have cooperated.).  Instead, VLS disconnected NEG's computers. *Id.* (". . . [T]here may be incentives to part ways without an extended notice or transition period . . . . Basically,

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

if the marriage is over, it can be better to 'move out' and move on.").  VLS could have but did not competently handle its decision to change warehouses in December 2017, and refused to coordinate any CFS transition. VLS sent out multiple notice of the change of warehouses and failed to mention NEG at all. This confused customers and disrupted the market. Further, VLS failed to take steps to maintain a presence in the New England market, and intentionally did not open a Boston office (but rather made the strategic decision to route all business through VLS's New Jersey/New York office), even though it knew a local presence was important.  It was VLS's decision as to which sales representative it hired, post-termination, and if Mr. Pimentel and others did not perform, then VLS failed to properly mitigate by hiring appropriate personnel. VLS knew, as early as September 2017, that there was a risk that its decision to take away NEG's CFS/warehouse business could cause VLS to lose business and NEG routings if the Agency Agreement were terminated, and VLS did not adequately make efforts to mitigate any damages.

### (4)    Tenth Affirmative Defense: Litigation Privilege

233.  "Under [the litigation privilege] privilege, which courts interpret broadly, defendants are immunized from tort liability for any communication: (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action. The primary purpose of [the litigation] privilege is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Nelson v. Tucker Ellis, LLP*, 262 Cal. Rptr. 3d 250, 265 (Ct. App. 2020) (citation omitted).

234.  The Court finds that the Joint Defense Agreement between NEG and ECU is not evidence of wrongful conduct because it was only entered into after the filing of this lawsuit, and because discussions about legal matters and potential litigation are privileged under California Civil Code section 47.  *See* Dkt. 217 at ¶ 48

[Abisch] (joint defense agreement only discussed, drafted and signed after lawsuit filed; no contact between NEG's counsel and ECU's counsel, until after lawsuit filed).

(5)  Eleventh Affirmative Defense: Competition Privilege and Thirteenth Affirmative Defense: Competition

235.  The Court finds that the competition privilege is truly an element of Plaintiff's claim as Plaintiff must prove independent wrongfulness. Nonetheless, even if treated as an affirmative defense, California law provides the following:  One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if:  (a) the relation concerns a matter involved in the competition between the actor and the competitor, and (b) the actor does not employ improper means, and (c) the actor does not intend thereby to create or continue an illegal restraint of competition, and (d) the actor's purpose is at least in part to advance his interest in his competition with the other. *Charles C. Chapman Bldg. Co. v. Cal. Mart*, 2 Cal. App. 3d 846, 855–56 (1969); RESTATEMENT (SECOND) OF TORTS § 768 (1979); *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture Partners*, 52 Cal. App. 4th 867, 880 (1997); *San Francisco Design Ctr. Assocs. v. Portman Cos.*, 41 Cal. App. 4th 29, 40 (1995), dismissed, remanded and ordered published, 911 P.2d 1373 (Cal. 1996).

236.  Similarly, the Court must find for ECU if it is established that ECU's motives in executing the challenged conduct was to further the economic interests of ECU in competition with VLS unless the conduct was unlawful. 13 Bus. & Com. Litig. Fed. Cts. § 138:60 (5th ed.).

237.  The Court finds that ECU's acts are not actionable because they are privileged under the competition privilege and to hold otherwise would be a restraint of trade. VLS admits that NEG and ECU had the right to discuss a business relationship at all times. Thus, VLS concedes at least some, if not all, of the

communication between NEG and ECU was proper. VLS abandoned its trade secret claims, and thus there is no issue about any improper use of allegedly confidential information.

238.   VLS admits that it did not suffer any damages before December 21, 2017, the date of termination, but tries to make the inconsistent argument that there must have been some wrongful conduct prior to that date. ECU's conduct was entirely proper. ECU had a right to meet with NEG and to offer NEG more favorable terms than VLS. It had a right to plan with NEG for an orderly transition given VLS's decision to terminate the NEG warehouse/CFS relationship on December 11, 2017 and VLS's ability and threat to terminate the agreement immediately. And there is no evidence whatsoever that ECU encouraged NEG not to give 90 days' notice of termination, or breach the agency agreement in any other way. At bottom, ECU's business activity was privileged as fair competition and VLS's effort to punish that behavior would act as a restraint of trade. Every party to an at-will agreement should understand that the other party can terminate and can, before such termination, consider alternatives.

(6)   <u>Seventeenth Affirmative Defense: Prior Breach, Eighteenth Affirmative Defense: Prevention, and Nineteenth Affirmative Defense: Acquiescence</u>

239.   A plaintiff's prior breach of a material term of a contract excuses a contractual counter-party's subsequent breach. *Mardiros v. City of Hope*, 2020 WL 8175604, *22 (C.D. Cal. 2020).

240.   Additionally, under California law, if one contracting party prevents the other from performing a condition precedent, the party that is subject to the condition is excused from performing it. *Bugarin v. All Nippon Airways Co., Ltd.*, 513 F. Supp. 3d 1172, 1182 (N.D. Cal. 2021); *see also City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455, 490 (2008) ("It is hornbook law that where one contracting party

prevents the other's performance of a condition precedent, the party burdened by the condition is excused from performing it, and the benefitted party's duty of performance becomes unconditional.").

241.   Furthermore, an abandonment of a contract may be implied from the acts of the parties and this may be accomplished by the repudiation of the contract by one of the parties and by the acquiescence of the other party in such repudiation. Abandonment is not an 'alteration' or modification of a contract. Abandonment of a contract terminates it and entirely abrogates so much of it as is unperformed. *Collins v. Wolf*, 591 B.R. 752, 772 (S.D. Cal. 2018) (citation omitted).

242.   Thus, if ECU demonstrated that Vanguard acquiesced to the termination, Vanguard will be found to have abandoned the contract, which results in termination of the contract and an entire abrogation of so much of it as is unperformed. *Collins v. Wolf*, 591 B.R. 752, 772 (S.D. Cal. 2018) (citation omitted).

243.   The Court finds that the claims against ECU based on NEG's breach of the Agreement are barred by the defenses of prior breach, prevention, and acquiescence. VLS itself breached the agreement, or at a minimum breached its duty of good faith and fair dealing, by terminating NEG's CFS business, knowing it was an important and valuable part of the overall relationship, and intending to have NEG's business suffer as "leverage" to force NEG to capitulate to VLS's demands for more favorable renegotiated contract terms. The CFS business and CFS compensation was specifically described in the Agency Agreement. Part of the very reason that VLS was dissatisfied with the Agency Agreement was that it wanted larger "rebate" payments from NEG in connection with NEG's CFS warehouse business. VLS needed to negotiate a change to the Agency Agreement in order to obtain these additional payments from NEG. VLS's own breaches and actions prevented NEG from performing and ECU cannot be held responsible for VLS's actions. VLS intentionally terminated NEG's CFS business for an improper purpose, to try to force

NEG to make concessions and pay more to VLS under the Agreement, while knowing that the termination would cause severe economic consequences for NEG, and likely force NEG to terminate its agency relationship with VLS. Finally, the evidence demonstrates that VLS consented and acquiesced to the termination by its conduct on December 21, 2017, effectively abandoning the contract and confirming termination as of that date.

## F.    The Non-Compete Is Unenforceable

244.    Vanguard never sought to enforce the non-compete language contained in Section 2.02(a) of the Agreement, and the claims at trial were not based on any breach of the non-compete.

245.    Section 2.02(a) provides:

> During the term of this Agreement and thereafter for a period of one (1) year after termination of the Agreement, NEG-shall not, and shall not permit any of its employees . . . to engage, as an agent, officer, director, shareholder, owner, partner, joint venturer, lender or in any capacity, whether as an employee, independent contractor, consultant or advisor, or as a sales representative, of any business selling any products or services in direct or indirect competition with the business of [Vanguard] located or operating within (100) miles of any facility of [Vanguard].

Ex. 75 § 2.02(a).

246.    In response to the Defendants' motion in limine to exclude evidence pertaining to a violation of the non-compete, Vanguard stated it is "not pursuing a claim for damages based on a theory of breach of the post-termination noncompete provisions of Sec. 2.02(a). Rather, VLS's claim for damages is based on NEG's breach of the 90-day notice of termination provision in Sec. 3.03(c) and its tort claims. In fact, it is Vanguard's position that NEG has never properly terminated the Agency Agreement, and it is possible that the post-termination non-compete language in Sec.

2.02(a) may not yet come into play." Dkt. 172 at 5. Notably, this issue was not identified as one to be tried in the Final Pretrial Conference Order [Dkt. 189]. Thus, the Court finds that this issue is not relevant to any claim in this proceeding.

247.   However, Vanguard argues that "NEG's violation of the post-termination non-compete is relevant to rebut defendants' argument that it was not reasonably foreseeable that NEG's breach of the 90-day notice provision would cause VLS to suffer more than 90 days of damages." Dkt. 172 at 5.

248.   As explained above, there is no evidence that Vanguard lost any business or customers as a result of the breach of the 90-day notice provision of the Agreement. The enforceability of the non-compete is, therefore, irrelevant. The issue of the non-compete is also irrelevant because Vanguard does not seek damages for a post-termination violation of the non-compete and because Vanguard does not seek any damages at all for the period before the termination.

249.   As an evidentiary matter, Vanguard argued that NEG and ECU's legal analysis of the enforceability of the non-compete prior to the termination was somehow improper. But parties to contracts always have the absolute right to seek legal advice as to whether provisions in the contracts are void under applicable law. Such conduct is absolutely privileged and, for obvious reasons, the law encourages it. When provisions of a contract are void as a matter of public policy, that same public policy means that parties should be encouraged to find that out.

250.   Moreover, Vanguard complains about the 2016 discussions regarding the enforceability of the non-compete but never challenged their substance. VLS did not offer evidence that the non-compete is in fact valid and enforceable. VLS did not present proof that the memorandum NEG's lawyer prepared was a sham or wrong. Vanguard only complains about the fact that NEG got legal advice and shared that with ECU and that ECU got legal advice and share the conclusion with NEG. Such conduct is privileged and not evidence of anything wrongful. Indeed, the non-compete

itself states that the parties understand that it might not be enforceable as written. *See* Ex. 75 § 2.02(c). Where parties sign a contract that says, in effect, this provision might not be enforceable, it is most certainly proper for a party to check.

251.   As a factual matter, of course, legal advice from a lawyer is not a guarantee that the law will not change or a court might not have a different view. The business question a party faces is, first, whether a provision is likely unenforceable and, second, will the other party to the contract try to enforce the provision given the enforceability question. NEG reasonably believed the non-compete was unenforceable post-termination and also reasonably believed, because of that, Vanguard would not attempt to enforce it. In fact, Vanguard did not attempt to enforce the non-compete post-termination. It did not seek an injunction and is not seeking damages based on a violation of the non-compete. Vanguard also concedes that its "damage claims are not based on the loss of any specific individual customers." Dkt. 189 at ¶53. Given all of this, the theoretical question of whether the non-compete would have been enforceable is irrelevant to this case. This Court can properly decide not to address the legal question.

252.   Additionally, the non-compete is irrelevant here because, on its face, it does not apply to the conduct at issue. The Agreement does not define "facility," but the closest Vanguard "locations" to Boston are New York and New Jersey, neither of which is within 100 miles of Boston. *See* Dkt. 268 at p. 138:14-23 [Brennan]; Dkt. 269 at p. 393:13-22 [Laufer]; *see also* https://www.vanguardlogistics.com/contact/locations (last visited October 7, 2022). The non-compete, therefore, does not apply in any way to restrict NEG's and ECU's ability to do business in Boston, after termination.

253.   Though the Court need not decide the enforceability of the non-compete, it is worth noting that the non-compete contained in the Agreement is unenforceable under California law, which strongly disfavors restraints on trade.

254.   In California, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. "The statute embodies the settled public policy in California that favors open competition." *Nulife Ventures, Inc. v. Avacen, Inc.*, No. 20-CV-2019-BAS-KSC, 2020 WL 7318122, at *11 (S.D. Cal. Dec. 11, 2020).[14]

255.   Upon certification by the Ninth Circuit, the California Supreme Court clarified that "section 16600 applies to business contracts," and is not limited to employment contracts. *Ixchel*, 470 P.3d at 581-82.

256.   Under section 16600, "covenants not to compete are generally unenforceable," save for the exceptions listed in sections 16601 through 16603. *Nulife Ventures, Inc.*, 2020 WL 7318122 at *11. Those exceptions apply to contracts governing (1) sales of goodwill of a business or disposition of ownership interest in the business entity; (2) dissolution of the partnership or dissociation of the partnership or dissociation of a partner from the partnership; and (3) dissolution or sale of a limited liability company. *Id.* (citing Cal. Bus. & Prof. Code §§ 16601–03.)

257.   None of those exceptions applies here.

---

[14] Consistent with California's approach, the Federal Trade Commission recently proposed a rule that would prohibit employers from imposing noncompete agreements on their workers. *See* Andrea Hsu, *Millions of works are subject to noncompete agreements. They could soon be banned*, NATIONAL PUBLIC RADIO (last visited Jan. 5, 2023), https://www.npr.org/2023/01/05/1147138052/workers-noncompete-agreements-ftc-lina-khan-ban. In addition, the California State Bar has issued an opinion that in certain circumstances it is unethical to seek to enforce a non-compete, one reason why parties like Vanguard might choose not to seek enforcement of non-compete provisions written long ago. State Bard of California Standing Committee on Professional Responsibility and Conduct, Formal Opinion Interim No. 19-0003, Advising Client on Illegal Contract Provisions at p. 6 ("If the lawyer knows that [a contract] provision is illegal, the lawyer . . . may not recommend the use of the provision.")

258.   "Where, as here, no exceptions to section 16600 apply, the court must apply the reasonableness standard and examine whether the contractual restraint unreasonably deters competition given the purpose and effect of each contract." *Nulife Ventures, Inc.*, 2020 WL 7318122 at *11 (citing *Ixchel*, 470 P.3d at 581-82). That inquiry, known as the "rule of reason," asks "whether an agreement harms competition more than it helps" by considering "the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption." *Ixchel*, 470 P.3d at 581-82.  Vanguard presented no evidence whatsoever to demonstrate how the non-compete could help competition.

259.   "[A]n employer cannot by contract restrain a former employee from engaging in his or her profession, trade, or business . . . ." *Edwards v. Arthur Andersen*, 44 Cal. 4th 937 (2008) (citing *Ixchel*, 470 P.3d at 587). "[T]he rationale in *Edwards* focused on policy considerations specific to employment mobility and competition." *Ixchel*, 470 P.3d at 587. The non-compete contained in the Agreement here, as it relates to NEG employees is void and unenforceable under *Edwards*.

260.   The VLS non-compete as relates to NEG as a company is also void because the restriction "harms competition more than it helps." Vanguard's entire case is based on how central NEG was to the functioning of the market in New England. It would be an unreasonable restraint of trade for a contract to provide that NEG would be forced out of the business for a year if either Vanguard or NEG terminated the agreement.

261.   In *Nulife Ventures*, the court held that NuLife, a multi-level marketing company, did not demonstrate the ability of prevailing on the merits of breach of contract claims grounded on non-compete clauses because they were unenforceable. The clauses restricted the ability of an independent brand partner to practice their sales

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

1  profession in the industry, which rely on a sales agent's recruitment of new sales
2  agents. *Nulife Ventures, Inc.*, 2020 WL 7318122 at *11. The same is true here.

3      262.   Because the non-compete is void and unenforceable, the Court finds that
4  Vanguard cannot rely upon that non-compete for any purpose, including for the
5  purpose of purporting to establish a one-year period for the damages claim. It would
6  be unreasonable for Vanguard or the parties to have any expectations about a year-
7  long damages period for any alleged breach of an at-will contract where the non-
8  compete is unenforceable.

9  **G.    Punitive Damages**

10     263.   Although not specified in the SAC, the only basis for punitive damages
11 on the claims alleged is Cal. Civ. Code § 3294. That section limits punitive damages
12 to "an action for the breach of an obligation not arising from contract." VLS's claims
13 stem exclusively from the Agreement and there is no basis for an award of punitive
14 damages in connection with the contractual obligations.

15     264.   An award of actual or compensatory damages is a prerequisite to an
16 award of punitive damages. *See Mother Cobb's Chicken Turnovers v. Fox*, 73 P.2d
17 1185, 1186 (Cal. 1937); *Cheung v. Daley*, 35 Cal. App. 4th 1673, 1676-77 (1995).
18 Punitive damages are not available to VLS because there are no actual damages and
19 because it has failed to prove any conduct that qualifies as oppressive, malicious, or
20 fraudulent. *Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 238-239
21 (2005) ("An award of actual damages, even if nominal, is required to recover punitive
22 damages."). *See also* Dkt. 217 at ¶ 55 [Abisch] (no improper conduct, such as bribes
23 or customer coercion).

24     265.   Moreover, for any award of punitive damages, Vanguard is required to
25 prove "by clear and convincing evidence that [the defendants have] been guilty of
26 oppression, fraud, or malice." Cal. Civ. Code § 3294; *Kappe v. AXA Equitable Life*
27 *Ins. Co.*, Case No. CV 09-03459 ODW (AGR), 2010 WL 11597481, at *7 (C.D. Cal.

28

Nov. 9, 2010) (granting motion for summary judgment to dismiss claim for punitive damages). Vanguard came forward with no evidence demonstrating oppression, fraud or malice. As discussed above, the evidence shows that the defendants acted consistent with acceptable competitive business practices, and punitive damages are not warranted.

**H.    Alternative Damages Limitations**

(1)    In the Alternative, Vanguard's Damages Are Limited to the 90-Day Notice Period

266.    Damages must not be "speculative, imaginary, continent or merely possible." *Navellier v. Sletten*, 262 F.3d 923, 939 (9th Cir. 2001).

267.    As discussed above, Vanguard failed to present evidence to establish that NEG's failure to provide 90-day notice of termination caused Vanguard to sustain non-speculative, clearly ascertainable damages. However, even if Vanguard sufficiently established that it was harmed, the Court concludes that any such damages Vanguard may recover, as a matter of law, is limited by the 90-day notice of termination period. Because the Agreement between the parties was at-will, future profits would be speculative beyond the 90-day notice period. Damages would be further limited by VLS's acceptance of NEG's termination, and that they cannot demonstrate that they lost any customers.

268.    Vanguard's claims against NEG and ECU are premised on its theory that NEG breached the Agency Agreement by not providing 90 days' notice of termination under the Agreement. Dkt. 205 at ¶ 28.

269.    Section 3.03 of the Agreement states, in pertinent part:

> (a) This Agreement shall continue in full force and effect unless either party terminates the Agreement pursuant to Sections 3.03(b) or (c) as the case may be.

. . .

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

(c) NEG may terminate this Agreement at any time upon ninety (90) days prior written notice to NACA (such notice effective upon receipt); provided that notwithstanding such termination, the obligations of NEG and its employees under Sections 2.02 and 2.03 shall survive for a period of one (1) year after such termination.

Ex. 31 at Section 3.03.

270.   It is well established under California law that the measure of damages for any breach of a contract that is terminable upon the giving of notice is limited to the period of the notice. In *J.M. Leasing, Inc. v. J.M. Smucker Co.*, the Ninth Circuit held that the trial court did not err "in disallowing evidence of damages suffered more than six months after the notice of termination since those damages were not foreseeable." 61 F.3d 911 (9th Cir. 1995). In so holding, the Ninth Circuit relied on *Martin v. U-Haul Co. of Fresno*, where the California Fifth District Court of Appeal considered "whether [a] contract provision which provides for the termination of the [ ] contract upon 30 days written notice effectively restricts the damages recoverable by either party to the contract to those attributable to that 30–day period." 204 Cal. App. 3d at 407.

271.   The *Martin* court held that the damages were limited to the notice period, explaining that, "[b]ecause of the 30–day notice provision neither party to the dealership contract could reasonably anticipate that damages resulting from a breach of that contract would exceed those potentially accruing during a 30–day period after the breach" and, therefore, "awarding the wronged party damages which exceed those attributable to the 30 days immediately following the breach would place that party in a better position than that resulting if the breaching party had performed in accordance with the terms of the agreement." *Id*. at 410-11. The court explained that "[t]he specific rule that a termination clause limits recoverable damages to the notice period is consistent with the general requirement that contract damages are limited to

1   those foreseeable by the parties at the time of contracting. Parties who agree that a

2   contract may be terminated for any reason, or no reason, upon the giving of the

3   specified notice could not reasonably anticipate that damages could exceed that notice

4   period." *Id*. at 409.

5          272.   State and federal courts in California have consistently followed the rule

6   set forth in *Martin*. *See N.B. Scrivner & Wilson, Inc. v. Mobil Oil Corp.*, 914 F.2d 263

7   (9th Cir. 1990) ("the district court properly limited damages to thirty days" on contract

8   that provided for "termination upon thirty days written notice"); *Strategic Concepts,*

9   *LLC v. Beverly Hills Unified Sch. Dist.*, 232 Cal. Rptr. 3d 579, 589 (Ct. App. 2018)

10  (where a party has the right to terminate a contract without cause upon a specified

11  period of notice, damages for breach is limited to lost profits for the period of the

12  notice); *see also RGJ Assocs., Inc. v. Stainsafe, Inc.*, 300 F. Supp. 2d 250, 253–54 (D.

13  Mass. 2004) (citing cases) ("Further, as uniformly held by the majority of courts, the

14  amount of damages following the termination date is limited to the time period of

15  what constitutes reasonable notice.").

16         273.   The Agreement entitled NEG to terminate the Agency Agreement upon

17  ninety (90) days' notice. Ex. 31 at Section 3.03(c). That provision imposes a

18  substantive limitation on the scope of VLS's recoverable damages against NEG and

19  ECU. *Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 934-37 (E.D. Cal.

20  2010) (concluding that agreement permitting party to terminate agreement upon sixty

21  (60) days advance notice imposes a substantive limitation of the scope of plaintiff's

22  recoverable damages—that is, any such damages cannot exceed the notice period).

23         274.   Vanguard argues that California law limiting damages for at-will

24  contracts to the contract notice period does not apply because the notice provision in

25  the Agency Agreement required NEG to comply with the non-compete in Section

26  2.02 for a period of one year after termination.

27

28

DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND
CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

275.    The Court, however, finds that argument unavailing because Section 2.02(a) of the Agreement, the so-called non-compete clause, cannot serve to prolong the recoverable period of damages.

276.    Section 2.02(a) of the Agreement states:

> (a) During the term of this Agreement and thereafter for a period of one (1) year after termination of the Agreement, NEG shall not, and shall not permit any of its employees, for any reason whatsoever, directly or indirectly, for itself or in conjunction with any other person, persons, company, partnership, corporation or business of whatever nature to (i) engage, as an agent, officer, director, shareholder, owner, partner, joint venture, lender or in any capacity, whether as an employee, independent contractor, consultant or advisor, or as a sales representative, of any business selling any products or services in direct or indirect competition with the business of NACA located or operating within one hundred (100) miles of any facility of NACA, (ii) engage or participate in any effort or act to divert or take away or attempt to divert or take away, call on or solicit, or attempt to call on or solicit any customer (as to whom such employee had contact while an employee of NEG), employee or independent contractor of NACA, or which has been a customer (as to whom such employee had contact while an employee of NEG), employee or independent contractor of NACA.

277.    Vanguard has never asserted that its claims against NEG and ECU arises from a purported breach by NEG of the non-compete provision. Ex. 2029, Response No. 3 (stating that its "breach of contract claim is not based upon and does not allege a breach of Section 2.02(a) of the Agency Agreement for conduct which occurred after the term of the Agency Agreement except with respect to misappropriation of trade secrets.").[15] Vanguard is not entitled to a longer period of damages based on a

_____

[15] The misappropriation claim is no longer at issue. By filing the Second Amended Complaint, Vanguard accepted the Court's conditional grant of leave to

claim it does not assert. Further, as discussed in Section IV(F), *supra,* the Court concludes that the non-compete is unenforceable, so it cannot apply to increase the range of Vanguard's recoverable damages.

278.    Vanguard also now seems to further argue that the Agreement was never terminated and, therefore, the principle of law articulated in *Martin* and its progeny does not apply. The Court finds that this argument is belied by the record and Vanguard's own pleadings. Vanguard has never pled that the Agreement remains in effect or remained in effect for a period of time after December 2017. Dkt. 97. The record shows that Vanguard never acted as if the agreement remained in effect. Vanguard never made any demands on NEG to perform as its agent after December. *See* Sections III(N), III(O), and III(P) *supra*. In fact, Vanguard actively prevented NEG from performing as its agent. *See id*. Moreover, its own witnesses testified that the Agreement terminated on December 21, 2017. (Dkt. 268 at p. 149:19-25 [Brennan] ("Q. "Right. The agency agreement was terminated December 21st; correct?" A. "Right"); p. 205:10-25 [Donahue]; p. 217:23—218:9 [Sanchoyerto])

279.    Lastly, Vanguard relies on an unpublished decision—*Nuasive, Inc. v. Madsen Med., Inc.*, 2015 WL 10943609 (S.D. Cal. 2015)—in support of its argument that the legal principle set forth in *Martin* and its progeny does not apply to its claims for tortious interference with, and inducement to breach, a contract against ECU. The Court, however, finds the decision in *Nuasive* is unpersuasive and does not apply to Vanguard's claims.

280.    First, the court in *Nuasive* fails to recognize that actual damages for a tortious interference claim should be the same as a breach of contract claim. *See In re Tamen*, 22 F.3d 199, 206 (9th Cir. 1994) ("Damages for breach of contract are, of course, computed as the profits [plaintiff] would have earned had the contract been

---

amend (Dkt. 96) and its claims for misappropriation of trade secrets were dismissed with prejudice.

performed. The same rule applies to [plaintiff's] tortious interference claim.") (citing RESTATEMENT (SECOND) OF TORTS § 774A cmt. b); *see also Am. Nat. Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W. 2d 274, 278 (Tex. 1990) ("The basic measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with, to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed.").

281. It would be completely illogical for a plaintiff to be able to recover more from a tortious interference defendant than it can from a contractual counterparty defendant for the consequences of the same purported harm—the contractual counterparty defendant's breach of the contract. Vanguard's claims against NEG and Vanguard arise from the same purported conduct—NEG's alleged failure to provide Vanguard with 90-day notice of termination.

282. Second, the *Nuasive* case does not help VLS. That case did not involve a claim where the only damages analysis combined all alleged claims—both tort and contract—computed as part of a single damages figure. Here, Dr. Luna did not differentiate between damages suffered by reason of any contract breach as compared to damages suffered because of any alleged interference or inducement claims. Dr. Luna presented only a single, unified damage theory as to all claims—both contract and tort. Dr. Luna provides no separate analysis opining as to tort damages, independent of and in addition to the alleged contract damages. *See* Section IV(A)(3), *supra*. Without a separate damages analysis demonstrating that different damages flowed from the different claims and different categories of purportedly wrongful conduct, Vanguard is limited to the same damages analysis proffered by Dr. Luna, and those contract damages must be limited to the 90-day period set forth in the Agreement.

283.   In any event, VLS failed to present evidence of damages incurred during this 90-day period. VLS's expert did not calculate damages for this 90-day period. Dkt. 201 [Luna]. Dr. Luna analyzed damages for a period of 10 years of lost profits on an annualized basis and on a cumulative basis so that the trier of fact could determine the amount of future lost profits for the time period the trier of fact determines is appropriate based on the evidence. *Id.* at ¶ 26. But, as set forth above, neither Dr. Luna nor Mr. Howard provided any acceptable methodology or analysis explaining why a 10-year damages period would apply to an at-will contract.

284.   Consequently, the Court concludes that Vanguard's damages are limited, as a matter of law, to that 90-day period set forth in the Agreement.

285.   VLS's witness Ms. Wiraatmadja confirmed that VLS actually made more on FCL shipments after termination ($72,000 in 2015-2017 compared to $95,000 in 2018-2020). Dkt. 268 at p. 163:14-165:11. She also testified that VLS's profits on the LCL shipments were $701,000 in 2017 with NEG compared to $501,000 in 2018. Dkt. 268 at p. 161:1-163:1.VLS's own numbers show a total decrease of $200,000 in LCL shipments, which calculates to losses of $16,666 per month, or $50,000 for the 3-month period following termination.

        (2)   <u>In the Alternative, Vanguard's Damages Are Limited to the One-Year Non-Compete Period</u>

286.   The Court finds that, even if Vanguard had sufficiently established that it was harmed, and assuming that if the non-compete is enforceable and applicable, Vanguard's damages would be limited to 90 days plus 12 months from December 2017.

287.   The limitations of Section 2.02 are plainly limited to a one-year term. So, at best, the damages period of 90 days is extended by 12 months. Vanguard's damages cannot exceed the 90-day notice period of Section 3.03 and the one-year

term in Section 2.02. *See N.B. Scrivner & Wilson, Inc.*, 914 F.2d at 263; *Strategic Concepts, LLC*, 232 Cal. Rptr. 3d at 589.

\*\*\*

IT IS, THEREFORE, after consideration of the extensive evidentiary record, the testimony at trial, and argument of counsel, **ORDERED AND ADJUDGED** as follows:

288.   The Court finds for NEG on Vanguard's remaining claims against NEG and is entitled to final judgment in its favor, specifically: Count I for breach of contract, Count II for breach of fiduciary duty, Count III for breach of the duty of loyalty, and Count III for declaratory relief.  VLS is not entitled to any relief on these claims alleged against NEG in the SAC.

289.   ECU is entitled to final judgment in its favor as to Count VII of the Second Amended Complaint.

290.   ECU is entitled to final judgment in its favor as to Count VIII of the Second Amended Complaint.

291.   NEG and ECU shall make a motion to recover their reasonable costs and attorneys' fees incurred in defending against VLS's now-dismissed frivolous trade secret claims pursuant to 18 U.S.C. § 1836(b)(3)(D) and Cal. Civ. Code § 3426.4.


**DONE AND ORDERED**, this _____ day of _____ 2023.


_____

HON. DALE S. FISCHER
DISTRICT COURT JUDGE

1  Dated: April 5, 2023                    Respectfully Submitted,

2                                          IRELL & MANELLA LLP.
3                                          Bruce A. Wessel
                                           By: /s/ Bruce A. Wessel
4
5                                              Bruce A. Wessel
                                               Attorneys for Defendant
6                                              EconoCaribe Consolidators, Inc.

7                                          STEARNS WEAVER MILLER
                                           WEISSLER ALHADEFF &
8                                          SITTERSON, P.A.
9
                                           By: /s/ Darrell Payne
10                                             Darrell Payne
11
                                               Pro Hac Vice Counsel for
12                                             Defendant Econocaribe Consolidators,
                                               Inc.
13
14                                         FERNALD LAW GROUP APC
15                                         By: /s/ Adam P. Zaffos
16                                             Adam P. Zaffos
17                                             Attorneys for Defendant and
                                               Counterclaimant
18                                             Groupage Services of New England,
19                                             LLC
20
21
22
23
24
25
26
27
28

- 124 -

## **PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1800 Avenue of the Stars, Suite 900, Los Angeles, California 90067.

On April 5, 2023, I served the foregoing document described as DEFENDANTS' JOINT PROPOSED FINDING OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS on each interested party, as stated on the attached service list.

| | | |
|---|---|---|
| David S Porter, Esq.<br>Law Offices of David S. Porter<br>17011 Beach Blvd.,<br>Suite 900,<br>Huntington Beach, CA 92647 | Telephone: (714) 444-5992<br>Fax:<br>(714) 960-9229<br>Email:<br>dporter@dporterlaw.com | Attorneys for Plaintiff, Vanguard Logistics Services (USA), Inc. |
| Merak Eskigian<br>Mark Goshgarian<br>Goshgarian and Associates PLC<br>23901 Calabasas Road, Suite<br>2073<br>Calabasas, CA 91302-1542 | Telephone: (818) 519-9000<br>Fax: (818) 591-0810<br>Email:<br>meskigian@gmlawplc.net<br>Email:<br>mgoshgarian@gmlawplc.net | Attorneys for Plaintiff, Vanguard Logistics Services (USA), Inc. |
| Adam P. Zaffos, Esq.<br>Fernald Law Group APC<br>15910 Ventura Blvd., Ste. 1702<br>Encino, CA 91436 | Telephone: (323) 410-0320<br>Facsimile: (323) 410-0330<br>Email:<br>adam@fernaldlawgroup.com | Attorneys for Groupage Services of<br>New England, LLC<br>Massachusetts limited<br>liability company |
| Darrell Payne, Esq. | Telephone: (305) 789-3200 | Attorneys for |

| Veronica de Zayas, Esq. Alejandro D. Rodriguez, Esq. Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. 150 W. Flagler Street Suite 2200 Miami, FL 33130 | Fax: 305-789-2650 Email: dpayne@stearnsweaver.com vdezayas@stearnsweaver.com arodriguez@stearnsweaver.com | Econocaribe Consolidators, Inc. |
|---|---|---|
| Bruce Wessel, Esq. Irell & Manella LLP 1800 Avenue of the Stars Suite 900 Los Angeles, CA 90067 | Telephone: (310) 203-7045 Email: BWessel@irell.com | Attorneys for Econocaribe Consolidators, Inc. |

X    (BY ELECTRONIC MAIL)  I caused the foregoing document to be served electronically by electronically mailing a true and correct copy through Irell & Manella LLP's electronic mail system to the e-mail address(es), as stated on the attached service list, and the transmission was reported as complete and no error was reported.

Executed on April 5, 2023, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


Brice A. Wessel
(bwessel@irell.com)
_____
(Type or print name)

/s/ Bruce A. Wessel
_____
(Signature)