## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANGUARD LOGISTICS SERVICES (USA) INC., Plaintiff, <br><br> v. <br><br> GROUPAGE SERVICES OF NEW ENGLAND, LLC, et al., Defendants. | CV 18-0517 DSF (GJSx) <br><br> Findings of Fact and Conclusions of Law After Court Trial |
| GROUPAGE SERVICES OF NEW ENGLAND, LLC, Counter-claimant, <br><br> v. <br><br> VANGUARD LOGISTICS SERVICES (USA) INC., Counter-defendants. | |

    This matter was tried to the Court on October 18-21, 2022. Having heard and reviewed the evidence, observed the credibility of the witnesses, and considered the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law.

# I. FINDINGS OF FACT[1,2]

## A. The Parties

1.     Plaintiff Vanguard Logistics Services (USA) Inc. (VLS) is a non-vessel operating common carrier, more commonly referred to as an NVOCC or an NVO, and is licensed with the Federal Maritime Commission (FMC).  Dkt. 189 (Pretrial Conference Order) at 3, Stipulated Facts ¶ 1.

2.     Defendant Econocaribe Consolidators, Inc. (ECU) is also an NVOCC licensed with the FMC and is a major competitor of VLS. Id. ¶¶ 2-3.

3.     Defendant Groupage Services of New England, LLC (NEG) is also a licensed NVOCC and has operated in the Boston and New England region for approximately 30 years.  Id. ¶ 4.

4.     NVOCCs generally arrange for shipments in containers that are used for intermodal transport (i.e., transfer from one mode of transportation to another).  NVOCCs commonly appoint agents throughout different geographical areas to provide sales and marketing services and support, promote their service offerings, serve as the local representation and the face of the NVOCC services, and handle the paperwork and transactions for shipments, including preparation of house bills of lading (HBLs) to be issued to shippers/customers.  Id. ¶¶ 5-6.

5.     NVOCCs issue paperwork, including the HBL, documenting its obligation to carry goods from origin to destination,

---

[1]  Any finding of fact deemed to be a conclusion of law is incorporated into the conclusions of law.  Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.

[2]  The parties submitted extensive evidentiary objections.  See Dkts. 235-245, 251, 256-262.  The Court declines to rule on each objection.  To the extent either party objected to evidence the Court relies on in this Order, the objection is overruled.

using primarily sea transit.  Cargo is also carried by rail, air, and truck.  To accomplish the physical handling and transport of goods, NVOCCs often hire third-party providers such as ocean carriers, rail carriers, air carriers. and motor truck carriers.  Id. ¶ 9.

6.  Some shipments require physical consolidation into the container at origin and deconsolidation of cargo from the containers at destination.  These consolidation/deconsolidation services are typically provided by a Container Freight Station (CFS).  Id. ¶ 10; Dkt. 194 at 4.  In various different markets, an NVOCC may own its own CFS; it may have a representative operate a CFS; it may use an independent CFS operator that accepts shipments from a variety of NVOs; or it may have a combination of some or all these options for each market.  Stipulated Facts ¶ 11.

7.  Boston Freight Terminal (BFT) operates a CFS warehouse in Boston and provides CFS services to different NVOCCs.  Id. ¶ 12.

8.  NEG was a representative agent for VLS and provided CFS services to VLS for many years.  Id. ¶ 13.

**B.  The Agency Agreement**

9.  Effective December 12, 2013, NEG and VLS entered into a contract entitled "Agency Agreement," relating to the New England region of the United States.  Id. ¶ 14; see Ex. 75 (Agreement).[3]

10.  The parties previously operated under an agency agreement that was effective April 17, 2008.  Stipulated Facts ¶ 16; see Ex. 27.

**1.  Scope of Work Provisions**

11.  Section 2.01(a) of the Agreement states: "NACA hereby appoints NEG as its representative for ocean exports and imports within the geographic region defined as the states Massachusetts,

---

[3] The Agreement refers to NACA Logistics (USA), Inc. (NACA).  See Agreement.  NACA did business as VLS.  See id.

Rhode Island, New Hampshire, Vermont and Maine. NACA reserves the right to instruct specific customers to book with an owned NACA office such as consignee controlled (or routed) cargo and/or corporate accounts."

12.     Section 2.01(b) states: "NEG hereby agrees to act exclusively as NACA's representative pursuant to section 2.0l(a) and agrees not to act as a representative for any other exporter and/or importer of goods or any other NVOCC without NACA's prior written consent."

13.     Article 4 of the Agreement addressed operations.

14.     Section 4.01 of the Agreement provides in part:

> On exports, NEG will attend to and be responsible for receiving cargo, packing of containers and stop-off trucks and control of paperwork and freight, ensuring that NACA's interests are protected at all times including, but not limited to:

> (a) arranging for containers to be loaded or cargo to be received and freight checked against the manifest at the time of container/stop-off container or truck loading;

> (b) not withstanding any other provision of this agreement, NEG shall at all times abide by NACA instructions received from any NACA employee regarding holding or releasing freight. This includes the release of import cargo not showing a full release, or the release of third party cargo without proper release documentation. . . .

> (c) attending to all necessary pre-carriage assignments as required, prior to the port or CFS of exit.

## 2.     Non-Compete Provisions

15.     Section 2.02(a) provides in relevant part:

During the term of this Agreement and thereafter for a period of one (1) year after termination of the Agreement, NEG shall not . . . (i) engage . . . in direct or indirect competition with the business of NACA located or operating within one hundred (100) miles of any facility of NACA, (ii) engage or participate in any effort or act to divert or take away or attempt to divert or take away, call on or solicit, or attempt to call on or solicit any customer (as to whom such employee had contact while an employee of NEG), employee or independent contractor of NACA . . . .

16.   Section 2.02(c) provides, in part:

The parties hereto agree that the duration and area for which the covenants in this Section 2.02 are to be effective are reasonable. In the event that any court finally determines that the time period or the geographic scope of any such covenant is unreasonable or excessive and any covenant is to that extent made unenforceable, the parties agree that the restrictions of this Section 2.02 shall remain in full force and effect for the greatest time period and within the greatest geographic area that would not render it unenforceable.

17.   Section 2.02(d) provides in part:

It is specifically agreed that the period of one (1) year stated above, shall be computed by excluding from such computation any time during which NEG or any of its employees is in violation of any provisions of this Section 2.02 and any time during which there is pending in any court of competent jurisdiction any action (including any appeal from any judgment) brought by any person, whether or not a party to this Agreement, in which action NACA seeks to enforce the agreements and covenants or their enforceability or seeks to avoid their performance or enforcement.

### 3.    Termination Provisions

18.    Section 3.03(a) states that the "Agreement shall continue in full force and effect unless either party terminates the Agreement pursuant to Section 3.03(b) or (c) as the case may be."

19.    Section 3.03(b) provides, in relevant part:

> NACA may terminate this Agreement either (i) at any time upon ninety (90) days prior written notice to NEG (such notice effective upon mailing) or (ii) upon written notice to NEG (such notice effective upon mailing) and the occurrence of any of the following events (an "Agent Default"):

> (A) NEG shall breach, default, fail to observe or violate any term, covenant or agreement contained in this Agreement[.]

20.    Section 3.03(c) provides:

> NEG may terminate this Agreement at any time upon ninety (90) days prior written notice to NACA (such notice effective upon receipt); provided that notwithstanding such termination, the obligations of NEG and its employees under Sections 2.02 ad [sic] 2.03 shall survive for a period of one (1) year after such termination.

### 4.    Accounting, Fees, and Commission Provisions

21.    Section 5.07 provides: "NEG hereby agrees that no claims shall be made against NACA for any discrepancy, fine, penalty, service or handling fee or any other item more than ninety (90) days following the end of each calendar quarter for such items occurring during each calendar quarter."

22.    Article 6 provides that NACA will pay NEG $250.00 per container or truck loaded by NEG and NEG is to refund NACA $25 "per IT import international shipments and $40 for 3rd party IPI shipments" for a maximum of $250.00 per trailer.  Section 6.03 also

provides "Export AIR: Effective December 1, 2013, 25% of the Net Profit on NACA/NEG File."

23. Section 7.01 addresses agency sales commissions:

NEG shall be paid 13% of the base ocean freight on all LCL export shipments booked by the NEG office in Holbrook, MA and assigned the NACA origin booking code "BOS" or similar designation in [sic] event NACA changes its system. This does not entitle NEG to the DDF, B/L fee, or 100% of the inland trucking profits. NEG shall retain 60% of the net profit of each FCL shipments booked by New England Groupage (net profit being defined as the gross revenue on the HB/L minus all direct transportation costs, marine insurance, agent handling fees, freight forwarder brokerage, claims, warehousing costs, DDF and BL Fee [sic] which are accrued to NACA, not NEG, etc.). NACA will pay NEG a commission of $5.00/CBM for any LCL NEG routings to the USA, except final destination Boston. Boston destination cargo receives no commission. The only exception to this is the existing Kravet Textile business for which VLS pays a 25% commission for all imports originating from anywhere except Italy. Italy originating business shall be based on a 15% commission. All NEG routed import FCL business will be commissionable at the same rate as export FCL business.

24. Section 7.03 of the agreement provides:

NEG recognizes that the above sales commission and agency fees articles are based on the premise that NEG will no longer issue its own HB/L without notification to NACA and written acknowledgement and authorization to do so, the traffic currently being run through the NEG system will now flow directly into the NACA system and will be shipped on a Brennan, Conterm or DCL HB/L and that NACA/NEG will work together on building direct services

7

ex. Boston on the export side and direct boxes to Boston on the import side in order to enhance profitability on all traffic. NACA reserves the right to amend the fee and commission structure down to 10% on the LCL export ocean shipments and a 50-50% net profit split on the FCL should the NEG business not materialize as forecast into[.]

25.   Section 7.05 provides: "NEG, through it's [sic] affiliate North American Terminals, will invoice to origin shippers a Pier Unloading Fee. There may be on occasion certain customers whereby NACA asked that this fee be waived for. On the basis that it is not consistent to the point of business disruption for NEG, NEG agrees to waive this charge from time to time or under special circumstances."

26.   The Agreement is to be governed by and construed in accordance with the laws of the State of California.  Agreement § 8.01.

27.   NEG eventually became dissatisfied with its relationship with VLS.  Stipulated Facts ¶ 15.  On April 24, 2015, Joseph Meunier, CEO of NEG, emailed David Sanchoyerto, Chief Operating Officer of VLS, and Mike Meierkort of VLS expressing concerns and issues related to working with VLS's management team in New Jersey.  See Ex. 3080.

28.   On July 21, 2015, representatives from NEG and VLS attended a meeting.  After the meeting, David Sanchoyerto circulated meeting minutes.  Stipulated Facts ¶ 15; see Ex. 3077.

## C.  Communications Between NEG and ECU

29.   At the end of 2015, Meunier was in contact with Tim Tudor and John Abisch of ECU.[4]  Among the topics discussed was NEG's

---

[4] Tim Tudor was formerly the COO of VLS.  Dkt. 228 (Tudor Depo.) 17:9-13, 18:21-23.  He began working at ECU in 2010.  Id. at 57:17-58:5.  At the time of his deposition on April 30, 2021, Tudor was the CEO of ECU, id. at 15:23-25, a position he had held since January 1, 2019, id. at 58:6-7.  Abisch was

dissatisfaction with VLS, and the possibility of NEG ending its agreement with VLS and entering into an agreement with ECU. Stipulated Facts ¶ 17.

30.    On October 31, 2016, NEG's then counsel, Casner & Edwards, prepared a research memorandum directed to Meunier (Legal Opinion).  Id. ¶ 18; Ex. 21.  The memorandum addressed the enforceability of the non-compete provision in the Agreement and opined that Cal. Bus. & Prof. Code § 16600 is "a blanket prohibition against non-competes and there is no exception for narrowly drafted or reasonable clauses."  Ex. 21 at 2.

31.    In November 2016, NEG sent the Legal Opinion and an unsigned copy of the Agreement to ECU.  Stipulated Facts ¶¶ 19-20.

32.    Both ECU and NEG lawyers concluded that the post-termination non-compete provisions in the Agreement were not valid and not enforceable under California law.  Id. ¶ 21.

33.    In August 2017, NEG and ECU began communicating about a possible new agency agreement and financial terms for NEG to become ECU's representative in Boston.  Id. ¶ 23.

**D. Termination of the Agency Agreement**

34.    In June 2017, Karl Laufer, VLS's Regional VP for the East Coast, see Dkt. 206 (Laufer Decl.) ¶ 1, reached out to Meunier, copying Hal Donahue, VLS's Regional Managing Director – Americas, see Dkt. 204 (Donahue Decl.) ¶ 2, and Richard Haddock and Carl Volpe of VLS, in an email with the subject "IPI loads to Boston – CFS refund."  Ex. 3078.  Laufer wrote, "We've been finding we have some very big monthly losses on our Import IPI cargo we send up to Boston. . . . I've reviewed the current agreement with NEG in regards to the IPI refund and it's a bit out of the current market levels. Would it be agreeable to increase the refund back to

---

the Regional CEO for North America, Central America, and the Caribbean for ECU.  Dkt. 217 (Abisch Decl.) ¶ 3.  He left ECU in 2019.  Id.

VLS to $45 per HB/L, and remove any per trailer maximum levels?"
Id. at 2.  Meunier replied in part, "We cannot accept this increase.
Since this is operational costs it needs to be passed along to the
import customers."  Id. at 1.

35.     In August 2017, VLS began talking to BFT about its Boston
CFS warehousing rates.  Stipulated Facts ¶ 22.

36.     On October 11, 2017, Donahue emailed Laufer copying
Sanchoyerto asking, "What do we do with Boston? He won't
negotiate unless we pull some business. What can we do on the
imports? I sent you an email a few weeks ago. When we factor in the
cost of sales staff, the loss of NEG's routed business and the loss of
Kravet, we lose by dropping NEG[.]"  Ex. 182 at 3.  Sanchoyerto
replied, "Another approach could be to speak with Joe and advise
that we have considered/reviewed alternatives in Boston which
provide more favorable results for VLS. That may push him to
renegotiate the agreement. . . ."  Donahue replied, "We can only
speak with Joe if we have an alternative to act. He is not rationale
and won't come to the table unless we act."  Id. at 1.

37.     VLS wanted Meunier to renegotiate the Agreement.
Meunier would not agree to the terms VLS wanted, so VLS sought
an alternative, moving the import CFS business to BFT.  See Ex.
182; Tr. 176:2-177:17.[5]

38.     On November 22, 2017, Donahue wrote to Charles
Brennan, CEO of VLS, see Dkt. 202 (Brennan Decl.) ¶ 2:

> We are ready to move our imports to Boston away from
> New England Groupage to Boston Freight Terminals
> effective December 1st. Karl negotiated a deal with them
> that doubles our CFS refund from USD25/HBL to
> USD50/HBL and removes the 10HBL max per trailer that

---

[5] All references to "Tr." refer to the trial transcripts at docket numbers 268-
71.

> Joe refused to discuss. . . . We are only moving the imports
> and plan to keep the exports with NEG.

Ex. 2013 at 1-2.

39.    On November 22, 2017, Brennan authorized Donahue to
move VLS's import CFS business in the New England region from
NEG to BFT.  Brennan Decl. ¶ 19.

40.    On November 27, 2017, VLS advised NEG orally that it
intended to discontinue using NEG's CFS services for import
shipments by the end of the year.  NEG expressed its objections to
VLS that this was a violation of the Agreement.  VLS expressed its
disagreement and stated that such a move would not affect NEG's
appointment to provide Agent Services under the Agreement.
Stipulated Facts ¶ 24.

41.    Between December 1 and 6, 2017, NEG sent emails to VLS
contending, among other things, that VLS's intention to change its
import CFS to BFT violated the Agreement.  Id. ¶ 25.

42.    On or about December 11, 2017, VLS sent a notice to its
customers about the CFS change.  Id. ¶ 26; Ex. 91.  The notice
stated in part: "To ensure our customers have the best network of
CFS stations to deliver their export cargo to, and pick up their
import cargo from; we have taken a major step toward finalizing our
USA domestic platform. We are excited to announce the following
change to our program which will ensure one CFS point no matter if
the IPI is coming from LAX or NYC."  Ex. 91.  The notice did not
mention NEG.  Stipulated Facts ¶ 27; Ex. 91.

43.    Based on the advice of counsel, NEG believed that VLS's
December 11, 2017 notice constituted a breach of the Agreement and
Meunier believed that the Agreement was no longer valid.
Tr. 465:22-466:5, 553:14-554:16, 556:4-9.

44.    Meunier informed ECU that VLS had violated the
Agreement and that NEG could terminate the Agreement; ECU
relied on NEG for this determination.  Dkt. 217 (Abisch Decl.) ¶ 31.

45.    After VLS sent its December 11, 2017 notice, ECU coordinated with NEG to prepare for the possibility that VLS would cut off NEG's access to VLS's computer networks after NEG sent its termination letter to VLS.  Id. ¶ 32; Dkt. 225 (Meunier Decl.) ¶ 87.

46.    On December 13, 2017, Abisch sent to NEG a Memorandum of Understanding (MOU) that set out the key terms for ECU and NEG's relationship.  Ex. 61.

47.    On or about December 14, 2017, VLS sent another notice to its customers.  Stipulated Facts ¶ 28.  The notice stated: "Vanguard is again moving forward to ensure our customers have the best network of CFS stations to pick up their import cargo from; we have taken a major step forward in finalizing our USA domestic platform. We are excited to announce the following change to our import program which will ensure there is one CFS point no matter if the IPI is coming from LAX or NYC Gateways."  Ex. 92.

48.    By December 15, 2017, NEG sent ECU a draft of its VLS termination letter.  Stipulated Facts ¶ 29.

49.    On December 15, 2017, Abisch sent an e-mail to a senior home office representative for ECU in India regarding finalizing ECU's relationship with NEG.  Id. ¶ 30; see Ex. 62.

50.    On December 18, 2017, Abisch emailed Meunier about a $50,000 advance ECU had approved for NEG "effective within 3 business days" after they began cooperation "and another 50k advance 21 days later."  Ex. 64; Stipulated Facts ¶ 31.

51.    On December 20, 2017, Meunier sent Abisch and others at ECU a draft of a notice to customers regarding the end of NEG's relationship with VLS and NEG's partnership with ECU.  Ex. 84.

52.    ECU had its IT Vice President and a Training and Development representative at NEG's offices beginning between December 19-20, 2017.  A few ECU email addresses were set up for some NEG employees, but no one from NEG was provided access to

ECU's computer systems or software.  Stipulated Facts ¶ 32; Abisch Decl. ¶ 32.

53.   NEG had no intention of running VLS's and ECU's systems at the same time.  The two systems never operated simultaneously, and NEG could not use ECU's systems until ECU gave it access. Meunier Decl. ¶ 88.

54.   On December 21, 2017, Michael Fencer, counsel for NEG, emailed a letter to VLS.  Stipulated Facts ¶ 33; Ex. 89A.  The letter stated in relevant part:

> NEG hereby gives notice that Vanguard is in material breach of the Agreement based upon, *inter alia*, Vanguard's abrupt and unilateral relocation of its import Container Freight Station ("CFS") in Boston to Boston Freight Terminals, and its abrupt and unilateral notification to third parties of the same, notably concerning both imports and exports . . . . As you know, Vanguard's utilization of NEG's facility for both imports and exports is both an express, and a material term of the Agreement, which term is also evidenced by the parties' longstanding course of performance. Since NEG receives no commission on imports terminating in Boston, but relies on warehouse revenue in lieu of such a commission, the warehousing that Vanguard unilaterally terminated was a material benefit of the NEG bargain under the Agreement. Based upon Vanguard's material breach, NEG hereby terminates the Agreement in all respects, and will no longer accept newly ordered Vanguard exports at its facility.

Ex. 89A.

55.   On December 21, 2017, Terry Groff, counsel for VLS responded with a letter to counsel for NEG.  Stipulated Facts ¶ 34; Ex. 1020.  The letter stated in relevant part:

You are incorrect that Vanguard materially breached the Agreement. First, there is nothing in the Agreement which states that "Vanguard's utilization of NEG's facility for both imports and exports" is a material term of the Agreement. While NEG explicitly agreed to act exclusively as Vanguard's representative under Section 2.01(b) of the Agreement, there is no corresponding provision that requires Vanguard to exclusively use NEG's services. (See Section 2.01(a)). In addition, there is nothing in the Agreement stating that Vanguard cannot use another agent to provide CFS services for imports in New England or that doing so is a material breach of the Agreement.

Further . . . NEG does not have any right to terminate the Agreement except by providing ninety (90) days' prior written notice to Vanguard. (Section 3.03(c)). . . . In fact, by rejecting Vanguard shipments and by "terminating" the Agreement without providing ninety days' notice, NEG has materially breached the Agreement . . . .

Further, NEG is to discontinue printing or issuing any Vanguard brand bills of lading.

Ex. 1020.

56.     On December 21, 2017, after VLS received the notice from NEG, VLS terminated NEG's access to VLS's VPN, computer systems, and network, and cut off NEG's access to emails directed to NEG through any VLS email address.  Stipulated Facts ¶ 35.

57.     On December 21, 2017, after VLS received the notice from NEG, VLS sent out another notice to customers advising that BFT would be providing CFS services for VLS effective December 21, 2017.  Ex. 93; Stipulated Facts ¶ 37.

58.     VLS continued to have business with some companies located in the New England region after December 21, 2017.  Stipulated Facts ¶ 42.

59.    On December 22, 2017, counsel for NEG and counsel for VLS exchanged further letters.  Id. ¶ 43; Exs. 1021, 1022.

60.    NEG and ECU would have been able to legally discuss the possibility of doing business together while the Agreement was still in effect if NEG and ECU had done so in a manner consistent with NEG's duties under the Agreement and applicable law.  Stipulated Facts ¶ 46.

61.     VLS's customers had the right to choose to move their business from Vanguard to NEG and ECU.  Id. ¶¶ 47-48.

62.    On March 23, 2018, VLS paid $27,600.35 to NEG for what it contended was the net reconciliation balance with NEG.  Id. ¶ 51.

63.    ECU and NEG formally entered into a Services Agreement on May 11, 2018.  Ex. 72.

## II. CONCLUSIONS OF LAW[6]

64.    This Court has jurisdiction over the parties and the subject matter of this litigation.  28 U.S.C. §§ 1332-33.

65.    This district is the proper venue for this litigation pursuant to 28 U.S.C. §§ 1391(a)(2), (b)(2).

66.    California law governs and applies to the interpretation of the Agreement because of the choice of law provision contained in the Agreement.  See Agreement § 8.01.

67.    "The interpretation of a contract is a judicial function. . . . In engaging in this function, the trial court give[s] effect to the mutual intention of the parties as it existed at the time the contract was executed. . . . Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the

---

[6] VLS argues in closing that it is entitled to judgment on NEG's third of cause of action for intentional interference with contractual relations.  See Dkt. 276 at 21.  NEG does not address this claim in its briefing.  See Dkts. 279 at 10-12, 280 at 23-34.  The Court concludes that NEG has abandoned this claim.

contract's terms." Brown v. Goldstein, 34 Cal. App. 5th 418, 432 (2019) (internal quotation marks and citation omitted); see Cal. Civ. Code §§ 1636, 1639; Int'l Bhd. of Teamsters v. NASA Servs., Inc., 957 F.3d 1038, 1042 (9th Cir. 2020) ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . .") (citations omitted).

68.    "A [contract] provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." Int'l Bhd. of Teamsters, 957 F.3d at 1044 (quoting MacKinnon v. Truck Ins. Exch., 31 Cal.4th 635, 648 (2003)); see Cal Civ. Code § 1641. "[C]ourts will not strain to create an ambiguity where none exists." Int'l Bhd. of Teamsters, 957 F.3d at 1044 (quoting Waller v. Truck Ins. Exch., Inc., 11 Cal.4th 1, 18-19 (Cal. 1995), as modified on denial of reh'g (Oct. 26, 1995)). "Nor is the language of a contract made ambiguous simply because the parties urge different interpretations." Id. (simplified).

69.    "Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning." Morey v. Vannucci, 64 Cal. App. 4th 904, 912 (1998) (citations omitted). "Extrinsic evidence is thus admissible to interpret the language of a written instrument, as long as such evidence is not used to give the instrument a meaning to which it is not reasonably susceptible. Where the interpretation of contractual language turns on a question of the credibility of conflicting extrinsic evidence, interpretation of the language is not solely a judicial function. . . . it is the [trier of fact's] responsibility to resolve any conflict in the extrinsic evidence properly admitted to interpret the language of a contract." Id. at 912-13 (citations omitted).

70.    "The interpretation of a contract involves 'a two-step process: First the court provisionally receives (without actually

admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step – interpreting the contract." <u>Brown</u>, 34 Cal. App. 5th at 432-33 (citations omitted).

71.    "If a contract is capable of two constructions courts are bound to give such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect . . . . In sum, courts must give a reasonable and commonsense interpretation of a contract consistent with the parties' apparent intent." <u>Id.</u> at 438 (simplified).

## A.  VLS's First Cause of Action: Breach of Contract

72.    VLS is required to establish, by a preponderance of the evidence, every element of its claim for breach of contract.  <u>See</u> <u>In re Exxon Valdez</u>, 270 F.3d 1215, 1232 (9th Cir. 2001) ("The standard of proof generally applied in federal civil cases is preponderance of evidence").

73.    "[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." <u>Oasis West Realty, LLC v. Goldman</u>, 51 Cal.4th 811, 821 (2011).

74.    VLS asserted that NEG breached the Agreement by terminating it without providing 90 days' written notice and entering into a secret agreement with ECU while the Agreement was still in force.

75.    The first element is satisfied.  The Agreement was a contract between VLS and NEG.

### 1. Termination Without 90 Days' Written Notice

76.    The Agreement gave VLS and NEG each the right to
terminate at any time on 90 days' prior written notice.  See
Agreement § 3.03.  It also gave VLS the right to terminate on
written notice to NEG – effective on mailing – and the occurrence of
certain events.  Id. § 3.03(b); Call v. Alcan Pac. Co., 251 Cal. App. 2d
442, 447 (1967) ("A contract may contain a valid provision giving one
or the other party an option to terminate it on specified conditions.").

77.    NEG's right to terminate on 90 days' written notice was not
conditioned on the occurrence of certain events.  See Estate of Jones,
82 Cal. App. 5th 948, 953 (2022) ("A 'condition precedent is either an
act of a party that must be performed or an uncertain event that
must happen before the contractual right accrues or the contractual
duty arises.' Conditions precedent may be created either expressly –
by words such as 'subject to' or 'conditioned upon' – or impliedly.
Courts will not interpret a provision as a condition precedent absent
clear, unambiguous language requiring that construction.")
(citations omitted).

78.    NEG contends VLS materially breached the Agreement by
failing to provide 90 days' notice of VLS's intent to switch CFS
services to BFT, and VLS's breach preceded NEG's alleged breach,
thereby excusing NEG's breach.

79.    VLS contends it was free to use whatever CFS was in its
best financial interest, and the Agreement did not give NEG the
exclusive right to provide CFS services to VLS.

80.    The Court therefore considers whether the Agreement
granted NEG the exclusive right to provide CFS services to VLS,
and whether VLS's decision to switch its import CFS services to BFT
and failure to provide 90 days' notice of the change constituted a
material breach of the Agreement.

81.    The Agreement provides that VLS appointed NEG as its
representative and NEG agreed to act "exclusively" as VLS's

18

representative in the region.  Agreement §§ 2.01(a), (b).  The
Agreement primarily restricted the rights and activities of NEG, not
VLS.  See id. §§ 2.01(b), 4.01(b), 7.03.

82.    Section 1.04 states: "NEG declares that it possesses the
financial and physical resources to represent NACA's interest in all
matters set forth hereunder and desires to represent NACA on the
terms and conditions set forth herein."  "NEG declares that it is an
NVOCC and that it holds a valid OTI/NVOCC license issues by the
FMC[.]"  Id.

83.    Section 2.01 states: "NACA hereby appoints NEG as its
representative for ocean export and imports . . ." and "NEG hereby
agrees to act exclusively as NACA's representative . . . and agrees
not to act as a representative for any other exporter and/or importer
of goods or any other NVOCC . . . ."

84.    The Agreement provides that NEG "will attend to and be
responsible for receiving cargo, packing of containers and stop-off
trucks and control of paperwork and freight, ensuring NACA's
interests are protected at all times including, but not limited to: (a)
arranging for containers to be loaded or cargo to be received and
freight checked against the manifest at the time of container/stop-off
container or truck loading[.]"  Agreement § 4.01.

85.    The Agreement also provides that VLS would pay NEG for
CFS services: "NACA will pay NEG $250.00 per container or truck
loaded by NEG."  Agreement § 6.01.

86.    It is unclear from these provisions whether NEG agreeing
to act exclusively as VLS's representative included the provision of
CFS services.  The Agreement's provisions are capable of two or
more constructions.  Int'l Bhd. of Teamsters, 957 F.3d at 1044.

87.    The Court finds, based on the evidence, that NEG had been
performing CFS services for VLS for years through its own CFS
facility and its affiliate, North American Terminals.  See Stipulated
Facts ¶ 13; Brennan Decl. ¶ 14; Meunier Decl. ¶¶ 6, 13.  The parties

were aware that NEG operated its own CFS facility and arranged CFS services for VLS.  See Ex. 25; Ex. 3077; Tr. 182:5-16, 392:22-393:2; Meunier Decl. ¶ 13; Brennan Decl. ¶ 14.

88.     The parties presented evidence that CFS services were not the same as agent services.  See Meunier Decl. ¶¶ 7-9; Brennan Decl. ¶ 9; Abisch Decl. ¶¶ 4-7, 10-11.  Sanchoyerto testified that the Agreement was not exclusive with respect to CFS services and that CFS services were separate from the exclusive agency services specified in the Agreement.  Tr. 246:2-247:9.  David Peters, General Manager of NEG, also testified that the invoicing structure for agent services was different from that for CFS services.  Tr. 660:15-661:11.

89.     The Court finds, based on the evidence, that the Agreement contemplated that NEG would provide CFS services, but CFS services were not the same as agent services.

90.     The critical issue, however, is whether NEG had the exclusive right to provide CFS services such that VLS's change in its CFS service provider constituted a breach of the Agreement.  As to this issue there is no ambiguity. While the Agreement clearly contemplated the provision of CFS services, it did not explicitly or implicitly grant NEG the exclusive right to provide CFS services to VLS, nor did it explicitly or implicitly require VLS to give NEG 90 days' notice about its decision to switch CFS service providers.  See Agreement §§ 4.01, 6.01, 7.01, 7.05; see also Tr. 82:3-10, 82:19-83:3, 84:7-15, 633:12-634:6; Ex. 3078.

91.     The Agreement never used the word "exclusively" to refer to anything except NEG's agreement to act as VLS's agent.  If the parties had intended to limit VLS, they would have used similar language with respect to VLS.

92.     The Court finds that the Agreement did not require VLS to provide NEG with 90 days' notice of its intent to switch import CFS services to BFT, nor did it require VLS to maintain CFS services with NEG.

20

93.     Further, VLS submitted testimony that it did not consider its decision to switch import CFS services to BFT as terminating the Agreement.  See Ex. 94.

94.     Meunier testified that he intended to terminate the Agreement on December 21, 2017.  Tr. 590:12-19.  He further testified that ECU's system became operational some time the same day.  Tr. 590:20-23.

95.     VLS's decision to make the CFS change and failure to provide NEG with 90 days' notice did not constitute a material breach of the Agreement nor did it terminate the Agreement.  VLS's emails to customers also did not constitute a breach of the Agreement.  VLS's conduct did not excuse NEG's failure to provide 90 days' notice.

96.     VLS was allowed to terminate the Agreement on 90 days' written notice in the event NEG breached it.  It did not create the same right for NEG.  Id. § 3.03(c); Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC, 185 Cal. App. 4th 1050, 1064 (2010) ("Th[e] provision must be given effect, and we cannot read it out of the [agreement] simply because one party feels its operation was harsh or unfair.").

97.     NEG's December 21, 2017 letter to VLS improperly terminated the Agreement.

98.     NEG's failure to provide VLS with 90 days' written notice of its intent to terminate the Agreement was a breach of the Agreement.  See Agreement § 3.03(c).

**2.     Agreement with ECU[7]**

99.     Section 2.02(a) provides, in relevant part: "During the term of this Agreement . . . NEG shall not . . . (i) engage, as an agent . . . of any business selling products or services in direct or indirect

---

[7] VLS does not base its claim on any post-termination conduct.  See Dkt. 153 (Order) at 11 n.4.

competition with the business of NACA located or operating within one hundred (100) miles of any facility of NACA."  Agreement § 2.02(a).  It also provides that NEG shall not "engage or participate in any effort or act to divert or take away or attempt to divert or take away . . . any customer (as to whom such employee had contact while an employee of NEG)" of VLS.  Id.

100.   Section 2.01(b) provides that NEG agrees to act exclusively as VLS's representative and "agrees not to act as a representative for any other exporter and/or importer of goods or any other NVOCC without [VLS]'s prior written consent."

101.   The parties did not submit evidence regarding the meaning of the word "engage" in the Agreement.  Therefore, the Court interprets its meaning.

102.   Black's Law Dictionary defines "engage" as "[t]o employ or involve oneself; to take part in; to embark on."  Engage, Black's Law Dictionary (11th ed. 2019).  The Court finds the definition "to employ or involve oneself" is most consistent with the overall purpose of the Agreement, which was for NEG to act "exclusively" as VLS's representative and for NEG "not to act as a representative for any other exporter and/or importer of goods or any other NVOCC without [VLS]'s prior written consent."  See Agreement § 2.01(b).

103.   The parties introduced documentary and testimonial evidence regarding whether NEG acted as a representative or engaged as an agent of ECU while it was VLS's exclusive agent.

104.   The evidence establishes that NEG and ECU were in communication about potentially working together between the end of 2015 and December 21, 2017.

105.   The evidence establishes that NEG and ECU were preparing for NEG to become ECU's agent while the Agreement was still in effect and planned for NEG to become ECU's agent after NEG terminated the Agreement.

106.   Between December 11, 2017 and December 21, 2017, Abisch sought internal approval to move forward with NEG as ECU's agent; NEG and ECU exchanged a draft of a redlined MOU regarding their relationship going forward; ECU provided NEG with laptops and computer training, and set up ECU email addresses for certain NEG employees in anticipation of VLS's decision to cut off NEG's access to VLS's computer systems after NEG provided VLS with its termination letter.

107.   The evidence does not establish that NEG had access to ECU's computer system, that NEG was booking business for ECU, or that ECU provided a loan to NEG prior to December 21, 2017.

108.   Although Meunier's ECU email had been set up by December 20, 2017 and his signature indicated that NEG was ECU's agent, see Ex. 84, there is no evidence that Meunier emailed customers from that email address or that NEG held itself out as ECU's representative prior to December 21, 2017.

109.   VLS has not established by a preponderance of the evidence that NEG engaged as an agent of ECU or acted as ECU's representative prior to December 21, 2017.  NEG's conduct did not constitute a breach of section 2.02(a) or section 2.01(b) of the Agreement.

### 3.   Causation

110.   "[T]o support an action at law for breach of contract, the plaintiff must show it has suffered damage." Emerald Bay Cmty. Ass'n. v. Golden Eagle Ins. Corp., 130 Cal. App. 4th 1078, 1088 (2005).  "Implicit in the element of damage is that the defendant's breach caused the plaintiff's damage. . . . Causation of damages in contract cases requires that the damages be proximately caused by the defendant's breach." Troyk v. Farmers Grp., Inc., 171 Cal. App. 4th 1305, 1352 (2009).

111.   "'Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's

breach, and that their causal occurrence be at least reasonably certain.' A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage." U.S. Ecology, Inc. v. State of California, 129 Cal. App. 4th 887, 909 (2005) (citations omitted).  "The term 'substantial factor' has no precise definition, but 'it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.'" Id.; see also City of Modesto v. Dow Chem. Co., 19 Cal. App. 5th 130, 156 (2018) ("[A] force which plays only an infinitesimal or theoretical part in bringing about injury, damage, or loss is not a substantial factor, but a very minor force that does cause harm is a substantial factor.") (simplified) (citation omitted).

112.   VLS introduced evidence that it was harmed by NEG's failure to provide 90 days' notice.

113.   VLS presented evidence that the purpose of the 90-day notice period was to give the party receiving notice of the termination a reasonable opportunity to protect its interests and to allow for an orderly transition among the parties, and their customers and vendors.  Dkt. 205 (Howard Decl.) ¶ 35d; Dkt. 248 (Abisch Dep.) 75:7-76:1.  During the 90-day period, the agent is supposed to continue to act on behalf of the principal.  Howard Decl. ¶ 35d; see Tr. 367:14-368:3.

114.   Howard declared that NEG's failure to provide 90 days' notice deprived VLS of the time and opportunity to take steps to protect itself and maintain its customer relationships in the Boston market.  Howard Decl. ¶ 32; Tr. 367:9-13, 386:17-387:10.  Brennan testified that after December 2017, VLS was at a disadvantage and could not compete in the market.  Tr. 153:19-154:11.  He testified that VLS did not have the time to go to recruiters or get management into the Boston region to hire people.  Tr. 154:12-17.

115.   Laufer reviewed VLS's sales performance – comparing NEG's efforts in 2017 against VLS's 2018 efforts – and found that Boston LCL exports or cargo delivered to the Boston warehouse,

went from 12,101 cbms (cubic meters) in 2017, to 8,024 cbms in 2018. The Boston FCL export bookings went from 1,081 in 2017 to zero in 2018. And the BOS LCL export bookings, defined as NEG booked cargo, went from 12,095 cbms in 2017 to 368 cbms in 2018. Laufer Decl. ¶ 18.

116.   VLS has established causation by a preponderance of the evidence.

### 4.   Damages

117.   "Damages awarded to an injured party for breach of contract 'seek to approximate the agreed-upon performance.' The goal is to put the plaintiff 'in as good a position as he or she would have occupied' if the defendant had not breached the contract. In other words, the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain." Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School Dist., 34 Cal.4th 960, 967-68 (2004) (citations omitted).

118.   "The injured party's damages cannot, however, exceed what it would have received if the contract had been fully performed on both sides. This limitation of damages . . . 'serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise.'" Id. at 968 (citations omitted); see Cal. Civ Code § 3358.

119.   "Contractual damages are of two types – general damages (sometimes called direct damages) and special damages (sometimes called consequential damages)." Lewis Jorge, 34 Cal.4th at 968.

120.   Under California law, the measure of direct damages for breach of contract is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby[.]" Cal. Civ. Code § 3300. "General damages are often characterized as those that flow directly and necessarily from a breach of contract, or that are a natural result of a breach. Because general damages are a natural and necessary consequence of a contract breach, they are

often said to be within the contemplation of the parties, meaning that because their occurrence is sufficiently predictable the parties at the time of contracting are 'deemed' to have contemplated them." Lewis Jorge, 34 Cal.4th at 968 (citations omitted).

121.   Consequential damages "are those losses that do not arise directly and inevitably from any similar breach of any similar agreement. Instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties." Id.  "Special damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test)." Id. at 968-69.

122.   "Lost profits may be recoverable as damages for breach of a contract. The general principle is that damages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent." Sargon Enters., Inc. v. Univ. of S. Cal., 55 Cal.4th 747, 773-74 (2012) (simplified).

123.   "Such damages must be proven to be certain both as to their occurrence and their extent, albeit not with mathematical precision." Id. at 774 (internal quotation marks omitted). "Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits." Id.  "A reasonable certainty only is required, not absolute certainty." Id. at 775.  But lost profits cannot be uncertain, hypothetical, and entirely speculative. See id.; Greenwich S.F., LLC v. Wong, 190 Cal. App. 4th 739, 743 (2010).

124.   VLS seeks lost profit damages plus pre-judgment interest in the amount of $6,967,863, for a 10-year period, from 2018 to 2027 resulting from NEG's failure to provide 90 days' notice to terminate the Agreement and failure to abide by the non-compete provisions in section 2.02(a).

125.   VLS's damages expert, Dr. Barbara Luna, calculated VLS's lost profits based on the historical net profits VLS received from LCL and FCL ocean export shipments under the Agreement with NEG from 2014 through 2017.  See Ex. 193 (Updated Luna Report) at 7; Dkt. 201 (Luna Decl.) ¶ 13.

126.   VLS argued that the terms of the Agreement put NEG on notice reasonably to expect damages far in excess of 90 days because NEG never gave VLS proper notice of termination.  VLS points to sections 3.03(a) and 3.03(c) of the Agreement as requiring NEG not to compete with it during the term of the Agreement plus an additional 12 months after proper termination.

127.   Section 3.03(c) provides:

> NEG may terminate this Agreement at any time upon ninety (90) days prior written notice to NACA (such notice effective upon receipt); provided that notwithstanding such termination, the obligations of NEG and its employees under Sections 2.02 ad [sic] 2.03 shall survive for a period of one (1) year after such termination.

128.   VLS argued that NEG's ability to terminate on 90 days' written notice was conditioned on NEG honoring the non-compete in section 2.02 for a one-year period after termination, and to this date, NEG has failed to terminate the Agreement in accordance with section 3.03(c), therefore, VLS's damages continue to accrue.

129.   VLS attempts to support this theory with a request for a judicial declaration that NEG was prohibited from competing against VLS for one year following termination of the Agreement. VLS does not cite any caselaw to support its position that a declaratory judgment must impact the damages to which it is entitled for a breach of contract claim.

130.   VLS's breach of contract claim is not based on NEG's alleged breach of the non-compete provisions in the Agreement.

131.   VLS did not pursue a breach of contract claim for failure to honor the post-termination non-compete provision, see Dkt. 97 (SAC) ¶ 32, and the Court has not made a finding that NEG's conduct constituted a breach of the Agreement's one-year non-compete provision.

132.   VLS may recover damages limited to the scope of NEG's breach of the contract – NEG's failure to provide 90 days' notice. Applied Equip. Corp. v. Litton Saudi Arabica Ltd., 7 Cal.4th 503, 515 (1994) ("Contract damages seek to approximate the agreed-upon performance. In the law of contracts the theory is that the party injured by breach should receive as nearly as possible the equivalent of the benefits of performance.") (internal quotation marks and citation omitted).

133.   Even if VLS had pleaded that NEG's conduct violated the post-termination non-compete provision and constituted a breach of the Agreement, VLS fails to explain why NEG's failure to terminate the agreement in accordance with section 3.03(c) would merit recovery of damages through 2027.  Such damages are speculative and unreasonable.

134.   It is unreasonable for VLS to base its damages calculations on the assumptions that NEG would continue with the Agreement with VLS through 2027, see Updated Luna Report at 8, and that VLS's profits would continue to be about the same, factoring in an annual rate of growth, see Tr. 282:12-284:21.

135.   VLS presented no evidence indicating that NEG would have continued to act as VLS's agent in the Boston area through 2027.  VLS presented no evidence that in the event that NEG had properly terminated the Agreement, VLS's profits would have stayed at the same or a similar level.

136.   Rather, VLS presented evidence that the Boston market is parochial and close-knit, and customers in the region are generally unwilling to do business with NVOCCs that do not demonstrate a commitment to a physical office presence in the area.  Howard Decl.

¶ 31.  NEG had been the physical face of VLS in the Boston region. Id.; Brennan Decl. ¶ 24.  VLS did not have a physical presence in the Boston region.  See Howard Decl. ¶ 31; Tr: 393:13-22.  There were no other viable options for agents for VLS at the time.  Tr. 374:8-375:12, 375:18-376:3.

137.   The parties also stipulated that VLS's customers had the right to choose to move their business from VLS to ECU and NEG. Stipulated Facts ¶¶ 47-48.

138.   It was not reasonable to calculate VLS's lost profits on the assumption that VLS's profits from the region would have been the same or similar to its profits prior to NEG's termination of the Agreement.

139.   Dr. Luna calculated damages on an annual and cumulative basis.  Luna Decl. ¶ 26.  She calculated lost profit damages for two scenarios, one calculating total lost profits, and the other calculating lost profits considering mitigation based on profits VLS continued to receive on FCL and LCL export shipments from shippers that continued to do business with VLS after NEG terminated the Agreement.  Updated Luna Report at 8-9.

140.   The Court relies on Dr. Luna's calculation of VLS's lost profits considering mitigation because VLS continued to receive a profit from certain shippers.  See Updated Luna Report, Ex. 1, Schedule 1B.  This figure provides the most reasonable estimate of VLS's profits had NEG provided a proper notice of termination and continued to act as VLS's agent for a 90-day period.

141.   Schedule 1B shows that Dr. Luna calculated VLS's total cumulative lost profits for 2018, including prejudgment interest, as $755,550.  See id.  Because NEG terminated the Agreement on December 21, 2017, close to the beginning of 2018, and the 90-day period following a proper notice of termination would have extended into March 2018, the Court relies on the $755,550 figure to calculate VLS's damages.

142.   The Court divides $755,550 by 365 to determine VLS's daily lost profits for 2018: $2,070.  VLS's 90-day lost profits total $186,300.

## B.  VLS's Second & Third Causes of Action: Breach of Fiduciary Duty and Breach of Duty of Loyalty

143.   "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages." Oasis, 51 Cal.4th at 820.

144.   "The elements of a cause of action for breach of a duty of loyalty, by analogy to a claim for breach of fiduciary duty, are as follows: (1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach." Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 410 (2007).

145.   "The duty of loyalty arises not from a contract but from a relationship – here, the relationship of principal and agent." Id. at 410-11.  "Where such a relationship arises, the agent assumes 'a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship.'" Id. at 411 (quoting Restatement (Third) of Agency § 8.01 (Am. L. Inst. 2006)); see Engalla v. Permanente Medical Grp., Inc., 15 Cal.4th 951, 977 (1997) ("An agency relationship is a fiduciary one, obliging the agent to act in the interest of the principal.").

146.   "The duty of loyalty embraces several subsidiary obligations, including the duty 'to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors[,]' the duty 'not to acquire a material benefit from a third party in connection with . . . actions taken . . . through the agent's use of the agent's position[,]' and the duty 'not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party.'" Huong Que, Inc., 150 Cal. App. 4th at 416 (quoting Restatement (Third) of Agency §§ 8.04, 8.02, 8.05(2)).

147.   "In California, principal-agent relationships give rise to a fiduciary duty and duty of loyalty on the part of the agent." Mendoza v. Cont'l Sales Co., 140 Cal. App. 4th 1395, 1398 (2006). The Court found that based on the Agreement, an agency relationship existed between NEG and VLS, as NEG acted as VLS's agent, and therefore NEG owed VLS a fiduciary duty and a duty of loyalty.  Dkt. 153 (MSJ Order) at 13.  The first element of each claim is satisfied.

148.   VLS asserted that NEG breached its fiduciary duty and duty of loyalty to VLS by terminating the Agreement without providing 90 days' notice and entering into a secret partnership or conspiracy with ECU.

149.   VLS has established that NEG's failure to provide 90 days' notice was a breach of its fiduciary duty and duty of loyalty to VLS and that VLS was damaged.

150.   The parties stipulated that NEG and ECU would have been able to legally discuss the possibility of doing business together while the Agreement was still in effect if NEG and ECU had done so in a manner consistent with NEG's duties under the Agreement and applicable law.  Stipulated Facts ¶ 46.

151.   VLS presented no evidence that NEG failed to fulfill its duties to VLS while the Agreement was in effect until December 21, 2017.  Instead, the evidence shows that VLS tracked NEG's performance and in October 2017, thought NEG was "doing pretty well" with respect to "export volumes and their export engagement." Ex. 182.  Sanchoyerto stated in an email to Donahue and Laufer that "[NEG] did extremely well on FCL exports in September."  Id.

152.   VLS presented no evidence indicating that NEG ever acted as ECU's agent while it was employed as VLS's agent.

153.   VLS has not established that NEG's communications and conduct with ECU constituted a breach of its fiduciary duty and duty of loyalty to VLS.

154.   In California, punitive damages may be awarded for certain claims "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice[.]"[8]  Cal. Civ. Code § 3294(a).

155.   VLS has not proven by clear and convincing evidence that NEG was guilty of oppression, fraud, or malice.  Punitive damages are not warranted.

### C.  NEG's Affirmative Defenses

#### 1.  Waiver

156.   Waiver is "the intentional relinquishment of a known right after knowledge of the facts."  City of Ukiah v. Fones, 64 Cal.2d 104, 107 (1966) (quoting Roesch v. De Mota, 24 Cal.2d 563, 572 (1944)). "To establish the defense of waiver, the defendant must prove that: (1) the plaintiff knew that the defendant was required to do a specified act under the contract; and (2) the plaintiff freely and knowingly gave up his right to have the defendant perform that contractual obligation."  Cyclone USA, Inc. v. LL&C Dealer Servs., LLC, No. CV 03-0992 AJW, 2007 WL 9662337, at *20 (C.D. Cal. Nov. 8, 2007) (citing Craig v. White, 187 Cal. 489, 498 (1921)).

157.   "The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right."  Waller, 11 Cal.4th at 31; see also Fones, 64 Cal.2d at 107 ("Waiver always rests upon intent.").

---

[8] Pursuant to Civil Code § 3294: (1) "malice" means conduct that is intended by the defendant to cause injury to the plaintiff or despicable conduct that is carried on by the defendant with a willful and conscious disregard of the rights or safety of others; (2) "oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights; and (3) "fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

158.   The defendant bears the burden of proving waiver "by clear
and convincing evidence that does not leave the matter to
speculation, and 'doubtful cases will be decided against a waiver.'"
<u>Waller</u>, 11 Cal. at 31 (quoting <u>Fones</u>, 64 Cal.2d at 108).

159.   NEG's December 21, 2017 letter to VLS stated, "Based
upon Vanguard's material breach, NEG hereby terminates the
Agreement in all respects, and will no longer accept newly ordered
Vanguard exports at its facility."  Ex. 89A.

160.    NEG made it clear that it was immediately terminating
the Agreement.  VLS's conduct in response did not constitute a
waiver of its right to receive 90 days' notice of termination.

## 2.   Estoppel

161.    The doctrine of equitable estoppel is founded on the
concept of equity and fair dealing and provides that "a person may
not deny the existence of a state of facts if that person has
intentionally led others to believe a particular circumstance to be
true and to rely upon such belief to their detriment."  <u>McGlynn v.
California</u>, 21 Cal. App. 5th 548, 561 (2018) (internal quotation
marks omitted); <u>P'ship v. Procopio, Cory, Hargreaves & Savitch,
LLP</u>, 152 Cal. App. 4th 42, 57 (2007).

162.   A valid claim for equitable estoppel requires:

>    (a) a representation or concealment of material facts; (b)
>    made with knowledge, actual or virtual, of the facts; (c) to a
>    party ignorant, actually and permissibly, of the truth; (d)
>    with the intention, actual or virtual, that the ignorant
>    party act on it; and (e) that party was induced to act on it.

<u>Simmons v. Ghaderi</u>, 44 Cal.4th 570, 584, (2008).  There can be no
estoppel if one of the elements is missing.  <u>Id.</u>

163.   NEG fails to identify what representation VLS made or
what facts it concealed.  It also fails to establish that it was ignorant
of the truth with respect to VLS's right to receive 90 days' notice.

164.   NEG's estoppel defense does not bar VLS's claims.

### 3.   Laches

165.   "Laches is an equitable defense that prevents a plaintiff, who with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." <u>Danjaq LLC v. Sony Corp.</u>, 263 F.3d 942, 950-51 (9th Cir. 2001) (internal quotation marks omitted).

166.   "The defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." <u>Johnson v. City of Loma Linda</u>, 24 Cal.4th 61, 68 (2000) (internal quotation marks omitted); <u>Julian Volunteer Fire Co. Assn. v. Julian-Cuyamaca Fire Protection Dist.</u>, 62 Cal. App. 5th 583, 602 (2021).  "The basic elements of laches are: (1) an omission to assert a right; (2) a delay in the assertion of the right for some appreciable period; and (3) circumstances which would cause prejudice to an adverse party if assertion of the right is permitted." <u>Stafford v. Ballinger</u>, 199 Cal. App. 2d 289, 296 (1962).

167.   NEG's December 21, 2017 letter to VLS firmly terminated the Agreement without providing 90 days' notice.

168.   The affirmative defense of laches does not bar VLS's claims.

### 4.   Unclean Hands

169.   The doctrine of unclean hands is an equitable defense where principles of fairness dictate that the plaintiff should not recover, regardless of the merits of the claim. <u>Meridian Fin. Servs., Inc. v. Phan</u>, 67 Cal. App. 5th 657, 685 (2021).  It applies when "a plaintiff has acted unconscionably, in bad faith, or inequitably in the matter in which the plaintiff seeks relief." <u>Salas v. Sierra Chem. Co.</u>, 59 Cal.4th 407, 432 (2014); <u>see also</u> <u>Gen. Elec. Co. v. Superior Ct.</u>, 45 Cal.2d 897, 899-900 (1955) ("Traditionally the doctrine of unclean hands is invoked when the one seeking relief in equity has violated conscience, or good faith, or other equitable principle, in his prior conduct.") (internal quotation marks omitted).

170.   "The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants." <u>Salas</u>, 59 Cal.4th at 432.

171.   VLS had the right to switch CFS service providers.  Its decision was not unconscionable, in bad faith, or inequitable.

172.   VLS's claims are not barred by the affirmative defense of unclean hands.

### 5.   Prior Material Breach

173.   "When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract." <u>Brown v. Grimes</u>, 192 Cal. App. 4th 265, 277 (2011).

174.   As discussed above, VLS's failure to provide 90 days' notice of its intent to switch CFS services to BFT was not a material breach of the Agreement.  The affirmative defense does not bar VLS's claims.

### 6.   Breach of Covenant of Good Faith and Fair Dealing

175.   The factual elements necessary to establish a breach of the covenant of good faith and fair dealing are:

> (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct.

<u>Rosenfeld v. JPMorgan Chase Bank, N.A.</u>, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010) (citing Judicial Council of California Civil Jury Instruction (CACI) No. 325).

176.   NEG asserted the breach of the covenant of good faith and fair dealing as an affirmative defense and counterclaim.  However, NEG's affirmative defense of the breach of the covenant of good faith and fair dealing is narrower in scope than its counterclaim.  NEG's affirmative defense asserts that VLS cannot maintain a claim for breach of contract because it materially breached the Agreement by failing to provide NEG 90 days' notice of its intention to switch CFS services to BFT.

177.   VLS was not required to provide NEG with 90 days' notice of its intention to switch CFS services to BFT.  VLS's failure to do so did not breach the covenant of good faith and fair dealing.  NEG's affirmative defense is without merit.

**7.    Setoff**

178.   The affirmative defense of setoff "is based on the equitable principle that when parties in litigation hold cross-demands for money, one demand should be applied against the other and the plaintiff may recover the balance due."  Morris Cerullo World Evangelism v. Newport Harbor Offs. & Marina, LLC, 67 Cal. App. 5th 1149, 1159 (2021); see Cal. Civ. Proc. Code § 431.70.  Relief by asserting the affirmative defense of setoff is limited to reducing the plaintiff's recovery or defeating a plaintiff's claim.  Constr. Protective Servs., Inc. v. TIG Specialty Ins. Co., 29 Cal.4th 189, 195 (2002), as modified (Nov. 14, 2002); see also Morris Cerullo, 67 Cal. App. 5th at 1159 ("[A] defendant may not obtain affirmative relief against a plaintiff based on the affirmative defense of setoff.").

179.   California Code of Civil Procedure section 431.70 states in relevant part:

> Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each

other, notwithstanding that an independent action asserting the person's claim would at the time of filing the answer be barred by the statute of limitations. If the cross-demand would otherwise be barred by the statute of limitations, the relief accorded under this section shall not exceed the value of the relief granted to the other party.

180.   As discussed below, NEG's breach of contract counterclaim is barred by a four-year statute of limitations to the extent it asserts claims accruing prior to March 6, 2014.  NEG's claim is not barred to the extent it is based on conduct occurring after March 6, 2014.

181.   NEG is entitled to have VLS's claims against it offset by its claims against VLS.

### 8.   Unsatisfied Condition Precedent

182.   "[A] condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed."  Cal. Civ. Code § 1436; see also Platt Pac., Inc. v. Andelson, 6 Cal.4th 307, 313 (1993) ("A condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises.").

183.   "[W]hen a party has failed to fulfill a condition that was within its power to perform, it is not an excuse that the party did not thereby intend to surrender any rights under the agreement."  Platt Pac., Inc., 6 Cal.4th at 314.

184.   Provisions in an agreement are not to be construed as conditions precedent unless "such construction is required by clear, unambiguous language; and particularly so where a forfeiture would be involved, or inequitable consequences would result."  Los Angeles Unified Sch. Dist. v. Torres Constr. Corp., 57 Cal. App. 5th 480, 502 (2020) (citation omitted).  "Because such conditions are not favored by the law, they are to be strictly construed against one [raising the defense]."  Id. (simplified).

185.   "A contract may contain a valid provision giving one or the other party an option to terminate it on specified conditions."   Call v. Alcan Pac. Co., 251 Cal. App. 2d 442, 447 (1967).

186.   NEG's right to terminate the Agreement on 90 days' written notice was not conditioned on the occurrence of certain events or VLS's particular performance.

187.   NEG's affirmative defense of unsatisfied condition precedent fails.

### 9.   Failure to Mitigate

188.   "The doctrine of mitigation of damages holds that a plaintiff who suffers damage as a result of a breach of contract has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided."   Agam v. Gavra, 236 Cal. App. 4th 91, 111 (2015) (simplified) (internal quotation marks and citation omitted).

189.   "[A] plaintiff may not recover for damages avoidable through ordinary care and reasonable exertion . . . [but] the duty to mitigate damages does not require an injured party to do what is unreasonable or impracticable."   Id.   "The rule of mitigation of damages has no application where its effect would be to require the innocent party to sacrifice and surrender important and valuable rights."   Valle de Oro Bank v. Gamboa, 26 Cal. App. 4th 1686, 1691 (1994) (internal quotation marks omitted).

190.   The burden of proving a plaintiff failed to mitigate is on the defendant.   Agam, 236 Cal. App. 4th at 111; Brandon & Tibbs v. George Kevorkian Acct. Corp., 226 Cal. App. 3d 442, 460 (1990) ("The burden of proving that losses could have been avoided by reasonable effort and expense must always be borne by the party who has broken the contract.").

191.   VLS was not required to give NEG notice of its decision to switch CFS services to BFT.

192.   NEG's December 21, 2017 letter to VLS terminated the Agreement.  See Ex. 89A.

193.   The evidence shows that VLS acted immediately to mitigate damages.

194.   Based on NEG's representations, on December 21, 2017, after VLS received the notice from NEG, Sanchoyerto sent out an internal email at VLS with the subject line "Boston Restructure Checklist."  Stipulated Facts ¶ 36; Ex. 1023.  Sanchoyerto wrote, "I started a checklist this morning to capture items that need to be actioned due to the change in our Boston CFS and the end of our relationship with NEG."  Ex. 1023 at 1-2.

195.   On December 22, 2017, Brennan asked Sanchoyerto and Donahue to reach out to Joe Pimentel about a possible agent position in the Boston area.  Donahue Decl. ¶ 15.  Donahue called Pimentel on the same day to make him a tentative offer for a sales position.  Id. ¶ 16.  Pimentel stated that he would have to give two-weeks' notice to his then-employer before he could start working for VLS.  Id.  Pimentel began working for VLS around the end of 2017 or January 2018.  Id. ¶ 17; Tr. 137:1-6.

196.   In the weeks after December 21, 2017, VLS contacted and stayed in touch with customers.  See Exs. 3012, 2041, 2071.

197.   NEG's failure to mitigate defense fails.

**10.   Economic Duress**

198.   "The doctrine of 'economic duress' can apply when one party has done a wrongful act which is sufficiently coercive to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract."  CrossTalk Prods., Inc. v. Jacobson, 65 Cal. App. 4th 631, 644 (1998).  The party subjected to the coercive act without a reasonable alternative can plead economic duress to avoid the contract.  Id.

199.   "[W]rongful acts will support a claim of economic duress
when a reasonably prudent person subject to such an act may have
no reasonable alternative but to succumb when the only other
alternative is bankruptcy or financial ruin." <u>Uniwill v. City of Los
Angeles</u>, 124 Cal. App. 4th 537, 545 (2004) (internal quotation
marks and citation omitted).   To constitute the defense of economic
duress, the act must be something more than the breach or
threatened breach of the contract itself.   <u>See</u> <u>River Bank Am. v.
Diller</u>, 38 Cal. App. 4th 1400, 1425 (1995).   An act for which a party
has an adequate legal remedy is not duress.   <u>Id.</u>   "It is not duress to
take a different view of contract rights, even though mistaken, from
that of the other contracting party, and it is not duress to refuse, in
good faith, to proceed with a contract, even though such refusal
might later be found to be wrong."   <u>Id.</u> (simplified).

200.   NEG has not proven the elements of the affirmative
defense of economic duress.

**11.   Good Faith**

201.   "The phrase 'good faith' in common usage has a well-
defined and generally understood meaning, being ordinarily used to
describe that state of mind denoting honesty of purpose, freedom
from intention to defraud, and, generally speaking, means being
faithful to one's duty or obligation." <u>People v. Nunn</u>, 46 Cal.2d 460,
468 (1956).

202.   However, "the law generally does not distinguish between
good and bad motives for breaching a contract. In traditional
contract law, the motive of the breaching party generally has no
bearing on the scope of damages that the injured party may recover
for the breach[.]" <u>Applied Equip.</u>, 7 Cal.4th at 516 (simplified).

203.   NEG does not cite any caselaw to support its affirmative
defense of "good faith" and fails to establish that "good faith" is an
affirmative defense to VLS's claims.

12.    **Superseding or Supervening Cause**

204.   "The defense of intervening and superseding cause applies in tort cases. In contract cases, the defense does not absolve the defendant of liability, although closely related is the principle that if the special damages are not foreseeable and proximately caused by the breach of contract they are not recoverable." Ash v. North American Title Co., 223 Cal. App. 4th 1258, 1274-75 (2014).

205.   NEG's affirmative defense of superseding or supervening cause is not relevant to VLS's claims.

13.    **Litigation Privilege**

206.   The litigation privilege provides that a "'publication or broadcast' made as part of a 'judicial proceeding' is privileged." Action Apartment Assn., Inc. v. City of Santa Monica, 41 Cal.4th 1232, 1241 (2007) (citing Cal. Civ. Code § 47(b)).  "The privilege is absolute in nature, applying to all publications, irrespective of their maliciousness."  Id. (internal quotation marks omitted).

207.   The privilege applies to

> any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that has some connection or logical relation to the action. The privilege is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.

Id. (simplified).  The privilege applies to all torts other than malicious prosecution, including fraud, negligence, and negligent misrepresentation.  Harris v. King, 60 Cal. App. 4th 1185, 1188 (1998).

208.   "Communications with 'some relation' to an anticipated lawsuit are . . . within the privilege."  Rubin v. Green, 4 Cal.4th

1187, 1194 (1993).  The goal is to provide litigants freedom to access courts without fear of being harassed by subsequent tort actions.  Id.

209.   NEG and ECU's communications regarding their lawyers' analyses of the Agreement's non-compete provisions are not privileged.  These communications were not made "in judicial proceedings" and they occurred long before litigation in this suit. See Stipulated Facts ¶¶ 18-21.

210.   The Joint Litigation and Confidentiality Agreement entered into between NEG and ECU is privileged.  VLS filed suit against NEG on January 19, 2018, and NEG and ECU entered into a joint litigation agreement on February 2, 2018.  See Ex. 85 (ECU's Objs. and Response to VLS Interrogatories Set No. 1); Abisch Statement ¶ 48.  In response to Interrogatory No. 13, ECU stated that it did "not contend that the agreement was effective at a date any earlier than December 21, 2017."  Ex. 85 at 6.  The privilege applies beginning December 21, 2017.

## 14.   Impossibility, Impracticality, and Frustration of Purpose

211.   A party's duty to render performance in a contract may be excused if that performance is made impossible due to unforeseen circumstances the nonoccurrence of which were a basic assumption on which both parties made the contract.  See Restatement (Second) of Contracts § 261 (1981).

212.   Impossibility of performance is "not only strict impossibility but . . . impracticability because of extreme and unreasonable difficulty, expense, injury, or loss involved."  Oosten v. Hay Haulers Dairy Emp. & Helpers Union, 45 Cal.2d 784, 788 (1955).  "The impossibility which will excuse the performance of a contract must consist in the nature of the thing to be done and not in the inability of the obligor to do it."  Caron v. Andrew, 133 Cal. App. 2d 402, 407 (1955).  "A party invoking the impossibility defense must show that he used reasonable efforts to surmount the obstacles which prevented performance."  McCalden v. Cal. Libr. Ass'n, 955 F.2d

1214, 1219 (9th Cir. 1990), rev'd on other grounds, 627 F.3d 1273 (9th Cir. 2010).

213.   "[A] thing is impracticable when it can only be done at an excessive and unreasonable cost." City of Vernon v. City of Los Angeles, 45 Cal.2d 710, 720 (1955).

214.   NEG has failed to establish that VLS's conduct rendered NEG's performance of the Agreement impossible and impracticable. NEG's affirmative defenses of impossibility and impracticality are not a bar to VLS's claims.

**15.   Frustration of Purpose**

215.   If performance is still possible, but the reason the parties entered the contract has been frustrated by an unforeseen circumstance "such that the value of performance by the party standing on the contract is substantially destroyed," frustration of purpose can excuse performance. Habitat Tr. for Wildlife, Inc. v. City of Rancho Cucamonga, 175 Cal. App. 4th 1306, 1336 (2009).

216.   "A party seeking to escape the obligations of its [contract] under the doctrine of frustration must show: (1) the purpose of the contract that has been frustrated was contemplated by both parties in entering the contract; (2) the risk of the event was not reasonably foreseeable and the party claiming frustration did not assume the risk under the contract; and (3) the value of counter-performance is totally or nearly totally destroyed." SVAP III Poway Crossings, LLC. V. Fitness Int'l, LLC, 87 Cal. App. 5th 882, 895 (2023).

217.   "Application of the doctrine 'has been limited to cases of extreme hardship so that businessmen, who must make their arrangements in advance, can rely with certainty on their contracts.'" Waegemann v. Montgomery Ward & Co., Inc., 713 F.2d 452, 454 (9th Cir. 1983) (quoting Lloyd v. Murphy, 25 Cal.2d 48, 54 (1944)).

218.   NEG's affirmative defense fails because it has not demonstrated that the purpose of the Agreement that was

purportedly frustrated was contemplated by both parties in entering the contract.

219.   Further, VLS's termination of NEG's access to its computer systems did not terminate the Agreement; NEG's December 21, 2017 letter terminated the Agreement.

## D.  VLS's Sixth Cause of Action: Declaratory Relief

220.   28 U.S.C. § 2201 provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

221.   California law similarly provides for declaratory relief.  See Cal. Civ. Proc. Code § 1060; Cal. Pub. Records Research, Inc. v. Cnty. of Yolo, 4 Cal. App. 5th 150, 185 (2016) ("Declaratory relief operates prospectively, serving to set controversies at rest before obligations are repudiated, rights are invaded or wrongs are committed. Thus the remedy is to be used to advance preventive justice[.]") (internal quotation marks and citation omitted); Artus v. Gramercy Towers Condominium Assoc., 19 Cal. App. 5th 923, 930 (2018) ("[D]eclaratory relief is an equitable remedy and need not be awarded if the circumstances do not warrant.").

222.   "Declaratory relief is designed to resolve uncertainties or disputes that may result in future litigation. It operates prospectively and is not intended to redress past wrongs." Streamcast Networks, Inc. v. Ibis LLC, No. CV 05-4239 MMM (Ex), 2006 WL 5720345, at *3 (C.D. Cal. May 2, 2006) (citing United States v. Washington, 759 F.2d 1353, 1356-57 (9th Cir. 1985) (en banc)).

223.   "The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the

proceeding. It follows that when neither of these results can be accomplished, the court should decline to render the declaration prayed." McGraw-Edison Co. v. Preformed Line Prods. Co., 362 F.2d 339, 342 (9th Cir. 1966) (internal quotation marks and citations omitted).  "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57.

224.   "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune, Inc. v. Genetech, Inc., 549 U.S. 118, 127 (2007).

225.   "The decision to grant declaratory relief is a matter of discretion, even when the court is presented with a justiciable controversy." Washington, 759 F.2d at 1356 (internal citations omitted).

226.   The Court addressed the issues on which VLS seeks declaratory relief as part of the parties' breach of contract claims. See Streamcast Networks, Inc., 2006 WL 5720345, at *4 ("The availability of other adequate remedies may make declaratory relief inappropriate . . . . Various courts have held . . . that where determination of a breach of contract claim will resolve any question regarding interpretation of the contract, there is no need for declaratory relief[.]") (citations omitted).

227.   A declaratory judgment here would "neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." Washington, 759 F.2d at 1357.

228.   VLS's request for declaratory relief is DENIED.

### E.  VLS's Seventh Cause of Action: Inducing Breach of Contract Against ECU

229.   The elements of a cause of action for inducing breach of contract are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach of the contract; and (5) resulting damage.  Quelimane Co. v. Stewart Title Guar. Co., 19 Cal.4th 26, 55 (1998), as modified (Sept. 23, 1998); Pac. Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal.3d 1118, 1129 (1990) (explaining that unlike the tort of intentional interference with contractual relations, a claim for inducing breach of contract "requires proof of a breach").

230.   "The act of inducing the breach must be an intentional one. If the actor had no knowledge of the existence of the contract or his actions were not intended to induce a breach, he cannot be held liable though an actual breach results from his lawful and proper acts."  Imperial Ice Co. v. Rossier, 18 Cal.2d 33, 37 (1941) (citation omitted).

231.   "It is not enough that the actor intended to perform the acts which caused the result – he or she must have intended to cause the result itself."  Kasparian v. Cnty. of Los Angeles, 38 Cal. App. 4th 242, 261 (1995); Little v. Amber Hotel Co., 202 Cal. App. 4th 280, 301 (2011) ("[T]o induce a breach of contract, the defendant must know of the contract, and must intend to interfere with contractual relations. However, the defendant's primary purpose need not be disruption of the contract. It is sufficient if the interference is known by him or her to be a necessary consequence of his or her action.") (simplified).

232.   The first element is satisfied.  The Agreement was a contract that existed between VLS and NEG.  See Agreement.

233.   The second element is satisfied. VLS has established that ECU knew of the existence of the Agreement.  See, e.g., Ex. 41; Dkt. 248 (Abisch Dep.) 71:5-21; Stipulated Facts ¶¶ 18-21.

234.   The Court considers whether ECU took intentional acts
designed to induce a breach or disruption of the contractual
relationship between VLS and NEG.

235.   VLS presented evidence that Abisch knew VLS had an
exclusive agency agreement with NEG, was interested in the non-
compete arrangement in the agreement, and knew NEG could not
work for VLS and ECU at the same time.  Abisch Dep. 21:13-22:8,
71:5-21, 73:8-14.

236.   VLS presented evidence that on December 13, 2017, Abisch
transmitted an MOU to NEG.  Ex. 61.  Abisch testified that the
MOU "defined the essential terms and conditions for what would
eventually become an agency agreement."  Dkt. 249 (Abisch Dep. II)
190:16-23.  He also testified that on December 13, 2017, NEG and
ECU had not reached an agreement on the specific terms, but he felt
"very confident at that point that . . . [they] would work together
because on December 11th, VLS sent out a notice . . . that they
weren't going to work with NEG's warehousing anymore."  Id. at
191:24-192:8.  Abisch added, "So they essentially ended their
relationship. So I felt extremely confident at that point that they
would work with us."  Id. at 192:8-10.

237.   VLS presented evidence that NEG transmitted to ECU a
draft of its termination letter to VLS in the days prior to December
21, 2017.  Ex. 62.  VLS argued that Abisch's statement that "[t]he
plan is once they feel comfortable they can take a booking and
process a hbl in our system, they will send the letter to Vanguard,"
as well as his testimony about planning with Meunier indicated that
ECU joined in a strategy in which NEG would terminate the
Agreement without providing 90 days' notice.  See Ex. 62 at 1;
Abisch Dep. II 220:8-221:10.

238.   VLS presented further evidence that between May 2016
and December 2017, NEG and ECU periodically communicated
about NEG ending its agreement with VLS.  See Exs. 35, 36, 46.
Then, in December 2017, prior to the termination of the Agreement,

ECU agreed to provide NEG with a $50,000 advance within 3 days
of ECU and NEG beginning cooperation, and ECU had its I.T. Vice
President and a representative in charge of Training and
Development at NEG's offices bringing laptops, providing training,
and setting up email accounts.  See Exs. 61, 64, 83, Ex. 2B at 3.

239.   ECU presented evidence suggesting that ECU encouraged
NEG to terminate the Agreement in a professional manner, relying
primarily on Abisch's testimony at trial.  Tr. 730:3-7, 785:22-786:5;
Ex. 57.  But on December 15, 2017, Abisch sent an internal email
circulating NEG's termination letter and stating, "I expect we will
be able to finalize a deal with New England Groupage (NEG) to
become both our agent and our warehouse in Boston next week."
Ex. 62.  This suggests that he knew or expected that NEG would not
provide 90 days' notice to VLS.

240.   ECU presented evidence that Abisch thought that NEG
was free to do business with it because NEG made representations
to it that VLS's decision to move its CFS services away from NEG
breached the Agreement.  Abisch testified that his "interpretation
from Joe whose interpretation from his legal counsel was that the
actions that Vanguard took with the warehouse made the contracts
not correct or null and void . . . ."  Tr. 773:11-15.  He stated that he
never discussed whether NEG was required to provide 90 days'
notice with Meunier.  Tr. 773:16-20.

241.   Meunier testified that when VLS issued its December 11,
2017 notice, he was advised by counsel that it was "a final breach of
the agreement," and that the Agreement was no longer valid.
Tr. 466:1-2.  After VLS sent the notice out, Meunier never contacted
VLS again.  Tr. 553:14-554:16.  He testified that he believed that the
phone call from VLS in November informing NEG of VLS's decision
to switch CFS services was a breach of the Agreement and "on
December 11th, [he] was under the impression and belief that
Vanguard had breached the agreement and the agreement no longer
existed."  Tr. 465:22-466:5, 556:4-9; see also Ex. 94.

242.   In addition, Abisch testified that he and Meunier first started having discussions about NEG potentially being an agent for ECU around 2003.  Abisch Dep. 22:9-23:2.  The parties also stipulated that at the end of 2015, NEG was in contact with ECU and "[a]mong the topics discussed was NEG's dissatisfaction with VLS, and the possibility of NEG ending its agreement with VLS and entering into an agreement with ECU," and "[i]n August of 2017, NEG and ECU began communicating about a possible new agency agreement and financial terms for NEG to become ECU's representative in Boston."  Stipulated Facts ¶¶ 17, 23.

243.   The parties do not dispute that NEG and ECU would have been able to legally discuss the possibility of doing business together while the Agreement was still in effect if NEG and ECU had done so in a manner consistent with NEG's duties under the Agreement and applicable law.  Id. ¶ 46.

244.   The evidence also shows that Meunier on occasion, initiated communications with ECU.  On August 7, 2017, Abisch reached out to Tudor about his thoughts on a fax he received from Meunier regarding an outline of potential terms for an agreement between NEG and ECU.  See Ex. 48.  He wrote, "Two weeks after the call from Joe M he sent me this today."  Id.  And on December 20, 2017, Meunier reached out to ECU about a draft email notifying customers about NEG's partnership with ECU after notifying VLS.  See Ex. 84.  Abisch's responded, in relevant part, "My suggestion is to NOT proactively put something out prior to learning more how VLS reacts to the letter you sent."  Id. at 1.

245.   There is no evidence that ECU provided feedback, offered advice, or otherwise communicated with NEG about the draft termination letter.

246.   Rather the evidence shows that ECU and NEG communicated intermittently between May 2016 and December 2017.  NEG and ECU were allowed to discuss the possibility of doing business together while the Agreement was still in effect.

247.   After VLS informed NEG that it was switching CFS
services to BFT, NEG believed that VLS's conduct constituted a
breach of the Agreement and terminated the agreement.  NEG
conveyed this to ECU, and after VLS sent out its December 11, 2017
email notification, ECU was operating under the assumption that
the Agreement has been terminated.

248.   Abisch's understanding was that NEG could work with
ECU right away because VLS had breached the Agreement.
Tr. 778:2-9.

249.   ECU's actions in December 2017 were not intended to
induce NEG to breach the Agreement because ECU believed the
Agreement had been breached and terminated by VLS.  See
Imperial Ice Co., 18 Cal.2d at 37; Short v. Nevada Joint Union High
School Dist., 163 Cal. App. 3d 1087, 1101 (1985) ("The tort of
inducing breach of contract requires that one to be held liable must
intend to induce a breach of contract; one who does not intend to
induce a breach of contract is not liable.") (citations omitted).

250.   VLS has not established that ECU had the requisite intent
to induce NEG into breaching the Agreement or to disrupt the
contractual relationship.

## F.  VLS's Eighth Cause of Action: Intentional Interference with Contract Against ECU

251.   The elements of a claim for interference with contractual
relations are the same as those for inducing breach of contract,
except that a plaintiff must also demonstrate the defendant engaged
in an independently wrongful act.  Ixchel Pharma, LLC v. Biogen,
Inc., 9 Cal.5th 1130, 1148 (2020).  "[A]n act is independently
wrongful if it is unlawful, that is, if it is proscribed by some
constitutional, statutory, regulatory, common law, or other
determinable legal standard."  Id. at 1142 (citation omitted).

252.   Moreover, "while the tort of inducing breach of contract
requires proof of a breach, the cause of action for interference with

contractual relations is distinct and requires only proof of interference." Pac. Gas & Elec. Co., 50 Cal.3d at 1129.

253.   VLS argued that inducing a breach of contract and civil conspiracy are independently wrongful acts.  It asserts that its seventh and eight causes of action allege that NEG and ECU engaged in a civil conspiracy.

254.   As discussed above, VLS did not establish that ECU induced a breach of contract.  Further, "[s]tanding alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort." Applied Equip., 7 Cal.4th at 511.  "By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. . . . A civil conspiracy, however atrocious, does not give rise to a cause of action unless a civil wrong has been committed resulting in damage." Id. (internal quotation marks and citation omitted).  VLS has not established that NEG and ECU committed a tort, nor has it established the existence of a civil conspiracy.

255.   VLS has not established that ECU engaged in an independently wrongful act.

## G.  NEG's First Cause of Action: Breach of Contract

256.   NEG's breach of contract counterclaim against VLS is based on alleged breaches of the Agreement by VLS, including: (1) terminating the Agreement by providing notice to the industry on December 11, 2017 and December 21, 2017 that it was switching its CFS services to BFT, (2) failing to provide NEG 90 days' notice of its intent to switch services to BFT, and (3) failing to perform various obligations under the Agreement.

257.   NEG is required to establish, by a preponderance of the evidence, every element of its claim for breach of contract.  See In re Exxon Valdez, 270 F.3d at 1232.  "[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2)

plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." Oasis, 51 Cal.4th at 821.

258.   The first element is satisfied.  The Agreement was a contract between VLS and NEG.  See Agreement.

259.   The Court considers the second and third elements.

## 1.   VLS's Decision to Switch CFS Services to BFT

260.   NEG's December 21, 2017 letter to VLS terminated the Agreement.

261.   The Agreement did not require VLS to provide NEG with 90 days' notice of its intent to switch import CFS services to BFT, nor did it require VLS to maintain CFS services with NEG.  VLS's decision to make the change and failure to provide NEG with 90 days' notice did not constitute a material breach of the Agreement nor did it terminate the Agreement.

262.   VLS's December 11, 2017 and December 21, 2017 notices to the industry did not materially breach or terminate the Agreement.

## 2.   Various Obligations and Fees Owed

263.   NEG asserts that VLS also breached the Agreement by failing to perform various obligations under the Agreement including: (1) failure to build direct services, (2) failure to pay CBM commissions, (3) abuse of the waiver of pier unloading fees, (4) failure to pay the appropriate Kravet commissions, (5) failure to pay full commission on FCL imports, (6) failure to pay outstanding invoices from 2017 after cutting of NEG's access to VLS's computer systems on December 21, 2017, (7) forcing NEG to absorb costs for certain customers, and (8) failure to pay NEG on purged commissions.

264.   VLS argues that NEG's claims are subject to California's four-year statute of limitations for breach of a written contract, and the 90-day limitations period set out in section 5 of the Agreement.

VLS asserts that because NEG filed its original Answer and
Counterclaim on March 6, 2018, all claims based on conduct
occurring prior to March 6, 2014 are barred.

265.  "The statute of limitations operates in an action as an
affirmative defense." Norgart v. Upjohn Co., 21 Cal.4th 383, 396
(1999).  "Under the statute of limitations, a plaintiff must bring a
cause of action within the limitations period applicable thereto after
accrual of the cause of action." Id. at 397.  "A cause of action accrues
at the time when the cause of action is complete with all of its
elements." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal.4th 797, 806
(2005) (internal quotation marks and citation omitted).

266.  In California, a four-year statute of limitations applies to
written contracts.  Cal. Civ. Proc. Code § 337; Amen v. Merced Cnty.
Title Co., 58 Cal.2d 528, 533 (1962).  "A cause of action for breach of
contract does not accrue before the time of breach. . . . There can be
no *actual* breach of a contract until the time specified therein for
performance has arrived." Romano v. Rockwell Int'l, 14 Cal.4th 479,
488 (1996) (internal quotation marks and citation omitted).

267.  NEG filed its Answer and Counterclaim on March 6, 2018.
Dkt. 19.

268.  A four-year statute of limitations applies to NEG's breach
of contract claim.  NEG may not recover damages for its breach of
contract claims accruing prior to March 6, 2014.

269.  Section 5.07 of the Agreement provides: "NEG hereby
agrees that no claims shall be made against NACA for any
discrepancy, fine, penalty, service or handling fee or any other item
more than ninety (90) days following the end of each calendar
quarter for such items occurring during each calendar quarter."
Agreement § 5.07.

270.  The Agreement does not define "claim," but discusses
claims in various contexts.  See id. §§ 5.02, 5.07, App. 1.

271.   VLS contends that a claim in the shipping industry refers to some type of written, actionable demand for payment, referring to 49 C.F.R. § 1005.2(b), which states that a notice of claim must be in writing and contain (1) facts sufficient to identify the property or loss, (2) an assertion of liability for alleged loss, damage, injury or delay, and (3) a claim for the payment of a specific or determinable amount of money.  However, there is no evidence that the parties intended to apply this definition to the Agreement.

272.   VLS's position is that there is no evidence that NEG submitted written notices of claims to it within the 90-day period provided in section 5.07 of the Agreement.  Donahue testified that he was "not aware of any list of shipments concerning LCL NEG routings which were not paid nor [was he] aware of any actual written notice of claims that VLS received."  Tr. 208:15-18.  He testified that he had "never seen a list of shipments that [NEG was] claiming a commission on[.]"  Tr. 210:14-18.  He added that "no disputes came to [him.]"  Tr. 211:3-6.

273.   However, Laufer testified that he was aware that there were issues between NEG and VLS in late 2015 regarding whether certain terms in the agreement were being fulfilled.  Tr. 397:1-16.

274.   NEG submitted evidence that over the years, it repeatedly raised issues with VLS about payments and fees due to NEG and other related matters, including during a July 21, 2015 meeting between NEG and VLS.  See Tr. 238:3-239:14, 665:8-666:11, 672:1-674:25, 676:6-677:14; Dkt. 223 (Peters Decl.) ¶¶ 6-7, 9, 12; Meunier Decl. ¶¶ 47-50; Exs. 2005, 3080, 3088.

275.   Meunier testified that he had put claims for money in writing and VLS was notified about them via email.  Tr. 456:23-457:9.  David Peters declared that he routinely ran reports to determine commissions and refunds due to NEG and raised these issues with VLS.  Peters Decl. ¶¶ 2-5.

276.   NEG submitted evidence indicating that at no point did VLS ever claim that NEG was not entitled to commissions after 90

days or had otherwise waived its right to payments owed.
Tr. 238:18-25, 399:5-10; Peters Decl. ¶ 10; Meunier Decl. ¶ 50.

277.   The evidence shows that NEG raised numerous claims with
VLS during the course of the term of the Agreement.  But it is
unclear exactly when NEG first raised the claims and whether NEG
raised them within 90 days of "the end of each calendar quarter for
such items occurring during each calendar quarter" per section 5.07.

278.   "It is a well-established principle of California law that a
contracting party may waive conditions placed in a contract solely
for the party's benefit. In fact, this maxim of contract law has
appeared in California jurisprudence for more than nine decades
since its first recognition by the California Supreme Court[.]"  Wyler
Summit Partnership v. Turner Broadcasting Sys., Inc., 135 F.3d
658, 662 (9th Cir. 1998) (internal quotation marks and citations
omitted); see Sabo v. Fasano, 154 Cal. App. 3d 502, 506 (1984)
("[O]ne who makes an offer and fixes a time for its acceptance may
waive the time and bind the late-accepting party.").

279.   VLS's conduct and communications with NEG demonstrate
that VLS waived the 90-day limit set in section 5.07.  The evidence
shows that VLS acknowledged that there were ongoing disputes
with respect to payments owed to NEG.  See, e.g., Exs. 3088 at 3,
2005 at 2-3.  There is no evidence that VLS thought that NEG was
raising issues improperly or in an untimely manner.  There is no
evidence that VLS ever informed NEG that it had waived its right to
recover payments by failing to make a claim on time per section
5.07.  Rather the evidence shows VLS attempting to work through
various issues with NEG.

280.   Section 5.07 does not bar NEG's claims.

     a.   Failure to Build Direct Services

281.   Section 7.03 of the Agreement states:

     NEG recognizes that the above sales commission and
     agency fees articles are based on the premise that NEG will

no longer issue its own HB/L without notification to NACA and written acknowledgement and authorization to do so, the traffic currently being run through the NEG system will now flow directly into the NACA system and will be shipped on a Brennan, Conterm or DCL HB/L and that NACA/NEG will work together on building direct services ex. Boston on the export side and direct boxes to Boston on the import side in order to enhance profitability on all traffic. NACA reserves the right to amend the fee and commission structure down to 10% on the LCL export ocean shipments and a 50-50% net profit split on the FCL should the NEG business not materialize as forecast into[.]

282. The Agreement does not require VLS to build direct services nor does it require VLS to accept NEG's proposals to do so.

283. VLS's failure to build direct services was not a breach of the Agreement.

        b.    <u>Failure to Pay CBM Commissions</u>

284. NEG argued that VLS breached section 7.01 of the Agreement because it failed to "pay NEG a commission of $5.00/CBM for any LCL NEG routings to the USA, except final destination Boston." <u>See</u> <u>id.</u> § 7.01.

285. VLS's position is that NEG's claim is unsupported because NEG did not present any documentation regarding the amount of CBM sales it had outside of Boston and the amount of CBM commissions it was paid by VLS during the relevant period. It also asserts the affirmative defenses of equitable estoppel and failure to mitigate damages, but does not explain how they apply here.

286. Meunier declared that he realized NEG was not receiving $5/CBM commissions on a large number of transactions and raised the issue with Laufer. Meunier Decl. ¶ 27. He stated that NEG provided VLS with Consignee Controlled Profiles (CCPs) which identified the origin customer, the destination customer, and the

port pairs for shipments booked by NEG.  Id.  NEG was unable to track all CBM commissions because NEG was not notified when an origin customer made a booking even though it was an NEG routing/booking.  Id.  Rather, local VLS offices were notified.  Id.

287.  Meunier declared that he was told by VLS that VLS's system did not properly capture the data to calculate the fees.  Id. He repeatedly requested that VLS fix the issue.  Id.

288.  The documentary evidence supports the conclusion that Meunier raised his concerns about VLS's failure to account for the commission fees with VLS.  Exs. 3069, 3080.  For example, on March 17, 2015, Meunier wrote to Sanchoyerto:

> While the Agency Agreement clearly states we are to receive $5.00 per CBM we have never been able to get paid as the answer has been it is too difficult for the local offices outside of Boston to be aware to cost the money. We have left thousands of dollars on the table over the years and when I tried to raise the issue again last year Karl's response was in order to do this you will have to add $5.00 per CBM to every rate sold and then reach out to every branch manager to get a system in place. If it's in the agency agreement why do we have to do all the leg work to get our revenue? It's quite simple to me. If the customer is assigned our sales code it is obvious we were involved in the sale. The vast majority of imports do not have CCP's because we have tariffs in place so the local forwarder after a review of those rate notifies their overseas office to utilize Vanguard.

Ex. 3069 at 1.

289.  VLS presented no evidence that it did in fact pay these commissions.

290.   VLS's failure to pay NEG CBM commissions for LCL NEG routings to the USA, with the exception of Boston, constitutes a breach of the Agreement.

291.   NEG has established that VLS's breach caused it to suffer damages.

292.   Because NEG no longer had access to its shipping volumes with VLS, NEG's damages expert, Luke Goetz, relied on NEG's 2019 shipping volume with ECU as an estimate of NEG's shipping volume with VLS in 2008.  Dkt. 220 (Goetz Decl.) ¶ 44; Ex. 3081 (Goetz Report) at 10.  Goetz then applied an annual growth rate of 3% to the CBM volume from 2008 to 2018 and determined that NEG should have earned $243,092 in profits.  Goetz Decl. ¶ 44.

293.   Goetz noted that NEG believes its shipping volumes with VLS were greater than their current shipping volumes with ECU, but provides no information on NEG's basis for that belief.  Id.

294.   As discussed above, NEG is entitled to damages only from March 6, 2014 through December 21, 2017.

295.   The Court relies on NEG's 2019 shipping volume with ECU applying the 3% annual growth rate for each consecutive year to determine NEG's damages.  See Goetz Report at 10.  And the Court excludes 64 days from 2014 to account for the statute of limitations and 11 days from 2017 to account for NEG's termination of the Agreement.

296.   NEG is awarded $15,652 for 2014, $19,549 for 2015, $20,136 for 2016, and $20,113 for 2017, for a total of $75,450.

c.   Abuse of Waiver of Pier Unloading Fee

297.   NEG argued that VLS breached section 7.05 of the Agreement by routinely unilaterally waiving or discounting the Pier Unloading Fee by 50% without consulting NEG.

298.   Section 7.05 of the Agreement states:

NEG, through it's affiliate North American Terminals, will invoice to origin shippers a Pier Unloading Fee. There may be on occasion certain customers whereby NACA asked that this fee be waived for. On the basis that it is not consistent to the point of business disruption for NEG, NEG agrees to waive this charge from time to time or under special circumstances.

299.   Meunier declared that VLS frequently made unilateral decisions to waive NEG's Pier Unloading Fee when quoting customers and regularly discounted the fees by 50% without consulting NEG.  See Meunier Decl. ¶ 33; see also Peters Decl. ¶ 6. He stated that VLS did not lose anything by providing these fee waivers and discounts, but NEG incurred overhead costs and suffered income loss because it was forced to handle cargo coming into its CFS stations without compensation.  Meunier Decl. ¶ 34.

300.   Meunier declared that NEG suffered an annual loss of $20,000 for the customer Rhom and Haas.  Id.

301.   Sanchoyerto also testified that there were customers for whom VLS wanted NEG to handle cargo for free.  Tr. 242:10-16.  He testified that there were occasions where VLS would book the customer, waive the fee, and then expect NEG to handle the booking for free.  Tr. 242:24-244:15.

302.   VLS did not present any evidence that it discussed decisions to waive or reduce the fees with NEG.  Nor is there any evidence that it communicated with NEG about whether its decisions would be a business disruption for NEG.

303.   NEG has established that VLS breached the Agreement by making unilateral decisions to waive or reduce NEG's Pier Unloading Fees.  The breach caused NEG harm.

304.   Goetz calculated NEG's damages for VLS's abuse of the waiver of the Pier Unloading Fees at $39,057 per year for 2012 through 2017.  Goetz Decl. ¶ 45.  He noted that from mid-2011

through 2017, NEG billed VLS for 50% of the Pier Unloading Fees
and determined that the balance was $39,057 per year.  Id.  Goetz's
calculations also factored in $68,303 in lost profits for domestic
bookings.  Id.

305.   It is unclear to the Court why lost profits for domestic
bookings were included as part of NEG's damages for VLS's abuse of
its waiver of Pier Unloading Fees.

306.   Goetz also provided no information about how he
determined that NEG was owed an annual balance of $39,057 and
what assumptions were made in reaching that figure.  The
Agreement did entitle VLS to request that the fee be waived on
occasion for certain customers.  Agreement § 7.05.  But it is unclear
to the Court whether Goetz's damages calculations assume that
NEG is entitled to recover all unpaid Pier Unloading Fees or
whether certain waivers were permissible.

307.   NEG's estimated damages for VLS's abuse of the waiver of
the Pier Unloading Fees are too speculative.  Because NEG has not
proven the amount of its damages with reasonable certainty, its
request for $598,527 in damages is DENIED.

308.   Because NEG has not proven damages in any other amount
with reasonably certainty, NEG is awarded $1 in nominal damages.
See Elation Sys., Inc. v. Fenn Bridge LLC, 71 Cal. App. 5th 958, 965-
66 (2021) ("A plaintiff is entitled to recover nominal damages for the
breach of a contract, despite inability to show that actual damage
was inflicted upon him. Nominal damages may be properly awarded
for the violation of a contractual right because failure to perform a
contractual duty is, in itself, a legal wrong that is fully distinct from
the actual damages.") (simplified) (citations omitted); Copenbarger
v. Morris Cerullo World Evangelism, Inc., 29 Cal. App. 5th 1, 15
(2018) ("Absent actual damages, a plaintiff might recover nominal
damages for breach of contract.").

      d.   <u>Loss of Kravet Commissions</u>

309.   NEG argued that VLS breached section 7.01 of the
Agreement because it paid NEG far less than the 25% and 15% of
commissions it was entitled to for the Kravet business.

310.   Section 7.01 of the Agreement states in relevant part: "The
only exception to this is the existing Kravet Textile business for
which VLS pays a 25% commission for all imports originating from
anywhere except Italy. Italy originating business shall be based on a
15% commission. All NEG routed import FCL business will be
commissionable at the same rate as export FCL business."

311.   Meunier declared that in 2015, he discovered NEG was
receiving less than 25% of the net revenue for the Kravet business.
Meunier Decl. ¶ 39; <u>see</u> Ex. 3068.  He stated that VLS acknowledged
this, but the issue was never resolved.  Meunier Decl. ¶ 39.

312.   Meunier specifically raised the issue with VLS on June 16,
2015.  Ex. 3068.  Meunier stated, "This unfortunately is a gross
injustice and we have taken it for granted for many years this was
being calculated correctly. The commission structure for Kravet is
25% of the net revenue and 15% of the net Revenue for Italy. The
agreement was not based on the Delta between Ocean Freight only
as the pricing had to be aggressive to secure the business." <u>Id.</u> at 3.
Margie Goddard replied in relevant part, "Here is the agreement
with the section on commission. I admit it does not spell out, but just
as the LCL export pays only on the base ocean, that is how it is
structured for import. Accessorials have never been commissionable.
No other structure ever crossed anyone's mind. . . . I'm sorry Joe. We
cannot bear more than what we have been doing." <u>Id.</u> at 1.

313.   Meunier raised this issue again at the July 21, 2015
meeting with VLS.  <u>See</u> Ex. 2005 at 3.

314.   Meunier declared that the Agreement makes no reference
to NEG's commission being based on the delta between buy and sell

rates for freight costs, but VLS issued NEG commission based only
on the freight difference.  Meunier Decl. ¶ 36.

315.   The Agreement does not state that NEG's commissions
with respect to the Kravet business were to be calculated based only
on the difference between ocean freight costs.

316.   Per the Agreement, NEG should have been paid a 25%
commission for all imports originating from anywhere except Italy,
and a 15% commission for business originating from Italy for
Kravet.

317.   VLS's failure to pay NEG the appropriate commission is a
breach of the Agreement that resulted in revenue loss for NEG.

318.   Goetz calculated NEG's damages to be $352,771 in
commissions from 2010 through 2017.  Goetz Decl. ¶ 46.  He relied
on annual net revenue figures from 2015 to determine the amount
attributable to Kravet shipments to Italy and other international
locations, and then calculated the commissions owed to NEG.

319.   Relying on the calculated damages from 2014 through 2017
and accounting for damages from March 6, 2014 through December
21, 2017 only, the Court finds that NEG's damages are $29,176 for
2014, $49,568 for 2015, $71,719 for 2016, and $69,563 for 2017, for a
total of $220,026.

e.   Failure to Pay Full Commission on FCL Imports

320.   NEG argued that VLS breached section 7.01 because VLS
did not pay NEG the full commission on FCL imports.

321.   Section 7.01 states in relevant part that "NEG shall retain
60% of the net profit of each FCL shipments booked by [NEG]," with
net profit "being defined as the gross revenue on the HB/L minus all
direct transportation costs, marine insurance, agent handling fees,
freight forwarder brokerage, claims, warehousing costs, DDF and
BL Fee which are accrued to NACA, not NEG, etc."

322.   Meunier declared that NEG routinely received only 25% of
the net profits for the FCL shipments, and that VLS was made
aware of the error but never corrected it.  Munier Decl. ¶ 41.  He
also conveyed this issue to VLS in March 2015 when he wrote to
Sanchoyerto, "I do agree the change was never made in the Agency
Agreement but neither was the reduced split on Import FCL yet we
have never received more thatn [sic] 25%."  Ex. 3069 at 1.

323.   VLS does not deny this.  Rather VLS argues that NEG
failed to present any competent evidence to support its claim.

324.   VLS's failure to pay NEG full commissions on FCL imports
is a breach of the Agreement, and as a result NEG lost revenue.

325.   Goetz relied on NEG's net profits from FCL imports with
ECU in 2020 to estimate NEG's net profits from FCL imports with
VLS.  Goetz Decl. ¶ 47.  Factoring in commission that VLS already
paid, Goetz calculated that VLS owed NEG $8,760 annually.

326.   NEG's damages total $7,224 for 2014, $8,760 for 2015,
$8,760 for 2016, and $8,496 for 2017, for a total of $33,240.

#### f.   Failure to Pay Outstanding Invoices

327.   NEG argued that VLS breached the Agreement by failing
to pay NEG's outstanding invoices for services provided under the
Agreement after it cut off NEG's access to its computer systems on
December 21, 2017.

328.   Meunier declared that the abrupt termination of NEG's
access left many unresolved accounting issues, including money
owed to NEG on recent invoices.  Meunier Decl. ¶ 104.

329.   On January 11, 2018, Meunier emailed VLS regarding the
outstanding payables and receivables between the parties.  Id.; Ex.
3018.  Meunier wrote, "Given the events that have transpired it is
prudent for VLS and NEG to come to an understanding on how we
are going to amicably handle the outstanding payables and
receivables between both parties."  Ex. 3018 at 2.  He added that

this should include "[a]ll files that existed prior to December 21st that we were not able to invoice when our system access was denied" and that "VLS will have to provide us a report with complete details of all LCL and FCL files that we had arranged bookings on that we have not been able to access or invoice." Id.

330.   Meunier declared that NEG did not have access to any accounting records and was unable to invoice files that existed prior to December 21, 2017 because its computer access had been terminated.  Meunier Decl. ¶ 104.

331.   Meunier declared that based on the information he had access to, NEG was owed in excess of $87,000 on outstanding invoices in addition to past commissions that were in dispute.  Id. ¶ 105.  He declared that he exchanged several emails with VLS between January and March 2018 in an attempt to resolve the balance, and VLS offered to pay a portion of the outstanding invoices in March 2018.  Id.  He declared that NEG received three checks from VLS totaling $27,600.35, but NEG was not fully compensated on the outstanding invoices.  Id.

332.   The parties stipulated that on March 23, 2018, VLS paid $27,600.35 to NEG for what VLS contended was the net reconciliation balance with NEG.  Stipulated Facts ¶ 51.

333.   NEG seeks to recover $67,267 in unpaid invoices.  Goetz Decl. ¶ 48.  Goetz breaks this figure down by four services that NEG provided for VLS, but he does not provide any information about the basis for his calculations.

334.   Meunier also did not explain the basis for his conclusion that NEG was owed in excess of $87,000 on outstanding invoices.

335.   Neither party presented any evidence about what VLS's $27,600.35 payment to NEG was for.  And NEG did not present any evidence that its damages calculations considered the potential for overlap between the services for which VLS already paid NEG and

the services for which NEG is seeking to recover additional payment.

336.   Nor did NEG present evidence of Meunier's exchanges with VLS in 2018 regarding the outstanding invoices.

337.   NEG has not established by a preponderance of the evidence that VLS breached the Agreement by failing to pay NEG on the outstanding invoices.

g.   NEG Forced to Absorb Costs for Certain Customers

338.   NEG argued that it received commissions only for freight it booked per section 7.01, and VLS forced it to absorb costs for some customers, such as Panalpina, by booking the freight itself through gateway bookings and having NEG handle it for free.

339.   Meunier declared that during the course of NEG's relationship with VLS he was "trying to find a way to recover income on some of the free work NEG had been providing for the Panalpina/Pantainer Gateway bookings" because it was "cargo booked by Vanguard through Boston that NEG was required to process without any compensation."  Meunier Decl. ¶ 57; Ex. 3030.

340.   Meunier declared that NEG had to manage the freight without being able to collect CFS fees.  For example, "NEG was required to receive Panalpina cargo, segregate it by destination, verify the hazardous material labelling and then store the cargo for unlimited amounts of time."  Meunier Decl. ¶¶ 42-43.

341.   But NEG does not argue that VLS's conduct constituted a breach of the Agreement.

342.   And in an August 14, 2017 email exchange between Meunier, Brennan, Donahue, Sanchoyerto, and Peters, Meunier wrote, "We currently handle many gateway bookings for which we receive no revenue and we are not asking for anything on those. We just wanted to isolate the Panalpina/Pantainer business because of

the amount of additional work that is involved with this account."
Ex. 3030 at 4.

343.   NEG has not established by a preponderance of the evidence that VLS's conduct was a breach of the Agreement.

344.   Moreover, there appears to be an overlap in VLS's alleged conduct here, and VLS's conduct that formed the basis for NEG's breach of contract claim based on an abuse of waiving NEG's Pier Unloading Fee.

345.   NEG sought to recover $360,310 in costs for handling freight for numerous VLS customers, based on an annual cost of $36,031.  See Goetz Decl. ¶ 49.  The $36,031 figure represented costs that NEG absorbed in 2010 for six customers – Rohm and Haas, Blue Anchor/K&N, Fed Ex, Agility/GEO, UPS, and SDV.  Id.

346.   NEG's damages expert, Luke Goetz, relied solely on a December 8, 2010 email from Joe Meunier to Hans Mikkelsen for the $36,031 figure in his damages calculation.  Id.; see Goetz Report at 15-16.  The December 8, 2010 email broke down costs NEG had incurred for the six customers in a year.  See Ex. 3082 (Goetz Report, App. D) at 766.

347.   However, in the email, Meunier identified those specific customer costs as "pier charges."  Goetz Report, App. D at 766.  In an earlier email in the chain, Mikkelsen wrote to Meunier, "As far as I understand, we have only requested you to waive the pier charge for a number of the corporate accounts."  Id. at 768.  Meunier responded, "Attached is the list of No Pier accounts and you can clearly see it is not a handful of accounts but the vast majority. The list is not even complete as it is not unusual to hear from a Vanguard office or Vanguard Sales person asking us to waive the fees on a particular customer or shipment or they will lose the business. Below is just a small random sample of the revenue loss which we estimate is close to 100K a year."  Id. at 766.

348.   NEG may not recover twice for the same injury.  See Crowley v. Katleman, 8 Cal.4th 666, 681-82 (1994) ("Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief.") (internal quotation marks and citations omitted); Plotnik v. Meihaus, 208 Cal. App. 4th 1590, 1612 (2012).

   h.    Failure to Pay Commissions on "Purged Payables"

349.   NEG argued that VLS failed to calculate and pay NEG its share of the net profit VLS realized from purging expenses on FCL shipments that were not paid to VLS after 4-6 months.

350.   Meunier declared that VLS's policy was to purge expenses that had not been paid after 4 to 6 months.  Meunier Decl. ¶ 44.  He declared that VLS's "revenue management office confirmed that, when [VLS] purged their unpaid accrued expenses, the revenue goes back to the booking station and [VLS's] revenue saw the increase from those purges."  Id.  Meunier further declared that VLS never calculated, and NEG never received its share of the additional net profit that resulted from VLS's purging of accrued, unpaid expenses on the FCL shipments.  Id. ¶ 45.

351.   Meunier did not explain the basis for his understanding of VLS's policy and NEG presented no documentary evidence to support Meunier's representations about VLS's policies.

352.   NEG has not established by a preponderance of the evidence that VLS's conduct was a breach of the Agreement and that VLS owed NEG payment for purged expenses on FCL shipments.

## H.   NEG's Second Cause of Action: Breach of the Implied Covenant of Good Faith and Fair Dealing

353.   "The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made."  Guz v. Bechtel Nat'l Inc., 24 Cal.4th 317, 349 (2000); see Kransco v. Am. Empire Surplus

<u>Lines Ins. Co.</u>, 23 Cal.4th 390, 400 (2000).  The covenant is implied
"to prevent a contracting party from engaging in conduct which
(while not technically transgressing the express covenant) frustrates
the other party's rights of the benefits of the contract."  <u>Marsu, B.V.
v. Walt Disney Co.</u>, 185 F.3d 932, 938 (9th Cir. 1999).

354.   "The covenant [] cannot be endowed with an existence
independent of its contractual underpinnings."  <u>Guz</u>, 24 Cal.4th at
349 (internal quotation marks and citation omitted).  "It cannot
impose substantive duties or limits on the contracting parties
beyond those incorporated in the specific terms of their agreement."
<u>Id.</u> at 349-50.

355.   The factual elements necessary to establish a breach of the
covenant of good faith and fair dealing are:

> (1) the parties entered into a contract; (2) the plaintiff
> fulfilled his obligations under the contract; (3) any
> conditions precedent to the defendant's performance
> occurred; (4) the defendant unfairly interfered with the
> plaintiff's rights to receive the benefits of the contract; and
> (5) the plaintiff was harmed by the defendant's conduct.

<u>Rosenfeld</u>, 732 F. Supp. 2d at 968.

356.   "If the allegations do not go beyond the statement of a mere
contract breach and, relying on the same alleged acts, simply seek
the same damages or other relief already claimed in a companion
contract cause of action, they may be disregarded as superfluous as
no additional claim is actually stated."  <u>Careau & Co. v. Security
Pac. Bus. Credit, Inc.</u>, 222 Cal. App. 3d 1371, 1395 (1990).  "Thus,
absent those limited cases where a breach of a consensual contract
term is not claimed or alleged, the only justification for asserting a
separate cause of action for breach of the implied covenant is to
obtain a tort recovery."  <u>Id.</u>

357.   Moreover, "[i]f a given state of facts entitles one to recover
damages upon the theory of tort, and the same state of facts entitles

him to recover upon the theory of contract, it would seem plain that recovery could not be twice had simply because the facts would support recovery upon either theory." <u>DuBarry Int'l, Inc. v. Southwest Forest Indus., Inc.</u>, 231 Cal. App. 3d 552, 564 (1991) (internal quotation marks and citation omitted).

358.   NEG's breach of the covenant of good faith and fair dealing is based on the same set of facts and seeks the same damages as its breach of contract claim and is therefore disregarded as superfluous.

## I.   NEG's Fourth Cause of Action: Declaratory Relief

359.   NEG asks the Court to make certain findings about the terms of the Agreement.

360.   The Court has already addressed these issues.  "[W]here determination of a breach of contract claim will resolve any question regarding interpretation of the contract, there is no need for declaratory relief[.]"  <u>Streamcast Networks, Inc.</u>, 2006 WL 5720345, at *4.

361.   Declaratory relief is unwarranted.  NEG's request is DENIED.

## J.   NEG's Fifth Cause of Action: Violation of the Massachusetts Consumer Protection Act (MCPA)

362.   NEG argued that VLS's conduct violated Massachusetts Consumer Protection Act, M.G.L. Chapter 93A §§ 2 and 11.

363.   VLS asserted that the claim is barred by the Agreement's choice of law provision.

364.   Section 8.01 provides, in relevant part: "This Agreement shall be governed by and construed in accordance with the laws of the State of California, as applied to contracts made and performed within the State of California, without regard to principles of conflicts of law."  Agreement § 8.01.

365.   "In determining the enforceability of a choice of law provision in a diversity action, a federal court applies the choice of law rules of the forum state, in this case California." Hatfield v. Halifax PLC, 564 F.3d 1177, 1182 (9th Cir. 2009) (citation omitted).

366.   "California's choice of law framework is set forth in Restatement § 187(2) and in Nedlloyd Lines B.V. v. Superior Court, 3 Cal.4th 459 (1992). California courts apply the parties' choice of law unless the analytical approach articulated in § 187(2) of the Restatement (Second) of Conflict of Laws . . . dictates a different result." Ruiz v. Affinity Logistics Corp., 667 F.3d 1318, 1323 (9th Cir. 2012) (internal quotation marks and citations omitted).

367.   "When two sophisticated, commercial entities agree to a choice-of-law clause like the one in this case, the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from or related to their contract." Nedlloyd, 3 Cal.4th at 468.

368.   "Once [a California court] determines the parties' intention, [it] will next analyze whether: (1) the chosen jurisdiction has a substantial relationship to the parties or their transaction; or (2) any other reasonable basis for the choice of law provision exists." Hatfield, 564 F.3d at 1182 (citation omitted).

369.   If either test is met, the court must then consider whether the chosen state's law is contrary to a fundamental policy of California, and whether California has a materially greater interest than the chosen state in the determination of the issue. Nedlloyd, 3 Cal.4th at 466; see also Ruiz, 667 F.3d at 1323.

370.   If it can be demonstrated "that the chosen state has a substantial relationship to the parties or their transaction, or that a reasonable basis otherwise exists for the choice of law, the parties' choice generally will be enforced unless the other side can establish both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in

the determination of the particular issue." <u>Wash. Mutual Bank, FA v. Superior Ct.</u>, 24 Cal.4th 906, 917 (2001).

371.   NEG and VLS are sophisticated commercial entities, and do not dispute that California law governs the Agreement.  They intended that California law apply to all causes of action arising from or related to the Agreement.  <u>Nedlloyd</u>, 3 Cal.4th at 468.

372.   VLS also asserts that its principal place of business is in California.  <u>See</u> <u>id.</u> at 467 ("If one of the parties resides in the chosen state, the parties have a reasonable basis for their choice.") (internal quotation marks and citation omitted).

373.   VLS has met its burden of demonstrating that California has a substantial relationship to VLS.

374.   NEG has failed to meet its burden.  NEG has not identified any substantive difference between Massachusetts and California law that would offend either state's public policy.  NEG has not demonstrated that Massachusetts has a materially greater interest in this dispute than California.  <u>See, e.g.</u>, <u>Rojas-Lozano v. Google, Inc.</u>, 159 F. Supp. 3d 1101, 1109-1112 (N.D. Cal. 2016) (ruling that choice of law provision applying California law was enforceable and dismissing plaintiff's claim under Chapter 93A).

375.   NEG's fifth cause of action is DISMISSED.

### III.  CONCLUSION

Judgment shall be entered in favor of Plaintiff VLS on its breach of contract claim against NEG, in favor of ECU on VLS's claims against it, and in favor of NEG on its breach of contract claim against VLS.

The parties are ordered to meet and confer and attempt to agree on a proposed judgment.  If the parties are unable to agree, VLS must file a proposed judgment.  NEG and ECU must file any objections and alternative proposed judgments within 10 business days.  The parties are also ordered to meet and confer and attempt to agree on whether any party is entitled to attorneys' fees and costs and, if so, which party

or parties may recover fees and costs.  The agreement should be reflected in a stipulation and a bill of costs may be filed.  If there is no agreement, the parties are to file a joint statement of no more than 8 pages by each party describing their positions as to which party is entitled to fees or costs, and the legal basis for that position.  This joint statement is to be filed no later than August 21, 2023.  After the Court determines whether any party is entitled to fees or costs, a further order will be issued.

      IT IS SO ORDERED.

Date: July 28, 2023

Dale S. Fischer
United States District Judge